# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

SHURE INCORPORATED, and      )
SHURE ACQUISITION HOLDINGS, INC.   )
                    )
           Plaintiffs,         )
                    )
           v.              )
                    )
CLEARONE, INC.,           )
                    )
           Defendant.       )

C.A. NO. 19-1343 (RGA) (CJB)

**JURY TRIAL DEMANDED**

████████████████████

PUBLIC VERSION FILED: October 22, 2019

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## <u>MOTION TO TRANSFER VENUE</u>

## <u>TABLE OF CONTENTS</u>

I.    STAGE OF THE PROCEEDINGS ................................................................................. 1

II.    SUMMARY OF ARGUMENT .................................................................................... 1

III.    STATEMENT OF FACTS .......................................................................................... 2

IV.    LEGAL STANDARDS .............................................................................................. 2

V.    ARGUMENT ............................................................................................................ 3

    A.    Transfer Is Inappropriate Because This Action Could Not Have Been Brought in the Northern District of Illinois .................................................................... 3

        1.    N.D. Ill. Could Not Apply Supplemental Jurisdiction Over This Case ......... 3

        2.    Shure Could Not Have Separately Brought This Case in N.D. Ill. ................. 6

    B.    The Balance of Interests Does Not Strongly Favor Transfer ................................ 9

        1.    The Relevant Private Interests Weigh Against Transfer .............................. 10

        2.    The Relevant Public Interests Weigh Against Transfer ............................... 17

        3.    Balancing the *Jumara* Factors Disfavors Transfer ...................................... 20

VI.    CONCLUSION ....................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ace Capital v. Varadam Found.*,
   392 F. Supp. 2d 671 (D. Del. 2005)............................................................17, 20

*ADE Corp. v. KLA-Tencor Corp.*,
   138 F. Supp. 2d 565 (D. Del. 2001)......................................................9, 14, 15

*Alexander v. Somer*,
   No. 1-C-1908, 2002 WL 31557607 (N.D. Ill. Nov. 18, 2002) ...........................4

*Autodesk Can. Co. v. Assimilate, Inc.*,
   No. 08-587, 2009 WL 3151026 (D. Del. Sept. 29, 2009)...............15, 17, 19, 20

*Auto. Techs. Int'l v. Am. Honda Motor Co.*,
   No 06-187, 2006 WL 3783477 (D. Del. Dec. 21, 2006) ...........................14, 18

*Callaway Golf Co. v. Achshnet Co.*,
   585 F. Supp. 2d 592 (D. Del. 2008)....................................................................5

*Cisco Sys. Inc. v. GPNE Corp.*,
   No. 07-671-SLR, 2008 WL 1758866 (D. Del. Apr. 17, 2008)....................9, 15

*Contour IP Holding, LLC v. GoPro, Inc.*,
   No. 15-1108, 2017 WL 3189005 (D. Del. July 6, 2017) ...........................14, 15

*David & Lily Penn, Inc. v. TruckPro, LLC*,
   No. 18-1681, 2019 WL 4671158 (D. Del. Sept. 25, 2019)..................... *passim*

*Elm 3DS Innovations LLC v. SK Hynix Inc.*,
   No. 14-1432, 2015 WL 4967139 (D. Del. Aug. 20, 2015)........................11, 12

*Escobedo v. Oswego Junction Enters.*,
   No. 17-cv-0682, 2017 WL 3130643 (N.D. Ill. July 24, 2017) .....................4, 5

*Fuisz Pharma LLC v. Theranos, Inc.*,
   No. 11-1061, 2012 WL 1820642 (D. Del. May 18, 2012) ...............................18

*GE Healthcare Bio-Scis. AB v. Bio-Rad Labs.*,
   No. 18-1899, 2019 WL 1985183 (D. Del. May 6, 2019) ...................................9

*Genentech, Inc. v. Amgen, Inc.*,
   No. 17-1407, 2018 WL 503253 (D. Del. Jan. 22, 2018) ......................... *passim*

*Graphics Props. Hldgs. Inc. v. Asus Comput. Int'l*,
   964 F. Supp. 2d 320 (D. Del. 2013)..............................................................10, 20

*In re Cordis Corp.*,
    769 F.2d 733 (Fed. Cir. 1985).................................................................................6, 9

*In re Cray, Inc.*,
    871 F.3d 1355 (Fed. Cir. 2017)......................................................................6, 7, 8, 9

*In re Link_A_Media Devices Corp.*,
    662 F.3d 1221 (Fed. Cir. 2011)..............................................................................10

*In re ML-Lee Acquisition Fund II, L.P.*,
    816 F. Supp. 973 (D. Del. 1993)............................................................................19

*Intellectual Ventures I LLC v. Altera Corp.*,
    842 F. Supp. 2d 744 (D. Del. 2012)..............................................................11, 16, 20

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995)............................................................................ *passim*

*LoganTree LP v. Omron Healthcare, Inc.*,
    No. 18-1617, 2019 WL 4538730 (D. Del. Sept. 19, 2019)...............................19

*Lyon v. Whisman*,
    45 F.3d 758 (3d Cir. 1995)....................................................................................4, 5

*McGrath v. Zenith Radio Corp.*,
    651 F.2d 458 (7th Cir. 1981) ....................................................................................4

*Novartis Pharm. Corp. v. Accord Healthcare Inc.*,
    No. 18-1043, 2019 WL 2502535 (D. Del. June 17, 2019) .........................7, 8, 9

*Pragmatus AV, LLC v. Yahoo! Inc.*,
    No. 11-902, 2012 WL 4889438 (D. Del. Oct. 15, 2012).......................11, 16, 20

*Praxair, Inc. v. ATMI, Inc.*,
    No. 03-1158, 2004 WL 883395 (D. Del. Apr. 20, 2004)....................................18

*Realtime Adaptive Streaming LLC v. Netflix, Inc.*,
    No. 17-1692, 2018 WL 4941785 (D. Del. Oct. 12, 2018) ........................ *passim*

*RealTime Data LLC v. Fortinet, Inc.*,
    No. 17-1635, 2018 WL 5630587 (D. Del. Oct. 31, 2018) ..............10, 12, 16, 20

*Round Rock Research, LLC v. Dell, Inc.*,
    904 F. Supp. 2d 374 (D. Del. 2012)........................................................................12

*Schubert v. OSRAM AG*,
    No. 12-923, 2013 WL 587890 (D. Del. Feb. 14, 2013)..............................12, 13

*Shutte v. Armco Steel Corp.*,
    431 F.2d 22 (3d Cir. 1970)......................................................................3, 10

*Sinochem Int'l Co. v. Malaysian Int'l Shipping Corp.*,
    549 U.S. 422 (2007)..................................................................................10

*Smart Audio Techs. v. Apple, Inc.*,
    910 F. Supp. 2d 718 (D. Del. 2012)..............................................12, 16, 20

*Tessera, Inc. v. Broadcom Corp.*,
    No. 16-379, 2017 WL 1065865 (D. Del. Mar. 21, 2017) ..................................11

*Tessera, Inc. v. Sony Elecs. Inc.*,
    No. 10-838, 2012 WL 1107706 (D. Del. Mar. 30, 2012) .........................14, 17

*TC Heartland v. Kraft Foods Grp. Brands, Inc.*,
    137 S. Ct. 1514 (2017)...............................................................................6

*TriStrata Tech. v. Emulgen Labs.*,
    537 F. Supp. 2d 635 (D. Del. 2008).........................................................20

*Tsoukanelis v. Country Pure Foods, Inc.*,
    337 F. Supp. 2d 600 (D. Del. 2004).....................................................14, 17

*Truth Hardware Corp. v. Ashland Prods.*,
    No. 02-1541, 2003 WL 118005 (D. Del. Jan. 13, 2003) ..................................14

*VLSI Tech. LLC v. Intel Corp.*,
    No. 18-966, 2018 WL 5342650 (D. Del. Oct. 29, 2018) ................11, 15, 16, 17

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*,
    157 F.R.D. 215 (D. Del. 1993) ..............................................................14, 15

**STATUTES**

28 U.S.C. § 1400(b) ............................................................................................6

28 U.S.C. § 1404(a) .......................................................................................2, 10

**EXHIBIT LIST**

| **Exhibit** | **Description** |
|---|---|
| Exhibit A | Complaint, *Shure Inc. v. ClearOne, Inc.*, No. 1:17-cv-03078 (N.D. Ill.) |
| Exhibit B | Answer & Counterclaims, *Shure Inc. v. ClearOne, Inc.*, No. 1:17-cv-03078 (N.D. Ill.) |
| Exhibit C | Complaint, *ClearOne, Inc. v. Shure Inc.*, No. 1:19-cv-02421 (N.D. Ill.) |
| Exhibit D | CLEARONE, *Contact Us*, https://clearone.com/contact_us |
| Exhibit E | CLEARONE, Form 10-K, available at https://www.sec.gov/Archives/edgar/data/840715/000143774919007187/clro20181231_10k.htm |
| Exhibit F | CLEARONE, Certificate of Incorporation, available at https://www.sec.gov/Archives/edgar/data/840715/000143774918018953/ex_126578.htm |
| Exhibit G | Declaration of Mr. James Schanz (Filed Under Seal) |
| Exhibit H | U.S. COURTS, *Federal Court Management Statistics* (June 2019), available at https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distcomparison0630.2019.pdf |

Despite enjoying the privileges of incorporating in Delaware, ClearOne now complains that Delaware poses a grave inconvenience. ClearOne protests[1] that it would be more practical to try this case in a state where one apparently irrelevant employee works from a garage. Nothing about this argument is sound, and Delaware law rejects it. ClearOne's motion should be denied.

## I.      STAGE OF THE PROCEEDINGS

Shure filed its original complaint on July 18, 2019. D.I. 1. Rather than answer for its conduct, ClearOne took to motion practice, filing motions to stay (D.I. 13) and dismiss (D.I. 11). Shure amended its complaint on September 9, adding new allegations of ClearOne's misconduct occurring after the original complaint. D.I. 19. In response, ClearOne escalated its motion practice, seeking to dismiss the amended complaint (D.I. 22), stay discovery (D.I. 27), and transfer the action (D.I. 30). Shure has opposed those motions. D.I. 20, 39, 40. It does so again here.

## II.      SUMMARY OF ARGUMENT

ClearOne's motion fails to show why transfer is warranted. First, Shure could not have brought this action in N.D. Illinois. Contrary to ClearOne's contentions, N.D. Illinois does not have supplemental jurisdiction over Shure's asserted patent claim because it does not share a "common nucleus" of facts with ClearOne's own patent assertions in Illinois. The parties' respective patent suits involve different patents, inventors, products, infringing acts, defenses, and damages. In addition, ClearOne falls far short of proving how the home of a lone employee storing products in one-third of his garage is an "established place of business" for ClearOne's global firm.

Undeterred, ClearOne next declares that it is more convenient to litigate this case in a state where one employee works at home rather than its state of incorporation. To make this implausible

---

[1] ClearOne's motion is overlength. The Local Rules require double-spacing (D. Del. LR 7.1.3), resulting in 23 uninterrupted lines per page. ClearOne's motion contains 27 uninterrupted lines per page, resulting in 3.5 ($\approx 20*4/23$) excess pages. *Compare, e.g.*, D.I. 30, *with* D.I. 22, *and* D.I. 40.

claim, ClearOne ignores decades of this Court's jurisprudence and incants facts having no bearing on its plea. A cursory dive into the operative law reveals the flaws of ClearOne's argument: having chosen to incorporate in Delaware, ClearOne is answerable to its courts. ClearOne's overreliance on unrelated cases in Illinois is no cause for transfer. ClearOne's motion should be denied.

## III.    STATEMENT OF FACTS

ClearOne offers longwinded explanations of the parties' prior dealings despite their limited impact on the issues here. The facts are simple. In 2017, Shure sought declaratory judgment of noninfringement of ClearOne's U.S. Patent No. 9,635,186 ("the '186 patent") in N.D. Illinois. Ex. A. ClearOne counterclaimed, alleging infringement of the '186 patent and U.S. Patent No. 9,813,806. Ex. B. ClearOne also sought a preliminary injunction preventing Shure from selling its MXA910 product, clearing the way for ClearOne's BMA product (*not* the accused BMA CT here). Prior to any operative rulings from the Court, ClearOne falsely stated to Shure's customers, among other things, that the MXA910 had been found to infringe ClearOne's patents, that such rulings were "unanimous," and that ClearOne had "won" it suit against Shure. *E.g.*, D.I. 19, ¶ 20. Those statements form part of the basis of Shure's nonpatent claims here. Shure's nonpatent claims are also based on a false and misleading letter issued by a ClearOne employee. *Id.*, ¶¶ 21-25.

In April 2019, ClearOne filed a separate action in Illinois alleging *inter alia* infringement of ClearOne's U.S. Patent No. 9,264,553 ("the '553 patent") by the MXA910. Ex. C. At no time in either case did Shure allege infringement of U.S. Patent No. 9,565,493 ("the '493 patent"), asserted here. Nor was ClearOne's BMA CT product (accused here) ever at issue in Illinois.

## IV.    LEGAL STANDARDS

District courts may transfer civil actions to other districts where the actions might have been brought. 28 U.S.C. § 1404(a). This inquiry has two steps. First, courts determine whether the suit could have been brought in the proposed transferee forum. *David & Lily Penn, Inc. v.*

*TruckPro, LLC*, No. 18-1681, 2019 WL 4671158, at *2 (D. Del. Sept. 25, 2019). If so, the court considers whether transfer is appropriate using the private and public interest factors set forth in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995). *TruckPro*, 2019 WL 4671158, at *2; *Genentech, Inc. v. Amgen, Inc.*, No. 17-1407, 2018 WL 503253, at *2, *5 (D. Del. Jan. 22, 2018).

The burden of establishing a need for transfer rests on the movant. *E.g.*, *Jumara*, 55 F.3d at 879. Transfer is proper only when the balance of interests is "strongly in favor of [the] defendant." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970); *TruckPro*, 2019 WL 4671158, at *2, *5. Courts thus deny transfer if the *Jumara* factors balance evenly or slightly favor transfer. *See, e.g.*, *TruckPro*, 2019 WL 4671158, at *2; *Genentech*, 2018 WL 503253, at *6.

## V.    ARGUMENT

The Court should deny ClearOne's motion. ClearOne has not shown how this action could have been brought in N.D. Illinois, and the balance of convenience factors disfavors transfer.

### A.    Transfer Is Inappropriate Because This Action Could Not Have Been Brought in the Northern District of Illinois

ClearOne asserts N.D. Illinois could have heard Shure's claims as either (1) counterclaims[2] under supplemental jurisdiction or (2) a separate action. D.I. 30, at 8. Both arguments fail.

#### 1.    N.D. Ill. Could Not Apply Supplemental Jurisdiction Over This Case

ClearOne first alleges that Shure could have brought this case in N.D. Illinois through counterclaims to ClearOne's infringement action there. D.I. 30, at 8-9. According to ClearOne, N.D. Illinois has supplemental jurisdiction over Shure's claims because they share a "common nucleus of operative facts" with ClearOne's patent infringement suit. *Id.*

ClearOne is wrong. In the Seventh Circuit, claims have a "common nucleus of operative

---

[2] In passing, ClearOne incorrectly frames Shure's claims as compulsory counterclaims in the N.D. Illinois suit. D.I. 30, at 8 (referencing D.I. 11, 22). But Shure's claims do not arise out of the same transaction or occurrence as ClearOne's 2019 suit, making them noncompulsory. *See* D.I. 40.

facts" when they share "the same witnesses, transactions and evidence." *Alexander v. Somer*, No. 1-C-1908, 2002 WL 31557607, at *9 (N.D. Ill. Nov. 18, 2002); *see also, e.g.*, *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 464 (7th Cir. 1981) (requiring "the same set of events" and "the same evidence"). Shure's claims here do not involve the same arguments, transactions, or evidence as ClearOne's patent infringement suit, making supplemental jurisdiction inapplicable. *See Escobedo v. Oswego Junction Enters.*, No. 17-cv-0682, 2017 WL 3130643, at *3 (N.D. Ill. July 24, 2017) (finding no common nucleus when the "two causes of action do not require the same factual or legal arguments, and would not rely on the same evidence").

ClearOne's 2019 Illinois infringement case asks whether Shure's MXA910 product infringes ClearOne's '553 patent. That case will thus involve evidence on Shure's MXA910 product, testimony from ClearOne's inventors, and constructions of claim terms in the '553 patent. The case at bar addresses none of these issues. Rather, Shure's infringement allegations here draw from evidence of ClearOne's BMA CT product (not Shure's MXA910), testimony from Shure's inventors (not ClearOne's), and constructions of Shure's '493 patent (not ClearOne's '553). Beyond their mere status as patent cases between competitors, the claims have virtually nothing to do with each other. Supplemental jurisdiction does not exist in these circumstances. *See Escobedo*, 2017 WL 3130643, at *3; *see also Lyon v. Whisman*, 45 F.3d 758, 763 (3d Cir. 1995) (finding no supplemental jurisdiction due to "little overlap between the evidence relevant to the . . . claims").

Shure's nonpatent claims stand even further afield. These claims stem from false statements made by ClearOne's agents about Shure's MXA910 and its availability, not the Illinois cases. D.I. 19, ¶¶ 42-70. The false statements share no common nucleus with Shure's infringement action (which involves patent law and products),[3] let alone ClearOne's distinct infringement suit

---

[3] Shure's state law claims share a common nucleus with Shure's Lanham Act claim, making supplemental jurisdiction proper for them in *this* case. *See, e.g.*, D.I. 19, ¶ 12.

asserting a different patent against a different product (not false statements by its agents). No common nucleus exists. *See Lyon*, 45 F.3d at 763; *Escobedo*, 2017 WL 3130643, at *3.

ClearOne tries to gloss over these differences by irrelevantly framing the parties' patents as "relat[ing] to the same technology." D.I. 30, at 9. This overbroad generalization misses the point. The parties' claims will not "require the same factual or legal arguments" or "rely on the same evidence" merely because different patents implicate similar technology. *Escobedo*, 2017 WL 3130643, at *3. Among other things, the claims involve different patents ('553 vs. '493), accused products (MXA910 vs. BMA CT), accused parties, alleged infringing acts, and inventors. These many differences preclude a common nucleus of operative facts. *Id.*; *Lyon*, 45 F.3d at 763.

Unable to show the requisite nexus, ClearOne attempts to manufacture one with irrelevant assertions. ClearOne first contends that its '553 patent asserted in Illinois is prior art here. D.I. 30, at 9. But this allegation has no bearing on the jurisdictional analysis. Whether Shure's MXA910 infringes the '553 patent (as alleged in Illinois) has nothing to do with whether, as alleged here, (i) ClearOne's BMA CT infringes the '493 patent or (ii) the '553 patent invalidates the '493 patent. *See Callaway Golf Co. v. Achshnet Co.*, 585 F. Supp. 2d 592, 599 (D. Del. 2008) (finding no supplemental jurisdiction where "the same prior art is being asserted" among various cases).

ClearOne concocts more illusory connections by blurring distinctions between the Illinois cases. ClearOne frames Shure's nonpatent claims as relating to "the N.D. Illinois matters," plural. D.I. 30, at 9. But ClearOne omits how these claims involve false statements about the MXA910 stemming from supposed findings in the 2017 declaratory judgment action and a 2019 IPR ruling—*not* ClearOne's 2019 infringement case. *See* D.I. 30, at 7-8. This distinction matters: Shure could not have raised its claims as counterclaims in the 2017 case, as the time to amend pleadings has long since passed. *See* D.I. 40. ClearOne acknowledges this reality, urging that Shure could

present its claims only "in the 2019 IL Case." D.I. 30, at 7. But as discussed above, ClearOne's false marketplace statements have no nucleus with the 2019 infringement action.

Finally, ClearOne's supplemental jurisdiction theory fails because it is incomplete. ClearOne nowhere explains how Shure could have asserted its Delaware state law causes of action in Illinois. *See* D.I. 19, ¶¶ 50-70. This omission further bars ClearOne's motion. Transfer is inappropriate on the basis of supplemental jurisdiction that ClearOne asserts.

## 2.      Shure Could Not Have Separately Brought This Case in N.D. Ill.

ClearOne next argues that Shure could have brought this case separately in N.D. Illinois. D.I. 30, at 9-13. But in trying to show how venue is proper there, ClearOne rests its entire theory on a lone employee who stores some ClearOne products in a portion of his garage. *Id.* at 10-13. Relying on *In re Cordis Corp.*, 769 F.2d 733 (Fed. Cir. 1985), ClearOne insists that the employee's home qualifies as its "place of business" under the venue statute, 28 U.S.C. § 1400(b). *Id.*

ClearOne's reliance on *Cordis* is misplaced. The Federal Circuit's recent decision *In re Cray, Inc.*, 871 F.3d 1355 (Fed. Cir. 2017) substantially narrows *Cordis* and confirms how Mr. Mergens' home is not a "regular and established place of business" for venue purposes. Indeed, *Cray* questioned *Cordis*' applicability to venue questions in the wake of *TC Heartland v. Kraft Foods Grp. Brands, Inc.*, 137 S. Ct. 1514 (2017), vacating a district court's "misplaced reliance" on *Cordis* for venue matters.[4] *See Cray*, 871 F.3d at 1359 (doubting *Cordis*'s "scope and effect" when *Cordis* did not "evaluate venue in light of the statutory language of § 1400(b)").

Under *Cray*, an established place of business must be one "*of the defendant*, not solely a place of the defendant's employee." *Id.* at 1363. A home office belongs to the defendant when the defendant owns, leases, or otherwise exercises possession or control over it. *Id.* Such control may

---

[4] ClearOne appears to concede that it does not "reside[]" in Illinois under § 1400(b). ClearOne resides only in its state of incorporation, Delaware. *TC Heartland*, 137 S. Ct. at 1520-21.

exist when the defendant "condition[s] employment" on an employee's continued residence in the district. *Id.* Employees who can move homes "without the approval of the defendant" cut against the employee's home serving as the defendant's established place of business. *Id.*

ClearOne cites *Cray* for general propositions of law but never confronts its core holding. D.I. 30, at 10-11. Instead, ClearOne waves at disparate facts failing to establish venue under *Cray*.

*First*, ClearOne avers that Mr. Mergens' employment is "based on" his proximity to the Midwest region. *See* D.I. 30, at 12; D.I. 34, ¶ 5. But ClearOne never proves it "conditioned" Mr. Mergens' employment on his "residence in the district." *Cray*, 871 F.3d at 1363, 1365; *see also Novartis Pharm. Corp. v. Accord Healthcare Inc.*, No. 18-1043, 2019 WL 2502535, at *4-5 (D. Del. June 17, 2019). Nor does ClearOne show it "played a part in selecting the place's location" of Mr. Mergens' home. *Cray*, 871 F.3d at 1365; *Novartis*, 2019 WL 2502535, at *4 n.6.

*Second*, ClearOne makes much of the inventory allegedly stored in Mr. Mergens' garage. D.I. 30, at 11; D.I. 34, ¶¶ 3-4. But nowhere does ClearOne state it "conditioned [his] employment" on this storage. *Cray*, 871 F.3d at 1363. Nor does it "own[], lease[], or rent[] any portion of Mr. [Mergens'] home" for this purpose. *Id.* at 1365; *Novartis*, 2019 WL 2502535, at *4 n.6.

*Third*, ClearOne couches Mr. Mergens' location as "important" to the company. D.I. 30, at 12; D.I. 34, ¶¶ 5-6. But it is apparently not "important" enough to "list[] the alleged place of business on a website." *Cray*, 871 F.3d at 1363. Instead, ClearOne's website depicts offices in Utah, Texas, Florida, Spain, the U.A.E., India, China, and Hong Kong. Ex. D. Illinois is not on the map. *Id.* Nor was it mentioned to the SEC. Ex. E, at 28. And even if it were "important" to conduct business in the Midwest, "that fact, without more, is not sufficient to make [Mergens' home] a location of [ClearOne's] regular and established business." *Novartis*, 2019 WL 2502535, at *4-5. While ClearOne may encourage Mr. Mergens to live in Illinois and enjoy that choice, doing so

does not "transform [his] chosen abode into a regular and permanent" place of ClearOne. *Id.*

*Fourth*, ClearOne emphasizes how Mr. Mergens "submits reimbursement requests" for office supplies and internet expenses. D.I. 30, at 12; D.I. 34, ¶ 7. But because ClearOne reimburses Mr. Mergens from outside Illinois, "all expense reimbursements . . . [come] from outside the district," rendering them irrelevant. *Cray*, 871 F.3d at 1364-65; *see also Novartis*, 2019 WL 2502535, at *5 (rejecting the same reimbursement argument). Nor does ClearOne show these payments were "conditioned on any particular employee location." *Cray*, 871 F.3d at 1364-65.

*Fifth*, ClearOne overstates the importance of Mr. Mergens' Chicago phone number. D.I. 30, at 12-13; D.I. 34, ¶¶ 7-8. As a resident near Chicago, one would expect him to have a Chicago area code. This unremarkable fact "indicate[s] at most that he conduct[s] business from [Illinois], not that [ClearOne] established a place of business there." *Cray*, 871 F.3d at 1365-66.

*Sixth*, Mr. Mergens' use of ClearOne's name on a shipping label does not mean ClearOne controls his home. D.I. 30, at 13; D.I. 34, ¶ 9. ClearOne never shows that it required Mr. Mergens to do so, ratified the home as its own, or explains how a shipping label transforms a home into ClearOne's place of business. *See Cray*, 871 F.3d at 1363; *Novartis*, 2019 WL 2502535, at *5.

Beyond falling short in its affirmative argument, ClearOne's motion conspicuously omits other considerations pertinent under *Cray*. Unsurprisingly, these facts cut against ClearOne:

- ClearOne never states Mr. Mergens can move residences only "with[] the approval of [ClearOne]." *Cray*, 871 F.3d at 1363; *Novartis*, 2019 WL 2502535, at *4-5.

- ClearOne does not contend it "place[d] its name on a sign associated with or on" Mr. Mergens' home. *Cray*, 871 F.3d at 1363-64.

- ClearOne nowhere suggests Mr. Mergens "received secretarial services" from anyone "located within the district." *Id.* at 1365.

- ClearOne never states it has "any intention to maintain some place of business" in N.D. Illinois should Mr. Mergens "decide[] to terminate [his] residence[]." *Id.*

- ClearOne never compares Mr. Mergens' activity with those of other districts. *Id.* at 1364. While Mr. Mergens claims to have generated over $100 million over sixteen years for his "region" (D.I. 34, ¶ 4), ClearOne does not list all the districts that "region" includes and never compares those figures to other judicial districts.

Even *Cordis*—ClearOne's only cited authority—is distinguishable. In *Cordis*, the defendant publicly advertised a local secretarial office as its own. *Cray*, 871 F.3d at 1365. The city telephone directory listed the secretary's phone number and address as the defendant's. *Cordis*, 769 F.2d at 735. ClearOne has done none of these things. ClearOne does not employ a secretarial service in N.D. Illinois, has not shown telephone directories listing ClearOne as present there, and has not shown how reimbursements to Mr. Mergens are conditioned on his location. *Cray* distinguished *Cordis* on this very basis. *See Cray*, 871 F.3d at 1365. The same result obtains here.

In sum, nothing on this record proves Mr. Mergens' home "is owned, controlled, or otherwise established by [ClearOne]; that [his] employment is conditioned upon residence is [N.D. Illinois]; or that there is anything to stop [him] from moving out of [N.D. Illinois], at any time [he] wishes, for any reason (without any threat to [his] continued employment by [ClearOne])." *Novartis*, 2019 WL 2502535, at *4. Rather than serve as "a place *of the defendant*," Mr. Mergens' home is unquestionably "solely a place of the defendant's employee." *Cray*, 871 F.3d at 1363. Venue is improper on such facts. So too is transfer. *See GE Healthcare Bio-Scis. AB v. Bio-Rad Labs.*, No. 18-1899, 2019 WL 1985183, at *1-2 (D. Del. May 6, 2019).

## B.    The Balance of Interests Does Not Strongly Favor Transfer

ClearOne's motion fails for a second reason. Even if Shure could have brought its claims in N.D. Illinois (it could not), the *Jumara* convenience factors disfavor transfer. "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail." *Cisco Sys. Inc. v. GPNE Corp.*, No. 07-671, 2008 WL 1758866, at *1 (D. Del. Apr. 17, 2008) (quoting *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 567-58 (D. Del. 2001)).

1.      **The Relevant Private Interests Weigh Against Transfer**

Under *Jumara*, courts must balance the following private interests: (1) plaintiff's choice of forum, (2) defendant's choice of forum, (3) where the claim arose, (4) convenience of the parties, (5) convenience of witnesses, but only insofar as they are unavailable for trial, and (6) location of books and records, but only insofar as they cannot be produced. *Jumara*, 55 F.3d at 879. As shown below, the net balance of these factors weighs against transfer.

a.      **Plaintiff's Choice of Forum Strongly Disfavors Transfer**

Shure's selection of Delaware as its chosen forum weighs strongly against transfer. Courts accord a plaintiff's choice of forum "paramount consideration." *Shutte*, 431 F.2d at 25; *RealTime Data LLC v. Fortinet, Inc.*, No. 17-1635, 2018 WL 5630587, at *5-6 (D. Del. Oct. 31, 2018). This choice "should not be lightly disturbed." *Shutte*, 431 F.2d at 25; *Graphics Props. Hldgs. Inc. v. Asus Comput. Int'l*, 964 F. Supp. 2d 320, 328 (D. Del. 2013).

Unable to upend the primary of Shure's choice, ClearOne appeals to irrelevant authority. ClearOne cites *Sinochem Int'l Co. v. Malaysian Int'l Shipping Corp.*, 549 U.S. 422 (2007) and *In re Link_A_Media Devices Corp.*, 662 F.3d 1221 (Fed. Cir. 2011) for their articulation of the so-called "home-turf" rule. This rule suggests that a plaintiff's forum choice applies with "less force" when litigating outside its home turf. *See* D.I. 30, at 16.

The first problem with this argument is that this Court has already rejected it. In *RealTime*, this Court held that *Sinochem* and *Link_A_Media* "apply only when the plaintiff . . . is a non-United States company." 2018 WL 5630587, at *5-6. This is so, the Court explained, because both cases involved foreign entities and dismissals under *forum non conveniens*—not transfers under § 1404(a). *Id.* Here, Shure is a U.S. company (D.I. 19, ¶¶ 3-4), and ClearOne seeks transfer under § 1404(a) (D.I. 30). ClearOne's cases are inapposite. *RealTime*, 2018 WL 5630587, at *5-6.

Other cases tell the same story. This Court has consistently explained how the home-turf

rule has "no independent significance as to the overall *Jumara* balance of convenience analysis, nor to the analysis regarding this first *Jumara* factor." *Genentech*, 2018 WL 503253, at *3 (quoting *Elm 3DS Innovations LLC v. SK Hynix Inc.*, No. 14-1432, 2015 WL 4967139, at *4 n.6 (D. Del. Aug. 20, 2015)); *see also VLSI Tech. LLC v. Intel Corp.*, No. 18-966, 2018 WL 5342650, at *5-6 (D. Del. Oct. 29, 2018); *Tessera, Inc. v. Broadcom Corp.*, No. 16-379, 2017 WL 1065865, at *4 n.6 (D. Del. Mar. 21, 2017) (citing *Pragmatus AV, LLC v. Yahoo! Inc.*, No. 11-902, 2012 WL 4889438, at *5 (D. Del. Oct. 15, 2012), *adopted in* 2013 WL 174499 (D. Del. Jan. 16, 2013))).

While some cases from this District mention the "home turf" rule, they still hasten to give "substantial weight" to the plaintiff's forum when a "legitimate, rational reason" exists for litigating there. *See, e.g.*, *TruckPro*, 2019 WL 4671158, at *2-3; *Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 754 (D. Del. 2012). Several such legitimate reasons apply here. *First*, courts universally acknowledge the legitimacy of suing Delaware corporations in Delaware, as jurisdiction and venue are assured. *See, e.g.*, *TruckPro*, 2019 WL 4671158, at *3; *Genentech*, 2018 WL 503253, at *3; *Altera*, 842 F. Supp. 2d at 754; *Pragmatus*, 2012 WL 4889438, at *5-6. ClearOne is a Delaware corporation. D.I. 30, at 6. *Second*, Delaware is a legitimate venue when infringing acts take place in the state. *See, e.g.*, *Altera*, 842 F. Supp. 2d at 754. ClearOne has committed acts of infringement here. D.I. 19, ¶¶ 9, 11, 13, 30-32. *Third*, Delaware courts have expressed how their "experience with patent litigation" makes Delaware a legitimate forum for patent infringement suits. *See Tessera*, 2017 WL 1065865, at *5. This case involves patent infringement allegations, D.I. 19, ¶¶ 26-41, making Delaware a legitimate forum.

Thus, whether this Court gives Shure's forum choice "paramount" or "substantial" weight is largely an academic exercise. The result is the same: this factor strongly disfavors transfer.

**b.    Defendant's Choice of Forum Favors Transfer**

ClearOne's forum choice favors transfer. But ClearOne's preference "receives less weight

than [Shure's]." *TruckPro*, 2019 WL 4671158, at *3; *Genentech*, 2018 WL 503253, at *3 (defendant's forum does not "displace" plaintiff's). And if a party's home turf matters—it does not, but ClearOne thinks so—N.D. Illinois is not ClearOne's home, making it even less apt.

### c. Where the Claims Arose Is Neutral

This factor is neutral. "[W]here a [defendant] operates on a national or global scope, this factor is generally neutral." *Schubert v. OSRAM AG*, No. 12-923, 2013 WL 587890, at *4 (D. Del. Feb. 14, 2013); *Genentech*, 2018 WL 503253, at *4 ("[W]hen the defendant operates on a national or global scale, . . . this factor is neutral."); *Smart Audio Techs. v. Apple, Inc.*, 910 F. Supp. 2d 718, 730 (D. Del. 2012); *Round Rock Research LLC v. Dell, Inc.*, 904 F. Supp. 2d 374, 376 (D. Del. 2012) (giving "no weight" to national sales). ClearOne is a global company operating throughout the U.S. and the world. D.I. 19, ¶¶ 8-9, 13, 30-32, 37-39; Ex. D (showing offices in the U.S., Spain, U.A.E., India, China, and Hong Kong); Ex. E, at 28 (same). That fact controls this analysis.

ClearOne's motion does not disturb this conclusion. Despite ClearOne stressing how Shure's inventive activity occurred in Illinois, D.I. 30, at 17-18, this Court does not recognize "inventive activity" as impacting the *Jumara* balancing. *See Schubert*, 2013 WL 587890, at *4 ("[T]hat the patent-in-suit may have some other connection to a particular state is irrelevant."). Next, ClearOne alleges that it sold more accused products (*three*) in N.D. Illinois than Delaware. D.I. 30, at 17. But this too is immaterial. As ClearOne's own authority explains, this factor "focuses on the location of the production, design and manufacture of the accused instrumentalities," not their location of sale. *Elm*, 2015 WL 4967139, at *6; *see also Genentech*, 2018 WL 503253, at *4; *Schubert*, 2013 WL 587890, at *4. ClearOne's irrelevant facts fail to overcome its global presence. *See, e.g.*, *Realtime Adaptive Streaming LLC v. Netflix, Inc.*, No. 17-1692, 2018 WL 4941785, at *7 (D. Del. Oct. 12), *adopted in* 2018 WL 5886172 (D. Del. Nov. 9, 2018) (ruling this factor neutral when accused products "are sold and used nationwide and globally," despite being

developed in the transferee forum); *Schubert*, 2013 WL 587890, at *4.

Perhaps sensing this result, ClearOne next contends that it "designed and developed" the accused product in Utah. D.I. 30, at 18. But Utah is not the proposed transferee forum—N.D. Illinois is. Nor does production take place in Illinois—it occurs in China. Ex. E, at 28. Acts transpiring outside the transferor and transferee fora receive little to no weight. *See TruckPro*, 2019 WL 4671158, at *3; *Schubert*, 2013 WL 587890, at *4. ClearOne's global presence continues to govern this factor. *See, e.g.*, *Netflix*, 2018 WL 4941785, at *7; *Schubert*, 2013 WL 587890, at *4.

ClearOne concludes by making irrelevant points about Shure's nonpatent claims. ClearOne first tries to link the claims to Illinois because they involve misstatements about Shure's MXA910 at issue there. *Id.* But as ClearOne knows, Shure's nonpatent claims arise where ClearOne made false statements, not where N.D. Illinois sits. D.I. 30, at 18. This consideration is neutral. ClearOne next asserts that it sent Mr. Narayanan's false letter to individuals in Illinois and not Delaware. *Id.* But ClearOne conspicuously omits describing *every other location* where it sent the letter. *See* D.I. 33, ¶ 5. ClearOne's incomplete and self-serving declaration fails to establish how Shure's nonpatent claims arose in Illinois relative to other districts. *See Schubert*, 2013 WL 587890, at *4.

ClearOne ends by contradicting itself. ClearOne dismisses Shure's nonpatent claims based on statements by ClearOne's Georgia-based employee because they have "no connection" to N.D. Illinois or Delaware. D.I. 30, at 18. But just one paragraph ago, ClearOne argued that transfer was warranted because N.D. Illinois is closer to Utah (where the BMA CT was allegedly developed) than to Delaware—despite such development having "no connection" to either forum. *Id.* In other words, proximity matters when it helps ClearOne, but not when it helps Shure. *Id.* ClearOne cannot have it both ways. While Shure agrees that acts outside Illinois and Delaware do not generally

impact this factor,[5] *see TruckPro*, 2019 WL 4671158, at *3, ClearOne's flip-flop is unavailing.

> ### d.    The Convenience of the Parties Disfavors Transfer

This factor disfavors transfer. As Delaware courts have long held, "absent some showing of a unique or unexpected burden, a company should not be successful in arguing that litigation in its state of incorporation is inconvenient." *ADE*, 138 F. Supp. 2d at 573; *see, e.g.*, *Netflix*, 2018 WL 4941785, at *4; *Auto. Techs. Int'l v. Am. Honda Motor Co.*, No 06-187, 2006 WL 3783477, at *2 (D. Del. Dec. 21, 2006) ("[H]aving received the benefits of Delaware incorporation, a Defendant cannot now complain that another corporation has chosen to sue it here."); *Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600, 604 (D. Del. 2004); *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993). ClearOne has not met this charge.

ClearOne first argues on Shure's behalf, insisting that litigating here is inconvenient for Shure. D.I. 30, at 19. This argument should not be heard. "[T]he best indicator of a plaintiff's own convenience is the plaintiff's own choice of forum." *Tessera, Inc. v. Sony Elecs. Inc.*, No. 10-838, 2012 WL 1107706, at *4 (D. Del. Mar. 30, 2012). Shure's choice of forum speaks for itself.

ClearOne then complains about a half-hour difference in flights from Utah to Illinois and Delaware. D.I. 30, at 19. Aside from being *de minimis*, this assertion has no force. "[A] flight to Delaware is not an onerous task warranting transfer." *Auto. Techs.*, 2006 WL 3783477, at *2; *Truth Hardware Corp. v. Ashland Prods.*, No. 02-1541, 2003 WL 118005, at *2 (D. Del. Jan. 13, 2003).

Invoking *Contour IP Holding, LLC v. GoPro, Inc.*, No. 15-1108, 2017 WL 3189005 (D. Del. July 6, 2017), ClearOne's only response is that its status as a Delaware corporation is not dispositive. But the peculiar facts in *Contour* are precisely the type of "unique" circumstances

---

[5] As discussed below, Shure's nonpatent claims also arose in states such as PA, MD, and NC—all of which are closer to DE than IL. *See* Ex. G, ¶ 4. They also arose in states like TX and OH, further evincing ClearOne's national reach. *Id.* This factor is neutral for national companies.

absent here. In *Contour*, this Court transferred a case to the defendant's headquarters when the plaintiff harassed the defendant with *identical actions* in multiple districts and misled the Court. *Id.* at *6-8. Though the defendant's Delaware status provided a reason to keep the suit (*id.* at *10-11), the Court found that plaintiff was "playing wasteful games with venue" and transferred the case. *Id.* at *8. No such "unique" plight exists here. ClearOne's peripheral point on dispositiveness thus fails to rebut how it "agree[d] to submit itself to the jurisdiction of the courts in this state for the purposes of resolving [patent] dispute[s]." *ADE*, 138 F. Supp. 2d at 572; *Netflix*, 2018 WL 4941785, at *4. Indeed, ClearOne consents to the Delaware Court of Chancery for certain kinds of lawsuits in its Certificate of Incorporation. *See* Ex. F, at 3 (Art. X). It is incongruent for ClearOne to complain about the burden of litigating here when its own founding documents consent to it.

Lastly, ClearOne's comparison of the parties' revenues misses the point. D.I. 30, at 19. This factor aims to protect "truly regional" companies from being hauled into distant courts. Transfer is otherwise improper. *Netflix*, 2018 WL 4941785, at *4 ("Unless the defendant is truly regional in character—that is, it operates essentially exclusively in a region that does not include Delaware—transfer is almost always inappropriate."); *Cisco*, 2008 WL 1758866, at *2. ClearOne is not a "regional" company in any sense of the word. It is a global enterprise with offices spanning several continents. Ex. D; Ex. E, at 28. Thus, "[d]espite the relatively larger financial resources of [Shure], [ClearOne] has sufficient resources to defend a lawsuit in Delaware—the jurisdiction in which it chose to incorporate—just as it has the resources to support employees and sales efforts in multiple countries." *Autodesk Can. Co. v. Assimilate, Inc.*, No. 08-587, 2009 WL 3151026, at *8 (D. Del. Sept. 29, 2009); *see VLSI*, 2018 WL 5342650, at *6, *Wesley-Jessen*, 157 F.R.D. at 218.

### e. Convenience of Nonparty Witnesses Is Neutral

This factor is neutral. ClearOne's focus on the mere *location* of witnesses disregards the purpose of this *Jumara* factor. D.I. 30, at 19-20. This factor gauges only the extent to which

"witnesses may actually be unavailable for trial." *Jumara*, 55 F.3d at 879; *see Netflix* 2018 WL 4941785, at *5; *VLSI*, 2018 WL 5342650, at *7; *Smart Audio*, 910 F. Supp. 2d at 732.

ClearOne's analysis on the convenience of party witnesses falls apart upon minimal examination. "Party witnesses or witnesses who are employed by a party carry no weight in the 'balance of convenience' analysis." *Altera*, 842 F. Supp. 2d at 756-57; *see TruckPro*, 2019 WL 4671158, at *4; *Netflix*, 2018 WL 4941785, at *5; *Realtime*, 2018 WL 5630587, at *7.

ClearOne's ensuing list of nonparty witnesses also fails to move the needle. While ClearOne states that it is unaware of third-party witnesses in Delaware, "[t]his is not the proper inquiry and is insufficient for this factor to weigh in favor of transfer." *Netflix*, 2018 WL 4941785, at *5. Instead, "this factor is neutral" unless ClearOne establishes "necessary witnesses [who] will refuse to appear in Delaware for trial without a subpoena." *Realtime*, 2018 WL 5630587, at *7; *see also TruckPro*, 2019 WL 4671158, at *4. It has not done so. No witness identified by ClearOne has given any indication of refusing to come to Delaware. In any event, the "practical impact" of this factor is "limited" given that so few cases go to trial. *Pragmatus*, 2012 WL 4889438, at *10.

Finally, ClearOne has made misrepresentations like those undergirding this lawsuit to companies in Illinois, Texas, Ohio, North Carolina, Pennsylvania, and Maryland. Ex. G, ¶ 4. While some of these companies are closer to N.D. Illinois, those in NC, PA, and MD are closer to Delaware. Shure is unaware of any witness unwilling to come to trial. This factor remains neutral.

### f.    The Location of Evidence Is Neutral

This factor is neutral. Shure initially notes how this Court has "repeatedly recognized that technological advances have reduced the weight of this factor." *Netflix*, 2018 WL 4941785, at *4 (citing cases). Thus, this factor has little impact on the *Jumara* balance.

On the merits, ClearOne again tries to usurp Shure's convenience for its own benefit, *see* D.I. 30, at 20, but "the best indicator of a plaintiff's own convenience is the plaintiff's own choice

of forum." *Sony*, 2012 WL 1107706, at *4. ClearOne's only remaining argument is that some documents have already been produced in N.D. Illinois and others are located closer to that district. D.I. 30, at 20. That is not the question *Jumara* asks. Rather, this factor is "limited to the extent that the files could not be produced in the alternative forum." *Jumara*, 55 F.3d at 879. Here, ClearOne has not identified a single document unproduceable in Delaware. Indeed, ClearOne's assertion that some documents have already been produced in Illinois refutes any claim of hardship in reproducing them here.[6] This Court has ruled this factor neutral when defendants "do[] not suggest that it would be difficult to produce these documents in Delaware." *Autodesk*, 2009 WL 3151026, at *8; *see VLSI*, 2018 WL 5342650, at *7; *Tsoukanelis*, 337 F. Supp. 2d at 604 (denying transfer when the movants did not identify documents "unavailable for trial"); *Ace Capital v. Varadam Found.*, 392 F. Supp. 2d 671, 676 (D. Del. 2005) (same). The Court should do the same here.

### 2.    The Relevant Public Interests Weigh Against Transfer

The relevant *Jumara* public interests include: (1) practical considerations, (2) court congestion, (3) local interests, and (4) public policy. *Jumara*, 55 F.3d at 879-880. The other factors are neutral. Like the private interests, the net balance of these factors weighs against transfer.

### a.    The Practical Considerations Are Neutral

ClearOne makes two points in its attempt to show how this factor "heavily" favors transfer. D.I. 30, at 14-15. But both points vastly overstate the judicial economy transfer allegedly achieves. Instead, this factor is neutral—N.D. Illinois may have some experience tangential and unrelated to the issues here, but Delaware courts have a better understanding of their own state law.

ClearOne summarily avers that N.D. Illinois has acquired an "extensive understanding" of the companies' products and technology. *Id.* But ClearOne overlooks how N.D. Illinois has not

---

[6] Should any hardship exist, Shure would stipulate to using such documents from Illinois here.

developed familiarity with any of the issues pertinent to *this case*. For example, N.D. Illinois' prior constructions on ClearOne's patents (D.I. 30, at 3) does not give it mastery of Shure's '493 patent asserted here. Nor has N.D. Illinois amassed experience with the accused product here—the BMA CT. *See* D.I. 19, ¶¶ 30-39. Instead, the N.D. Illinois cases relate to different products—Shure's MXA910 and ClearOne's BMA. The BMA (relevant in Illinois) is not accused here, and the BMA CT (relevant here) is not at issue in Illinois. *See* D.I. 19, ¶¶ 30-39. These cases thus involve "different patents, claims, inventors, prosecution histories, and a different set of alleged infringing activities," offering no judicial economy. *Praxair, Inc. v. ATMI, Inc.*, No. 03-1158, 2004 WL 883395, at *2 (D. Del. Apr. 20, 2004); *see Genentech*, 2018 WL 503253, at *5 ("[U]nrelated cases have no weight in the transfer analysis."); *Auto. Techs.*, 2006 WL 3783477, at *3. ClearOne tries to salvage its point by arguing that Judge Chang is familiar with his own orders. D.I. 30, at 14-15. But Shure's nonpatent claims do not require interpreting those orders. Rather, they arise from false statements wrong on their face—e.g., how ClearOne "won" an ongoing case. D.I. 19, ¶ 20.

In a single-sentence argument, ClearOne then declares without citation that it has produced "substantial" documents in N.D. Illinois relevant to this case. D.I. 30, at 15. ClearOne again exaggerates its cause. ClearOne has not produced documents in Illinois relating to its financials or sales conduct relevant here, nor does it argue that its production on the BMA CT in Illinois is exhaustive or complete.[7] ClearOne also overlooks how all of Shure's relevant documentation and evidence (e.g., inventor testimony) has not been taken or produced in Illinois. Any judicial economy served by transfer is minimal. ClearOne's cited case *Fuisz Pharma LLC v. Theranos, Inc.*, No. 11-1061, 2012 WL 1820642 (D. Del. May 18, 2012), is inapposite because that case dealt with multidistrict litigation involving the "same patent." *Id.* at *16. That is not the case here.

---

[7] Again, Shure consents to using ClearOne's already-produced documents if necessary.

Finally, this Court has a better understanding of Shure's state law claims than N.D. Illinois. *See, e.g.*, *In re ML-Lee Acquisition Fund II, L.P.*, 816 F. Supp. 973, 979 (D. Del. 1993) ("The courts in this district have stated that it is preferable for the court of the state whose substantive law controls to hear the case."). ClearOne nowhere addresses this reality, save for a single case applying Delaware law cited in a different section in its motion. D.I. 30, at 14 n.4. One case cannot supplant the hundreds of instances this Court has applied the Delaware Deceptive Practices Act, tortious interference under Delaware law, or common law unfair competition.[8]

### b.   The Relative Court Congestion Disfavors Transfer

This factor disfavors transfer. The most recent Judicial Caseload Profiles show Delaware has a lower median time to civil trial than N.D. Illinois (32.5 to 36.7 months, respectively) and fewer pending cases per judgeship (640 to 755). Ex. H at 14, 47. This Court used the same statistics to deny transfer to N.D. Illinois just last month. *See LoganTree LP v. Omron Healthcare, Inc.*, No. 18-1617, 2019 WL 4538730, at *8 (D. Del. Sept. 19, 2019). It should do so here.

ClearOne's statistics miss the point because they refer only to patent cases. D.I. 30, at 16. Patent suits represent only a sliver of all pending cases, and this Court considers the latter more helpful. *LoganTree*, 2019 WL 4538730, at *8. Further, ClearOne's statistics are unilluminating insofar as they rely on time to disposition. Time to *trial* is more instructive, disfavoring transfer. *Genentech*, 2018 WL 503253, at *6 (finding *inter alia* time-to-trial "more illuminating" than time-to-disposition); *Autodesk*, 2009 WL 3151026, at *8 (using time-to-trial from Judicial Profiles).

### c.   The Local Interest in Resolving This Dispute Is Neutral

This factor is neutral. Contrary to ClearOne's assertions (*see* D.I. 30, at 15-16), N.D. Illinois has no interest in this patent dispute. "[P]atent issues do not give rise to local controversy

---

[8] Shure recognizes that familiarity of state law is relevant for another *Jumara* factor relating to diversity cases. The point here is one of judicial economy—Delaware judges know Delaware law.

or implicate local interests." *Realtime*, 2018 WL 5630587, at *8 (quoting *TriStrata Tech. v. Emulgen Labs.*, 537 F. Supp. 2d 635, 643 (D. Del. 2008)); *Smart Audio*, 910 F. Supp. 2d at 733-34 (same); *Altera*, 842 F. Supp. 2d at 760 (same); *Pragmatus*, 2012 WL 4889438, at *13-14 (same). ClearOne itself concedes Delaware law refutes its out-of-circuit cases. D.I. 30 at 15.

### d.    Delaware's Public Policy Disfavors Transfer

This factor disfavors transfer. ClearOne's status as a Delaware corporation is a "crucial fact" on the score, as "Delaware clearly has a substantial interest in addressing lawsuits brought against Delaware corporations." *Autodesk*, 2009 WL 3151026, at *9. Indeed, this Court routinely affirms Delaware's interest in deciding actions against its corporations.[9] *E.g.*, *TruckPro*, 2019 WL 4671158, at *5; *Netflix*, 2018 WL 4941785, at *7 ("Because [Defendant] is a Delaware corporation, this factor weighs against transfer."); *Graphics*, 964 F. Supp. 2d at 331 ("[Defendant] is a Delaware corporation. This factor weighs against transfer."); *Ace*, 392 F. Supp. 2d at 676.

ClearOne tries to renounce Delaware's public interest by disavowing the privileges of incorporating here. D.I. 30 at 15-16. But the public interest in deciding suits against its corporations belongs to Delaware, not to ClearOne. ClearOne cannot surrender Delaware's interests. Because this factor concerns *public* interests, ClearOne's *private* desires (addressed above) carry no weight.

### 3.    Balancing the *Jumara* Factors Disfavors Transfer

As shown above, weighing the private and public factors disfavors transfer. ClearOne has not met its substantial burden of showing how the factors are "strongly in favor of a transfer." *Realtime*, 2018 WL 5630587, at *8. Accordingly, Shure's choice of forum controls. *Id.*

## VI.    CONCLUSION

For the foregoing reasons, Defendant's motion to transfer should be denied.

---

[9] Some courts invoke this idea under the local interest factor. *E.g.*, *TruckPro*, 2019 WL 4671158, at *5. Under that framework, the policy factor is neutral and the local factor disfavors transfer.

Dated: October 15, 2019

OF COUNSEL:

Gerald F. Ivey
Mareesa A. Frederick
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Elliot C. Cook
Alexander M. Boyer
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

McCARTER & ENGLISH, LLP

/s/ Brian R. Lemon
Michael P. Kelly (#2295)
Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
405 N. King St., 8th  Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
blemon@mccarter.com
ajoyce@mccarter.com

*Counsel for Plaintiffs*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SHURE INCORPORATED | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. _____ |
|     v. | ) | |
| | ) | |
| CLEARONE, INC. | ) | |
| | ) | **JURY DEMANDED** |
|     Defendant. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT
OF PATENT NON-INFRINGEMENT AND INVALIDITY**

Plaintiff Shure Incorporated ("Shure") files this Complaint against Defendant ClearOne, Inc. ("ClearOne"), and respectfully alleges as follows:

## NATURE OF THIS ACTION

1.    This is a declaratory judgment action for non-infringement and invalidity of U.S. Patent No. 9,635,186 and non-infringement of U.S. Patent No. 9,264,553.

## PARTIES

2.    Plaintiff Shure is a corporation organized under the laws of Illinois with a principal place of business at 5800 W. Touhy Avenue, Niles, Illinois 60714.

3.    Defendant ClearOne is a corporation organized under the laws of Utah with a principal place of business at 5225 Wiley Post Way, Suite 500, Salt Lake City, UT 84116.

## JURISDICTION AND VENUE

4.     This action arises under the Patent Laws of the United States, Title 35, United States Code 35 U.S.C. § 1 *et seq.*, and under Title 28, United States Code, Chapter 151, §§ 2201 and 2202, entitled Declaratory Judgments.

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and/or 2202.

6.     This Court has personal jurisdiction over ClearOne in this matter.  Among other things, ClearOne regularly and systematically ships and sells its products to customers and through numerous of its dealers and installers located in Illinois and in this District.  Moreover, ClearOne sent the communications to Shure giving rise to this matter, as described herein, specifically into Illinois and this District.  Based on these and other contacts with Illinois and this District, ClearOne is subject to personal jurisdiction in this District.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and/or (d), and/or 1400(b).

## BACKGROUND

8.     On March 10, 2017, ClearOne, through its counsel, sent a letter to Shure addressed to Christine Schyvinck, Shure's President and CEO (the "ClearOne Letter").  A true and accurate copy of the ClearOne Letter is attached hereto as Exhibit A, and is incorporated herein in its entirety by reference.

9.     In the ClearOne Letter, ClearOne asserted that it is the owner and assignee of a certain United States Patent Application No. 15/190,424 (the "424 Application").

10.     Further, in the ClearOne Letter, ClearOne indicated to Shure that the '424 Application has been examined and is allowed for issuance as a patent.  The ClearOne Letter

referenced and attached a copy of the Notice of Allowance in the '424 Application, listing the allowed claims.

11.     On April 25, 2017, U.S. Patent 9,635,186 (the "'186 Patent") entitled "Conferencing Apparatus That Combines a Beamforming Microphone Array With An Acoustic Echo Canceller" was duly issued by the United States Patent and Trademark Office.  The '186 Patent is assigned to and is owned by ClearOne.

12.     The '186 Patent issued and came into full force and effect immediately after 12:00 AM E.D.T. on April 25, 2017.

13.     The '186 Patent issued and resulted from the '424 Application.

14.     The allowed and issued claims of the '186 Patent are identical to the allowed claims in the '424 Application referenced by ClearOne in the ClearOne Letter.

15.     The '186 Patent claims priority to U.S. Patent 9,264,553 ("the '553 Patent") entitled "Methods and Apparatuses for Echo Cancelation with Beamforming Microphone Arrays."  The '186 Patent and the '553 Patent are in the same patent family.  A true and correct copy of the '553 Patent is attached hereto as Exhibit B.

16.     Both the '186 Patent and the '553 Patent claim priority to the same three U.S. provisional patent applications (numbers 61/495,971, 61/495,968 and 61/495,961), all three of which were filed on June 11, 2011.

17.     The '186 Patent and the '553 Patent are directed to the same subject matter of echo cancellation in beam forming microphone arrays.   Furthermore, large portions of specification of the '186 Patent are identical to the specification of the '553 Patent.

18.     The claims of the '553 Patent are directed at the same subject matter as the claims of the '186 Patent.  However, the claims of the '553 Patent are broader in scope than the claims of the '186 Patent.

19.     In the ClearOne Letter, ClearOne (i) accuses Shure of infringement of the allowed claims of the '424 Application, which are now issued in the '186 Patent, (ii) identifies specific Shure® products which it alleges are the infringing devices, (iii) outlines specific conduct attributable to Shure which forms the basis of its infringement allegations, (iv) demands that Shure cease and desist from activities which would infringe upon ClearOne's patent rights, and (v) threatens prompt seeking of injunctive and other relief if ClearOne's rights are not respected. The ClearOne Letter further includes "litigation hold" language demanding that Shure preserve material relevant to the allegations contained therein.

20.     In the ClearOne Letter, ClearOne specifically alleges infringement of the allowed claims of ClearOne's '424 Application stating that those claims "cover the Shure/Biamp and Shure/QSC integrated systems" identified elsewhere in the ClearOne Letter.

21.     The ClearOne Letter goes on to provide "a detailed claim chart" comparing allowed claim 1 of the '424 Application (which is claim 1 of the '186 Patent) to the accused devices.  At the end of the claim chart, ClearOne alleges that each of the accused devices "similarly meets the other independent claims (claim 7, 13, and 19), as well as the dependent claims."

22.     Therefore, ClearOne has asserted all of the claims of the '186 Patent against the Shure products identified in the ClearOne Letter.

23.     The ClearOne Letter specifically identifies and accuses Shure's Microflex Advance Array Microphone, Shure model MXA910 (the "MXA910") and Shure's IntelliMix P300 signal processor (the "P300") as being infringing devices (the "Accused Shure Products").

24.     The ClearOne Letter further accuses Shure of certain other activities which it alleges infringe the '186 Patent, including but not limited to "advertis[ing], and encourag[ing] and instruct[ing] its customers to make and use, integrated systems" (the "Accused Practices") which allegedly infringe the '186 Patent.

25.      The ClearOne Letter further accuses Shure of infringement based on (i) the combination of its MXA910 with "acoustic echo cancellation products" from third parties (such as QSC's Q-SYS platform and Biamp's Tesira/TesiraFORTE audio processors and software) (the "Accused Third Party Products"), and (ii) activities by Shure, including the Accused Practices, which ClearOne alleges to be instructing, encouraging, partnering and/or otherwise collaborating with third parties in violation of the '186 Patent.

26.     The claim charts provided in the ClearOne Letter expressly accuse the Accused Products, Accused Third Party Products and the Accused Practices of infringing the claims by outlining each claim limitation allegedly present.

27.     All of the claim limitations of the independent claims of the '553 Patent comprise the same claim limitations of the independent claims of the '186 Patent, such that the '553 Patent claims contain claim limitations that are effectively a subset of the claim limitations of Claim 1 of the '186 Patent.

28.     The parties have a clear conflict of asserted rights against one another, and an actual controversy exists between Shure and ClearOne with respect to '186 Patent and the '553 Patent.

29.     As a result of ClearOne's actions, Shure has a reasonable apprehension of enforcement of the '186 and '553 Patents against it.  Therefore, Shure files this action in order to resolve an actual and justiciable controversy between the parties hereto.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '186 Patent)

30.     Shure hereby incorporates by reference its allegations contained in paragraphs 1 through 29 of this Complaint.

31.     Shure does not make, use, offer for sale, sell, import, or export, and has never made, used, offered to sell, sold, imported, or exported, a device or apparatus that infringes, either directly or indirectly, any valid and enforceable claim of the '186 Patent.

32.     Furthermore, Shure does not practice or perform, and has never practiced or performed, any method that infringes, either directly or indirectly, or performed any acts constituting contributory infringement of, or inducement to infringe any valid and enforceable claim of the '186 Patent.

33.     Neither the Accused Shure Products, alone or in combination with the Accused Third Party Products, infringe, either directly or indirectly, any valid and enforceable claim of the '186 Patent.

34.     Specifically, each of  the Accused Shure Products (alone or in combination with each other, or in any combination with any of the Accused Third Party Products), and all of the Accused Practices fail to include or satisfy at least the claim limitation of  "select[ing] with a signal module, one or more of the combined echo cancelled signals for transmission to the far end, wherein said signal selection module uses the far end signal as information to inhibit said

signal selection module from changing the selection of the combined echo cancelled signals while only the far end is active," which is a claim limitation required of each of the independent claims (claims 1, 7, 13 and 19) of the '186 Patent, and therefore, is a claim limitation required by each and every claim of the '186 Patent.

35.     Because each of the Accused Shure Products (alone or in combination with each other or in any combination with the Accused Third Party Products), and all of the Accused Practices do not include or satisfy at least the above recited limitation, such products and practices do not infringe any claims of the '186 Patent.

36.     As set forth in detail above, an actual controversy exists between Shure and ClearOne concerning the non-infringement of the '186 Patent.

37.     Accordingly, Shure seeks and is entitled to a judgment against ClearOne that all of the Accused Shure Products (alone or in combination with the Accused Third Party Products), and other Shure products incorporating microphone arrays and/or acoustic echo cancellation, as well as Shure's activities and undertakings in selling, marketing and distributing its products, including but not limited to the Accused Practices, have not infringed and do not infringe (directly, indirectly, contributorily, or by inducement) any valid claim of the '186 Patent.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '186 Patent)

38.     Shure hereby incorporates by reference its allegations contained in paragraphs 1 through 37 of this Complaint.

39.     The '186 Patent is invalid for failure to meet one or more of the conditions of patentability specified in Title 35 of the United States Code.  Specifically, the '186 Patent does not satisfy at least the requirements of 35 U.S.C. §§ 102, 103, and/or 112.

40.     Specifically, the '186 Patent is invalid under 35 U.S.C. § 102, as being anticipated by prior art.  The '186 Patent is further invalid under 35 U.S.C. § 103 as being obvious in light of prior art.  The '186 Patent is further invalid under 35 U.S.C. § 112 as being indefinite, for at least the reason that one or more of its claim terms fail to particularly point out and distinctly claim the invention, rendering the claims indefinite.

41.     As set forth in detail above, an actual controversy exists between Shure and ClearOne as to whether the '186 Patent is invalid.

42.     Accordingly, Shure seeks and is entitled to a judgment against ClearOne that the '186 Patent is invalid.

## THIRD CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '553 Patent)

43.     Shure hereby incorporates by reference its allegations contained in paragraphs 1 through 42 of this Complaint.

44.     Shure does not make, use, offer for sale, sell, import, or export, and has never made, used, offered to sell, sold, imported, or exported, a device or apparatus that infringes, either directly or indirectly, any valid and enforceable claim of the '553 Patent.

45.     Furthermore, Shure does not practice or perform, and has never practiced or performed, any method that infringes, either directly or indirectly, or performed any acts constituting contributory infringement of, or inducement to infringe any valid and enforceable claim of the '553 Patent.

46.     Neither the Accused Shure Products, alone or in combination with the Accused Third Party Products, infringe, either directly or indirectly, any valid and enforceable claim of the '186 Patent.

47.     Specifically, each of  the Accused Shure Products (alone or in combination with each other, or in any combination with any of the Accused Third Party Products), and all of the Accused Practices fail to include or satisfy at least the claim limitation of  "perform[ing] a beamforming operation to combine the plurality of microphone signals to a plurality of combined signals that is greater in number than one and less in number than the plurality of microphone signals, each of the plurality of combined signals corresponding to a different fixed beam," which is a claim limitation  required of each of the independent claims (claims 1, 8 and 15) of the '553 Patent, and therefore, is a claim limitation required by each and every claim of the '553 Patent.

48.     Because each of the Accused Shure Products, alone or in combination with each other or in any combination with the Accused Third Party Products, and all of the Accused Practices do not include at least the above recited limitation, such products and practices do not infringe any claims of the '553 Patent.

49.     As set forth in detail above, an actual controversy exists between Shure and ClearOne concerning the non-infringement of the '553 Patent.

50.     Accordingly, Shure seeks and is entitled to a judgment against ClearOne that all of the Accused Shure Products (alone or in combination with the Accused Third Party Products), and other Shure products incorporating microphone arrays and/or acoustic echo cancellation, as well as Shure's activities and undertakings in selling, marketing and distributing its products, including but not limited to the Accused Practices, have not infringed and do not infringe (directly, indirectly, contributorily, or by inducement) any valid claim of the '553 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Shure requests that this Court enter judgment in its favor and against ClearOne as follows:

A.      Declaring that Shure does not infringe, and has not infringed, any valid claim of any of the '186 Patent;

B.      Declaring that the '186 Patent is invalid under one or more of 35 U.S.C. §§ 102 103, and/or 112;

C.      Declaring that Shure does not infringe, and has not infringed, any valid claim of any of the '553 Patent;

D.      Enjoining ClearOne, its officers, agents, employees, representatives, counsel and all parties acting in concert with it, permanently and preliminarily during the pendency of this action, from directly or indirectly asserting or charging infringement of the '186 Patent and/or the '553 Patent against Shure, its representatives, agents, distributors, customers, or contractors, present and prospective;

E.      Declaring this case exceptional under 35 U.S.C. § 285 at least as a result of ClearOne's assertion of the '186 Patent and/or the '553 Patent despite ClearOne's knowledge of their invalidity and/or Shure's non-infringement of them, and ordering ClearOne to pay Shure's reasonable attorneys' fees and expenses in this action;

F.      Ordering ClearOne to pay Shure's costs pursuant to 28 U.S.C. § 1920;

G.      Ordering such other and future relief as this Court deems just and proper.


## JURY DEMAND

Shure respectfully requests a trial by jury.

10

Dated:  April 24, 2017                    Respectfully Submitted,

                                          By:  /s/ Vladimir I. Arezina
                                                One of the Attorneys for Plaintiff,
                                                SHURE INCORPORATED

                                                Vladimir I. Arezina
                                                  (ARDC No. 6276348)
                                                William J. Lenz
                                                  (ARDC No. 6257555)
                                                NEAL, GERBER & EISENBERG LLP
                                                Two North LaSalle Street
                                                Suite 1700
                                                Chicago, Illinois  60602
                                                Telephone:  (312) 269-8000
                                                Facsimile:  (312) 269-1747
                                                varezina@nge.com
                                                wlenz@nge.com

11

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

| | |
|---|---|
| Shure Incorporated,<br><br>     Plaintiff,<br>vs.<br><br>ClearOne, Inc.,<br><br>     Defendant. | Civil Number 1:17-cv-03078<br>Jury Trial Demanded<br><br><br>Hon. Edmond E. Chang<br>Mag. Judge Hon. Maria Waldez |

ClearOne, Inc.,

     Counter-Plaintiff,

vs.

Shure Incorporated, Biamp Systems
Corporation, and QSC Audio Products, LLC,

     Counter-Defendants.

---

## DEFENDANT CLEARONE'S ANSWER TO PLAINTIFF SHURE'S COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT AND INVALIDITY, JOINDER, AND COUNTERCLAIM

## ANSWER

### NATURE OF THE ACTION

1.      ClearOne, Inc. ("ClearOne") admits that Plaintiff Shure Incorporated's ("Plaintiff" or "Shure") Complaint seeks a judgment declaring U.S. Patent No. 9,635,186 (the "'186 Patent") invalid and not infringed, and U.S. Patent No. 9,264,553 (the "'553 Patent") not infringed.  ClearOne denies that Plaintiff is entitled to a declaration of either noninfringement or invalidity of either patent.

### PARTIES

2.      Admit.

5117623

3.       Admit.

## JURISDICTION AND VENUE

4.       ClearOne admits that this is purportedly an action arising under the United States

Patent Laws and the Declaratory Judgment Act.  ClearOne denies that this Court has subject

matter jurisdiction over the '553 Patent.  ClearOne also denies that Plaintiff is entitled to any

relief.

5.       Admit.

6.       Admit.

7.       ClearOne admits that venue is proper in this District pursuant to 28 U.S.C.

§ 1391(b), (c), and/or (d).  ClearOne denies the remaining allegations contained in Paragraph 7.

## BACKGROUND

8.       Admit.

9.       Admit.

10.      Admit.

11.      Admit.

12.      ClearOne admits that the '186 Patent was issued by the United States Patent and

Trademark Office on April 25, 2017.  ClearOne otherwise denies the allegations contained in

Paragraph 12.

13.      Admit.

14.      Admit.

15.      The '186 Patent claims priority to earlier filed Provisional United States

Application Nos. 61/495,968, 61/495,961, and 61/495,971.  The '186 Patent issued from the '424

Application, which is a continuation of United States Patent Application No. 15/040,135, which

in turn is a continuation of United States Patent Application No. 13/493,921 (the "'921

Application"). The '553 Patent issued from the '921 Application.  ClearOne admits that Exhibit

B appears to be a copy of the '553 Patent.  Plaintiffs use of the phrase "same patent family" is

vague, and ClearOne is unclear as to the meaning intended by Plaintiff.  ClearOne thus does not

have enough information to analyze whether that statement is true, and therefore denies the

remaining allegations of Paragraph 15.

      16.     Admit.

      17.     ClearOne admits that the '186 Patent is entitled "Conferencing Apparatus that

Combines a Beamforming Microphone Array with an Acoustic Echo Canceller," and that the

'553 Patent is entitled "Methods and Apparatuses for Echo Cancellation with Beamforming

Microphone Arrays."  Plaintiff's use of the phrase "large portions of specification[s]" is vague,

and ClearOne is unclear as to the meaning intended by Plaintiff.  ClearOne thus does not have

enough information to analyze whether that statement is true, and therefore denies the remaining

allegations of Paragraph 17.

      18.     ClearOne admits that both the '186 Patent and '553 Patent are similarly titled.

Plaintiff's use of the phrases "same subject matter" and "broader in scope" are vague, and

ClearOne is unclear as to the meaning intended by Plaintiff.  ClearOne thus does not have

enough information to analyze whether those statements are true, and therefore denies the

remaining allegations of Paragraph 18.

      19.     ClearOne believes that the text of its March 10, 2017 letter ("letter") is the best

evidence and speaks for itself.  ClearOne otherwise denies Plaintiff's characterization of the

letter.

      20.     ClearOne believes that the text of its letter is the best evidence and speaks for

itself.  ClearOne otherwise denies Plaintiff's characterization of the letter.

21.     ClearOne believes that the text of its letter is the best evidence and speaks for itself.  ClearOne otherwise denies Plaintiff's characterization of the letter.

22.     ClearOne admits that its letter identified independent claims 1, 7, 13, and 19, as well as dependent claims of the '424 Application as covering Shure products.  ClearOne is without information sufficient to form a belief as to the truth or falsity of the other allegations of Paragraph 22, and therefore denies the allegations.

23.     ClearOne believes that the text of its letter is the best evidence and speaks for itself.  ClearOne otherwise denies Plaintiff's characterization of the letter.

24.     ClearOne believes that the text of its letter is the best evidence and speaks for itself.  ClearOne otherwise denies Plaintiff's characterization of the letter.

25.     ClearOne believes that the text of its letter is the best evidence and speaks for itself.  ClearOne otherwise denies Plaintiff's characterization of the letter.

26.     ClearOne admits that the claim chart provided in its letter provides an infringement analysis of claim 1 of the '186 Patent.  ClearOne denies the remaining allegations.

27.     ClearOne admits that the '186 and '553 Patents share some similar claim limitations.  ClearOne otherwise denies Plaintiff's characterization of the Patents.

28.     ClearOne admits that an actual controversy exists between Plaintiff and ClearOne with respect to the '186 Patent.  ClearOne otherwise denies the allegations contained in Paragraph 28.

29.     ClearOne admits that Plaintiff has a reasonable apprehension of enforcement of the '186 Patent against it.  ClearOne otherwise denies the allegations contained in Paragraph 29.

**Count 1: Declaratory Judgment of Non-Infringement of the '186 Patent**

30.     To the extent not inconsistent, ClearOne incorporates by reference its answers to the allegations of Paragraph 1 through 29 of the Complaint the same as if fully set forth herein.

31.     Deny.

32.     Deny.

33.     Deny.

34.     Deny.

35.     Deny.

36.     ClearOne admits that an actual controversy exists between Plaintiff and ClearOne concerning the non-infringement of the '186 Patent, but otherwise denies the remaining allegations in Paragraph 36.

37.     Deny.

**Count 2: Declaratory Judgment of Invalidity of the '186 Patent**

38.     To the extent not inconsistent, ClearOne incorporates by reference its answers to the allegations of Paragraph 1 through 37 of the Complaint the same as if fully set forth herein.

39.     Deny.

40.     Deny.

41.     ClearOne admits that an actual controversy exists between Plaintiff and ClearOne as to whether the '186 Patent is invalid, but otherwise denies the remaining allegations in Paragraph 41.

42.     Deny.

**Count 3: Declaratory Judgment of Non-Infringement of the '553 Patent**

Paragraphs 43–50: No response required as subject to a motion to dismiss for lack of

- 5 -

subject matter jurisdiction.

## PRAYER FOR RELIEF

ClearOne denies that Plaintiff is entitled to any of the requested relief.  ClearOne

demands a trial by jury of all disputed, material facts (including any such facts later pleaded in

the joinder and counterclaims below).

## JURY DEMAND

Admit.  ClearOne demands a trial by jury of all disputed, material facts (including any

such facts later pleaded in the joinder and counterclaims below).

## AFFIRMATIVE DEFENSES

1.      Shure has failed to allege a sufficient case or controversy over the non-

infringement of the '553 patent and thus this Court lacks subject matter jurisdiction over Count 3

of Shure's declaratory judgment claims.

2.      The '186 and '553 Patents are presumed to be, and are, valid.

3.      ClearOne reserves its rights to assert additional claims or defenses as appropriate.

## JOINDER AND COUNTERCLAIM

Counterclaimant ClearOne by and through counsel of record, hereby files this

Counterclaim against Shure.  ClearOne also files this Counterclaim against Biamp System

Corporation ("Biamp") and QSC Audio Products, LLC ("QSC"), which it joins as Counterclaim

Defendants to this action (Shure, Biamp, and QSC collectively referred to as "Counterclaim

Defendants").

## INTRODUCTION

1.      ClearOne brings this patent infringement action to stop Counterclaim Defendants

Shure, Biamp, and QSC from their wrongful use of ClearOne's market-leading, patented audio

conferencing technologies.

2.      Despite being a small public company, ClearOne has grown into the global market leader in the installed audio conferencing market and a leading provider of premium audio conferencing systems and other related products for audio, video, and web conferencing applications.  As a market leader, ClearOne is focused on developing cutting-edge conferencing and collaboration products.  Through decades of innovation, investment, and effort by ClearOne and its team of inventors and engineers, ClearOne has developed industry-leading products and a portfolio of over 100 issued patents and pending patent applications.

3.      No later than 2010, ClearOne inventors conceived and developed a beamforming microphone conferencing system that was designed to replace up to a dozen individual microphones with a small beamforming microphone array that could be placed overhead or otherwise out of the way and yet had superior audio quality and clarity.  In 2012, four years ahead of its closest competitors, ClearOne was first to market with this beamforming audio conferencing technology – the Beamforming Microphone Array audio conferencing system – which combined beamforming with acoustic echo cancellation and adaptive steering or smart beam selection to provide superior audio performance and clarity.



ClearOne Beamforming Microphone Array

4.      ClearOne has been recognized several times for its continued innovation and

excellence in the installed audio conferencing market, including:

- 2017 Integrated Systems Europe "Best of Show" for its Beamforming Microphone Array 2;

- 2014 TMCnet Communications Product of the Year for its Beamforming Microphone Array;

- 2014 Frost & Sullivan Global Installed Audio Conferencing Systems Market Leadership Award; and

- 2013 Utah Innovation Awards Finalist for its Beamforming Microphone Array.

5.      To protect its industry-leading technology, ClearOne filed provisional and utility patent applications, including United States Patent Application No. 15/190,424 (the "'424 Application") entitled "Conferencing Apparatus that combines a Beamforming Microphone Array with an Acoustic Echo Canceller."  The '424 Application has now issued as United States Patent No. 9,635,186 (the "'186 Patent").  A true and correct copy of the '186 Patent is included as Exhibit A.

6.      Counterclaim Defendants' products and services make pervasive use of ClearOne's patented technology and infringe the '186 Patent.

7.      ClearOne seeks injunctive relief barring Counterclaim Defendants from infringing ClearOne's patented technology, damages for Counterclaim Defendants past infringement, and ClearOne's attorneys' fees and costs associated with this action.

## JURISDICTION AND VENUE

8.      This Counterclaim for patent infringement arises under the Patent Laws of the United States, 35 U.S.C. § 101 et seq.  This Court has subject matter jurisdiction over this Counterclaim and all Counterclaim Defendants pursuant to 28 U.S.C. §§ 1331, 1338(a), and

1367.

9.      This Court has personal jurisdiction over Counterclaim Defendants in this matter. Among other things, Counterclaim Defendants transact and have transacted business in Illinois and have caused injury to ClearOne in Illinois.  Moreover, Shure filed its Complaint in Illinois and this District.

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) & (c) and 1400(b).

## PARTIES

### ClearOne, Inc.

11.     ClearOne is a public corporation, incorporated in Utah, with a principal place of business at 5225 Wiley Post Way, Suite 500, Salt Lake City, Utah 84116.

12.     ClearOne was founded in 1983.  From its inception, ClearOne has been dedicated to the design, development, and sales of conferencing, collaboration, and network streaming and signage solutions for voice and visual communications.  ClearOne has created hundreds of new products that improve people's ability to collaborate and communicate, whether they are in the same room or on opposite sides of the globe.

13.     ClearOne's commitment to innovation and quality in the field of voice and visual communication solutions is well-known.  ClearOne has developed several industry firsts, including:

- First professional-grade Beamforming Microphone Array;

- First product to use Distributed Audio Echo Cancellation in an audio conferencing system;

- First conference phone to provide wireless conferencing;

- First fully-scalable conference phone that daisy-chains multiple phone units; and

- First product to bridge the wide price/performance gap that existed between plug-and-play tabletop conferencing phones and professionally-installed audio conferencing systems.

14.     Today, installed audio conferencing is one of ClearOne's core businesses, and ClearOne has become the market leader in that field, with over 50% of the global market. ClearOne's products are used by thousands of organizations worldwide, including schools, government entities, medical facilities, law firms, businesses, and houses of worship.

**Shure Incorporated**

15.     Shure is a private corporation, incorporated in Illinois, with its principal place of business at 5800 W. Touhy Avenue, Niles, Illinois 60714.

16.     Shure designs and manufactures audio systems.  Shure's products include wireless and wired microphone systems, digital signal processors, and personal monitor systems, among others.  Shure is a competitor of ClearOne.

17.     Shure advertises, encourages, and instructs its customers to make and use integrated systems consisting of its beamforming microphones (such as the Shure Microflex Advance Array microphone) and its upcoming Intellimix P300 Audio Conferencing Processor (scheduled for launch in fall 2017), as well as acoustic echo cancellation products from other companies (such as QSC's Q-SYS platform and Biamp's Tesira/TesiraFORTE audio processors and software).

18.     The performance of these integrated systems plays a key role in Shure's ability to compete effectively in the audio conferencing market.

19.     Shure is aware that ClearOne has patents relating to beamforming audio conferencing systems.

**Biamp Systems Corporation**

20.     Biamp is a private corporation, incorporated in Delaware, with a principal place of business at 9300 S.W. Gemini Drive, Beaverton, Oregon 97008.

21.     Biamp designs and manufactures audio systems.  Biamp's products include networked digital audio platforms, digital signal processors, and scalable media systems for digital audio networking, among others.  Biamp is a competitor of ClearOne.

22.     Biamp advertises, encourages, and instructs its customers to make and use integrated systems consisting of its acoustic echo cancellation products (such as its Tesira/TesiraFORTE audio processors and software) and the Shure Microflex Advance Array microphone.

23.     The performance of these integrated systems plays a key role in Biamp's ability to compete effectively in the audio conferencing market.

24.     Biamp is aware that ClearOne has at least one patent relating to beamforming audio conferencing systems.

**QSC Audio Products, LLC**

25.     QSC is a private company organized as a California limited liability company with its principal place of business at 1675 MacArthur Blvd., Costa Mesa, California 92626.

26.     QSC designs and manufacturers audio systems.  QSC's products include power amplifiers, loudspeakers, mixers, and networked audio and control.  QSC is a competitor of ClearOne.

27.     QSC advertises, encourages, and instructs its customers to make and use integrated systems consisting of its acoustic echo cancellation products (such as its Q-SYS platform) and the Shure Microflex Advance Array microphone.

- 11 -

28.     The performance of these integrated systems plays a key role in QSC's ability to compete effectively in the audio conferencing market.

29.     QSC is aware that ClearOne has at least one patent relating to beamforming audio conferencing systems.

## BACKGROUND OF THE TECHNOLOGY

30.     The technology at issue in this case pertains generally to the field of digital signal processing techniques, as used primarily in audio and video teleconferencing systems that are often deployed in conference rooms.

31.     Beamforming, also known as spatial filtering, is a signal processing technique used in sensor arrays for directional signal transmission or reception.  Beamforming can be used to select desired sound sources, while rejecting unwanted sounds.  In an audio conferencing system, beamforming can be used to select, or focus on, a participant's voice, while rejecting noise and interfering speech from other directions, which provides superior audio performance and clarity.

32.     Another related and important technology in audio conferencing is acoustic echo cancellation.  This technology improves audio quality by reducing or preventing echo from being created or reducing/removing it after it is already present.  For example, from the perspective of remote audio conferencing participants, their own voices are recreated by loudspeakers in the conference room, and these audio signals are also then picked up by the microphones in the room and sent back the remote participants, causing an undesirable echo.  Acoustic echo cancellation involves recognizing that echo, then reducing or removing it by subtracting it from the transmitted signal.

33.   ClearOne is at the forefront of integrating beamforming microphone arrays with acoustic echo cancellation.  ClearOne's '186 Patent covers a conferencing apparatus that combines a beamforming microphone array with an acoustic echo canceller and, among other things, inhibits the changing of the selection of the combined echo cancelled signals while only the far end signal is active, as well as other embodiments.

34.   The '186 Patent employs a "hybrid" method, wherein microphone signals are beamformed into a plurality of fixed beams, and echo cancellation is then applied to those fixed beams.  This allows the echo cancelers to avoid continuous learning based on the changing characteristics of the beamformer, but also avoids having to increase the number of echo cancelers when the number of microphones is increased, two problems which plague other methods.

35.   ClearOne currently employs the technology in the '186 Patent in its Beamforming Microphone Array and CONVERGE Pro products, both of which are now in their second generation.

36.   ClearOne's investments in technology and its reputation as a leader and innovator is harmed by ongoing unauthorized use of its technology.

**COUNTERCLAIM DEFENDANTS' WILLFUL INFRINGEMENT**

37.   On March 10, 2017, ClearOne's counsel wrote to Christine Schyvinck, President and CEO of Shure; Matt Czyzewski, President and CEO of Biamp; and Joe Pham, President and CEO of QSC, to notify them of the existence of the '424 Application and the fact that the USPTO had provided ClearOne a Notice of Allowance.  ClearOne alerted each company as to the scope of the '424 Application, including the allowed claims.  ClearOne also stated its belief that the Shure Microflex Advance beamforming microphone array combined with the Biamp

Tesira or QSC Q-SYS audio processors were covered by the allowed claims of the '424

Application and provided a detailed 18-page claim chart that set forth the publicly available

evidence demonstrating Defendants' infringement.  The claim chart is attached as Exhibit B.

ClearOne also demanded that each company cease and desist from any activities that would

infringe upon ClearOne's patent rights.

     38.    On March 21,2017, Shure responded with a short letter indicating that they

received ClearOne's March 10 letter and were still investigating its merits.  By letter with the

same date, counsel for Biamp sent counsel for ClearOne a three-sentence note, indicating that

they had received the March 10 letter, were investigating its merits, and planned to respond in

due course.  Prior to the '186 Patent's issue, QSC never responded to the March 10 letter.

     39.    On April 10, 2017, Shure requested a call with ClearOne to discuss the issues

raised in ClearOne's March 10 letter, and ClearOne proposed a call on April 18 or 19.

     40.    Rather than respond to ClearOne's offer to discuss the matter, Shure instead sent

another letter on April 17, 2017, stating that they had completed their review of ClearOne's

March 10 letter and claiming that Shure's products did not infringe the '424 Application.

Despite having the benefit of ClearOne's detailed claim charts, Shure did not provide any

explanation as to why they believed that Shure's products did not infringe the allowed claims of

the '424 Application.

     41.    There had been no further communications with Shure, Biamp, or QSC before the

'186 Patent issued on April 25, 2017.  On the same day, this lawsuit ensued.

## COUNT I

### Counterclaim for Relief for Patent Infringement of the '186 Patent
### (Against All Counterclaim Defendants)

     42.    ClearOne incorporates by reference paragraphs 1 through 41.

43.     ClearOne is the owner of all rights, title, and interest in the '186 Patent.  The '186 Patent issued on April 25, 2017.

44.     The '186 Patent is valid and enforceable.

45.     Counterclaim Defendant Shure manufactures, uses, offer to sell, and sells beamforming microphones.  Shure advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell, integrated systems consisting of Shure's beamforming microphones (such as the Shure Microflex Advance Array microphone) and acoustic echo cancellation products from other companies (such as QSC's Q-SYS platform and Biamp's Tesira/TesiraFORTE audio processors and software).  These integrated systems perform beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '186 Patent.  Indeed, Shure has announced partnerships with several AV hardware and software providers, including both Biamp and QSC, to manufacture and sell these integrated systems.  Shure thereby participates in joint infringement, contributory infringement, or inducement to infringe with acoustic echo cancellation companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '186 Patent, including representative claims 1, 7, and 13 of the '186 Patent.

46.     Counterclaim Defendant Biamp manufactures, uses, offers to sell, and sells acoustic echo cancellation products.  Biamp advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell, integrated systems consisting of Biamp's acoustic echo cancellation products (such as Biamp's Tesira/TesiraFORTE audio processors and software) and other companies' beamforming microphones (such as the Shure Microflex Advance Array Microphone).  These integrated systems perform beamforming operations that combine

microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '186 Patent.  Indeed, Biamp has announced partnerships with beamforming microphone providers such as Shure to manufacture and sell these integrated systems.  Biamp thereby participates in joint infringement, contributory infringement, and/or inducement to infringe with microphone companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '186 Patent, including representative claims 1, 7, and 13 of the '186 Patent.

47.    Counterclaim Defendant QSC manufactures, uses, offers to sell, and sells acoustic echo cancellation products.  QSC advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell, integrated systems consisting of QSC's acoustic echo cancellation products (such as QSC's Q-SYS platform) and other companies' beamforming microphones (such as the Shure Microflex Advance Array Microphone).  These integrated systems perform beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '186 Patent.  Indeed, QSC has announced partnerships with beamforming microphone providers such as Shure to manufacture and sell these integrated systems.  QSC thereby participates in joint infringement, contributory infringement, or inducement to infringe with microphone companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '186 Patent, including representative claims 1, 7, and 13 of the '186 Patent.

48.    Each Counterclaim Defendant knew of the '424 Application, which issued as the '186 Patent, prior to the filing of this action at least due to ClearOne's identification of the '424 Application to Counterclaim Defendants in the March 10, 2017 letter that was sent to each

Counterclaim Defendant's respective chief executive officer.

49.      Counterclaim Defendants' infringement is willful.

50.      ClearOne has suffered and continues to suffer damages and irreparable harm

because of Counterclaim Defendants' past and ongoing infringement.

51.      Unless Counterclaim Defendants' infringement is enjoined, ClearOne will

continue to be damaged and irreparably harmed.

52.      ClearOne meets the criteria for, and is entitled to, temporary, preliminary, and

permanent injunctive relief.

## COUNT II

### Conditional Counterclaim for Relief for Patent Infringement of the '553 Patent
### (Against All Counterclaim Defendants)

ClearOne has moved to dismiss Shure's declaratory judgment claim against United States

Patent No. 9,264,553 (the "'553 Patent."). Contingent on the Court's consideration of such

motion and the Court's denial of it, ClearOne asserts the following conditional Counterclaim

within the time period for doing so as a matter of right in order to preserve such claim.

53.      ClearOne incorporates by reference paragraphs 1 through 52.

54.      ClearOne is the owner of all rights, title, and interest in the '553 Patent. The '553

Patent issued on February 16, 2016.

55.      The '553 Patent is currently pending reissuance.

56.      Counterclaim Defendant Shure manufactures, uses, offer to sell, and sells

beamforming microphones. Shure advertises, encourages, and instructs its customers to make,

use, offer to sell, and/or sell, integrated systems consisting of Shure's beamforming microphones

(such as the Shure Microflex Advance Array microphone) and acoustic echo cancellation

products from other companies (such as QSC's Q-SYS platform and Biamp's

Tesira/TesiraFORTE audio processors and software).  These integrated systems perform beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '553 Patent.  Indeed, Shure has announced partnerships with several AV hardware and software providers, including both Biamp and QSC, to manufacture and sell these integrated systems.  Shure thereby participates in joint infringement, contributory infringement, or inducement to infringe with acoustic echo cancellation companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '553 Patent.

57.     Counterclaim Defendant Biamp manufactures, uses, offers to sell, and sells acoustic echo cancellation products.  Biamp advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell, integrated systems consisting of Biamp's acoustic echo cancellation products (such as Biamp's Tesira/TesiraFORTE audio processors and software) and other companies' beamforming microphones (such as the Shure Microflex Advance Array Microphone).  These integrated systems perform beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '553 Patent.  Indeed, Biamp has announced partnerships with beamforming microphone providers such as Shure to manufacture and sell these integrated systems.  Biamp thereby participates in joint infringement, contributory infringement, and/or inducement to infringe with microphone companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '553 Patent.

58.     Counterclaim Defendant QSC manufactures, uses, offers to sell, and sells acoustic echo cancellation products.  QSC advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell, integrated systems consisting of QSC's acoustic echo cancellation products (such as QSC's Q-SYS platform) and other companies' beamforming microphones (such as the Shure Microflex Advance Array Microphone).  These integrated systems perform beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals, in addition to other operations in the '553 Patent.  Indeed, QSC has announced partnerships with beamforming microphone providers such as Shure to manufacture and sell these integrated systems.  QSC thereby participates in joint infringement, contributory infringement, or inducement to infringe with microphone companies to manufacture, make, use, sell, offer for sale, or import integrated systems that embody one or more claims of the '553 Patent.

59.     ClearOne has suffered and continues to suffer damages and irreparable harm because of Counterclaim Defendants' past and ongoing infringement.

60.     Unless Counterclaim Defendants' infringement is enjoined, ClearOne will continue to be damaged and irreparably harmed.

61.     ClearOne meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, ClearOne respectfully asks that the Court enter judgment against Counterclaim Defendants as follows:

A.     That Counterclaim Defendants Shure, Biamp, and QSC have infringed (either literally or under the doctrine of equivalents), jointly, and/or indirectly, by way of

- 19 -

inducing or contributing to the infringement of, one or more claims of ClearOne's '186 and '553 Patents;

B.  That Counterclaim Defendants infringement of the '186 Patent was willful;

C.  For temporary, preliminary, and permanent injunctive relief enjoining Counterclaim Defendants and their officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with them, from infringement, inducing the infringement, or contributing to the infringement of the '186 and '553 Patents;

D.  For an award to ClearOne for its damages, costs, expenses, and prejudgment and post-judgment interest for Counterclaim Defendants' infringement of the '186 and '553 Patents as provided under 35 U.S.C. §§ 154(d) and 284;

E.  For an award to ClearOne for enhanced damages equal to treble the amount of actual damages, for the willful nature of Counterclaim Defendants' acts of infringement as to the '186 Patent, with notice being made at least as early as the date of the filing of the complaint, as provided under 35 U.S.C. § 284;

F.  That this be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that ClearOne be awarded its reasonable attorneys' fees against Counterclaim Defendants;

G.  For any and all other relief to which ClearOne may show itself to be entitled.

Dated: May 30, 2017

By:    /s/   Garret A. Leach

Garret A. Leach, P.C. (IL Bar No. 6237520)
garret.leach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Alexander C.D. Giza, *pro hac vice*
agiza@hueston.com
Hueston Hennigan LLP
523 West 6th Street, Suite #400
Los Angeles, CA 90014
Telephone: (213) 788-4340

*Attorneys for Defendant ClearOne, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, hereby certify that on May 30, 2017, the foregoing document was filed electronically through the Court's Electronic Case Filing System.  Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.


By: __/s/ Garret A. Leach_____

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ClearOne, Inc.,

      Plaintiff,

vs.

Shure Incorporated,

      Defendant.

Case Number 19-cv-2421

Jury Trial Demanded

## COMPLAINT FOR PATENT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

Plaintiff ClearOne, Inc. ("ClearOne") files this Complaint against Defendant Shure Incorporated ("Shure"), and alleges as follows:

### INTRODUCTION

1.      ClearOne brings this action to stop Shure from its predatory actions against ClearOne, including wrongful and willful infringement of ClearOne's market-leading, patented audio conferencing technologies and intentional misappropriation of ClearOne's valuable trade secrets related to its products.[1]

2.      Despite being a small public company, ClearOne had grown into the global market leader in the installed audio conferencing market and a leading provider of premium audio conferencing systems and other related products for audio, video, and web conferencing applications.  As a market leader, ClearOne is focused on developing cutting-edge conferencing and collaboration products.  Through decades of innovation, investment, and effort by

---

[1] Pursuant to Shure's objection to public disclosure of internal Shure documents and related material, ClearOne has redacted references to specific evidence of Shure's trade secret misappropriation from the public version of this Complaint.

- 1 -

ClearOne's inventors and engineers, ClearOne has developed industry-leading products and a portfolio of approximately 100 issued patents and pending patent applications.

3.      No later than 2010, ClearOne inventors conceived and developed a beamforming microphone conferencing system that was designed to replace up to a dozen individual microphones with a compact beamforming microphone array that could be placed overhead or otherwise out of the way and yet have superior audio quality and clarity.  Over the next several years, ClearOne developed this beamforming microphone conferencing system and also conceived and developed other inventions involving related technology. In 2012, ClearOne was first to market with this beamforming audio conferencing technology – the Beamforming Microphone Array ("BMA") audio conferencing system – which combined beamforming with acoustic echo cancellation and adaptive steering or smart beam selection to provide superior audio performance and clarity.



4.      To protect its industry-leading technology, ClearOne filed provisional and utility patent applications, including United States Patent Application No. 13/493,921 (the "'921 Application") entitled "Methods and Apparatuses for Echo Cancelation with Beamforming Microphone Arrays."  The '921 Application issued as United States Patent No. 9,264,553 (the "'553 Patent").  A true and correct copy of the '553 Patent is included as Exhibit A.

5.      Once it was ready to sell the BMA, ClearOne encountered the issue of how to price the BMA conferencing system.  Since ClearOne's beamforming microphone conferencing

- 2 -

system was unique in the market, there was little precedent for what ClearOne should charge for the system. Accordingly, ClearOne spent significant time and effort developing highly confidential pricing lists for the BMA, including standard discounts to appeal to manufacturer representatives, dealers, resellers, and distributors, and special pricing to drive sales of this new product.

6.     These highly confidential price lists carry significant value to ClearOne, and a competitor's access to these price lists would harm ClearOne's ability to compete. By maintaining the price lists confidentially, ClearOne is able to offer preferential pricing and confidential discounts. Indeed, even ClearOne partners are not permitted to share pricelists with other partners because pricing differs among different ClearOne partners. This enables ClearOne to sell more of its products and thereby positions ClearOne as the most price-effective solution. And it allows ClearOne to maintain fair pricing among various partners and partner levels. If the price lists were made public or released to ClearOne's competitors, the competitors could simply undercut ClearOne's prices (or offer more advantageous bundle pricing) and thereby steal customers that could have otherwise bought ClearOne products. And by continually undercutting ClearOne prices, the competitors would gain goodwill and reputational benefits by appearing to be more price-competitive than ClearOne. In addition, knowing ClearOne's price lists would help the competitors better position their products in the market and save significant time in price discovery (a process where the manufacturer keeps adjusting prices to get the desired sales volume).

7.     Accordingly, ClearOne maintains these lists as trade secrets, including by restricting access to them both internally and externally to only those who need to use or see them (those with a "need to know") in order to further ClearOne's business. And before sharing

- 3 -

these highly confidential price lists with a limited number of manufacturer representatives, dealers, resellers, distributors, and employees, ClearOne marks them "Confidential" and includes strict confidentiality clauses in its contracts to protect the price lists from disclosure.

8.      Due to the innovative nature of ClearOne's BMA and the BMA's significant commercial success upon entry into the market, ClearOne has been recognized several times for its continued innovation and excellence in the installed audio conferencing market.

9.      Shure is a large microphone and audio company that sells products throughout the world.  Witnessing the success of the ClearOne BMA in the audio conferencing market, Shure embarked on a coordinated campaign to capture market share from ClearOne.  But it went about doing so in an unfair and improper manner.  Within three years of the BMA's release, Shure released its own competing products: the MXA910 Ceiling Microphone Array ("MXA910") and the Microflex Advance Table Array microphone (the "MXA310").   The MXA910 and MXA310, as designed and operated, make pervasive use of ClearOne's patented technology and infringe ClearOne's '553 Patent.

10.      

11.      ClearOne files this Complaint to hold Shure responsible for its deleterious

conduct and prevent it from further harming ClearOne.  ClearOne seeks injunctive relief barring

Shure from infringing ClearOne's patented technology and from further acquiring and using

ClearOne's trade secrets, damages for Shure's past infringement and trade secret

misappropriation, punitive and treble damages to hold Shure responsible for its conduct, and

ClearOne's attorneys' fees and costs associated with this action.

## JURISDICTION AND VENUE

12.     ClearOne's claim for patent infringement arises under the Patent Laws of the

United States, 35 U.S.C. § 101 et seq.  ClearOne's claim for trade secret misappropriation arises

under the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.  Accordingly, this Court has

subject matter jurisdiction over this Complaint and Shure pursuant to 28 U.S.C. §§ 1331,

1338(a), 1367.

13.     This Court has personal jurisdiction over Shure in this matter.  Among other

things, Shure's headquarters are located at 5800 West Touhy Avenue in Niles, Illinois 60714 and

it regularly transacts business in Illinois.  Shure has also caused injury to ClearOne in Illinois

through its willful patent infringement and trade secret misappropriation.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) & (c) and/or 1400(b).

## PARTIES

### ClearOne, Inc.

15.     ClearOne is a small public corporation, incorporated in Utah, with a principal

place of business at 5225 Wiley Post Way, Suite 500, Salt Lake City, Utah 84116.

16.     ClearOne was founded in 1983.  Since its inception, ClearOne has grown to

become a company dedicated to the design, development, marketing, and sales of conferencing,

collaboration, and network streaming solutions for voice and visual communications.  ClearOne

- 5 -

has created hundreds of new products that improve people's ability to collaborate and communicate, whether they are in the same room or on opposite sides of the globe.

17.    ClearOne's commitment to innovation and quality in the field of voice and visual communication solutions is well known.  ClearOne has developed several industry firsts including, but not limited to:

- First professional-grade Beamforming Microphone Array;

- First product to use Distributed Acoustic Echo Cancellation in an audio conferencing system;

- First conference phone to provide wireless conferencing;

- First fully-scalable conference phones that daisy-chain multiple phone units;

- First product to bridge the wide price/performance gap that existed between plug-and-play tabletop conferencing phones and professionally-installed audio conferencing systems; and

- First product that is a complete professional video collaboration system with state-of-the-art audio and video technology, and a patented ceiling tile beamforming mic array designed for medium and large meeting rooms.

18.    Today, installed audio conferencing is one of ClearOne's core businesses, and, before Shure's willful infringement and misappropriation, ClearOne had become the market leader in that field, with over 50% of the global market.  ClearOne's products have been used by thousands of organizations worldwide, including schools, government entities, medical facilities, law firms, businesses, and houses of worship.

**Shure Incorporated**

19.    Shure is a private corporation, incorporated in Illinois, with its principal place of

- 6 -

business at 5800 W. Touhy Avenue, Niles, Illinois 60714.

20.    Shure designs and manufactures audio systems.  Shure's products include wireless and wired microphone systems, digital signal processors, and personal monitor systems, among others.  Shure is a competitor of ClearOne.

21.    Shure advertises, encourages, and instructs its customers to make and use integrated systems consisting of its beamforming microphones (such as the Shure MXA910 and MXA310), as well as acoustic echo cancellation products from other companies (such as QSC's Q-SYS platform and Biamp's Tesira/TesiraFORTE audio processors and software).

22.    The performance of these integrated systems plays a key role in Shure's ability to compete effectively in the audio-visual conferencing market.

23.    Shure is aware that ClearOne has patents relating to beamforming audio conferencing systems.

24.    ████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

## RELEVANT NONPARTIES

## Biamp Systems Corporation

25.    Biamp is a private corporation, incorporated in Delaware, with a principal place of business at 9300 S.W. Gemini Drive, Beaverton, Oregon 97008.

26.    Biamp designs and manufactures audio and video systems.  Biamp's products include networked digital audio platforms, digital signal processors, and scalable media systems for digital audio networking, among others.  Biamp is a competitor of ClearOne.

27.    Biamp advertises, encourages, and instructs its customers to make and use

- 7 -

5413078

integrated systems consisting of its acoustic echo cancellation products (such as its Tesira/TesiraFORTE audio processors and software) and the Shure MXA910 and MXA310 microphones.

28.     The performance of these integrated systems plays a key role in Biamp's ability to compete effectively in the audio conferencing market.

29.     Biamp is aware that ClearOne has at least two patents relating to beamforming audio conferencing systems.

## QSC, LLC

30.     QSC is a private company organized as a California limited liability company with its principal place of business at 1675 MacArthur Blvd., Costa Mesa, California 92626.

31.     QSC designs and manufacturers audio systems.  QSC's products include power amplifiers, loudspeakers, audio DSP mixers, and networked audio and control.  QSC is a competitor of ClearOne.

32.     QSC advertises, encourages, and instructs its customers to make and use integrated systems consisting of its acoustic echo cancellation products (such as its Q-SYS platform) and the Shure MXA910 and MXA310 microphones.

33.     The performance of these integrated systems plays a key role in QSC's ability to compete effectively in the audio conferencing market.

34.     QSC is aware that ClearOne has at least two patents relating to beamforming audio conferencing systems.

## BACKGROUND OF THE TECHNOLOGY

35.     The technology at issue in this case pertains generally to the field of digital signal processing techniques, as used primarily in audio and video teleconferencing systems that are

- 8 -

often deployed in conference rooms.

36.     Beamforming, also known as spatial filtering, is a signal processing technique used in sensor arrays for directional signal transmission or reception.  Beamforming can be used to select desired sound sources, while rejecting unwanted sounds.  In an audio conferencing system, beamforming can be used to select, or focus on, a participant's voice, while rejecting noise and interfering speech, in order to provide superior audio performance and clarity.

37.     Another related and important technology in audio conferencing is acoustic echo cancellation.  Acoustic echo cancellation involves recognizing an echo, and then reducing or removing it by subtracting it from a transmitted signal.  For example, during an audio conference, the voice of a speaker on one end of a conference line is output through speakers at the other end of the conference line.  Often, that speaker output is then picked up by the microphones on the same end of the conference line, and relayed back to the original speaker as undesirable echo.  Acoustic echo cancellation reduces, eliminates, or minimizes this effect.

38.     ClearOne was at the forefront of integrating beamforming microphone arrays with acoustic echo cancellation.  ClearOne's '553 Patent covers methods and apparatuses that, among other things: (1) perform a beamforming operation that combines a plurality of microphone signals into a smaller number of combined signals that each correspond to a different fixed beam; and (2) performs an acoustic echo cancellation operation on the combined signals.

39.     The '553 Patent employs a particular "hybrid" method, wherein microphone signals are beamformed into a plurality of fixed beams, and echo cancellation is then applied to those fixed beams.  Performing the echo cancellation step on pre-formed, fixed beams minimizes the computer processing effort involved in acoustic echo cancellation, while also keeping the absolute number of echo cancellers to a minimum.  This solves two problems that plagued other

- 9 -

methods at the time of invention of the '553 Patent.

40.     Ashutosh Pandey, Darrin Thurston, David Lambert, and Tracy Bathurst, the inventors of the '553 Patent, created the methods recited therein after unsuccessful attempts to develop other beamforming and echo cancellation technologies.  For example, Mr. Pandey and his team members worked for over a year on a project that performed acoustic echo cancellation first, and then conducted beamforming using the output of each microphone signal.  This project was ultimately scrapped due to high costs, high processing requirements, and insufficient sound quality.

41.     Pandey and his co-inventors then went back to the drawing board and began developing a beamforming microphone array that would use fixed beams.  Ultimately, they realized that they could dramatically reduce processing requirements and achieve excellent sound quality by *first* using a digital signal processor ("DSP") to perform a beamforming algorithm and *then* performing AEC on the signals of each fixed beams, rather than performing AEC on the output of each microphone.  The result was a new technology with significant cost and processing improvements and excellent sound quality.  It is this new technology that is described and claimed in the '553 Patent.

42.     ClearOne currently employs the technology in the '553 Patent in its Beamforming Microphone Array and CONVERGE Pro products, both of which are now in their second generation.  ClearOne also employs the technology in its BMA CT ceiling tile beamforming microphone array, ClearOne's third-generation product.

### SHURE'S INFRINGEMENT OF CLEARONE'S '553 PATENT

43.     In or around January 2016, Shure announced the release of its MXA910 (Ceiling Array) and MXA310 (Table Array) microphones.  The microphones began shipping later that

year, in August 2016.  Shure continues to sell both microphone products today.

44.     The Shure MXA910 and MXA310 microphones utilize the technology in the '553 Patent.  Both Shure microphone products offer the same beamforming as that claimed in the '553 Patent.  Specifically, they, among other things: perform a beamforming operation with a beamforming module; combine "[m]ultiple mic elements together to produce multiple, highly-directional pickup lobes"; and combine a plurality of microphone signals such that each of the plurality of combined signals corresponds to a different fixed beam.

45.     Shure's MXA910 and MXA310 microphones also require acoustic echo cancellation ("AEC").  To provide this functionality, Shure directs end users to use digital signal processors with Shure's MXA910 and MXA310 microphones.  At first, Shure encouraged the use of QSC's Q-SYS platform and Biamp's Tesira/TesiraFORTE audio processors and software—both of which provide the required AEC—with their MXA910 and MXA310 microphones.  Now, Shure also offers its own digital signal processor, the Shure IntelliMix P300.

46.     Combined with a DSP, the Shure MXA910 and MXA310 microphones offer the same combination of beamforming and acoustic echo cancellation as ClearOne's BMA.  In fact, upon its release of the MXA910 and MXA310, Shure become the only company in the United States to sell a substantially similar beamforming microphone array to ClearOne's BMA.  Shure's infringement, on its own and in combination with others, has harmed ClearOne's investments in technology and its reputation as a leader and innovator.

### SHURE'S KNOWLEDGE AND WILLFUL PATENT INFRINGEMENT

47.     Shure has knowingly infringed and willingly continued to infringe the '553 Patent by selling its MXA910 and MXA310 products, even after challenging ClearOne's '553 Patent in federal court and unsuccessfully with the PTAB.

48.     On April 24, 2017, Shure filed an action in the U.S. District Court for the
Northern District of Illinois seeking a declaratory judgment of noninfringement and invalidity of
the '553 Patent.  *Shure Inc. v. ClearOne, Inc.*, Case No. 17-cv-03078 (N.D. Ill.).

49.     ClearOne had filed an application for reissue of the '553 Patent on April 16, 2017,
prior to Shure's complaint.  On July 14, 2017, Shure filed a petition for *Inter Partes* Review
("IPR") of the '553 Patent, and on January 29, 2018, the Patent Trial and Appeal Board
("PTAB") instituted IPR proceedings for the '553 Patent.

50.     On March 16, 2018, the Court declined to exercise jurisdiction over Shure's
declaratory judgment claim with respect to the '553 Patent, noting that "[t]he '553 patent is
currently in reissuance proceedings before the Patent and Trademark Office, and the Patent Trial
and Appeal Board recently granted *inter partes* review of the patent."  (*See Shure Inc. v.
ClearOne, Inc*., Case No. 17-cv-03078 at Dkt. 280.)

51.     On January 24, 2019, the PTAB issued its unanimous Final Written Decision for
the IPR of the '553 Patent, finding that Shure "ha[d] not demonstrated by a preponderance of the
evidence that any of [the challenged claims] are unpatentable under 35 U.S.C. §§ 103(a)."  (*See*
Case No. 17-cv-03078 at Dkt. 478, Ex. A.)  The PTAB panel which reached this decision
consisted of three technically trained administrative patent judges: Dr. Kevin Turner (Ph.D.,
Physics), Joni Chang (B.Sc., Chemical Engineering), and Arthur Peslak (M.Sc., Mechanical
Engineering).  According to a 2017 publication, Judges Chang and Turner are two of the PTAB's
most experienced patent judges; both Judge Chang and Judge Turner have presided over more
than 400 PTAB trials.

52.     Shure filed a Request for Rehearing ("Request") of the PTAB's Final Written
Decision on February 22, 2019.  Just over a month later, on March 25, 2019, the PTAB denied

Shure's Request, holding, among other things, that Shure's contentions were "without merit," "not persuasive," and "unavailing." Under the law—including 35 U.S.C. § 325(e)(2)—Shure should be estopped from asserting invalidity of the '553 Patent "on any ground that [it] raised or reasonably could have raised during th[e] post-grant review."

### SHURE'S MISAPPROPRIATION OF CLEARONE TRADE SECRETS

53.     In the audio conferencing market, two of the principal factors that market participants, including manufacturer representatives, dealers, resellers, and distributors, take into account when choosing a conferencing product are technology and pricing. As discussed above, the BMA became successful in large part due to its unique technology—yielding improved performance—and the functionalities it could offer because of that technology. But another important driver of success for the BMA—along with ClearOne's other products—was pricing.

54.     Before the BMA was first released, ClearOne spent considerable time deliberating about what the right price should be for a product with such unique technology and resultant performance. It was an arduous task, because there was no directly competitive product that it could be compared to. Accordingly, ClearOne developed pricing for the BMA by examining, among other things, the benefits the BMA offered above and beyond benefits offered by existing products at the time, costs of procuring and installing existing products, and costs of manufacturing the BMA. ClearOne then worked into its pricing tiered discounts for its manufacturer representatives, dealers, resellers, and distributors based on purchasing volume and other factors. ClearOne developed this pricing to gain a competitive advantage over other products in the market.

55.     Price lists are a "secret sauce" in the audio-visual conferencing industry. The publicly-available MSRP prices for conferencing products have only indicative value, as bids for

- 13 -

projects are rarely won based on MSRP prices.  Instead, dealers, integrators, and use resellers win bids by offering confidential discounts and preferential pricing.  Industry participants thus take significant measures and time to develop their price lists, and to ensure that they are not being released to their competitors.

56.     ClearOne memorialized its prices for the BMA and its other products in highly confidential distributor and dealer price lists, specific to each region that it operated in.  In the United States, ClearOne called these price lists "North America Pricing Guides."  Price lists in the United States were offered under different tiers, namely Distributor, Platinum Dealer, Gold Dealer and Dealer.  ClearOne shared these price lists with its manufacturer representatives, dealers, resellers, and distributors to ensure that they had up-to-date pricing—applicable to particular distributors or dealers based on the tier to which they belonged—when deciding between ClearOne and other products for end users.  And ClearOne ensured that the dealers, resellers, and distributors got access to only the price list applicable to them based on whether they were a Distributor, a Platinum Dealer, a Gold Dealer, or a Dealer.

57.     Although ClearOne had to share its highly confidential price lists to carry out its business, ClearOne took numerous steps to keep the price lists confidential, and especially to keep the price lists out of the hands of ClearOne's competitors.  It was—and is—important for ClearOne to keep the price lists secret because the price lists provide ClearOne a competitive advantage in selling its products.  ClearOne strategically uses the price lists to offer confidential discounts and preferential pricing to be competitive and win projects.  ClearOne has a clear advantage in the market when it can provide the best conferencing product at the best prices.  However, if the price lists were disclosed publicly, competitors—like Shure—could use the knowledge of ClearOne's confidential discounts and preferential pricing to undercut ClearOne's

- 14 -

prices.  The competitors would then be positioned as the more price-efficient conferencing option and would gain goodwill from manufacturer representatives, dealers, resellers, distributors, and end users at the expense of ClearOne.  In addition, even if competitors who got access to ClearOne's highly confidential price lists did not use those lists to undercut ClearOne's prices, they could use their knowledge of ClearOne's prices to, among other things, protect their price from getting too low and save time by not bidding for projects that they know, based on ClearOne's prices, would not let them obtain the required margins.  Moreover, competitors could quote a slightly lower price than they would otherwise—even if higher than ClearOne's—and then attempt to justify their only-slightly-increased price to purchasers.

58.    ClearOne's efforts to maintain the confidentiality of the price lists started with marking every page of the price lists with a "ClearOne Confidential" stamp to make it clear to any reader that the price lists were (and contained) ClearOne's confidential information.

59.    Internally, ClearOne locks down and secures access to the highly confidential price lists.  IT restricts access to the price lists to only those ClearOne employees who have a need to access and view the price lists—*e.g.*, an engineer does not have access to the price lists. If an employee without access wants to obtain access to the price lists, the employee needs to get authorization from his/her manager and then also obtain authorization from the ClearOne Sr. Vice President of Finance.   Once granted access, the employee only has access to the specific price lists they require, not every ClearOne price list.  For example, sales persons only have access to the price lists applicable to their regions.  These strict requirements are part of ClearOne's internal IT controls that are key to its public reporting and in compliance with the requirements of the Sarbanes-Oxley Act of 2002.  These practices and policies have been in place at all times relevant to this lawsuit.

60.     Moreover, ClearOne employees are, as a condition of their employment, required to execute a non-disclosure agreement in which they agree, among other things, not to improperly use and/or disclose ClearOne confidential information and trade secrets during or after the course of their employment at ClearOne.  ClearOne employees are reminded of their covenants of confidentiality throughout their employment, including in the Employee Handbook, which they need to periodically sign to acknowledge receipt and understanding.  Employees' confidentiality obligations pursuant to these signed agreements apply throughout their employment and beyond termination.

61.     Similar restrictions apply to external recipients, including sales channel partners such as manufacturer representatives, dealers, resellers, and distributors. Before sending any highly confidential price lists, ClearOne requires external recipients to sign agreements with broad confidentiality clauses that prohibit them from disclosing this confidential information to anyone outside of ClearOne's sales channel or to anyone without a need to know.  For example, one such confidentiality clause states:

> "Reseller understands and acknowledges that in order to facilitate the business arrangements contemplated by this Agreement, certain confidential and proprietary technical, financial and/or business information of ClearOne will be disclosed to Reseller. This confidential and proprietary information includes, without limitation, all proprietary inventions, sales support materials, processes, product design(s), drawing and schematics of product design(s), methods of doing business, pricing, marketing programs, and other data and information, whether patented or not, heretofore or hereafter developed or acquired by ClearOne in the course of the design, manufacture, marketing, or sale of or otherwise relating to the Products or future conceptual or unreleased products. Reseller

- 16 -

acknowledges that all ClearOne Confidential Information is the exclusive property and

trade secrets of ClearOne. Reseller agrees not to use or disclose any ClearOne

Confidential Information in any manner adverse to the best interests of ClearOne."

Finally, ClearOne only sends external partners the specific price list applicable to them, which

depends on their region and purchasing tier.  For example, a dealer in Illinois in March 2016

would only receive the North American Dealer price list for March 2016 that relates to that

dealer's partner level, not the price lists for any other region, any other period, or any other

partner level.  ClearOne transmits the highly confidential price lists via e-mail to external

partners in e-mails that state that the "electronic mail message and any attachment is

confidential."

62.  ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

63.  ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

64.  ████████████████████████████████████



65.

66.

67.

5413078

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███

68.     Shure's brazen and illegal conduct has yielded it considerable benefit. ███

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████

69.     The effects on ClearOne are also clear: among other things, lost sales and loss of goodwill due to Shure's anticompetitive behavior.

## COUNT I

### Claim for Relief for Patent Infringement of the '553 Patent

70.     ClearOne incorporates by reference paragraphs 1 through 69 and Exhibits A-G attached hereto.

71.     ClearOne is the owner of all rights, title, and interest in the '553 Patent.  The '553 Patent issued on February 16, 2016.

72.     The '553 Patent is valid and enforceable.  Indeed, under the law—including

- 19 -

35 U.S.C. § 325(e)(2)—Shure should be estopped from asserting invalidity "on any ground that [it] raised or reasonably could have raised" during the IPR Shure lost while attempting to challenge the validity of the '553 Patent.

73.     Defendant Shure manufactures, uses, offers to sell, and sells beamforming microphone arrays and digital signal processing platforms and thereby directly infringes at least one claim of the '553 Patent.  Shure advertises, encourages, and instructs its customers to make, use, offer to sell, and/or sell infringing integrated systems consisting of Shure's beamforming microphones (such as the MXA910 and MXA310) and digital signal processors that perform acoustic echo cancellation (such as Shure's IntelliMix P300, QSC's Q-SYS platform, and Biamp's Tesira/TesiraFORTE audio processors and software).  Upon information and belief, the Shure beamforming microphones practice a material part of the claimed invention of the '553 Patent, have no substantial non-infringing use, and are marketed and sold to be used together with a digital signal processor that performs acoustic echo cancellation.

74.     Shure's beamforming microphones are intended for audio and video conferencing.  *See, e.g.,* Exhibit H (Shure MXA310 User Guide Excerpt) at 1 ("The Microflex® Advance™ table array is a premium networked tabletop microphone for AV conferencing environments, including boardrooms, huddle rooms, and multi-purpose spaces."); Exhibit I (Shure MXA910 User Guide Excerpt) at 1 ("The Microflex® Advance™ Ceiling Array is a premium networked array microphone for AV conferencing environments, including boardrooms, huddle rooms, and multi-purpose spaces.").  Upon information and belief, for audio conferencing purposes, the Shure MXA910 and MXA310 beamforming microphones require acoustic echo cancellation ("AEC").  The AEC functionality is provided to the MXA910 by digital signal processors such as by Shure's IntelliMix P300, QSC's Q-SYS platform, and

Biamp's Tesira/TesiraFORTE audio processors and software.  These integrated systems thus infringe the '553 patent, including by performing beamforming operations that combine microphone signals into signals corresponding to fixed beams, and then perform acoustic echo cancellation on the combined signals.

75.     In addition, Shure has formed joint enterprises with several AV hardware and software providers, including both Biamp and QSC, to manufacture and sell these infringing integrated systems to customers.  *See, e.g.*, Exhibit J (2017-02-07 Press Release) ("Shure Expands Partnership Program With Leading AV Hardware and Software Providers … [including] Biamp, QSC …."); Exhibit K (QSC-Shure Software Integration Alliance (accessed Apr. 9, 2019)) ("Shure and QSC have co-developed a control plugin for their Microflex Wireless microphone series."  In addition, specific microphones in the Shure catalog, including the Microflex Wireless series, can pass audio to the Q-SYS Platform via AES67, all without additional Dante I/O card hardware."); Exhibit L (2017-01-09 Press Release) ("QSC, LLC and Shure Incorporated are proud to announce an expanded level of integration between Shure Microflex® Advance™ and Microflex® Wireless microphones with the entire Q-SYS™ Platform. The partnership includes the release of new control plug-ins for the Shure MXA910 Ceiling Array Microphone and Microflex Wireless microphone systems."); Exhibit M (2016-12-06 Press Release) (Biamp is "excited to come together with an industry leader like Shure in an effort to streamline the integration of [their] products"; "Adding Shure microphone-specific software blocks to [Biamp] Tesira's cutting-edge software made sense; it allows system designers to easily incorporate the power of Shure mics with the power of [Biamp] Tesira."); Exhibit N (2018-10-02 Biamp Article) ("The purpose of this article is to provide a starting point to aid in the successful deployment of the [Biamp] TesiraFORTÉ DAN with Shure

- 21 -

MXA910 and/or MXA310 microphone arrays."); Exhibit O (Shure Q&A) (answering that customers can use QSC Qsys with MXA310). Shure thereby jointly infringes one or more claims of the '553 Patent, including claims 1, 8, and 15 of the '553 Patent, by conditioning the receipt of a benefit to the end user on performing the steps outlined in the '553 Patent. And Shure uses, offers to sell and/or sells in the United States, and/or imports into United States, the infringing integrated systems.

76.    Shure has also induced and continues to induce infringement of one or more claims of the '553 Patent, including, without limitation, claims 1, 8, and 15 of the '553 Patent, by supplying, advertising and/or providing instructions for the infringing integrated systems with the specific intent that its customers infringe the '553 Patent despite knowledge that its customers' induced acts infringe the '553 Patent. Shure has also contributorily infringed and continues to contributorily infringe one or more claims of the '553 Patent, including, without limitation, claims 1, 8, and 15 of the '553 Patent, by, despite its knowledge of the '553 Patent, offering to sell and selling within the United States, or importing into the United States, material components of the claimed invention in the '553 Patent that have no substantial non-infringing use to Shure's customers, knowing such components are especially made or adapted for use to infringe the '553 Patent.

77.    In addition, upon information and belief, Shure has supplied and continues to supply—from the United States to foreign countries—the individual components (including hardware, software, and firmware) of the MXA910, MXA310, and IntelliMix P300 which constitute all or a substantial portion of the components of the apparatus claimed in the '553 Patent. Shure is inducing the combination of these individual components—into the apparatus claimed in the '553 Patent—outside of the United States in at least Shure's Juarez, Mexico

manufacturing plant.

78.     Upon information and belief, Shure has also supplied and continues to supply—from the United States to foreign countries including but not limited to China, Brazil, and Germany—the completed MXA910, MXA310, and IntelliMix P300, which individually constitute a substantial portion of the components of the '553 Patent. Shure is inducing its customers into combining the MXA910 and MXA310 with the P300, Tesira/TesiraFORTE, or Q-SYS audio DSP mixers outside of the United States.

79.     Shure is intending and inducing each of the aforementioned combinations despite its knowledge that these combinations would infringe the '553 Patent if they occurred in the United States.

80.     In addition, upon information and belief, Shure has supplied and continues to supply—from the United States to foreign countries including but not limited to China, Brazil, and Germany—the MXA910 and MXA310 microphones, despite knowing that it is not a staple article suitable for substantial noninfringing use, but is especially made or adapted for use in an infringing combination with the P300, Tesira/TesiraFORTE, or Q-SYS.  Shure is intending that the MXA910 and MXA310 be combined with the P300, Tesira/TesiraFORTE, or Q-SYS.

81.     Shure is intending and inducing each of the aforementioned combinations despite its knowledge that these combinations would infringe the '553 Patent if they occurred in the United States.

82.     Shure knew of the '921 Application, including after its issuance as the '553 Patent.  Indeed, Shure filed litigation against ClearOne relating to the '553 Patent.

83.     Shure's infringement is willful.

84.     ClearOne has suffered and continues to suffer damages and irreparable harm

- 23 -

because of Shure's past and ongoing infringement.

85.     Unless Shure's infringement is enjoined, ClearOne will continue to be damaged and irreparably harmed.  ClearOne meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT II

### Claim for Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.)

86.     ClearOne incorporates by reference paragraphs 1 through 85 and Exhibits A-O attached hereto.

87.     ClearOne's highly confidential price lists constitute protectable trade secrets under the federal Defend Trade Secrets Act, codified at 18 U.S.C. § 1836 et seq. ("DTSA"). ClearOne's successful business is directly dependent upon maintaining the secrecy of its trade secrets and other confidential and proprietary information.  ClearOne's nonpublic price lists for its products are business and economic information.  The price lists derive independent economic value from being nonpublic because they provide ClearOne a competitive advantage in being able to offer preferable pricing to sell its products.  If the price lists were publicly available, ClearOne's competitors would be able to use the price lists to, among other things, undercut ClearOne and win sales and harm ClearOne's ability to maintain fair and orderly pricing among its channel partners.

88.     ClearOne's highly confidential price lists are meant to be used to sell ClearOne's products throughout the United States and worldwide.  Accordingly, ClearOne's trade secrets at issue are related to a product or service used in, or intended for use in, interstate commerce.

89.     ClearOne takes reasonable measures to keep its highly confidential price lists confidential.  For example, it includes broad confidentiality provisions in its contracts with

manufacturer representatives, dealers, resellers, and distributors to ensure that they do not share the price lists outside of the ClearOne sales channel.  Moreover, ClearOne routinely marks the dealer price lists "Confidential" to make it clear that the price lists are not meant to be shared outside of those with a need to know.  ClearOne also restricts the dissemination of price lists both internally at ClearOne and externally to manufacturer representatives, dealers, resellers, and distributors.  Only employees with express authorization of the Sr. Vice President of Finance and their manager are authorized access to the price lists and, even then, only the specific price lists they require.  With respect to external persons, only those specific price lists are shared that will assist the manufacturer representatives, dealers, resellers, and distributors in selling ClearOne products and the e-mail transmittal of the price lists contains language making clear to the recipient that the communication and attachment are confidential.

90. ██████████████████████████████
████████████████████████████████████
███████████████████████████████
████████████████████████████████
████████████████████████████████
███████████████████████████████
███████████████████████████████
██████████████████████████

91. ██████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

- 25 -



92. 

Shure's conduct caused ClearOne to lose sales that it would have otherwise not lost, if not for Shure's misappropriation.

93.     As a proximate result of Shure's misappropriation, ClearOne has suffered, and will continue to suffer, actual damages, and Shure will be unjustly enriched, in sums not yet ascertained.  ClearOne has also suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

94.     Shure's misappropriation was intentional, malicious, and in bad faith.  It has subjected and will continue to subject ClearOne to unjust hardship in conscious disregard of ClearOne's rights, so as to justify an award of exemplary and punitive damages according to proof at trial.  Under the DTSA, ClearOne is entitled to recover its reasonable attorneys' fees as a result of Shure's willful and malicious misappropriation.

### COUNT III

**Claim for Misappropriation of Trade Secrets
Under the Illinois Trade Secrets Act (765 ILCS 1065)
(Against Shure)**

95.     ClearOne incorporates by reference paragraphs 1 through 94 and Exhibits A to O attached hereto.

96.     ClearOne's highly confidential price lists constitute protectable trade secrets, as defined in the Illinois Trade Secrets Act ("ITSA") at 765 ILCS 1065/2(d).  ClearOne's successful business is directly dependent upon maintaining the secrecy of its trade secrets and other confidential and proprietary information.  ClearOne's nonpublic dealer price lists for its products are business and economic information.  The price lists derive independent economic value from being nonpublic because they provide ClearOne a competitive advantage in being able to offer preferable pricing to sell its products.  If the price lists were publicly available, ClearOne's competitors would be able to use the price lists to, among other things, undercut ClearOne and win sales and harm ClearOne's ability to maintain fair and orderly pricing among its channel partners.

97.     ClearOne takes reasonable measures to keep its price lists highly confidential.  For example, it includes broad confidentiality provisions in its contracts with manufacturer representatives, dealers, resellers, and distributors to ensure that they do not share the price lists outside of the ClearOne sales channel.  Moreover, ClearOne routinely marks the dealer price lists "Confidential" to make it clear that the price lists are not meant to be shared publicly.  ClearOne also restricts the dissemination of price lists both internally at ClearOne and externally to manufacturer representatives, dealers, resellers, and distributors.  Only employees with express authorization of the Sr. Vice President of Finance and their manager are authorized access to the price lists and, even then, only the specific price lists they require.  With respect to external persons, only those specific price lists are shared that will assist the manufacturer representatives, dealers, resellers, and distributors in selling ClearOne products and the e-mail transmittal of the price lists contains language making clear to the recipient that the communication and attachment are confidential.

- 27 -

98. 

99.

100.

Shure's conduct caused ClearOne to lose sales that it would have otherwise not lost, if not for Shure's misappropriation.

101.

5413078

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

102.    As a proximate result of Shure's misappropriation, ClearOne has suffered, and will continue to suffer, actual damages, and Shure will be unjustly enriched, in sums not yet ascertained.  ClearOne has also suffered and will continue to suffer immediate and irreparable harm and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

103.    Shure's misappropriation was intentional, malicious, and in bad faith.  It has subjected and will continue to subject ClearOne to unjust hardship in conscious disregard of ClearOne's rights, so as to justify an award of exemplary and punitive damages according to proof at trial.  Under the ITSA, ClearOne is entitled to recover its reasonable attorneys' fees as a result of Shure's willful and malicious misappropriation.

**PRAYER FOR RELIEF**

WHEREFORE, ClearOne respectfully asks that the Court enter judgment against Shure as follows:

A.    That Shure has infringed (either literally or under the doctrine of equivalents), directly, jointly, and/or indirectly by way of inducing or contributing to the infringement of, one or more claims of ClearOne's '553 Patent;

B.    That Shure's infringement of the '553 Patent was willful;

C.    For temporary, preliminary, and permanent injunctive relief enjoining Shure and its officers, directors, agents, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with

- 29 -

it, from infringement, inducing the infringement, or contributing to the infringement of the '553 Patent;

D.     For an award to ClearOne for its damages, costs, expenses, and prejudgment and post-judgment interest for Shure's infringement of the '553 Patent as provided under 35 U.S.C. §§ 154(d) and 284;

E.     For an award to ClearOne for enhanced damages equal to treble the amount of actual damages, for the willful nature of Shure's acts of infringement as to the '553 Patent, with notice being made at least as early as the date of the filing of the complaint, as provided under 35 U.S.C. § 284;

F.     That this be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that ClearOne be awarded its reasonable attorneys' fees against Shure;

G.     That Shure has misappropriated ClearOne's trade secrets under the DTSA, 18 U.S.C. § 1836, and ITSA, 765 ILCS 1065;

H.     For an award of actual loss, unjust enrichment, and/or reasonable royalty under the DTSA, 18 U.S.C. § 1836(b)(3), and ITSA, 765 ILCS 1065/4;

I.     For injunctive relief and/or an imposition of a reasonable royalty as compensation for future use, under the DTSA, 18 U.S.C. § 1836(b)(3), and ITSA, 765 ILCS 1065/3;

J.     For an award of reasonable attorney's fees under the DTSA, 18 U.S.C. § 1836(b)(3)(D), and ITSA, 765 ILCS 1065/5; and

For any and all other relief to which ClearOne may show itself to be entitled.


Dated: April 10, 2019               By:   _/s/    Garret A. Leach_____

- 30 -

5413078

John C. Hueston, *pro hac application forthcoming*
Douglas J. Dixon, *pro hac application forthcoming*
Christina V. Rayburn, *pro hac application forthcoming*
Sourabh Mishra, *pro hac application forthcoming*
jhueston@hueston.com
ddixon@hueston.com
crayburn@hueston.com
smishra@hueston.com
Hueston Hennigan LLP
523 West 6th Street, Suite #400
Los Angeles, CA 90014
Telephone: (213) 788-4340

And

Garret A. Leach, P.C.
(IL Bar No. 6237520)
garret.leach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for ClearOne, Inc.*

# EXHIBIT D

CONTACT US
(/)

HOST A MEETING (HTTPS://WWW.COLLABORATESPACE.NET/#/HOSTMEETING)

JOIN A MEETING (HTTPS://WWW.COLLABORATESPACE.NET/#/MEETING)

LOGIN (/USER/LOGIN?CURRENT=CONTACT_US)



# Contact Us

LET'S CHAT

First Name

Last Name

Email

Company

Phone

How can we help you?

**SUBMIT**

### SLC Corporate Headquarters

**US & Canada:**

**Main:** 1-801-975-7200 (skype:+18019757200)

**Fax:** 1-801-303-5711

**Email: contact@clearone.com**



LET'S CHAT

## Subscribe to our Blog

Enter Email                                    **SUBSCRIBE**



Edgewater Corporate Park South Tower

5225 Wiley Post Way, Suite 500

Salt Lake City, UT 84116

# Phone: 1-801-975-7200

All rights reserved © ClearOne Inc. 2019

**Privacy Policy** **(/privacy-policy)**

LET'S CHAT

# EXHIBIT E

10-K 1 clro20181231_10k.htm FORM 10-K

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# Form 10-K

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2018

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

Commission file number 001-33660

# CLEARONE, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **87-0398877** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. employer identification number) |
| **5225 Wiley Post Way, Suite 500, Salt Lake City, Utah** | **84116** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (801) 975-7200

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name on each exchange on which registered** |
|---|---|
| Common Stock, $0.001 par value | The NASDAQ Capital Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☐Yes ☒No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. ☐Yes ☒No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒Yes ☐No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒Yes ☐No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Larger Accelerated Filer ☐                          Accelerated Filer ☐
Non-Accelerated Filer ☐                             Smaller Reporting Company ☒
                                                    Emerging Growth Company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell Company (as defined in Rule 12b-2 of the Act). ☐Yes ☒No

Table of Contents

The aggregate market value of the shares of voting common stock held by non-affiliates was approximately $16.8 million at June 30, 2018, (the Company's most recently completed second fiscal quarter), based on the $3.85 closing price for the Company's common stock on the NASDAQ Capital Market on such date. For purposes of this computation, all officers, directors, and 10% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed to be an admission that such officers, directors, or 10% beneficial owners are, in fact, affiliates of the registrant.

The number of shares of ClearOne common stock outstanding as of April 12, 2019 was 16,630,597.

DOCUMENTS INCORPORATED BY REFERENCE

Information required by Part III is incorporated by reference from registrant's proxy statement for the 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of its fiscal year ended December 31, 2018.

Table of Contents

# CLEARONE, INC.

## Annual Report on Form 10-K For the year ended December 31, 2018

## Table of Contents

|  |  |  | Page |
|---|---|---|---|
|  | **PART I** |  |  |
| Item 1. | Business | | 1 |
| Item 1A. | Risk Factors | | 11 |
| Item 1B. | Unresolved Staff Comments | | 20 |
| Item 2. | Properties | | 20 |
| Item 3. | Legal Proceedings | | 20 |
| Item 4. | Mine Safety Disclosures | | 20 |
|  | **PART II** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | | 21 |
| Item 6. | Selected Financial Data | | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 22 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | | 30 |
| Item 8. | Financial Statements and Supplementary Data | | 30 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | | 30 |
| Item 9A. | Controls and Procedures | | 30 |
| Item 9B. | Other Information | | 31 |
|  | **PART III** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | | 32 |
| Item 11. | Executive Compensation | | 32 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | | 32 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | | 32 |
| Item 14. | Principal Accounting Fees and Services | | 32 |
|  | **PART IV** |  |  |
| Item 15. | Exhibits, Financial Statement Schedules | | 33 |
| Item 16. | Form 10-K Summary | | 33 |

[Table of Contents](#)

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This report contains forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. These statements reflect our views with respect to future events based upon information available to us at this time. These forward-looking statements are subject to uncertainties and other factors that could cause actual results to differ materially from these statements. Forward-looking statements are typically identified by the use of the words "believe," "may," "could," "will," "should," "expect," "anticipate," "estimate," "project," "propose," "plan," "intend," and similar words and expressions. Examples of forward-looking statements are statements that describe the proposed development, manufacturing, and sale of our products; statements that describe expectations regarding pricing trends, the markets for our products, our anticipated capital expenditures, our cost reduction and operational restructuring initiatives, and future impact of regulatory developments; statements with regard to the nature and extent of competition we may face in the future; statements with respect to the anticipated sources of and need for future financing; and statements with respect to future strategic plans, goals, and objectives and forecasts of future growth and value. Forward-looking statements are contained in this report under "Business" included in Item 1 of Part I, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in Item 7 of Part II of this Annual Report on Form 10-K. The forward-looking statements are based on present circumstances and on our predictions respecting events that have not occurred, that may not occur, or that may occur with different consequences and timing than those now assumed or anticipated. Actual events or results may differ materially from those discussed in the forward-looking statements as a result of various factors, including the risk factors discussed in this report under the caption "Item 1A Risk Factors." These cautionary statements are intended to be applicable to all related forward-looking statements wherever they appear in this report. The cautionary statements contained or referred to in this report should also be considered in connection with any subsequent written or oral forward-looking statements that may be issued by us or persons acting on our behalf. Any forward-looking statements are made only as of the date of this report and we assume no obligation to update forward-looking statements to reflect subsequent events or circumstances.

## PART I

References in this Annual Report on Form 10-K to "ClearOne," "we," "us," "CLRO" or "the Company" refer to ClearOne, Inc., a Delaware corporation, and, unless the context otherwise requires or is otherwise expressly stated, its subsidiaries.

## ITEM 1. BUSINESS

### GENERAL

ClearOne, Inc. (the Company) was incorporated in Utah in 1983 and reincorporated in Delaware on October 25, 2018. The Company is headquartered in Salt Lake City, Utah. The Company has other locations in Gainesville, Florida; Austin, Texas; Zaragoza, Spain; Shenzhen, China; Chennai, India; and Dubai, United Arab Emirates.

We have been a global market leader enabling conferencing, collaboration, and network streaming solutions. We design, develop and sell conferencing, collaboration and network streaming solutions for voice and visual communications. The performance and simplicity of our advanced comprehensive solutions offer unprecedented levels of functionality, reliability and scalability.

Our comprehensive line of high-quality conferencing and collaboration products are targeted for large, medium and small businesses, as well as for personal use. We have been a global market leader in the installed professional audio conferencing market, where our products are used in numerous industries such as enterprise, healthcare, education, government, legal and finance.

We have an established history of product innovation and plan to continue to apply our expertise in audio, video and networked AV to design, develop and introduce innovative new products and enhance our existing products. Our end-users range from some of the world's largest and most prestigious companies and institutions to small and medium-sized businesses, higher education and government organizations, as well as individual consumers. We sell our commercial products to these end-users through a global network of independent distributors who, in turn, sell our products to dealers, systems integrators and other value-added resellers. We also sell directly to dealers, systems integrators and other value-added resellers. Our solutions save end-users time and money by creating a natural environment for collaboration and communication. Our partners, who are involved in system integration are benefitted with simpler project design and support costs with our products designed and built to work with each other seamlessly.

On December 4, 2018, we closed a subscription rights offering (the "Rights Offering") in which we raised $10.0 million in gross proceeds. In the Rights Offering, we issued one subscription right to each of our shareholders for each share of our common stock that they held. Each subscription right entitled the shareholder to purchase one share of our common stock at a purchase price of

$1.20 per share. At the closing, we sold 8,306,535 shares of our common stock and returned subscriptions for 754,868 shares that were oversubscribed after allocating oversubscribed shares on a pro-rata basis.

| 1 |

[Table of Contents](#)

# ITEM 1-BUSINESS

## Company Information

Our website address is http://www.clearone.com. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to such reports are available, free of charge, on our website in the "Investor Relations" section under "Company." These reports are made available as soon as reasonably practicable after we file such material with, or furnish it to, the SEC. These reports are also available on the SEC's website, which is located at http://www.sec.gov.

For a discussion of certain risks applicable to our business, results of operations, financial position, and liquidity, see the risk factors described in "Item 1A, Risk Factors" below.

## Our Business Strategy

The Company's primary challenge is the loss in revenue due to infringement of our patents by competitors and consequent reduction in cash flows due to operating losses and litigation costs. Our current strategy consists of the following three elements to overcome this adverse situation:
- Continue our product innovation to bring to market products that are needed by our partners and end-users
- Cut costs to operate efficiently
- Defend our intellectual property through litigation

We currently participate in the following markets:

- All aspects of audio conferencing including installed professional audio conferencing through DSP mixers, USB based speakerphones and table-top conferencing;
- Professional microphones to support audio and video collaboration through patented beamforming microphones, ceiling microphones and wireless microphones;
- Visual collaboration in all forms including low-cost room appliances, professional cameras, Bring-Your-Own-Device and cloud video services encompassing conferencing, interactive whiteboarding, webinar, and wireless sharing; and
- Audio Visual Networking which includes network media streaming, video walls, sound reinforcement and audio distribution.

Our business goals are to:

- Maintain our leading global market share in professional installed audio conferencing products for large businesses and organizations;
- Position ClearOne as the preferred AV channel partner uniquely offering a complete value-chain of natively integrated solutions from audio to video maximizing AV channel partner profitability;
- Extend total addressable market from installed audio conferencing beachhead to adjacent complementary markets – microphones, video collaboration and AV networking;
- Continue to leverage the video conferencing, collaboration and AV networking technologies to enlarge our current market share;
- Focus on the small and medium business market with appropriately scaled, lower cost and less complex products and solutions;
- Capitalize on the growing influence of information technology channels in the audio-visual market and introduce more solutions to these channels;
- Capitalize on the convergence of audio visual and information technology to meet enterprise and commercial multimedia needs and the endusers' transition from high-priced systems to low cost, complete AV room solutions and cloud services;
- Leverage software-based platforms across all our product lines; and
- Expand and strengthen our sales channels.

| 2 |

Table of Contents

## ITEM 1- BUSINESS

We will continue to focus on our core strengths, which include the following:

- Providing a superior conferencing and collaboration experience;
- Delivering the complete value chain for audio visual communication;
- Extending our capabilities in product innovation through software based video collaboration and AV networking
- Offering greater innovation, interoperability and value to our end-users and channel partners;
- Leveraging and extending ClearOne technology, leadership and innovation;
- Leveraging our strong domestic and international channels to distribute new products; and
- Strengthening existing end-user and channel partner relationships through dedicated and comprehensive support.

## PRODUCTS

Our products can be broadly categorized into the following:

- Audio conferencing including installed DSP based professional audio conferencing, USB-based speakerphones and table-top audio conferencing
- Professional microphones consisting of patented beamforming microphones, ceiling microphones and wireless microphones; and
- Video products including video collaboration and AV networking

### *AUDIO CONFERENCING*

Our full range of audio conferencing products include (i) professional installed DSP based audio conferencing and sound-reinforcement products used in enterprise, healthcare, education and distance learning, government, legal and finance organizations, (ii) mid-tier premium conferencing products for smaller rooms and small and medium businesses which interface with video and web conferencing systems, (iii) affordable USB-based speakerphones that can be used with PCs, laptops, tablets, smartphones, and other portable devices, and (iv) traditional tabletop conferencing phones used in conference rooms and offices.

Our audio conferencing products feature our proprietary HDConference®, Distributed Echo Cancellation® and noise cancellation technologies to enhance communication during a conference call by eliminating echo and background noise. Most of our products also feature some of our other HDConference proprietary audio processing technologies such as adaptive modeling and first-microphone priority, which combine to deliver clear, crisp and full-duplex audio. These technologies enable natural and fatigue-free communication between distant conferencing participants.

Our audio conferencing products contributed 49.5% and 50.4% of our consolidated revenue in 2018 and 2017, respectively.

### *Professional installed audio conferencing and sound reinforcement*

We have been a global market leader in the professional installed audio conferencing market. We have been a pioneer in the development of high-end, professional conferencing products and we have established strong brand recognition for these products worldwide. Our installed professional conferencing products include the CONVERGE® Pro 2, CONVERGE Pro and CONVERGE SR product lines.

Our flagship CONVERGE Pro 2 and CONVERGE Pro product lines lead our professionally installed audio products line. The CONVERGE Pro product line includes the CONVERGE Pro 880, CONVERGE Pro 880T, CONVERGE Pro 880TA, CONVERGE Pro 840T, CONVERGE Pro 8i, CONVERGE Pro TH20 and CONVERGE Pro VH20, and the CONVERGE SR product line including CONVERGE SR1212 and SR1212A which together offer various levels of integration and features to allow a commercial system integrator to optimize a system to fit diverse conferencing applications and environments.

We began shipping a limited number of SKUs of the latest generation of CONVERGE Pro products broadly called as CONVERGE Pro 2 at the end of 2016. We added more SKUs to CONVERGE Pro 2 line which now includes CONVERGE Pro 2 128, CONVERGE Pro 2 128D, CONVERGE Pro 2 128T, CONVERGE Pro 2 128TD, CONVERGE Pro 2 128V, CONVERGE Pro 2 128VD, CONVERGE Pro 2 120, CONVERGE Pro 2 012, CONVERGE Pro 2 48T, CONVERGE Pro 2 48V, CONVERGE Pro 2 128SR and CONVERGE Pro 2 128SRD. We began shipping all SKUs in the CONVERGE Pro 2 line of products in 2017.

| 3 |

## ITEM 1 - BUSINESS

CONVERGE Pro 2's broad DSP platform satisfies clients' diverse audio needs with these features:

- Best-in-class audio delivered through next-gen Acoustic Echo Cancellation and Noise Cancellation processing with Acoustic Intelligence, advanced microphone gating and built-in DARE™ feedback elimination.
- Powerful architecture with smaller footprint – 12 Mic/line inputs per unit, built-in USB audio interface, built-in optional Dante™ for networked audio.
- Daisy-chainable design to support up to 144 Mic/line inputs, C-Link expansion bus with 64 channels and P-Link bus for scalable connection of peripheral devices including any combination of ClearOne peripheral devices, such as the new Beamforming Microphone Array 2, USB Expander unit, GPIO Expander unit and/or the new DIALOG® 20 Wireless Microphone system.
- Supports video conferencing, audio and web conferencing, Skype® for Business meetings, in-room meetings, wireless presentation, and more.
- Integration of VoIP or telephony, USB, and Dante™ for maximum functionality.
- A new expansion bus that delivers increased audio-channel scalability to support large audio projects.
- Ability to control local meeting rooms and audio distribution applications with flexible options – touch panel controller, BYOD dialer apps or 3rd party control modules.
- Configure, manage, monitor and troubleshoot the entire system of auto-discovered devices with MatrixView™ and FlowView™ for visualized audio signal paths.

CONVERGE Pro 2 line of products is ably supported by a touch panel controller, a GPIO expansion box and a USB expansion box. CONVERGE Pro 2 VoIP SKUs are certified to interoperate with Cisco, Avaya and ShoreTel SIP based VoIP systems and also interoperate with Microsoft Skype for Business.

*Mid-Tier Premium Conferencing*

Our INTERACT® product line is a mid-tier, lower cost, conferencing product line designed to meet the needs of our larger customers with smaller conferencing rooms as well as small and medium businesses. The INTERACT product series is comprised of the INTERACT AT and the INTERACT Pro. Both systems can be easily connected to enterprise telephones, analog POTS lines, existing HD video codecs and soft video clients. These INTERACT systems also include a USB audio interface to connect to PCs, laptops and tablets, as well as to rich multimedia devices, such as video or web conferencing systems and emerging unified communication systems for enhanced collaboration.

During 2018, we introduced and started shipping CONVERGE Huddle, another addition to the mid-tier premium conferencing line. CONVERGE Huddle is a versatile solution for multiple use huddle room environments at a price point that meets budget requirements for audio and video collaboration applications. CONVERGE Huddle connects to ClearOne or third-party peripheral devices, such as microphones, speakers, cameras, and display screens and applications such as Spontania®, Skype® for Business, GoToMeeting ™, WebEx® through single clutter-free connection via USB 3.0 to laptop. It comes with the latest Acoustic Echo Cancellation and Noise Cancellation algorithms and a user-friendly CONSOLE® software. It can be mounted easily under a table, behind a display, on a wall or in a rack.

*Speakerphone*

Our CHAT® product line of speakerphones includes affordable and stylish USB based personal and group speakerphones. CHAT speakerphones provide full-duplex and rich full bandwidth frequency response for superior audio clarity. CHAT products are designed for a wide variety of applications and devices (fixed or portable) for greatly enhanced collaboration wherever and whenever needed. CHAT speakerphones are offered either as personal speakerphones under CHAT 50, CHAT 60 or CHAT 70 SKUs or as group speakerphones under CHAT 150, CHAT 160 and CHAT 170 SKUs.

| 4 |

## ITEM 1 - BUSINESS

CHAT 50/60/70 personal speakerphones are approximately the size of a deck of cards, and connect to PCs and MACs for rich, clear, hands-free audio and playback. CHAT 150 group speakerphones are designed for small group use. These can also connect many of the same devices and applications as the CHAT personal speakerphones but feature three microphones in larger design for use by a larger number of participants. CHAT 150/160/170 group speakerphones have the ability to add high-quality, full-duplex speakerphones to user enterprise telephone handsets such as Avaya and Cisco. CHAT group speakerphones make it possible to introduce rich, crystal clear conferencing capability without the need for introducing a separate traditional conference phone. CHATAttach® is comprised of two CHAT 150 group speakerphones which can be daisy-chained together to function as a single conferencing system for much larger coverage than a single CHAT 150. CHAT group speakerphones are integral to our media collaboration product line as our media collaboration products are tightly integrated with CHAT group speakerphones for high quality audio experience.

### Tabletop Conferencing

Our tabletop conferencing product line offered under MAX® brand is comprised of the following product families: MAX EX and MAXAttach® wired conference phones; MAX Wireless and MAXAttach Wireless conference phones; and MAX IP and MAXAttach IP conferencing phones. Designed for use in executive offices or small conference rooms with multiple participants, MAX Wireless can be moved from room to room within 150 feet of its base station. MAXAttach Wireless was the industry's first and remains the only dual-phone, completely wireless solution. This system gives customers tremendous flexibility in covering larger conference room areas. MAX EX and MAXAttach wired phones can be daisy chained together, up to a total of four phones. This provides even distribution of microphones, loudspeakers, and controls for better sound quality and improved user access in medium to large conference rooms. In addition, all MAXAttach wired phones can be used separately when they are not needed in a daisy-chain configuration. MAX IP and MAXAttach IP are VoIP tabletop conference phones which are based on the industry-standard SIP signaling protocol. These phones can also be daisy-chained together, up to a total of four phones.

### PROFESSIONAL MICROPHONES

Our microphones contributed 32.0% and 32.1% of our consolidated revenue in 2018 and 2017, respectively.

### Beamforming Microphone Array

ClearOne began shipping the first generation Beamforming Microphone Array in March 2013. This product works with CONVERGE Pro 880, CONVERGE Pro 880T, CONVERGE Pro 880TA and CONVERGE Pro 840T.

Beamforming Microphone Array 2, the next generation Beamforming Microphone Array started shipping in the last quarter of 2017 and affirmed ClearOne's clear industry leadership with the following outstanding features:

- Significantly enhanced and new echo cancellation, using direction of arrival determination for demanding acoustic environments.
- Acoustic intelligence with adaptive ambience - faster convergence and better adaptation to changes in room acoustics, such as ambient noise from chairs moving, doors closing, chatter in the background, or any spikes in sound that alter the path of the audio, using separate acoustic echo cancellation for each fixed beam and inhibiting beam selection when the far end is active.
- Dramatically better mic pickup, including using an augmenting microphone signal, sharpening the capability to detect softer voices.
- Natural and clearly intelligible audio, even when two people speak at once.
- Zero consumption of analog I/O and signal processing in the DSP mixer leaving those resources available for other needs.
- Single cable for power, audio and control.
- Two power options – P-Link and POE.
- Daisy-chains with all ClearOne P-Link devices and works with CONVERGE Pro 2 DSP AEC mixers.
- Easy configuration and management through CONSOLE software.

| 5 |

Table of Contents

## ITEM 1 - BUSINESS

*Ceiling Microphone Array*

The ClearOne Ceiling Microphone Array enhances almost any professional conferencing application which demands high-quality audio. The Ceiling Microphone Array is easily installed and combines affordability with exceptional audio quality. With three wide-range microphones mounted together into a single unit array, the Ceiling Microphone Array provides the rich sound of three individual unidirectional microphones while maintaining full 360-degree coverage.

This product line was further strengthened in 2018 by the introduction of the Ceiling Microphone Array Analog-X and Ceiling Microphone Array Dante series of ceiling microphones. These products feature superior sound quality, adjustability for desired height from 0 to 7 feet and numbered microphone elements for easy identification

*Wireless Microphones*

In 2013, ClearOne introduced WS800 Wireless Microphone Systems, including four new models of wireless microphones/transmitters (Tabletop/boundary, Gooseneck, Handheld, Bodypack) and a base-station receiver with either 4 or 8 channels, which connect to professional audio mixers. Since the Sabine acquisition in 2014, our portfolio of wireless microphone systems was enhanced by the introduction of digital compressed versions, Dante standard compatible versions and more frequency ranges catering to various international markets.

During 2017, we started shipping DIALOG® 20, the two-channel wireless microphone system. Leveraging the full power of ClearOne's robust, adaptive frequency-hopping "spread" spectrum technology within the 2.4 GHz unlicensed spectrum, DIALOG 20 has several advantages over fixed-frequency transmission. DIALOG 20 incorporates flexible features and multiple options usually available only in much larger systems. While DIALOG 20 works seamlessly with all commercially available mixers, it boasts additional features when natively interfacing with our new CONVERGE Pro 2 or new Beamforming Microphone Array 2.

### *VIDEO*

Our video products include video collaboration and AV networking products. Our video products contributed 18.5% and 17.5% of our consolidated revenue in 2018 and 2017, respectively.

*Video Collaboration*:

Our Media Collaboration suite of products is led by our comprehensive portfolio of industry-leading COLLABORATE® branded videoconferencing and collaboration solutions.

COLLABORATE Pro 300: includes video appliance, UNITE® 150 camera, CHAT® 150C speakerphone and 90-days subscription to Spontania cloud video, audio and web conferencing, SIP/H.323 video conferencing, in-room wireless presentation and optional Skype® for Business native integration. This solution is targeted for huddle and small-size rooms.

COLLABORATE Pro 600: includes video appliance, UNITE 200 camera, CHATAttach® 150 speakerphones, and 90-days subscription to Spontania cloud video, audio and web conferencing, SIP/H.323 video conferencing with 4-way built-in MCU, in-room wireless presentation, optional Skype for Business native integration, capture recording and streaming. This solution is targeted at medium-size rooms.

COLLABORATE Pro 900: includes video appliance, UNITE 200 camera, CONVERGE® Pro installed audio endpoint, Beamforming Microphone Array and 90-days subscription to Spontania cloud video, audio and web conferencing, SIP/H.323 video conferencing with 4-way built-in MCU, multi-user in-room wireless presentation, optional Skype for Business native integration, capture recording and streaming. This solution is targeted at medium and large-size rooms.

Our Media Collaboration series also include Spontania cloud video, audio and web conferencing service that can be deployed on-premises or in the cloud. Spontania offers all sort of collaboration tools such as screen sharing, application sharing, whiteboard, annotation over presentation, recording, hand-raise and chat. The service is targeted for any workspace including mobile, desktop and rooms of any size; and multiple use cases including meetings, classrooms and training sessions.

| 6 |

Table of Contents

## ITEM 1 - BUSINESS

Bring your own video and web conferencing – COLLABORATE Versa series offer a USB PTZ camera, a speakerphone and a central hub that connects the laptop to the meeting room peripherals via single USB 3.0 connectivity. COLLABORATE Versa, compatible with Cisco WebEx, Google Hangouts, Microsoft Skype for Business and more, is also bundled with 90-days subscription of Spontania cloud video, audio and web conferencing. This solution is targeted at huddle spaces and medium conference rooms.

UNITE 200/150 is a professional-grade PTZ camera series supporting USB, HDMI and IP connectivity. It delivers 1080p HD resolution, 12X optical zoom and is compatible with PC-based and Pro-AV applications, supporting wide range of meeting spaces.

### AV Networking

Our AV networking products are primarily sold under VIEW® and VIEW Pro brands and deliver the ultimate IP A/V experience by streaming time sensitive high definition audio and video and control over TCP/IP networks. By combining audio and/or video content, meta-data and control signals into one digital stream in harmony with industry standards, its distributed, edge of the network architecture allows the hardware and the processing power to be distributed across any existing TCP/IP network. This leverages many of the advantages of using TCP/IP over traditional analog systems and other centrally controlled IP-based systems. The ClearOne VIEW and VIEW Pro products are powered by ClearOne's patented StreamNet® technology. A user can activate and control a single audio source or combination of audio sources, video sources, security systems, HVAC systems, lighting, and other room or facility monitoring functions such as paging or security access by just a single touch to its attractive touch screens. Alternatively, any PC, laptop, tablet, iPod, or other device with a built-in web browser with Flash can control the equipment connected to the system. The VIEW and VIEW Pro systems have no limits on the numbers of sources, displays, or amplifiers in a project and can be used in venues from high-end residential homes to large-scale commercial projects. The number of devices could be determined by the network bandwidth availability, number of media streams and its bandwidth requirements.

Converting an audio or video signal to TCP/IP preserves the digital quality of the signal across the network. Unlike analog systems, which lose quality over long distances, TCP/IP packets are decoded to retain the same digital quality as when they were encoded. The addition of Digital Encoder and Digital Decoder products with DVI/HDMI input and output enhances the flexibility of complete AV distribution system and makes it as easy to use as analog devices.

VIEW Pro solution provides 1080p60, H.264 high definition HDMI video-audio, 4:4:4 true-color, 24 bit per pixel video output. It comes with dual inputs encoder, single input encoder and single output decoder with balanced audio, general purpose control ports and clock synchronized video output. VIEW Pro system also provides PANORAMA$^{TM}$ , a multi-view video composition and video-wall software application using its built-in video processing engine, without using external expensive hardware video processors. This continues to be truly differentiated in the professional market by offering complete AV streaming and distribution systems that can scale to fulfill projects of any size and complexity, from light commercial to the very largest environments. VIEW Pro products include E110 and E120 encoders and D110, D210 and D310 decoders. VIEW Pro solution also comes with multiple license options including audio mixing, video composition, video wall, multicast RTSP and local playback.

VIEW CONSOLE software gives integrators a comprehensive platform from which to configure, manage, monitor, and control VIEW system installation using an easy, modern interface. The new toolset, which spotlights the latest in advanced software development technologies, works across ClearOne's full line of VIEW/VIEW Pro products. In 2017, we released an updated version of VIEW CONSOLE and PANORAMA software applications.

During 2018, the VIEW line of products was strengthened by the introduction of VIEW Lite. The VIEW Lite series which includes an encoder, a decoder and a controller, provide essential functionality that meets the full needs of simple AV over IP applications while simultaneously delivering superb price-to-performance value.

## MARKETING AND SALES

We use a two-tier channel model through which we sell our commercial products to a worldwide network of independent professional audiovisual, information technology and telecommunications distributors, who then sell our products to independent systems integrators, dealers, and value-added resellers, who in turn work directly with the end-users of our products for product fulfillment and installation, if needed. Our products are also specified and recommended by professional audio-visual consultants. We also sell our commercial products directly to certain dealers, systems integrators, value-added resellers, and end-users.

Table of Contents

## ITEM 1 - BUSINESS

Our product sales generated in the United States and outside the United States for the years ended December 31 are as follows:

| Revenue in millions | 2018 | | 2017 | |
|---|---|---|---|---|
| | Revenue | % | Revenue | % |
| In the United States | $ 14.8 | 53% | $ 24.6 | 59% |
| Outside United States | 13.4 | 47% | 17.2 | 41% |
| | $ 28.2 | 100% | $ 41.8 | 100% |

We sell directly to our distributors and resellers in approximately 62 countries worldwide. We anticipate that the portion of our total product revenue from international sales will continue to be a significant portion of our total revenue as we further enhance our focus on developing new products, establishing new channel partners, strengthening our presence in key growth areas, complying with regional environmental regulatory standards, and improving product localization with country-specific product documentation and marketing materials.

### Distributors, Resellers and Independent Integrators

We sold our products directly to approximately 360 distributors and direct resellers throughout the world during 2018. Distributors and resellers purchase our products at a discount from list price and resell them worldwide to hundreds of independent systems integrators, telephony value-added resellers, IT value-added resellers, and PC dealers on a non-exclusive basis. Our distributors maintain their own inventory and accounts receivable and are required to provide technical and non-technical support for our products to the next level of distribution participants. We work with our distributors and resellers to establish appropriate inventory stocking levels. We also work with our distributors and resellers to maintain relationships with our existing systems integrators, dealers, and other value-added resellers.

While dealers, resellers, and system integrators all sell our products directly to the end-users, system integrators typically add significant value to each sale by combining our products with products from other manufacturers as part of an integrated system solution. Commercial dealers and value-added resellers usually purchase our products from distributors and may bundle our products with products from other manufacturers for resale to the end-user. We maintain close working relationships with all our reseller partners and offer them education and training on all of our products.

### Marketing

Much of our marketing effort is conducted in conjunction with our channel partners who provide leverage for us in reaching existing and prospective customers worldwide. We also regularly attend industry forums and exhibit our products at multiple regional and international trade shows, often with our channel partners. These trade shows provide exposure for our brand and products to a wide audience. We market our ClearOne-branded commercial products on our website www.clearone.com. We also conduct public relations initiatives to get press coverage and product reviews in industry and non-industry publications alike.

## Customers

Since we sell through distributors and value-added resellers, we do not have comprehensive information on end-users who ultimately use our products. As a result, we do not know whether any end-user accounted for more than 10 percent of our total revenue during any of the periods reported in this Annual Report. Our customers are distributors and value-added resellers. During the year ended December 31, 2018, no customer accounted for more than 10% of consolidated revenue. During the year ended December 31, 2017 sales to Starin Marketing represented approximately 16% of consolidated revenue with no other customer accounting for more that 10 percent. Starin Marketing ceased to be a ClearOne distributor in 2018.

As discussed above, distributors facilitate product sales to a large number of independent systems integrators, dealers, and value-added resellers, and subsequently to their end-users. The loss of one or more distributors could reduce revenue and have a material adverse effect on our business and results of operations. Our orders fulfilled on which we had not recognized revenue were $0.3 million and $4.6 million as of December 31, 2018 and 2017, respectively. We had a backlog of unfulfilled orders of approximately $0.3 million and $0.2 million as of December 31, 2018 and 2017, respectively.

| 8 |

[Table of Contents](#)

# ITEM 1 - BUSINESS

## Competition

The audio-visual product markets are characterized by intense competition, rapidly evolving technology, and increased business consolidation. We compete with businesses having substantially greater financial, research and product development, manufacturing, marketing, and other resources. If we are not able to continually design, manufacture, and successfully market new or enhanced products or services that are comparable or superior to those provided by our competitors and at comparable or better prices, we could experience pricing pressures and reduced sales, gross profit margins, profits, and market share, each of which could have a materially adverse effect on our business. Our competitors vary within each product category. We believe we are able to differentiate ourselves and therefore successfully compete as a result of the high audio quality of our products resulting from a combination of proprietary and highly advanced audio signal processing technologies and networking technology in the form of trade secrets and patented intellectual property, technical and channel support services, and the strength of our channels and brands. It is critical for our success to be able to defend our intellectual property including trademarks, trade secrets and patents from our competitors who have far more resources.

We believe the following principal factors drive our sales:

- Quality, features and functionality, and ease of use of the products.
- Broad and deep global channel partnerships.
- Brand name recognition and acceptance.
- Effective sales and marketing.
- Quality of sales and technical support services.
- Significant established history of successful worldwide installations for diverse vertical markets.

In the professional audio conferencing system and sound reinforcement markets our main competitors include AcousticMagic, AMX Biamp, BOSE, Crestron, Extron, Harman International/BSS, Peavey, Phoenix Audio, Polycom, QSC, Shure, Symetrix, Vaddio and Yamaha and their original equipment manufacturing (OEM) partners, along with several other companies potentially poised to enter the market.

Our primary competitors in the USB-based speakerphones market are GN Netcom (Jabra), Logitech, Phoenix Audio, Plantronics, Polycom, and Yamaha and their OEM partners.

In the tabletop audio conferencing market, we face significant competition from Avaya/Konftel, Phoenix Audio, Polycom and Yamaha, and especially from their OEM partnerships. A significant portion of the tabletop market is covered by sales through OEM partnerships. While we believe MAX products have unique features and superior quality, our limited OEM partnerships and pricing pressures from higher volume competitors limit our ability to expand our existing share of this market.

In the microphones market, our primary competitors include AKG, Audio Technica, Audix, Avlex/Mipro, Beyerdynamic, Biamp, Clock Audio, Lectrosonics, Nureva, Mediavision/Taiden, Polycom, Phoenix Audio, Sennheiser, Shure, TeachLogic, TOA, Yamaha/Revolabs and Vaddio and their OEM partners.

Our video conferencing products face tremendous competition from well established players as well as emerging players, including Acano/CISCO, Adobe Connect, Amazon Chime, Avaya (Radvision), Aver, Barco, Blackboard Collaborate, Blue Jeans, Cisco, Citrix, Fuze, Huawei, InFocus, Kramer, LifeSize, Magor, Pexip, Polycom, Microsoft Skype for Business, Starleaf, Telylabs, UNIFY, Videxio, Vidyo, Yealink, Zoom and ZTE.

Our AV networking products face intense competition from a few well-established corporations of diversified capabilities and strengths, including AMX, Atlona, Aurora Multimedia, Barco, Biamp, Cisco, Crestron, Extron, Gefen, Goopie, Haivision, Hall Research, Infocus (Jupiter), Key Digital, Kramer, Liberty AV, Magenta Research, Matrox, Mediasite, Ncast, RGB Spectrum, SVSi/Harman, voLANte, Teracue, tvONE, VBrick, Visionary Solutions, WyreStorm and ZeeVee. We believe that our software based patented technology delivers superior audio and video streaming performance and flexibility and provides us with a competitive edge over other industry players.

| 9 |

# ITEM 1 - BUSINESS

## Regulatory Environment

Regulations regarding product safety, product operational agency compliance, the materials used in manufacturing, the process of disposing of electronic equipment and the efficient use of energy may require extensive lead-time to obtain regulatory approvals of new products in both domestic and international markets. Such regulations may impact our ability to expand our sales in a timely and cost-effective manner and, as a result, our business could be harmed.

## Sources and Availability of Raw Materials

We manufacture our products through electronics manufacturing services ("EMS") providers, who are generally responsible for sourcing and procuring required raw materials and components. Most of the components that our EMS providers require for manufacturing our products are readily available from a number of sources. During 2017, we witnessed a significant tightening of the electronics market with demand for electronic products especially for memories and processors far exceeding the supply caused price increases and longer fulfillment cycles. During 2018 the fulfillment cycles improved.

We continually work with our EMS providers to seek alternative sources for all our components and raw material requirements to ensure higher quality and better pricing. Most of our EMS providers and their vendors are duly qualified by our corporate quality assurance process. We work with our EMS providers to ensure that raw materials and components conform to our specifications.

## Manufacturing

Currently, all of our products are manufactured by EMS providers. Our primary EMS provider is Flextronics.

## Seasonality

We do not recognize a consistent pattern between the quarters to identify seasonality.

## Research and Product Development

We are committed to research and product development and view our continued investment in research and product development as a key ingredient to our long-term business success. Our research and product development expenditures were approximately $7.8 million and $9.3 million during the years ended December 31, 2018 and 2017, respectively.

Our core competencies in research and product development include (a) many audio technologies, including acoustic echo cancellation, noise cancellation and other advanced adaptive digital signal processing technologies, (b) networking and multimedia streaming technologies, (c) video technologies, and (d) cloud technologies. We also have expertise in wireless technologies, VoIP, software and network system development. We believe that continued investment in our core technological competencies is vital to developing new products and to enhancing existing products.

## Intellectual Property and Other Proprietary Rights

We believe that our success depends in part on our ability to protect our proprietary rights. We rely on a combination of patent, copyright, trademark, and trade secret laws and confidentiality agreements and processes to protect our proprietary rights.

As of December 31, 2018, we had approximately 90 patents and 13 pending patent applications, including foreign counterpart patents and foreign applications. Our patents and pending patent applications cover a wide range of our products and services including, but not limited to acoustic echo cancellation, beamforming microphone arrays, systems that enable streaming media over IP networks, algorithms for video processing, wireless conferencing systems, spatial audio, and technologies for the Internet of Things. The durations of our patents are determined by the laws of the country of issuance. For the U.S., patents may be 17 years from the date of issuance of the patent or 20 years from the date of its filing, depending upon when the patent application was filed. In addition, we hold numerous U.S. trademarks. The laws of foreign countries may not protect our intellectual property to the same degree as the laws of the United States.

| 10 |

[Table of Contents](#)

# ITEM 1 - BUSINESS

We will obtain patents and other intellectual property rights used in connection with our business when practicable and appropriate. Our intellectual property policy is to protect our products, technology and processes by asserting our intellectual property rights where appropriate and prudent. From time to time, assertions of infringement of certain patents or other intellectual property rights of others have been made against us. In addition, certain pending claims against a competitor are in various stages of litigation. See Part I, Item 3. Legal Proceedings and Note 8 – Commitments and Contingencies of the Notes to Consolidated Financial Statements (Part II, Item 8) for information regarding current legal proceedings involving our intellectual property rights.

We are dependent on our intellectual property. If we are not able to protect our proprietary rights or if those rights are invalidated or circumvented, our business may be adversely affected. We may be subject to litigation and infringement claims, which could cause us to incur significant expenses or prevent us from selling our products or services. For more information concerning the risks related to patents, trademarks, and other intellectual property, please see "Risk Factors-Risks Related to our Business."

We generally require our employees, certain customers and partners to enter into confidentiality and non-disclosure agreements before we disclose any confidential aspect of our technology, services, or business. In addition, our employees are required to assign to us any proprietary information, inventions, or other technology created during the term of their employment with us. However, these precautions may not be sufficient to protect us from misappropriation or infringement of our intellectual property.

The Company is involved in patent infringement lawsuits against Shure Inc. ("Shure").

On April 24, 2017, Shure initiated litigation against the Company in the matter styled *Shure Inc. v. ClearOne, Inc.*, 1:17-cv-03078, which is pending in the United States District Court for the Northern District of Illinois, Eastern Division, before the Honorable Edmond E. Chang. Shure's initial complaint sought a declaratory judgment for non-infringement and invalidity of the Company's U.S. Patent No. 9,635,186 ("'186 Patent") and Patent No. 9,264,553 ("'553 Patent"). In early 2018, Shure added a claim that the '186 Patent is unenforceable. The Court dismissed Shure's request for declaratory judgment relating to the '553 Patent, which at the time in 2017, had not been asserted by the Company against any defendant and had been submitted to the USPTO for reissue. The Company has filed counterclaims against Shure for willful infringement of the Company's '186 Patent and the Company's U.S. Patent No. 9,813,806 ("'806 Patent").

On April 10, 2019, the Company filed a new lawsuit against Shure in the United States District Court for the Northern District of Illinois, Eastern Division, styled *ClearOne, Inc. v. Shure Inc.*, 1:19-cv-02421.  In this lawsuit, the Company asserts claims against Shure for infringement of the Company's '553 Patent and for trade secret misappropriation.

## Employees

As of December 31, 2018, we had 130 full-time employees. Of these employees, 88 were located in the U.S. and 42 in locations outside the U.S. None of our employees are subject to a collective bargaining agreement and we believe our relationship with our employees is good. We also hire contractors with specific skill sets to meet our operational needs.

## ITEM 1A. RISK FACTORS

*Investors should carefully consider the risks described below. The risks described below are not the only ones we face and there are risks that we are not presently aware of or that we currently believe are immaterial that may also impair our business operations. Any of these risks could harm our business. The trading price of our common stock could decline significantly due to any of these risks, and investors may lose all or part of their investment. In assessing these risks, investors should also refer to the other information contained or incorporated by reference in this annual report on Form 10-K, including our consolidated financial statements and related notes.*

### *Risks Relating to Our Business*

*A material weakness has been identified in our internal control over financial reporting. If we fail to remediate and maintain effective internal control over financial reporting, we may be unable to report our financial results accurately on a timely basis, investors could lose confidence in our reported financial information, the trading price of our common shares could decline and our access to the capital markets or other financing sources could become limited.*

In connection with the audit of our consolidated financial statements as of December 31, 2017, our independent registered public accounting firm identified deficiencies in our system of internal control over financial reporting that it considered to be a material weakness related to the accurate and timely reporting of our financial results and disclosures for the fiscal year ended December 31,

2017 and our testing and assessment of the design and operating effectiveness of internal controls over financial reporting in a timely manner. The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis.  See Part II, Item 9A, "Controls and Procedures."

| 11 |

## ITEM 1A - RISK FACTORS

The management conducted an evaluation of the effectiveness of our internal control over financial reporting for the year ended December 31, 2018 based on the framework set forth in *Internal Control - Integrated Framework* (2013 framework) issued by the Committee of Sponsoring Organizations of the Treadway Commission, concluding that remediation of the material weakness identified during the 2017 audit has not yet been completed.

We have initiated remedial measures, however there can be no assurance that these actions, as well as further actions we may take, will allow us to remediate this material weakness and provide a solid foundation to meet our reporting obligations under the Exchange Act. If we fail to implement and maintain effective internal control over financial reporting (including appropriately and effectively remediating this material weakness), or if additional material weaknesses in our internal control over financial reporting are discovered or occur in the future, our consolidated financial statements may contain material misstatements, and we could be required to restate our financial results. In addition, if we are unable to successfully remediate this material weakness and if we are unable to produce accurate and timely financial statements, our stock price may be materially adversely affected and we may be unable to maintain compliance with applicable stock exchange listing requirements.

*We face intense competition in all markets for our products and services and our operating results will be adversely affected if we cannot compete effectively against other companies.*

The markets for our products and services are characterized by intense competition, pricing pressures and rapid technological change. Our competitive landscape continues to rapidly evolve, in particular with respect to our video-related services and products, as we move into new markets for video collaboration such as mobile, social and cloud-delivered video. We compete with businesses having substantially greater financial, research and product development, manufacturing, marketing, and other resources than we do. If we are not able to continually design, manufacture, and successfully introduce new or enhanced products or services that are comparable or superior to those provided by our competitors and at comparable or better prices, we could experience pricing pressures and reduced sales, gross profit margins, profits, and market share, each of which could have a materially adverse effect on our business.

*Difficulties in estimating customer demand in our products segment could harm our profit margins.*

Orders from our distributors and other distribution participants are based on demand from end-users. Prospective end-user demand is difficult to measure. This means that our revenue during any fiscal quarter could be adversely impacted by low end-user demand, which could in turn negatively affect orders we receive from distributors and dealers. Our expectations for both short and long-term future net revenues are based on our own estimates of future demand. Revenue for any particular time period is difficult to predict with any degree of certainty. We typically ship products within a short time after we receive an order; consequently, unshipped backlog has not historically been a good indicator of future revenue. We believe that the level of backlog is dependent in part on our ability to forecast revenue mix and plan our manufacturing accordingly. A significant portion of our customers' orders are received during the last month of the quarter. We budget the amount of our expenses based on our revenue estimates. If our estimates of sales are not accurate and we experience unforeseen variability in our revenue and operating results, we may be unable to adjust our expense levels accordingly and our gross profit and results of operations will be adversely affected. Higher inventory levels or stock shortages may also result from difficulties in estimating customer demand.

*If we are unable to protect our intellectual property rights or have insufficient proprietary rights, our business would be materially impaired.*

We currently rely primarily on a combination of trade secrets, copyrights, trademarks, patents, patents pending, and nondisclosure agreements to establish and protect our proprietary rights in our products. Our success is dependent in part on obtaining, maintaining and enforcing our intellectual property rights. If we are unable to obtain, maintain and enforce intellectual property legal protection covering our products, then no assurances can be given that others will not independently develop technologies similar to ours, or duplicate or design around aspects of our technology. In addition, we cannot assure that any patent or registered trademark owned by us will not be invalidated, circumvented or challenged, or that the rights granted thereunder will provide competitive advantages to us. Costly litigation may be necessary to enforce our intellectual property rights. We believe our products and other proprietary rights do not infringe upon any proprietary rights of third parties; however, we cannot ensure that third parties will not assert infringement claims in the future. We currently hold only a limited number of patents. To the extent that we have patentable technology that is material to our business and for which we have not filed patent applications, others may be able to use such technology or even gain priority over us by patenting such technology themselves, which could have a material adverse effect on our business. With respect to any patent application we have filed, we cannot ensure that a patent will be awarded.

| 12 |

## ITEM 1A - RISK FACTORS

*We are currently subject to patent litigation, including claims challenging the validity and enforceability of some of our patents, which could cause us to incur significant expenses or prevent us from protecting our products or services against competing products.*

Our industry is characterized by vigorous protection of intellectual property rights. We have initiated litigation to enforce our intellectual property rights, which has resulted in our adversaries in such litigation challenging the validity, scope, and/or enforceability of our intellectual property. Irrespective of the merits of these claims, any resulting litigation could be costly and time consuming and could divert the attention of management and key personnel from other business issues. The complexity of the technology involved and the uncertainty of intellectual property litigation increase these risks. See Part I, Item 3. Legal Proceedings and Note 8 – Commitments and Contingencies of the Notes to Consolidated Financial Statements (Part II, Item 8) for information regarding current legal proceedings involving our intellectual property rights.

*Our sales depend to a certain extent on government funding and regulation.*

In the audio conferencing products market, the revenue generated from sales of our audio conferencing products for distance learning and courtroom facilities depends on government funding. In the event government funding for such initiatives was reduced or became unavailable, our sales could be negatively impacted. Additionally, many of our products are subject to governmental regulations. New regulations could impact sales in a materially adverse manner.

*Environmental laws and regulations subject us to a number of risks and could result in significant costs and impact on revenue.*

Regulations regarding the materials used in manufacturing, the process of disposing of electronic equipment and the efficient use of energy require us to take additional time to obtain regulatory approvals of new products in international markets. Such regulations may impact our ability to expand our sales in a timely and cost-effective manner and, as a result, our business could be harmed.

*Our profitability may be adversely affected by our continuing dependence on our distribution channels.*

We market our products primarily through a network of distributors who in turn sell our products to value-added resellers. All of our agreements with such distributors and other distribution participants are non-exclusive, terminable at will by both parties, and generally short-term. No assurances can be given that any or all such distributors or other distribution participants will continue their relationship with us. Distributors and, to a lesser extent, value-added resellers cannot easily be replaced and any loss of revenues from these and other sources or our inability to reduce expenses to compensate for such loss of revenue could adversely affect our net revenue and profit margins.

Although we rely on our distribution channels to sell our products, our distributors and other distribution participants are not obligated to devote any specified amount of time, resources, or efforts to the marketing of our products, or to sell a specified number of our products. There are no prohibitions on distributors or other resellers offering products that are competitive with our products, and some do offer competitive products. The support of our products by distributors and other distribution participants may depend on the competitive strength of our products and the price incentives we offer for their support. If our distributors and other distribution participants are not committed to our products, our revenue and profit margins may be adversely affected.

Additionally, we offer our distributors price protection on their inventory of our products. If we reduce the list price of our products, we will compensate our distributors for the respective products that remain in their inventory on the date the price adjustment becomes effective, provided that they have been providing inventory reports consistently and the inventory was bought within the six months preceding the price adjustment date. Our net revenue and profit margins could be adversely affected if we reduce product prices significantly or distributors happen to have significant on-hand inventory of the affected product at the time of a price reduction. Further, if we do not have sufficient cash resources to compensate distributors on terms satisfactory to them or us, our price protection obligations may prevent us from reacting quickly to changing market conditions.

| 13 |

## ITEM 1A - RISK FACTORS

*Product development delays or defects could harm our competitive position and reduce our revenue.*

We have in the past experienced, and may again experience, technical difficulties and delays with the development and introduction of new products. Many of the products we develop contain sophisticated and complicated circuitry, software and components and utilize manufacturing techniques involving new technologies. Potential difficulties in the development process that we may experience include the following: (a) meeting required specifications and regulatory standards; (b) hiring and keeping a sufficient number of skilled developers; (c) meeting market expectations for performance; (d) obtaining prototype products at anticipated cost levels; (e) having the ability to identify problems or product defects in the development cycle; and (f) achieving necessary manufacturing efficiencies.

Once new products reach the market, they may have defects, or may be met by unanticipated new competitive products, which could adversely affect market acceptance of these products and our reputation. If we are not able to manage and minimize such potential difficulties, our business and results of operations could be negatively affected.

*We depend on an outsourced manufacturing strategy, and any disruption in outsourced services could negatively impact our product availability and revenues.*

We outsource the manufacturing of all of our products except digital signage and wireless microphone products to electronics manufacturing services ("EMS") providers located outside the U.S. If any of these EMS providers experience (i) difficulties in obtaining sufficient supplies of components, (ii) component prices significantly exceeding anticipated costs, (iii) an interruption in their operations, or (iv) otherwise suffers capacity constraints, we could experience a delay in production and shipping of these products, which would have a negative impact on our revenue. Should there be any disruption in services due to natural disaster, economic or political difficulties, transportation restrictions, acts of terror, quarantines or other restrictions associated with infectious diseases, or other similar events, or any other reason, such disruption could have a material adverse effect on our business. Operating in the international outsourcing environment exposes us to certain inherent risks, including unexpected changes in regulatory requirements and tariffs, and potentially adverse tax consequences, which could materially affect our results of operations. Currently, we have no second source of manufacturing for a large portion of our products.

Switching from one EMS provider to another is an expensive, difficult and a time-consuming process, with serious risks to our ability to successfully transfer our manufacturing operations. Our operations, and consequently our revenues and profitability, could be materially adversely affected if we are forced to switch from any of our EMS providers to another EMS provider due to any of a number of factors, including financial difficulties faced by the manufacturer, disagreements in pricing negotiations between us and the manufacturer or organizational changes in the manufacturer.

The cost of delivered product from our EMS providers is a direct function of their ability to buy components at a competitive price and to realize efficiencies and economies of scale within their overall business structures. If they are unsuccessful in driving efficient cost models, our delivered costs could rise, affecting our profitability and ability to compete. In addition, if the EMS providers are unable to achieve greater operational efficiencies, delivery schedules for new product development and current product delivery could be negatively impacted.

EMS providers often require long range forecasts to help them plan their operations as well as to allocate their resources. We are tied to these forecasts through contracts as well as to maintain harmony in business relationships. Our ability to react to actual demand from our customers and order optimum levels of inventory is severely limited due to these forecasts provided to the EMS providers. Our inability to accurately forecast our future demands could lead to either excess inventory causing potential inventory obsolescence and cashflow problems or shortage in inventory causing potential loss of revenue.

Additionally, the sourcing and availability of raw materials necessary for our EMS providers to manufacture certain of our products, including "conflict minerals" has been and could continue to be significantly constrained, which is likely to result in continued elevated price levels. Furthermore, compliance with SEC disclosure and reporting requirements in the future regarding the use of "conflict minerals" mined from the Democratic Republic of Congo and adjoining countries could adversely affect the sourcing, supply and pricing of materials used in our products. As a result, we may not be able to obtain the materials necessary to manufacture our products, which could force us to cease production or search for alternative supply sources, possibly at a higher cost. Such disruptions may have a material adverse effect on our business, financial condition, results of operations and cash flows.

Table of Contents

## ITEM 1A - RISK FACTORS

*Global economic conditions have adversely affected our business in the past and could adversely affect our revenues and harm our business in the future.*

Adverse economic conditions worldwide have contributed to slowdowns in the communications industry and have caused a negative impact on the specific segments and markets in which we operate. Adverse changes in general global economic conditions can result in reductions in capital expenditures by end-user customers for our products, longer sales cycles, the deferral or delay of purchase commitments for our products and increased competition. These factors have adversely impacted our operating results in prior periods and could also impact us again in the future. Global economic concerns, such as the varying pace of global economic recovery, European and domestic debt and budget issues, the slowdown in economic growth in large emerging markets such as China and India, and international currency fluctuations, may continue to create uncertainty and unpredictability in the global and national economy. A global economic downturn would negatively impact technology spending for our products and services and could materially adversely affect our business, operating results and financial condition. Further, global economic conditions may result in a tightening in the credit markets, low liquidity levels in many financial markets, decrease in customer demand and ability to pay obligations, and extreme volatility in credit, equity, foreign currency and fixed income markets.

Such adverse economic conditions could negatively impact our business, particularly our revenue potential, potentially causing losses on investments and the collectability of our accounts receivable. These factors potentially include: the inability of our customers to obtain credit to finance purchases of our products and services, customer or partner insolvencies or bankruptcies, decreased customer confidence to make purchasing decisions resulting in delays in their purchasing decisions, decreased customer demand or demand for lower-end products, or decreased customer ability to pay their obligations when they become due to us.

*We are a smaller company than some of our competitors and may be more susceptible to market fluctuations, other adverse events, increased costs and less favorable purchasing terms.*

Since we are a relatively small Company, there is a risk that we may be more susceptible to market fluctuations and other adverse events. In particular, we may be more susceptible to reductions in government and corporate spending from our government and enterprise customers. We may also experience increased costs and less favorable terms from our suppliers than some of our larger competitors who may have greater leverage in their purchasing spend. Any of these outcomes could result in loss of sales or our products being more costly to manufacture and thus less competitive. Any such unfavorable market fluctuations, reductions in customer spending or increased manufacturing costs could have a negative impact on our business and results of operations.

*Difficulties in integrating past or future acquisitions could adversely affect our business.*

Any acquisition involves numerous risks and challenges, including difficulties and time involved in integrating the operations, technologies and products of the acquired companies, entering new business or product lines, the diversion of our management's attention from other business concerns, geographic dispersion of operations, generating market demand for expanded product lines and the potential loss of key customers or employees of an acquired Company. Failure to achieve the anticipated benefits of these and any future acquisitions or to successfully integrate the operations of these or any other companies or assets we acquire, could also harm our business, results of operations and cash flows. Additionally, we cannot assure you that we will not incur material charges in future periods to reflect additional costs associated with these acquisitions or any future acquisitions we may make.

*Profitability could be negatively impacted if we do not adequately forecast the demand for our products and are unable to monetize our long-term inventories.*

We hold approximately $9.0 million in long-term inventories. There can be no assurance that we will be able to successfully anticipate changing consumer preferences and product trends or economic conditions and, as a result, we may not successfully monetize our long-term inventory. Inventory levels in excess of consumer demand may result in inventory write-downs and the sale of excess inventory at discounted prices, which could have an adverse effect on the image and reputation of our brands and negatively impact profitability.

| 15 |

Table of Contents

## ITEM 1A - RISK FACTORS

*Conditions in China, India, Spain and United Arab Emirates may affect our operations.*

We have different teams working outside the U.S. in China, India, Spain and United Arab Emirates offering various services including research and development, sales and marketing, and manufacturing operations support. Our ability to operate the company smoothly may be affected significantly if either one or more of these countries are adversely impacted by political, economic, security and military conditions in these countries.

*Product obsolescence could harm demand for our products and could adversely affect our revenue and our results of operations.*

Our industry is subject to technological innovations that could render existing technologies in our products obsolete and thereby decrease market demand for such products. If any of our products becomes slow-moving or obsolete and the recorded value of our inventory is greater than its market value, we will be required to write down the value of our inventory to its fair market value, which would adversely affect our results of operations. In limited circumstances, we are required to purchase components that our outsourced manufacturers use to produce and assemble our products. Should technological innovations render these components obsolete, we will be required to write down the value of this inventory, which could adversely affect our results of operations.

*International sales account for a significant portion of our net revenue and risks inherent in international sales could harm our business.*

International sales represent a significant portion of our total product revenue. We anticipate that the portion of our total product revenue from international sales will continue to increase as we further enhance our focus on developing new products for new markets, establishing new distribution partners, strengthening our presence in emerging economies, and improving product localization with country-specific product documentation and marketing materials. Our international business is subject to the financial and operating risks of conducting business internationally, including the following:

- unexpected changes in, or the imposition of, additional legislative or regulatory requirements;
- unique or more onerous environmental regulations;
- fluctuating exchange rates;
- tariffs and other barriers;
- difficulties in staffing and managing foreign sales operations;
- import and export restrictions;
- greater difficulties in accounts receivable collection and longer payment cycles;
- potentially adverse tax consequences;
- potential hostilities and changes in diplomatic and trade relationships; and
- disruption in services due to natural disaster, economic or political difficulties, transportation, quarantines or other restrictions associated with infectious diseases.

*We may not be able to hire and retain qualified key and highly-skilled technical employees, which could affect our ability to compete effectively and may cause our revenue and profitability to decline.*

We depend on our ability to hire and retain qualified key and highly skilled employees to manage, research and develop, market, and service new and existing products. Competition for such key and highly-skilled employees is intense, and we may not be successful in attracting or retaining such personnel. To succeed, we must hire and retain employees who are highly skilled in the rapidly changing communications and Internet technologies. Individuals who have the skills and can perform the services we need to provide our products and services are in great demand. Because the competition for qualified employees in our industry is intense, hiring and retaining employees with the skills we need is both time-consuming and expensive. We may not be able to hire enough skilled employees or retain the employees we do hire. In addition, provisions of the Sarbanes-Oxley Act of 2002 and related rules of the SEC impose heightened personal liability on some of our key employees. The threat of such liability could make it more difficult to identify, hire and retain qualified key and highly-skilled employees. We have relied on our ability to grant stock options as a means of recruiting and retaining key employees. Accounting regulations requiring the expensing of stock options will impair our future ability to provide these incentives without incurring associated compensation costs. If we are unable to hire and retain employees with the skills we seek, our ability to sell our existing products, systems, or services or to develop new products, systems, or services could be hindered with a consequent adverse effect on our business, results of operations, financial position, or liquidity. In addition, given the current political climate regarding the U.S. immigration laws, we may not be able attract highly-skilled technical employees from abroad.

| 16 |

Table of Contents

## ITEM 1A - RISK FACTORS

*We rely on third-party technology and license agreements, the loss of any of which could negatively impact our business.*

We have licensing agreements with various suppliers for software and hardware incorporated into our products. These third-party licenses may not continue to be available to us on commercially reasonable terms, if at all. The termination or impairment of these licenses could result in delays of current product shipments or delays or reductions in new product introductions until equivalent designs can be developed, licensed, and integrated, if at all possible, which would have a material adverse effect on our business.

*We may have difficulty in collecting outstanding receivables.*

We grant credit to substantially all of our customers without requiring collateral. In times of economic uncertainty, the risks relating to the granting of such credit will typically increase. Although we monitor and mitigate the risks associated with our credit policies, we cannot ensure that such mitigation will be effective. We have experienced losses due to customers failing to meet their obligations. Future losses could be significant and, if incurred, could harm our business and have a material adverse effect on our operating results and financial position.

*Interruptions to our business could adversely affect our operations.*

As with any Company, our operations are at risk of being interrupted by earthquake, fire, flood, and other natural and human-caused disasters, including disease and terrorist attacks. Our operations are also at risk of power loss, telecommunications failure, human error, physical or electronic security breaches and computer viruses (which could leave us vulnerable to the loss of confidential proprietary information as well as disruption of our business activities) and other infrastructure and technology-based problems. To help guard against such risks, we carry business interruption loss insurance to help compensate us for losses that may occur, but we cannot assure that such coverage will protect us from all such possible losses.

*Changes in tax laws and uncertainties in the interpretation and application of the 2017 Tax Cuts and Job Act could materially affect our financial position, results of operations and cash flows.*

On December 22, 2017, Pub. L. No. 115-97 (informally known as the Tax Cuts and Jobs Act) (the "Tax Act") was enacted into law. The Tax Act makes significant changes to the Internal Revenue Code of 1986, as amended (the "Code"). In particular, the Tax Act reduces the maximum corporate tax rate from 35% to 21%. The full ramifications of the Tax Act remain unclear and will likely remain unclear until further Treasury guidance is issued. Key provisions of the Tax Act that could impact us and the market price of our shares include:

- temporarily reducing individual U.S. federal income tax rates on ordinary income; the highest individual U.S. federal income tax rate was reduced from 39.6% to 37% (through tax years beginning before January 1, 2026);
- eliminating miscellaneous itemized deductions and limiting state and local tax deductions;
- a requirement for companies to pay a one-time transition tax on the earnings of certain foreign subsidiaries that were previously tax deferred;
- the creation of new taxes (global intangible low-taxed income, or GILTI) on certain foreign-source earnings;
- reducing the maximum corporate income tax rate from 35% to 21%;
- limiting the deduction for net operating losses incurred after December 31, 2017 to 80% of taxable income (prior to the application of the dividends paid deduction), where taxable income is determined without regarding to the net operating loss deduction itself, and generally eliminating net operating loss carrybacks and allowing unused net operating losses to be carried forward indefinitely;
- creating a new limitation on the deduction of net interest expense for all businesses other than certain real estate businesses that make an election to not be subject to such limitation;
- expanding the ability of businesses to deduct the cost of certain purchases of property in the year in which such property is purchased; and
- eliminating the corporate alternative minimum tax.

In addition to the foregoing, the Tax Act may impact our distributors, resellers, customers, and the overall economy, which may have an effect on us. It is not possible to state with certainty at this time the effect of the Tax Reform Act on us and on an investment in our shares.

| 17 |

Table of Contents

## ITEM 1A - RISK FACTORS

*Security breaches and other disruptions could compromise our information and expose us to liability, which would cause our business and reputation to suffer.*

In the ordinary course of our business, we collect and store sensitive data, including intellectual property, our proprietary business information and that of our employees, customers, licensors, vendors and business partners, including personally identifiable information of our customers and employees, in our data centers and on our networks. Despite our security measures, our information technology and infrastructure may be vulnerable to attacks by hackers or breached due to employee error, malfeasance or other disruptions. Security breaches have occurred with increased frequency and sophistication in recent years. Any such breach could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure or other loss of information could result in legal claims or proceedings, liability under laws that protect the privacy of personal information, disrupt our operations, and damage our reputation, which could adversely affect our business.

### *Risks Relating to Share Ownership*

*Our stock price fluctuates as a result of the conduct of our business and stock market fluctuations.*

The market price of our common stock has experienced significant fluctuations and may continue to fluctuate significantly. The market price of our common stock may be significantly affected by a variety of factors, including the following:

- statements or changes in opinions, ratings, or earnings estimates made by brokerage firms or industry analysts relating to the market in which we do business or relating to us specifically;
- disparity between our reported results and the projections of analysts;
- the shift in sales mix of products that we currently sell to a sales mix of lower-gross profit product offerings;
- the level and mix of inventory held by our distributors;
- the announcement of new products or product enhancements by us or our competitors;
- technological innovations by us or our competitors;
- success in meeting targeted availability dates for new or redesigned products;
- the ability to profitably and efficiently manage our supply of products and key components;
- the ability to maintain profitable relationships with our customers;
- the ability to maintain an appropriate cost structure;
- quarterly variations in our results of operations;
- general consumer confidence or market conditions, or market conditions specific to technology industry;
- domestic and international economic conditions;
- unexpected changes in regulatory requirements and tariffs;
- our ability to report financial information in a timely manner;
- the markets in which our stock is traded;
- our ability to integrate the companies we have acquired; and
- our ability to successfully utilize our cash reserves resulting from the settlement of litigation and arbitration matters.

| 18 |

Table of Contents

## ITEM 1A - RISK FACTORS

*Our stock price may in the future not meet the minimum bid price for continued listing on the Nasdaq Capital Market. Our ability to publicly or privately sell equity securities and the liquidity of our common stock could be adversely affected if we are delisted from The Nasdaq Capital Market.*

Nasdaq Listing Rule 5450(a)(1) provides that the closing bid price for our common stock may not be below $1.00 per share for any period of 30 consecutive trading days to maintain our continued listing on The Nasdaq Capital Market ("Minimum Bid Price Rule"). Although we are currently in compliance with the Minimum Bid Price Rule, there can be no assurance that our common stock will continue to satisfy this rule. If we were to fail to comply with the Minimum Bid Price Rule in the future and became subject to delisting, such delisting from Nasdaq would adversely affect our ability to raise additional financing through the public or private sale of equity securities, would significantly affect the ability of investors to trade our securities and would negatively affect the value and liquidity of our common stock. Delisting also could have other negative results, including the potential loss of confidence by employees, the loss of institutional investor interest and fewer business development opportunities.

*Rights to acquire our common stock could result in dilution to other holders of our common stock.*

As of December 31, 2018, there were outstanding options to acquire approximately 624,256 shares of our common stock at a weighted average exercise price of $8.87 per share. During the terms of these options, the holders thereof will have the opportunity to profit from an increase in the market price of the common stock. The existence of these options may adversely affect the terms on which we can obtain additional financing, and the holders of these options can be expected to exercise such options at a time when we, in all likelihood, would be able to obtain additional capital by offering shares of our common stock on terms more favorable to us than those provided by the exercise of these options.

*The sale of additional shares of our common stock could have a negative effect on the market price of our common stock.*

The sale of substantial amounts of our common stock in the public market, such as the Rights Offering, could adversely affect prevailing market prices and could impair our ability to raise capital through the sale of our equity securities. Most shares of common stock currently outstanding are eligible for sale in the public market, subject in certain cases to compliance with the requirements of Rule 144 under the securities laws. Shares issued upon the exercise of stock options granted under our stock option plan generally will be eligible for sale in the public market. We also have the authority to issue additional shares of common stock and shares of one or more series of preferred stock. The issuance of such shares could dilute the voting power of the currently outstanding shares of our common stock and could dilute earnings per share.

*If equity research analysts do not publish research or reports about our business or if they issue unfavorable commentary or downgrade our common stock, the price of our common stock could decline.*

The liquidity of the trading market for our common stock may be affected in part by the research and reports that equity research analysts publish about us and our business. We do not control the opinions of these analysts. The price of our stock could decline if one or more equity analysts downgrade our stock or if those analysts issue other unfavorable commentary or cease publishing reports about us or our business.

*Write off of capitalized legal expenses related to our defense of patents could negatively impact our net income and stockholders' equity.*

Our intangible assets include capitalized legal expenses net of amortization of $6.6 million related to our defense of patents from infringement by our competitors. Legal expenses have been capitalized upon satisfaction of two conditions: (a) a determination being made that a successful defense of this litigation is probable, and (b) that the monetary benefits arising out of such successful defense will be in excess of the costs for the defense. If either one of these conditions fail to be satisfied in the future, the carrying amount in the books may have to be written off either completely or partially. There can be no assurance that we will be successful in the defense of these litigation claims, in whole or in part.

| 19 |

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2. PROPERTIES

We occupy a 5,000 square-foot facility in Gainesville, Florida under the terms of an operating lease that expires in February 2021 with the possibility of renewing the lease for 10 more years. The Gainesville facility was used primarily to support our research and development activities.

We currently occupy a 21,443 square-foot facility in Salt Lake City, Utah under the terms of an operating lease expiring in March 2024, with an option to extend for additional five years. The facility supports our principal administrative, sales, marketing, customer support, and research and product development activities.

We occupy a 10,700 square-foot warehouse in Shenzhen, China under the terms of an operating lease expiring in September 2019, which serves as manufacturing support center for Asia.

We occupy a 7,070 square-foot facility in Austin, Texas - under the terms of an operating lease expiring in October 2019. This facility supports our sales, marketing, customer support, and research and development activities.

We occupy a 40,000 square-foot warehouse in Salt Lake City, Utah under the terms of an operating lease expiring in April 2025, which serves as our primary inventory fulfillment and repair center.

We occupy a 3,068 square-foot facility in Zaragoza, Spain - under the terms of an operating lease expiring in March 2020. This facility supports our customer support, and research and development activities.

We occupy a 6,175 square-foot facility in Chennai, India - under the terms of an operating lease expiring in August 2021. This facility supports our administrative, marketing, customer support, and research and product development activities.

We believe our current facilities are adequate to meet our needs for the foreseeable future and that suitable additional or alternative space will be available in the future on commercially reasonable terms as needed.

## ITEM 3. LEGAL PROCEEDINGS

See Note 8 – Commitments and Contingencies of the Notes to Consolidated Financial Statements (Part II, Item 8) for information regarding legal proceedings in which we are involved, which is incorporated in this Item 3 by reference.

## ITEM 4. MINE SAFETY DISCLOSURES

Not Applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information

Our common stock is traded on the NASDAQ Capital Market under the symbol CLRO. On April 12, 2019, there were 16,630,597 shares of our common stock issued and outstanding held by approximately 300 shareholders of record. Each broker dealer or a clearing corporation that holds shares for customers is counted as a single shareholder of record.

### Dividends

The Company paid a cash dividend of $0.07 per share of ClearOne common stock in the first quarter of 2018. As part of the focus on preserving cash in connection with our litigation to defend our strategic patents from infringement, on June 13, 2018, the Company announced the suspension of its dividend program until such time as the Company deems it appropriate to once again declare dividends.

### Issuer Purchases of Equity Securities

On March 1, 2017, the Board of Directors of the Company renewed and extended the repurchase program until March 8, 2018 for up to an additional $10 million of common stock over the next twelve months. In connection with the repurchase extension authorization, the Company was authorized to complete the repurchases through open market transactions or through an accelerated share repurchase program, in each case to be executed at management's discretion based on business and market conditions, stock price, trading restrictions, acquisition activity and other factors. All the transactions effectuated under this program occurred in open market purchases. This program terminated in March 2018.

From March 11, 2016 to March 17, 2017, the Company offered to repurchase eligible vested options to purchase shares under the 1998 Plan and the 2007 Plan from employees and directors. The Company repurchased delivered options at a repurchase price equal to the difference between the closing market price on the date of the employee's communication of accepting the repurchase offer and the exercise price of such employee's delivered options, subject to applicable withholding taxes and charges. The Company repurchased 225,542 stock options from employees and directors between March 11, 2016 and March 17, 2017 at an average purchase price of $7.77. The repurchase program expired on March 8, 2018 and the Board of Directors determined not to renew or extend it at that time.

Before the program was terminated in March 2018, the Company acquired 17,549 shares at an average price of $8.39 per share during 2018.

### Sales of Unregistered Securities

None.

Table of Contents

**ITEM 6. SELECTED CONSOLIDATED FINANCIAL DATA**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following discussion should be read in conjunction with our consolidated financial statements and related notes included in this report, as well as our other filings with the SEC. This discussion contains forward-looking statements based on current expectations that involve risks and uncertainties, such as our plans, objectives, expectations, and intentions, as set forth under "Disclosure Regarding Forward-Looking Statements." Our actual results and the timing of events could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth in the following discussion and under the caption "Risk Factors" in Item 1A and elsewhere in this report.

**OVERVIEW**

ClearOne is a global Company that designs, develops and sells conferencing, collaboration, and network streaming solutions for voice and visual communications. The performance and simplicity of our advanced, comprehensive solutions offer a high level of functionality, reliability and scalability.

We derive a major portion of our revenue from audio conferencing products and microphones by promoting our products in the professional audio-visual channel. We have extended our total addressable market from the installed audio conferencing market to adjacent complementary markets – microphones, video collaboration and AV networking. We have achieved this through strategic technological acquisitions as well as by internal product development.

During 2018, seven more patents related to video synchronization, speech technology, integrated microphone array and ceiling or wall tile, echo cancellation with beamforming microphone array, audio distribution over local area networks, and USB to Bluetooth audio bridging were issued to us. Additionally, during 2018 we continued our serious litigation efforts to stop infringement of two of our strategic patents. We introduced a new ceiling microphone array product line and made improvements to our VIEW Pro and Converge Pro 2 product lines. We also started shipping CONVERGE Huddle, an affordable DSP mixer during the year. We also launched many new products including COLLABORATE Space, CONVERGE Amplifier and wireless microphone systems in 537-563 MHz range at our industry's largest trade show in North America. We have also been focusing on company-wide cost cutting programs and speeding up product development that we believe will enable us to surpass our competitors. On the sales and marketing front, our initiatives included revamping our manufacturer representatives in the U.S., bringing more system integrators and valued added resellers to partner with us directly, creating a robust program to focus on and support our strategic partners in the U.S. and bringing on new channel partners to boost sales opportunity funnels.

Additionally, we fortified our cash position through an oversubscribed subscription rights offering (the "Rights Offering") which closed on December 4, 2018 and which raised $9.9 million (net of stock issuance costs). In the Rights Offering, we issued one subscription right to each of our shareholders for each share of our common stock that they held. Each subscription right entitled the shareholder to purchase one share of our common stock at a purchase price of $1.20 per share. At the closing, we sold 8,306,535 shares of our common stock and returned subscriptions for 754,868 shares that were oversubscribed after allocating oversubscribed shares on a pro-rata basis.

Overall revenue declined in 2018 across all product groups. The on-going infringement of ClearOne's patents is the major cause of our revenue decline in the audio conferencing and microphones categories. We are inappropriately being forced to compete against our own patented technology. We believe the revenue decline in video products was caused partially by increased competition in the space as well as due to reduced attention from our partners caused by the alternatives made available through infringement of our patents.

Our gross profit margin decreased in 2018 to 47% compared to 57% in 2017. Gross profit margin decreased primarily due to a decline in licensing revenues and reduced overhead absorption into inventory as we continue to reduce our net spend on inventory. Net loss increased from $14.2 million in 2017 to $16.7 million in 2018. Net loss in 2018 was primarily due to operating losses of about $10.3 million and $6.4 million in tax expense caused by recording a full valuation allowance on our net deferred tax assets.

*Industry conditions*

We operate in a very dynamic and highly competitive industry which is dominated on the one hand by a few players with respect to certain products like traditional video conferencing appliances while on the other influenced heavily by a fragmented reseller market consisting of numerous regional and local players. The industry is also characterized by venture capitalist funded start-ups and private companies willing to fund cumulative cash losses in order to gain market share and achieve certain non-financial goals.

| 22 |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*Economic conditions, challenges and risks*

The audio-visual products market is characterized by intense competition and rapidly evolving technology. Our competitors vary within each product category. Our installed professional audio conferencing products, which is our flagship product category, continue to be ahead of the competition despite the reduction in revenues. Our strength in this space is largely due to our fully integrated suite of products consisting of DSP mixers, wide range of professional microphone products and video collaboration products. Despite our strong leadership position in the installed professional audio conferencing market, we face challenges to revenue growth due to the limited size of the market and pricing pressures from new competitors attracted to the commercial market due to higher margins.

Despite the decline in revenue, our video products are critical to our long term growth. We face intense competition in this market from well-established market leaders as well as emerging players rich with marketing funds. We expect our strategy of combining Spontania, our cloud-based video conferencing product, Collaborate, our appliance-based media collaboration product, our high quality professional cameras, and our high-end audio conferencing technology will generate high growth in the near future. We believe we are also well positioned to capitalize on the continuing migration away from the traditional hardware-based video conferencing systems to software-based video conferencing applications.

We derive a major portion of our revenue (approximately 47% for the year ended December 31, 2018) from international operations and expect this trend to continue in the future. Most of our revenue from outside the U.S. is billed in U.S. dollars and is not exposed to any significant currency risk. However, we are exposed to foreign exchange risk if the U.S. dollar is strong against other currencies as it will make U.S. Dollar denominated prices of our products less competitive.

*Deferred Revenue*

Deferred revenue decreased by $4.3 million to $0.3 million in 2018, primarily due to the effect of the new revenue recognition standard that became effective January 1, 2018.

## DISCUSSION OF RESULTS OF OPERATIONS

The following table sets forth certain items from our consolidated statements of operations and comprehensive loss for the years ended December 31, 2018 and 2017, together with the percentage change each item represents. Throughout this discussion, we compare results of operations for the year ended December 31, 2018 ("2018") to the year ended December 31, 2017 ("2017" or "the comparable period").

| (In thousands, except percentages) | 2018 | 2017 | Percentage Change 2018 vs 2017 |
|---|---|---|---|
| Revenue | $ 28,156 | $ 41,804 | -33% |
| Cost of goods sold | 14,785 | 17,795 | -17% |
| Gross profit | 13,371 | 24,009 | -44% |
| Sales and marketing | 9,908 | 10,996 | -10% |
| Research and product development | 7,840 | 9,342 | -16% |
| General and administrative | 5,950 | 7,161 | -17% |
| Impairment of intangible assets | — | 769 | 100% |
| Impairment of goodwill | — | 12,724 | 100% |
| Legal settlement paid/(received) | — | (790) | 100% |
| Operating expenses | 23,698 | 40,202 | -41% |
| Operating loss | (10,327) | (16,193) | 36% |
| Loss before income taxes | (10,247) | (15,893) | 36% |
| Provision for/(benefit from) income taxes | 6,440 | (1,721) | -474% |
| Net loss | (16,687) | (14,172) | -18% |

| 23 |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Revenue

Our revenue decreased to $28.2 million in 2018 compared to $41.8 million in 2017. The highest decline was seen in audio conferencing category with 34% decline followed by microphones with 33% decline and video products with 29% decline. The decline in audio conferencing category was due to decline in licensing revenue, CONVERGE Pro product line and INTERACT Pro. An increase in revenues from CONVERGE Pro 2 was not sufficient enough to offset the decline in the CONVERGE Pro product line. The decline in microphones category was due to decline in all microphones especially beamforming microphones and wireless microphones. During 2017, a big project contributed significant revenues from video products. Absence of such a project in 2018 made decline in revenue from video products sharper. The on-going infringement of ClearOne's patents is the major cause of our revenue decline in audio conferencing and microphones categories. We believe the revenue decline in video products was caused partially by increased competition in the space as well as due to reduced attention from our partners caused by the alternatives made available through infringement of our patents.

The share of audio conferencing products in our product mix declined marginally from 50.4% to 49.5%. The share of microphones remained almost the same from 32.1% in 2017 to 32.0% in 2018. Share of video products in the revenue mix increased marginally from 17.5% in 2017 to 18.5% in 2018.

During 2018, revenue declined across all major markets. The decline was more pronounced in the USA, China, Japan, Southern Europe and Australia. Asia Pacific including Middle East decreased by 29%, Europe and Africa declined by 16% and Americas declined by about 37%.

We believe, although there can be no assurance, that we will return to growth path when our strategic initiatives namely product innovation, cost reduction and defense of our intellectual property succeed.

### Cost of Goods Sold and Gross Profit

Cost of goods sold ("COGS") includes expenses associated with finished goods purchased from outsourced manufacturers, the manufacture of our products (including material and direct labor), our manufacturing and operations organization, property and equipment depreciation, warranty expense, freight expense, royalty payments, and the allocation of overhead expenses.

Our gross profit during 2018 was approximately $13.4 million or 47% compared to approximately $24.0 million or 57% in 2017. Gross profit margin decreased primarily due to a decline in licensing revenues and reduced overhead absorption into inventory as we continue to reduce our net spend on inventory.

Our profitability in the near-term continues to depend significantly on our revenues from audio conferencing products. We hold long-term inventory and if we are unable to sell our long-term inventory, our profitability might be affected by inventory write-offs and price mark-downs. Our long-term inventory includes approximately $2.7 million of wireless microphones related finished goods and assemblies, $2.7 million of CONVERGE Pro and CONVERGE Pro 2 products and about $1.0 million of raw materials that will be used for manufacturing installed professional audio conferencing products.

### Operating Expenses and Profits (Losses)

Operating income/(loss), or income/(loss from operations, is the surplus or deficit after operating expenses are deducted from gross profits. Operating expenses include sales and marketing ("S&M") expenses, research and product development ("R&D") expenses and general and administrative ("G&A") expenses. Total operating expenses were $23.7 million in 2018, compared to $40.2 million in 2017, which included $13.5 million in impairment of goodwill and intangible assets. The following contains a more detailed discussion of expenses related to sales and marketing, research and product development, general and administrative, and other items.

**Sales and Marketing** S&M expenses include sales, customer service, and marketing expenses such as employee-related costs, allocations of overhead expenses, trade shows, and other advertising and selling expenses.

S&M expenses in 2018 decreased by 10% from $11.0 million in 2017 to $9.9 million in 2018. The decrease was mainly due to decreases in commissions to independent reps, payments to consultants, inventory costs for demonstration equipment, employee related costs and tradeshow exhibition costs.

Table of Contents

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Research and Product Development** R&D expenses include research and development, product line management, engineering services, and test and application expenses, including employee-related costs, outside services, expensed materials, depreciation, and an allocation of overhead expenses.

R&D expenses decreased during 2018 to $7.8 million from $9.3 million in 2017. The decrease was primarily due to decreases in R&D project costs and employee-related costs.

**General and Administrative** G&A expenses include employee-related costs, professional service fees, allocations of overhead expenses, litigation costs, and corporate administrative costs, including costs related to finance and human resources.

G&A expenses were approximately $6.0 million in 2018 compared with approximately $7.2 million in 2017. The decrease was primarily due to decreases in legal expenses, employee related costs and stock based compensation partially offset by an increase in amortization expenses.

#### Impairment of Goodwill and Intangibles

We recognized impairment of goodwill of $12.7 million and intangibles of $0.8 million during the twelve months ended December 31, 2017. There were no such impairment charges during the years ended December 31, 2018. The analysis for impairment was mainly triggered due to the decrease of our market capitalization. We recorded impairment charges upon the determination that the carrying value of certain intangibles and goodwill is in excess of the implied fair value of such assets.

#### Provision for income taxes

The effective tax benefit rate was 62.9% (benefit) in 2018 as compared to effective tax rate of 10.7% during 2017. The decrease in the effective tax rate was primarily due to the recording of a full valuation allowance on the Company's net deferred tax assets.

Income tax expense for 2018 was $6.4 million as compared to $1.7 million of benefit from income taxes in 2017. The current year loss did not result in income tax benefit due to recording a valuation allowance of $6.5 million in 2018-Q3 on the related net deferred tax assets. The valuation allowance was recorded as we concluded that it was more likely than not that our deferred tax assets were not realizable primarily due to the Company's recent pre-tax losses.

### LIQUIDITY, CAPITAL RESOURCES AND FINANCIAL POSITION

As of December 31, 2018, our cash and cash equivalents were approximately $11.2 million compared to $5.6 million as of December 31, 2017. Our working capital was $28.4 million and $23.3 million as of December 31, 2018 and 2017, respectively.

Net cash flows used in operating activities were approximately $6.6 million during 2018, a decrease of approximately $2.7 million from $9.3 million used in operating activities in 2017. The decrease was primarily due to reduction of changes in inventories by $10.9 million partially offset by a decrease in non-cash charges of $5.1 million and an increase in net loss by $2.5 million.

Net cash flows provided by investing activities were $3.2 million during 2018 compared to net cash flows provided by investing activities of $10.2 million during 2017, a decrease of $7.0 million during 2018. The decrease was primarily due to a decrease in net sales of marketable securities of $5.1 million partially offset by an increase in capitalized patent defense costs by $2.4 million.

*Capitalization of patent defense costs.* We capitalize external legal costs incurred in the defense of our patents when we believe that a significant, discernible increase in value will result from the defense and a successful outcome of the legal action is probable. When we capitalize patent defense costs we amortize the costs over the remaining estimated useful life of the patent, which is 15 to 17 years. During 2018 we spent $4.7 million of legal costs related to the defense of our patents and capitalized the entire amount.

Net cash provided by financing activities increased in 2018 by $16.7 million primarily due to raising of additional capital through a rights offering of $9.9 million, reduction of payments for stock and options repurchases by $5.3 million and reduction in dividend payments by $1.7 million.

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

We are currently pursuing all available legal remedies to defend our strategic patents from infringement. We have already incurred approximately $8.5 million in costs from 2016 through December 31, 2018 towards this litigation and may be required to incur more to continue to enforce our patents. We have been actively engaged in preserving cash by suspending our dividend program, allowing the share repurchase program to expire and implementing company-wide cost reduction measures. In addition, we raised additional proceeds of $9.9 million (net of issuance costs) from the Rights Offering, which we closed in December 2018. We also believe additional cash will be generated as we consume our inventory and bring it down to historical levels. We also believe that the measures taken by us to defend our patents and enforce our intellectual property rights will yield higher revenues in the future. We believe all of these and effective management of working capital will provide the liquidity needed to meet our short-term and long-term operating requirements and finance our growth plans. We also believe that our strong portfolio of intellectual property and our solid brand equity in the market will enable us to raise additional capital if and when needed to meet our short and long-term financing needs. In addition to capital expenditures, we may use cash in the near future for selective infusions of technology, sales and marketing, infrastructure, and other investments to fuel our growth.

At December 31, 2018, we had open purchase orders related to our electronics manufacturing service providers of approximately $1.2 million, primarily related to inventory purchases.

At December 31, 2018, we had inventory totaling $22.2 million, of which non-current inventory accounted for $9.0 million. This compares to total inventories of $23.1 million and non-current inventory of $8.7 million as of December 31, 2017.

#### Off-Balance Sheet Arrangements

We have no off-balance-sheet arrangements that have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial conditions, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources, results of operations or liquidity.

### CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our discussion and analysis of our results of operations and financial position are based upon our consolidated financial statements, which have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP"). We review the accounting policies used in reporting our financial results on a regular basis. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. We evaluate our assumptions and estimates on an ongoing basis and may employ outside experts to assist in our evaluations. We believe that the estimates we use are reasonable; however, actual results could differ from those estimates. Our significant accounting policies are described in Note 1 - Business Description, Basis of Presentation and Significant Accounting Policies to the Consolidated Financial Statements included in Part IV of this report. We believe the following critical accounting policies identify our most critical accounting policies, which are the policies that are both important to the representation of our financial condition and results and require our most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain.

#### Revenue and Associated Allowances for Revenue Adjustments and Doubtful Accounts

The Company recognizes revenue when it satisfies a performance obligation. The Company recognizes revenue from sales agreements upon transferring control of a product to the customer. This typically occurs when products are shipped or delivered, depending on the delivery terms, or when products that are consigned at customer locations are sold to dealers or end users. Revenue recognized during the twelve months ended December 31, 2018 for equipment sales was $27,369, and for software, licenses, etc. was $787. Sales returns and allowances are estimated based on historical experience. Provisions for discounts and rebates to customers, estimated returns and allowances, ship and credit claims and other adjustments are provided for in the same period the related revenues are recognized, and are netted against revenues. For returns, the Company recognizes a related asset for the right to recover returned products with a corresponding reduction to cost of goods sold. The Company reviews warranty and related claims activity and records provisions, as necessary.

| 26 |

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Frequently, the Company receives orders with multiple delivery dates that may extend across reporting periods. Since each delivery constitutes a performance obligation, the Company allocates the transaction price of the contract to each performance obligation based on the stand-alone selling price of the products. The Company invoices the customer for each delivery upon shipment and recognizes revenues in accordance with delivery terms. Although payment terms vary, distributors typically pay within 45 days of invoicing and dealers pay within 30 days of invoicing. As scheduled delivery dates are within one year, revenue allocated to future shipments of partially completed contracts are not disclosed.

The Company has elected to record freight and handling costs associated with outbound freight after control over a product has transferred to a customer as a fulfillment cost and include it in cost of revenues. Taxes assessed by government authorities on revenue-producing transactions, including value-added and excise taxes, are presented on a net basis (excluded from revenues) in the Consolidated Statements of Operations and Comprehensive Income.

The details of deferred revenue and associated cost of goods sold and gross profit are as follows:

|                             | As of December 31, | |
|                             | 2018 | 2017 |
|-----------------------------|------|------|
| Deferred revenue            | $ 283 | $ 4,635 |
| Deferred cost of goods sold | - | 1,555 |
| Deferred gross profit       | $ 283 | $ 3,080 |

The Company offers rebates and market development funds to certain of its distributors, dealers/resellers, and end-users based upon the volume of product purchased by them. The Company records rebates as a reduction of revenue in accordance with GAAP.

The Company provides, at its discretion, advance replacement units to end-users on defective units of certain products under warranty. Since the purpose of these units is not revenue generating, the Company tracks the units due from the end-user, until the defective unit has been returned. Any amount due from the customer upon failure to return the products is accounted as receivable only after establishing customer's failure to return the products. The inventory due from the customer is accounted at cost or market value whichever is lower.

#### Impairment of Goodwill and Intangible Assets

We perform impairment tests of goodwill and intangible assets with indefinite useful lives on an annual basis in the fourth fiscal quarter, or sooner if a triggering event occurs suggesting possible impairment of the values of these assets. Impairment testing for these assets involves a two-step process. In the first step, the fair value of the reporting unit holding the assets is compared to its carrying amount. If the carrying amount of the reporting unit exceeds its fair value, the second step of the impairment test is performed to measure the amount of the impairment loss, if any. In the second step, the fair value of the reporting unit is allocated to all of its assets and liabilities, including intangible assets and liabilities not recorded on the balance sheet. The excess, if any, of the fair value of the reporting unit over the sum of the fair values allocated to identified assets and liabilities is the value of goodwill to be compared to its carrying value.

During the third quarter of 2017, the Company determined that goodwill and an intangible asset consisting of customer relationships were impaired and recognized a charge of $12.7 million towards goodwill impairment and $0.8 million towards the intangible asset impairment. There were no such impairment charges during the year ended December 31, 2018.

| 27 |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Impairment of Long-Lived Assets

We assess the impairment of long-lived assets, such as property and equipment and definite-lived intangible assets subject to amortization, whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset or asset group to estimated future undiscounted net cash flows of the related asset or group of assets over their remaining lives. If the carrying amount of an asset exceeds its estimated future undiscounted cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the estimated fair value of the asset. Impairment of long-lived assets is assessed at the lowest levels for which there are identifiable cash flows that are independent of other groups of assets. The impairment of long-lived assets requires judgments and estimates. If circumstances change, such estimates could also change. Assets held for sale are reported at the lower of the carrying amount or fair value, less the estimated costs to sell.

### Accounting for Income Taxes

We are subject to income taxes in both the United States and in certain non-U.S. jurisdictions. We account for income taxes following ASC 740, *Accounting for Income Taxes,* recognizing deferred tax assets and liabilities using enacted tax rates for the effect of temporary differences between book and tax basis of recorded assets and liabilities. We estimate our current tax position together with our future tax consequences attributable to temporary differences resulting from differing treatment of items, such as deferred revenue, depreciation, and other reserves for tax and accounting purposes. These temporary differences result in deferred tax assets and liabilities. We assess the likelihood that our deferred tax assets will be recovered from future taxable income, prior year carryback, or future reversals of existing taxable temporary differences. To the extent we believe that recovery is not more likely than not, we establish a valuation allowance against these deferred tax assets. Significant judgment is required in determining our provision for income taxes, our deferred tax assets and liabilities, and any valuation allowance recorded against our deferred tax assets.

To the extent we establish a valuation allowance in a period, we must include and expense the allowance within the tax provision in the consolidated statement of operations. In accordance with ASC Topic 740, "Accounting for Income Taxes", we analyzed our valuation allowance at December 31, 2018 and determined that based upon available evidence it is more likely than not that certain of our net deferred tax assets will not be realized and, accordingly, we have recorded a full valuation allowance against these deferred tax assets in the amount of $11.5 million. Please refer to Note 12 - Income Taxes in the Notes to Consolidated Financial Statements for additional information.

### Share-Based Payments

We estimate the fair value of stock options using the Black-Scholes option pricing model, which requires certain estimates, including an expected forfeiture rate and expected term of options granted. We also make decisions regarding the method of calculating expected volatilities and the risk-free interest rate used in the option-pricing model. The resulting calculated fair value of stock options is recognized as compensation expense over the requisite service period, which is generally the vesting period. When there are changes to the assumptions used in the option-pricing model, including fluctuations in the market price of our common stock, there will be variations in the calculated fair value of our future stock option awards, which results in variation in the compensation cost recognized.

### IMPACT OF RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

For descriptions of recently issued accounting standards, see Note 1. Business Description, Basis of Presentation and Significant Accounting Policies of our Notes to Consolidated Financial Statements.

| 28 |

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Not Applicable

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Financial statements and supplementary data required by this are included herein as a separate section of this Form 10-K, beginning on page F-1, and are incorporated in this Item 8 by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A. CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

We maintain disclosure controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized, and reported within the required time periods, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Senior Vice President of Finance, as appropriate, to allow for timely decisions regarding required disclosure. As required by Rule 13a-15 under the Exchange Act, we have completed an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and the Senior Vice President of Finance, of the effectiveness and the design and operation of our disclosure controls and procedures as of December 31, 2018. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives. Based upon this evaluation, our Chief Executive Officer and Senior Vice President of Finance concluded that, as of the end of the period covered by this Annual Report, our disclosure controls and procedures were not effective at a reasonable assurance level as of December 31, 2018 due to the material weakness in internal control over financial reporting as described below. Despite the existence of this material weakness, the Company believes the financial information presented herein is materially correct and in accordance with U.S. generally accepted accounting principles, and do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made. The consolidated financial statements together with the other financial information included in the consolidated financial statements and this Annual Report on Form 10-K fairly present, in all material respects, the financial condition, financial performance and cash flows of the Company for the year ended December 31, 2018.

The effectiveness of any system of disclosure controls and procedures is subject to certain limitations, including the exercise of judgment in designing, implementing, and evaluating the controls and procedures, the assumptions used in identifying the likelihood of future events, and the inability to eliminate improper conduct completely. A controls system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the controls system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a Company have been detected. As a result, there can be no assurance that our disclosure controls and procedures will detect all errors or fraud.

### *Management's Annual Report on Internal Control Over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

| 29 |

Table of Contents

Our management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018 based on the framework set forth in *Internal Control - Integrated Framework* (2013 framework) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis. Management identified a material weakness in the operating effectiveness of internal control over financial reporting relating to the accurate and timely reporting of its financial results and disclosures for the fiscal year ended December 31, 2018 and its testing and assessment of the design and operating effectiveness of internal controls over financial reporting in a timely manner. This material weakness was identified prior to the issuance of our consolidated financial statements for the year ended December 31, 2018, and could result in material misstatements in the Company's annual or interim consolidated financial statements that would not be prevented or detected.

As a result of the material weakness described above, management concluded that our internal control over financial reporting was not effective as of December 31, 2018.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting that occurred during the fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### Remediation Activities

To address the material weakness, management is working on a remediation plan which supplements the existing controls. The remediation plan includes an assessment of personnel levels and responsibilities, additional training of financial reporting personnel and ability to handle new requirements and projects on a timely basis with respect to the preparation of the consolidated financial statements and public company reporting requirements and timelines. The material weakness will be fully remediated when, in the opinion of management, the control processes have been operating for a sufficient period of time to provide reasonable assurance as to their effectiveness. The remediation and ultimate resolution of the material weakness will be reviewed with the Audit Committee of the Board of Directors.

### ITEM 9B. OTHER INFORMATION

None.

Table of Contents

## PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

The information required by this item is incorporated herein by reference to the definitive proxy statement for our 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of our fiscal year covered by this Annual Report on form 10-K.

### ITEM 11. EXECUTIVE COMPENSATION

The information required by this item is incorporated herein by reference to the definitive proxy statement for our 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of our fiscal year covered by this Annual Report on form 10-K.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this item is incorporated herein by reference to the definitive proxy statement for our 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of our fiscal year covered by this Annual Report on form 10-K.

### ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE

The information required by this item is incorporated herein by reference to the definitive proxy statement for our 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of our fiscal year covered by this Annual Report on form 10-K.

### ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this item is incorporated herein by reference to the definitive proxy statement for our 2019 annual meeting of shareholders or an amendment to this Annual Report on Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days after the end of our fiscal year covered by this Annual Report on form 10-K.

| 31 |

Table of Contents

**PART IV**

## ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES

1.    Financial Statements: Financial statements set forth under Part II, Item 8 of this Annual Report on Form 10-K are filed in a separate section of this Form 10-K. See the "Index to Consolidated Financial Statements".

2.    Financial Statement Schedules: All schedules are omitted since they either are not required, not applicable or the information is presented in the accompanying consolidated financial statements and notes thereto.

3.    Exhibits: The exhibits listed under the Index of exhibits in the next page are filed or incorporated by reference as part of this Form 10-K.

## ITEM 16. FORM 10-K SUMMARY

Not applicable.

| 32 |

Table of Contents

## INDEX TO EXHIBITS

| Exhibit Number | Exhibit Description | Form | Exhibit Incorporated Herein by Reference | Filing Date |
|---|---|---|---|---|
| 3.1 | Certificate of Incorporation of ClearOne, Inc. | 8-K | 3.1 | 10/29/18 |
| 3.2 | Bylaws | 8-K | 3.2 | 10/29/18 |
| 10.1 | 1997 Employee Stock Purchase Plan | S-8 | 4.9 | 10/06/06 |
| 10.2 | 1998 Stock Option Plan | S-8 | 4.8 | 10/06/06 |
| 10.3 | 2007 Equity Incentive Plan | S-8 | 4.7 | 01/22/08 |
| 10.4 | ClearOne, Inc. Equity Incentive Plan | S-8 | 4.8 | 01/26/16 |
| 10.5 | Amendment No. 1 to the ClearOne, Inc. Equity Incentive Plan | S-8 | 4.11 | 06/30/15 |
| 10.6 | ClearOne, Inc. Employee Stock Purchase Plan | S-8 | 4.3 | 06/30/15 |
| 10.7 | Office Lease between Edgewater Corporate Park, LLC and ClearOne Communications, Inc. dated June 5, 2006 | 10-K | 10.19 | 09/14/06 |
| 10.8 | Stock Purchase Agreement Between ClearOne, Inc. and Doran M. Oster Dated March 4, 2014 for the Sabine Acquisition. | 10-K | 10.7 | 03/20/14 |
| 10.9 | Manufacturing Services Agreement between Flextronics Industrial, Ltd. and ClearOne Communications, Inc. dated November 3, 2008 | 10-K | 10.21 | 10/13/09 |
| 10.10 | Framework Agreement between ClearOne, Inc. and Dialcom Networks S.L., dated December 20, 2013 | 8-K | 10.1 | 04/07/14 |
| 10.11 | Amendment to Framework Agreement between ClearOne, Inc. and Dialcom Networks S.L., dated March 31, 2014 | 8-K | 10.2 | 04/07/14 |
| 10.12 | Purchase Agreement between ClearOne, Inc. and Dialcom Networks S.L., dated March 31, 2014 | 10-Q | 10.3 | 05/14/14 |
| 10.13 | Form of Offer to Repurchase Eligible Options for Cash | 10-Q | 10.1 | 05/10/16 |
| 14.1 | Code of Ethics, approved by the Board of Directors on August 23, 2006 | 10-K | 14.1 | 09/14/06 |
| 21.1† | Subsidiaries of the registrant | | | |
| 23.1† | Consent of Tanner LLC, Independent Registered Public Accounting Firm | | | |
| 31.1† | Section 302 Certification of Chief Executive Officer | | | |
| 31.2† | Section 302 Certification of Chief Financial Officer | | | |
| 32.1† | Section 906 Certification of Chief Executive Officer | | | |
| 32.2† | Section 906 Certification of Chief Financial Officer | | | |
| 101.INS‡ | XBRL Instance Document | | | |
| 101.SCH‡ | XBRL Taxonomy Extension Schema | | | |
| 101.CAL‡ | XBRL Taxonomy Extension Calculation Linkbase | | | |
| 101.DEF‡ | XBRL Taxonomy Extension Definitions Linkbase | | | |
| 101.LAB‡ | XBRL Taxonomy Extension Label Linkbase | | | |
| 101.PRE‡ | XBRL Taxonomy Extension Presentation Linkbase | | | |

\* Constitutes a management contract or compensatory plan or arrangement.

† Filed herewith

‡ Information furnished herewith shall not be deemed to be "filed" for the purposes of Section 18 of the 1934 Act

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CLEARONE, INC.
Registrant

*/s/ Zeynep Hakimoglu*
Zeynep Hakimoglu
President, Chief Executive Officer and Chairman of the Board
April 15, 2019

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | |
|---|---|
| */s/ Zeynep Hakimoglu* | */s/ Narsi Narayanan* |
| Zeynep Hakimoglu | Narsi Narayanan |
| President, Chief Executive Officer and Chairman of the Board | Senior Vice President of Finance |
| (principal executive officer) | (principal accounting and principal financial officer) |
| April 15, 2019 | April 15, 2019 |
| | |
| */s/ Eric L. Robinson* | */s/ Larry R. Hendricks* |
| Eric L. Robinson | Larry R. Hendricks |
| Director | Director |
| April 15, 2019 | April 15, 2019 |

| 34 |

Table of Contents

# CLEARONE, INC.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|                                                                                                      | Page |
|------------------------------------------------------------------------------------------------------|------|
| Report of Independent Registered Public Accounting Firm                                              | F-1  |
| Consolidated Balance Sheets as of December 31, 2018 and December 31, 2017                            | F-2  |
| Consolidated Statements of Operations and Comprehensive Loss for the years ended December 31, 2018 and 2017 | F-3  |
| Consolidated Statements of Shareholders' Equity for the years ended December 31, 2018 and 2017       | F-4  |
| Consolidated Statements of Cash Flows for the years ended December 31, 2018 and 2017                 | F-5  |
| Notes to Consolidated Financial Statements                                                          | F-7  |

| 35 |

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and Board of Directors
ClearOne, Inc.

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of ClearOne, Inc. and subsidiaries (collectively, ClearOne) as of December 31, 2018 and 2017, and the related consolidated statements of operations and comprehensive loss, shareholders' equity, and cash flows for each of the years in the two-year period ended December 31, 2018, and the related notes to the consolidated financial statements (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements referred to above present fairly, in all material aspects, the financial position of ClearOne as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

We were not engaged to examine management's assertion about the effectiveness of ClearOne's internal control over financial reporting as of December 31, 2018 included in the accompanying management's annual report on internal control over financial reporting and, accordingly, we do not express an opinion thereon.

We have served as the Company's auditor since October 14, 2015.
*/s/ TANNER LLC*

Salt Lake City, Utah
April 15, 2019

| F-1 |

Table of Contents

# CLEARONE, INC.
## CONSOLIDATED BALANCE SHEETS
### (Dollars in thousands, except par value)

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 11,211 | $ 5,571 |
| Marketable securities | 951 | 2,689 |
| Receivables, net of allowance for doubtful accounts of $631 and $472, as of December 31, 2018 and 2017 respectively | 6,782 | 7,794 |
| Inventories | 13,228 | 14,415 |
| Distributor channel inventories | — | 1,555 |
| Prepaid expenses and other assets | 2,193 | 1,862 |
| Total current assets | 34,365 | 33,886 |
| Long-term marketable securities | 3,764 | 10,349 |
| Long-term inventories, net | 8,953 | 8,708 |
| Property and equipment, net | 1,388 | 1,549 |
| Intangible assets, net | 10,249 | 6,543 |
| Deferred income taxes | — | 6,531 |
| Other assets | 196 | 311 |
| Total assets | $ 58,915 | $ 67,877 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 3,729 | $ 4,122 |
| Accrued liabilities | 1,996 | 1,843 |
| Deferred product revenue | 283 | 4,635 |
| Total current liabilities | 6,008 | 10,600 |
| Deferred rent | 135 | 103 |
| Other long-term liabilities | 571 | 607 |
| Total liabilities | 6,714 | 11,310 |
| Shareholders' equity: | | |
| Common stock, par value $0.001, 50,000,000 shares authorized, 16,630,597 and 8,319,022 shares issued and outstanding as of December 31, 2018 and 2017 respectively | 17 | 8 |
| Additional paid-in capital | 57,840 | 47,464 |
| Accumulated other comprehensive loss | (181) | (65) |
| Retained earnings/(accumulated deficit) | (5,475) | 9,160 |
| Total shareholders' equity | 52,201 | 56,567 |
| Total liabilities and shareholders' equity | $ 58,915 | $ 67,877 |

*See accompanying notes*

| F-2 |

# CLEARONE, INC.
## CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS
### (Dollars in thousands, except per share amounts)

| | Year ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Revenue | $ 28,156 | $ 41,804 |
| Cost of goods sold | 14,785 | 17,795 |
| Gross profit | 13,371 | 24,009 |
| Operating expenses: | | |
| Sales and marketing | 9,908 | 10,996 |
| Research and product development | 7,840 | 9,342 |
| General and administrative | 5,950 | 7,161 |
| Impairment of an intangible asset | — | 769 |
| Impairment of goodwill | — | 12,724 |
| Legal settlement | — | (790) |
| Total operating expenses | 23,698 | 40,202 |
| Operating loss | (10,327) | (16,193) |
| Other income, net | 80 | 300 |
| Loss before income taxes | (10,247) | (15,893) |
| Provision for/(benefit from) income taxes | 6,440 | (1,721) |
| Net loss | $ (16,687) | $ (14,172) |
| Basic loss per common share | $ (1.87) | $ (1.65) |
| Diluted loss per common share | $ (1.87) | $ (1.65) |
| Basic weighted average shares outstanding | 8,942,629 | 8,576,588 |
| Diluted weighted average shares outstanding | 8,942,629 | 8,576,588 |
| Comprehensive loss: | | |
| Net loss | $ (16,687) | $ (14,172) |
| Other comprehensive income/loss: | | |
| Unrealized gain (loss) on available-for-sale securities, net of tax | (38) | 36 |
| Change in foreign currency translation adjustment | (78) | 104 |
| Comprehensive loss | $ (16,803) | $ (14,032) |

*See accompanying notes*

| F-3 |

Table of Contents

# CLEARONE, INC.
## CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
### (Dollars in thousands, except per share data)

| | Common Stock | | Additional Paid-in Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings (Accumulated Deficit) | Total Shareholders' Equity |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balances at December 31, 2016 | 8,812,644 | 9 | 46,669 | (205) | 30,976 | 77,449 |
| Exercise of stock options | 45,260 | — | 64 | — | — | 64 |
| Stock repurchased | (551,936) | (1) | — | — | (5,118) | (5,119) |
| Restricted stock granted | 5,000 | — | — | — | — | — |
| Cash dividends, $0.26 per share | — | — | — | — | (2,239) | (2,239) |
| Stock-based compensation expense | — | — | 665 | — | — | 665 |
| Cancellation of restricted stock and stock options | (1,056) | — | — | — | (287) | (287) |
| Proceeds from employee stock purchase plan | 9,110 | — | 66 | — | — | 66 |
| Unrealized gain on available-for-sale securities, net of tax | — | — | — | 36 | — | 36 |
| Foreign currency translation adjustment | — | — | — | 104 | — | 104 |
| Net loss | — | — | — | — | (14,172) | (14,172) |
| Balances at December 31, 2017 | 8,319,022 | 8 | 47,464 | (65) | 9,160 | 56,567 |
| Issuance of common stock | 8,306,535 | 9 | 9,874 | — | — | 9,883 |
| Stock repurchased | (17,549) | — | — | — | (147) | (147) |
| Cash dividends, $0.07 per share | — | — | — | — | (583) | (583) |
| Stock-based compensation expense | — | — | 463 | — | — | 463 |
| Cancellation of restricted stock and stock options | (1,200) | — | — | — | — | — |
| Proceeds from employee stock purchase plan | 23,789 | — | 39 | — | — | 39 |
| Unrealized loss on available-for-sale securities, net of tax | — | — | — | (38) | — | (38) |
| Foreign currency translation adjustment | — | — | — | (78) | — | (78) |
| Impact on retained earnings for change in revenue recognition policy | — | — | — | — | 2,782 | 2,782 |
| Net loss | — | — | — | — | (16,687) | (16,687) |
| Balances at December 31, 2018 | 16,630,597 | $ 17 | $ 57,840 | $ (181) | $ (5,475) | $ 52,201 |

*See accompanying notes*

| F-4 |

Table of Contents

# CLEARONE, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| Cash flows from operating activities: | | |
| Net loss | $ (16,687) | $ (14,172) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization expense | 1,590 | 1,531 |
| Impairment of goodwill and intangible assets | — | 13,493 |
| Amortization of deferred rent | 12 | (44) |
| Stock-based compensation expense | 463 | 665 |
| Provision for doubtful accounts, net | 159 | 252 |
| Write-down of inventory to net realizable value | 787 | 649 |
| Loss on disposal of assets | 1 | 7 |
| Deferred income taxes | 6,531 | (1,877) |
| Changes in operating assets and liabilities: | | |
| Receivables | 835 | (526) |
| Inventories | 155 | (10,756) |
| Prepaid expenses and other assets | 43 | 9 |
| Accounts payable | (392) | 572 |
| Accrued liabilities | 184 | (23) |
| Income taxes payable | (258) | 853 |
| Deferred product revenue | (8) | 740 |
| Other long-term liabilities | (36) | (644) |
| Net cash used in operating activities | (6,621) | (9,271) |
| | | |
| Cash flows from investing activities: | | |
| Capitalized patent defense costs | (4,698) | (2,289) |
| Purchase of property and equipment | (336) | (638) |
| Purchase of intangible assets | (101) | (278) |
| Proceeds from maturities and sales of marketable securities | 10,516 | 17,640 |
| Purchase of marketable securities | (2,230) | (4,248) |
| Net cash provided by investing activities | 3,151 | 10,187 |
| | | |
| Cash flows from financing activities: | | |
| Issuance of common stock | 9,883 | — |
| Net proceeds from equity-based compensation programs | 39 | 130 |
| Repurchase and cancellation of stock options | — | (287) |
| Dividend payments | (583) | (2,239) |
| Payments for stock repurchases | (147) | (5,119) |
| Net cash used in financing activities | 9,192 | (7,515) |
| | | |
| Effect of exchange rate changes on cash and cash equivalents | (82) | 70 |
| Net increase (decrease) in cash and cash equivalents | 5,640 | (6,529) |
| Cash and cash equivalents at the beginning of the year | 5,571 | 12,100 |
| Cash and cash equivalents at the end of the year | $ 11,211 | $ 5,571 |

| F-5 |

Table of Contents

# CLEARONE, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | |
| | 2018 | 2017 |
| --- | --- | --- |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for income taxes | $ 11 | $ 6 |

*See accompanying notes*

| F-6 |

**CLEARONE, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**1. Business Description, Basis of Presentation and Significant Accounting Policies**

*Business Description:*

ClearOne, Inc., together with its subsidiaries (collectively, "ClearOne" or the "Company"), is a global market leader enabling conferencing, collaboration, and network streaming solutions. The performance and simplicity of our advanced, comprehensive solutions offer unprecedented levels of functionality, reliability and scalability.

*Basis of Presentation:*

*Fiscal Year* – This report on Form 10-K includes consolidated balance sheets for the years ended December 31, 2018 and 2017 and the related consolidated statements of operations and comprehensive loss, shareholders' equity, and cash flows for each of the years 2018 and 2017.

*Consolidation* – These consolidated financial statements include the financial statements of ClearOne, Inc. and its wholly owned subsidiaries. All inter-Company accounts and transactions have been eliminated in consolidation.

*Use of Estimates* – The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America (GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of sales and expenses during the reporting periods. Key estimates in the accompanying consolidated financial statements include, among others, revenue recognition, allowances for doubtful accounts receivable and product returns, provisions for obsolete inventory, potential impairment of goodwill and of long-lived assets, and deferred income tax asset valuation allowances. Actual results could differ materially from these estimates.

*Foreign Currency Translation* – We are exposed to foreign currency exchange risk through our foreign subsidiaries. Other than our subsidiaries in India and Spain, all other foreign subsidiaries are U.S. dollar functional, for which gains and losses arising from remeasurement are included in earnings. Our Spanish subsidiary is Euro functional, for which gains and losses arising from translation are included in accumulated other comprehensive income or loss. Our Indian subsidiary is Indian Rupee functional, for which gains and losses arising from translation are included in accumulated other comprehensive income or loss. We translate and remeasure foreign assets and liabilities at exchange rates in effect at the balance sheet dates. We translate revenue and expenses using average rates during the year.

*Concentration Risk* – We depend on an outsourced manufacturing strategy for our products. We outsource the manufacture of all of our products to third party manufacturers located in Asia. If any of these manufacturers experience difficulties in obtaining sufficient supplies of components, component prices significantly exceeding the anticipated costs, an interruption in their operations, or otherwise suffer capacity constraints, we would experience a delay in production and shipping of these products, which would have a negative impact on our revenues. Should there be any disruption in services due to natural disaster, economic or political difficulties, transportation restrictions, acts of terror, quarantine or other restrictions associated with infectious diseases, or other similar events, or any other reason, such disruption may have a material adverse effect on our business. Operating in the international environment exposes us to certain inherent risks, including unexpected changes in regulatory requirements and tariffs, and potentially adverse tax consequences, which could materially affect our results of operations. Currently, we have no second source of manufacturing for a portion of our products.

*Significant Accounting Policies:*

*Cash Equivalents* – The Company considers all highly-liquid investments with a maturity of three months or less, when purchased, to be cash equivalents. The Company places its temporary cash investments with high-quality financial institutions. At times, such investments may be in excess of the Federal Deposit Insurance Corporation insurance limits.

| F-7 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

*Marketable Securities* - The Company has classified its marketable securities as available-for-sale securities. These debt securities are carried at estimated fair value with unrealized holding gains and losses included in other comprehensive income (loss) in shareholders' equity until realized. Gains and losses on marketable security transactions are reported on the specific-identification method. Dividend and interest income are recognized when earned.

A decline in the market value of any available-for-sale security below cost that is deemed other than temporary results in a charge to earnings and establishes a new cost basis for the security. Losses are charged against "Other income" when a decline in fair value is determined to be other than temporary. We review several factors to determine whether a loss is other than temporary. These factors include, but are not limited to: (i) the extent to which the fair value is less than cost and the cause for the fair value decline, (ii) the financial condition and near term prospects of the issuer, (iii) the length of time a security is in an unrealized loss position and (iv) our ability to hold the security for a period of time sufficient to allow for any anticipated recovery in fair value. There were no other-than-temporary impairments recognized during the years ended December 31, 2018 and 2017.

*Accounts Receivable* – Accounts receivable are recorded at the invoiced amount. Generally, credit is granted to customers on a short-term basis without requiring collateral, and as such, these accounts receivable, do not bear interest, although a finance charge may be applied to such receivables that are past due. The Company extends credit to customers who it believes have the financial strength to pay. The Company has in place credit policies and procedures, an approval process for sales returns and credit memos, and processes for managing and monitoring channel inventory levels.

The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in the Company's existing accounts receivable. Management regularly analyzes accounts receivable including current aging, historical write-off experience, customer concentrations, customer creditworthiness, and current economic trends when evaluating the adequacy of the allowance for doubtful accounts. We review customer accounts quarterly by first assessing accounts with aging over a specific duration and balance over a specific amount. We review all other balances on a pooled basis based on past collection experience. Accounts identified in our customer-level review as exceeding certain thresholds are assessed for potential allowance adjustment if we conclude the financial condition of that customer has deteriorated, adversely affecting their ability to make payments. Delinquent account balances are written off if the Company determines that the likelihood of collection is not probable. If the assumptions that are used to determine the allowance for doubtful accounts change, the Company may have to provide for a greater level of expense in future periods or reverse amounts provided in prior periods.

The Company's allowance for doubtful accounts activity for the years ended December 31, 2018 and 2017 is as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| Balance at beginning of the year | $ 472 | $ 187 |
| Allowance increase (decrease) | 159 | 287 |
| Write offs, net of recoveries | - | (2) |
| Balance at end of the year | $ 631 | $ 472 |

*Inventories* – Inventories are valued at the lower of cost or market, with cost computed on a first-in, first-out ("FIFO") basis. In addition to the price of the product purchased, the cost of inventory includes the Company's internal manufacturing costs, including warehousing, engineering, material purchasing, quality and product planning expenses and applicable overhead, not in excess of estimated realizable value. Consideration is given to obsolescence, excessive levels, deterioration, direct selling expenses, and other factors in evaluating net realizable value.

Distributor channel inventories include products that have been delivered to customers for which revenue recognition criteria have not been met.

The inventory also includes advance replacement units (valued at cost) provided by the Company to end-users to service defective products under warranty. The value of advance replacement units included in the inventory was $184 and $76, as of December 31, 2018 and 2017, respectively.

The inventory consists of current inventory of $13,228 and long-term inventory of $8,953. Long term inventory represents inventory held in excess of our current (next 12 months) requirements based on our recent sales and forecasted level of sales.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

*Property and Equipment* – Property and equipment are stated at cost less accumulated depreciation and amortization. Expenditures that materially increase values or capacities or extend useful lives of property and equipment are capitalized. Routine maintenance, repairs, and renewal costs are expensed as incurred. Gains or losses from the sale, trade-in, or retirement of property and equipment are recorded in current operations and the related book value of the property is removed from property and equipment accounts and the related accumulated depreciation and amortization accounts. Estimated useful lives are generally two to ten years. Depreciation and amortization are calculated over the estimated useful lives of the respective assets using the straight-line method. Leasehold improvement amortization is computed using the straight-line method over the shorter of the lease term or the estimated useful life of the related assets.

*Goodwill and Intangible Assets* – Intangible assets acquired in a purchase business combination are amortized over their useful lives unless these lives are determined to be indefinite. Intangible assets are carried at cost, less accumulated amortization. Amortization is computed over the estimated useful lives of the respective assets, which are generally three to ten years. Goodwill represents the excess of costs over the fair value of net assets of businesses acquired. Goodwill and intangible assets acquired in a purchase business combination and determined to have an indefinite useful life are not amortized.

*Impairment of Goodwill* - Goodwill is measured as the excess of the cost of acquisition over the sum of the amounts assigned to tangible and identifiable intangible assets acquired less liabilities assumed. In accordance with the provisions of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 350, *Intangibles – Goodwill and Other* the Company performs impairment tests of goodwill on an annual basis in the fourth fiscal quarter, or sooner if a triggering event occurs suggesting possible impairment of the values of these assets.

We assess the recoverability of our one reporting unit's carrying value of goodwill by making a qualitative or quantitative assessment. If we begin with a qualitative assessment and are able to support the conclusion that it is not more likely than not that the fair value of the Company is less than its carrying value, we are not required to perform the two-step impairment test. Otherwise, using the two−step approach is required (See Note 3 – Business Combinations, Goodwill and Intangibles). ClearOne and all of its subsidiaries are considered as one reporting unit for this purpose.

In the first step of the goodwill impairment test, we compare the carrying value the Company, including its recorded goodwill, to the estimated fair value. We estimate the fair value using an equity-value based methodology. The principal method used is an equity-value based method in which the Company's market-cap is compared to the net book value. This value is then compared to total net assets. If the fair value of the Company exceeds its carrying value, the goodwill is not impaired and no further review is required. However, if the fair value of the reporting unit is less than its carrying value, we perform the second step of the goodwill impairment test to determine the amount of the impairment charge, if any.

The second step involves a hypothetical allocation of the fair value of the Company to its net tangible and intangible assets (excluding goodwill) as if the business unit were newly acquired, which results in an implied fair value of goodwill. The amount of the impairment charge is the excess of the recorded goodwill over the implied fair value of goodwill.

During the third quarter ended September 30, 2017, we recorded $12,724, or the entire value of goodwill, as an impairment charge. There were no such impairment charges during the year ended December 31, 2018.

*Impairment of Long-Lived Assets* - Long-lived assets, such as property, equipment, and definite-lived intangible assets subject to depreciation and amortization, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset or asset group to estimated future undiscounted net cash flows of the related asset or group of assets over their remaining lives. If the carrying amount of an asset exceeds its estimated future undiscounted cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the estimated fair value of the asset. Impairment of long-lived assets is assessed at the lowest levels for which there are identifiable cash flows that are independent of other groups of assets. The impairment of long-lived assets requires judgments and estimates. If circumstances change, such estimates could also change. Assets held for sale are reported at the lower of the carrying amount or fair value, less the estimated costs to sell.

During the twelve months ended December 31, 2017 we recorded $769 as a charge for impairment of an intangible asset consisting of customer relationships.

| F-9 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

*Adoption of New Revenue Standard:* On January 1, 2018, as required, the Company adopted ASU No. 2014-09 - Revenue from Contracts with Customers (Topic 606) ("ASU 2014-09"), ASU No. 2015-14 - Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date ("ASU 2015-14"), ASU No. 2016-08 - Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations ("ASU 2016-08"), ASU No. 2016-10 - Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing ("ASU 2016-10"), ASU No. 2016-12 - Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients ("ASU 2016-12") and ASU No. 2016-20 - Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers" ("ASU 2016-20") (collectively "the New Revenue Standard"). To conform to the New Revenue Standard, the Company modified its revenue recognition policy as described further below.

*Change in Accounting Policy:* On January 1, 2018, the Company adopted the New Revenue Standard using the modified retrospective method, applying the guidance to all open contracts and recognized an adjustment to increase retained earnings by $2,783, reduce deferred product revenue by $4,338 and reduce distributor channel inventories by $1,555 as of that date. The comparative financial information has not been restated and continues to be presented under the accounting standards in effect for the respective periods. The Company applied the practical expedient and has not disclosed the revenue allocated to future shipments of partially completed contracts.

Prior to our change in accounting policy, revenue from product sales to distributors was not recognized until the return privilege had expired or until it can be determined with reasonable certainty that the return privilege had expired, which approximated when the product was sold-through to customers of our distributors (dealers, system integrators, value-added resellers, and end-users), rather than when the product was initially shipped to a distributor. At each quarter-end, we evaluated the inventory in the distribution channel through information provided by our distributors. The level of inventory in the channel fluctuated up or down each quarter based upon our distributors' individual operations. Accordingly, each quarter-end deferral of revenue and associated cost of goods sold were calculated and recorded based upon the actual channel inventory reported at quarter-end. Further, with respect to distributors and other channel partners not reporting the channel inventory, the revenue and associated cost of goods sold were deferred until we received payment for the product sales made to such distributors or channel partners.

After the change in the accounting policy, substantially all of the Company's revenue is recognized following the transfer of control of the products to the customer, which typically occurs upon shipment or delivery depending on the terms of the underlying contracts. During the 12 months ended December 31, 2018, revenue decreased by $1,252 due to the impact of the adoption of the New Revenue Standard.

*Revenue Recognition Policy:* The Company generates revenue from sales of its audio and video conferencing equipment to distributors, system integrators and value-added resellers. The Company also generates revenue, to a much lesser extent, from sale of software and licenses to distributors, system integrators, value-added resellers and end-users. The Company recognizes revenue when it satisfies a performance obligation in an amount reflecting the consideration to which it expects to be entitled. For sales agreements, the Company has identified the promise to transfer products, each of which are distinct, to be the performance obligation. The Company applies a five-step approach in determining the amount and timing of revenue to be recognized: (1) identifying the contract with a customer, (2) identifying the performance obligations in the contract, (3) determining the transaction price, (4) allocating the transaction price to the performance obligations in the contract and (5) recognizing revenue when the performance obligation is satisfied. Substantially all of the Company's revenue is recognized at the time control of the products transfers to the customer.

Sales agreements with customers are renewable periodically and contain terms and conditions with respect to payment, delivery, warranty and supply, but typically do not require mandatory purchase commitments. In the absence of a sales agreement, the Company's standard terms and conditions at the time of acceptance of purchase orders apply. The Company considers the customer purchase orders, governed by sales agreements or the Company's standard terms and conditions, to be the contract with the customer. The Company evaluates certain factors including the customer's ability to pay (or credit risk).

In determining the transaction price, the Company evaluates whether the price is subject to refund or adjustment to determine the net consideration to which the Company expects to be entitled. Sales to distributors, are typically made pursuant to agreements that provide return rights with respect to discontinued or slow-moving products, referred to as stock rotation. Sales to distributors can also be subject to price adjustment on certain products, primarily for distributors with drop-shipping rights. Although payment terms vary, most distributor agreements require payment within 45 days of invoicing.

| F-10 |

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Dollars in thousands, except share and per share amounts)

The Company recognizes revenue when it satisfies a performance obligation. The Company recognizes revenue from sales agreements upon transferring control of a product to the customer. This typically occurs when products are shipped or delivered, depending on the delivery terms, or when products that are consigned at customer locations are sold to dealers or end users. Revenue recognized during the twelve months ended December 31, 2018 for equipment sales was $27,369, and for software, licenses, etc. was $787. Sales returns and allowances are estimated based on historical experience. Provisions for discounts and rebates to customers, estimated returns and allowances, ship and credit claims and other adjustments are provided for in the same period the related revenues are recognized, and are netted against revenues. For returns, the Company recognizes a related asset for the right to recover returned products with a corresponding reduction to cost of goods sold. The Company reviews warranty and related claims activity and records provisions, as necessary.

Frequently, the Company receives orders with multiple delivery dates that may extend across reporting periods. Since each delivery constitutes a performance obligation, the Company allocates the transaction price of the contract to each performance obligation based on the stand-alone selling price of the products. The Company invoices the customer for each delivery upon shipment and recognizes revenues in accordance with delivery terms. Although payment terms vary, distributors typically pay within 45 days of invoicing and dealers pay within 30 days of invoicing. As scheduled delivery dates are within one year, revenue allocated to future shipments of partially completed contracts are not disclosed.

The Company has elected to record freight and handling costs associated with outbound freight after control over a product has transferred to a customer as a fulfillment cost and include it in cost of revenues. Taxes assessed by government authorities on revenue-producing transactions, including value-added and excise taxes, are presented on a net basis (excluded from revenues) in the consolidated statements of operations and comprehensive income.

The details of deferred revenue and associated cost of goods sold and gross profit are as follows:

|  | As of December 31, | |
|  | 2018 | 2017 |
|---|---|---|
| Deferred revenue | $ 283 | $ 4,635 |
| Deferred cost of goods sold | - | 1,555 |
| Deferred gross profit | $ 283 | $ 3,080 |

The Company offers rebates and market development funds to certain of its distributors, dealers/resellers, and end-users based upon the volume of product purchased by them. The Company records rebates as a reduction of revenue in accordance with GAAP.

The Company provides, at its discretion, advance replacement units to end-users on defective units of certain products under warranty. Since the purpose of these units is not revenue generating, the Company tracks the units due from the end-user, until the defective unit has been returned. Any amount due from the customer upon failure to return the products is accounted as receivable only after establishing customer's failure to return the products. The inventory due from the customer is accounted at cost or market value whichever is lower.

The following table disaggregates the Company's revenue into primary product groups:

|  | Twelve months ended December 31, 2018 | Twelve months ended December 31, 2017 |
|---|---|---|
| Audio Conferencing | $ 13,946 | $ 21,078 |
| Microphones | 9,012 | 13,430 |
| Video products | 5,198 | 7,296 |
|  | $ 28,156 | $ 41,804 |

| F-11 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

The following table disaggregates the Company's revenue into major regions:

| | Twelve months ended December 31, 2018 | Twelve months ended December 31, 2017 |
|---|---|---|
| North and South America | $ 16,534 | $ 26,310 |
| Asia (including Middle East) and Australia | 7,924 | 11,087 |
| Europe and Africa | 3,698 | 4,407 |
| | $ 28,156 | $ 41,804 |

*Warranty Costs* – The Company accrues for warranty costs based on estimated warranty return rates and estimated costs to repair. These reserve costs are classified as accrued liabilities on the consolidated balance sheets. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty returns, and repair cost. The Company reviews the adequacy of its recorded warranty accrual on a quarterly basis.

The details of changes in the Company's warranty accrual are as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2018 | 2017 |
| Balance at the beginning of year | $ 245 | $ 246 |
| Accruals/additions | 288 | 399 |
| Usage/claims | (339) | (400) |
| Balance at end of year | $ 194 | $ 245 |

*Advertising* – The Company expenses advertising costs as incurred. Advertising costs consist of trade shows, magazine advertisements, and other forms of media. Advertising expenses for the years ended December 31, 2018 and 2017 totaled $1,037 and $1,079, respectively, and are included in sales and marketing on the consolidated statements of operations and comprehensive loss.

*Research and Product Development Costs* – The Company expenses research and product development costs as incurred.

- sufficient taxable income within the allowed carryback or carryforward periods;
- future reversals of existing taxable temporary differences, including any tax planning strategies that could be utilized;
- nature or character (e.g., ordinary vs. capital) of the deferred tax assets and liabilities; and
- future taxable income exclusive of reversing temporary differences and carryforwards.

*Income Taxes* – The Company uses the asset and liability method of accounting for income taxes. Under the asset and liability method, deferred tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases, and operating loss and tax credit carry-forwards. These temporary differences will result in deductible or taxable amounts in future years when the reported amounts of the assets or liabilities are recovered or settled. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided when it is more likely than not that some or all of the deferred tax assets may not be realized. On a quarterly basis, the Company tests the value of deferred tax assets for impairment at the taxpaying-component level within each tax jurisdiction. Significant judgment and estimates are required in determining whether valuation allowances should be established as well as the amount of such allowances. The valuation allowance is based on our estimates of future taxable income and the period over which we expect the deferred tax assets to be recovered. Our assessment of future taxable income is based on historical experience and current and anticipated market and economic conditions and trends. In 2018, as a result of negative evidence, principally three years of cumulative pre-tax operating losses, we concluded that it was more likely than not that net operating losses, tax credits and other deferred tax assets were not realizable and therefore, we recorded a full valuation allowance against those net deferred tax assets. Adjustments to the valuation allowance increase or decrease the Company's income tax provision or benefit. As of December 31, 2018, the Company had no net deferred tax assets primarily due to valuation allowances recorded to account for the consecutive quarters with losses before taxes.

| F-12 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

*Recent changes:* On December 22, 2017, the U.S. government enacted comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act, which is generally effective for tax years beginning on January 1, 2018, makes broad and complex changes to the U.S. tax code, including, but not limited to, (1) reducing the U.S. federal corporate tax rate from 35 percent to 21 percent; (2) eliminating the corporate alternative minimum tax (AMT); (3) bonus depreciation that will allow for full expensing of qualified property; (4) creating a new limitation on deductible interest expense; (5) the repeal of the domestic production activity deduction; (6) the creation of the base erosion anti-abuse tax (BEAT), a new minimum tax; (7) a general elimination of U.S. federal income taxes on dividends from foreign subsidiaries and imposing a one-time repatriation tax on deemed repatriated earnings and profits of U.S.-owned foreign subsidiaries (the Transition Tax); (8) a new provision designed to tax global intangible low-taxed income (GILTI), which allows for the possibility of using foreign tax credits (FTCs) and a deduction of up to 50 percent to offset the income tax liability (subject to some limitations); and (9) changing rules related to uses and limitation of net operating loss carryforwards created in tax years beginning after December 31, 2017.

Shortly after enactment, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 118 ("SAB 118") which provided U.S. GAAP guidance on the accounting for the Tax Act's impact at December 31, 2017. A reporting entity may recognize provisional amounts, where the necessary information is not available, prepared or analyzed (including computations) in reasonable detail or where additional guidance is needed from the taxing authority to determine the appropriate application of the Act. A reporting entity's provisional impact analysis may be adjusted within the 12-month measurement period provided for under SAB 118.

The Transition Tax is based on the Company's post-1986 earnings and profits (E&P) of U.S.-owned foreign subsidiaries for which the Company had previously deferred U.S. income taxes. Due to the aggregate loss position of these subsidiaries, the Company estimates that the Transition Tax will not result in additional U.S. tax.

The reduction in the corporate tax rate to 21 percent due to the Tax Act became effective on January 1, 2018. Consequently, the Company has recorded a decrease related to the net deferred tax assets of approximately $3.3 million with a corresponding net adjustment to deferred income tax expense of approximately $3.3 million for the year ended December 31, 2017.

The impact of the Tax Act may differ from amounts currently recorded, possibly materially, during the 12-month measurement period due to, among other things, further refinement of the Company's calculations, changes in interpretations and assumptions the Company has made, guidance that may be issued and actions the Company may take as a result of the Tax Act.

The Company follows the provisions contained in ASC Topic 740, *Income Taxes.* The Company recognizes the tax benefit from an uncertain tax position only if it is at least more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position.

| F-13 |

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Dollars in thousands, except share and per share amounts)

*Earnings Per Share* – The following table sets forth the computation of basic and diluted loss per common share:

|  | Year Ended December 31, | |
|  | 2018 | 2017 |
|---|---|---|
| Numerator: | | |
|    Net loss | $ (16,687) | $ (14,172) |
| Denominator: | | |
|    Basic weighted average shares | 8,942,629 | 8,576,588 |
|    Dilutive common stock equivalents using treasury stock method | - | - |
|    Diluted weighted average shares | 8,942,629 | 8,576,588 |
| | | |
| Basic loss per common share: | $ (1.87) | $ (1.65) |
| Diluted loss per common share: | $ (1.87) | $ (1.65) |
| | | |
| Weighted average options outstanding | 713,331 | 815,870 |
| Anti-dilutive options not included in the computation | 713,331 | 815,870 |

*Share-Based Payment* – We estimate the fair value of stock options using the Black-Scholes option-pricing model, which requires certain estimates, including an expected forfeiture rate and expected term of options granted. We also make decisions regarding the method of calculating expected volatilities and the risk-free interest rate used in the option-pricing model. The resulting calculated fair value of stock options is recognized as compensation expense over the requisite service period, which is generally the vesting period. When there are changes to the assumptions used in the option-pricing model, including fluctuations in the market price of our common stock, there will be variations in the calculated fair value of our future stock option awards, which results in variation in the compensation cost recognized.

*Recent Accounting Pronouncements* - In February 2016, the FASB issued ASU No. 2016-02, Leases (Topic 842) to bring transparency to lessee balance sheets. The ASU will require organizations that lease assets (lessees) to recognize assets and liabilities on the balance sheet for the rights and obligations created by all leases with terms of more than 12 months. The standard will apply to both types of leases-capital (or finance) leases and operating leases. Previously, GAAP has required only capital leases to be recognized on lessee balance sheets. The standard is effective for fiscal years beginning after December 15, 2018 and interim periods within fiscal years beginning after December 15, 2018. Early application will be permitted for all organizations. The original guidance required application on a modified retrospective basis with the earliest period presented. In August 2018, the FASB issued ASU 2018-11, Targeted Improvements to ASC 842, which includes an option to not restate comparative periods in transition and elect to use the effective date of ASC 842, Leases, as the date of initial application of transition. Based on the effective date, this guidance will apply and the Company will adopt this ASU beginning on January 1, 2019 and plan to elect the transition option provided under ASU 2018-11. The Company expects this standard will have a material effect on its consolidated balance sheets with the recognition of new right of use assets and lease liabilities for all operating leases, as these leases typically have a non-cancelable lease term of greater than one year.

In August 2016, the FASB issued ASU No. 2016-15, Classification of Certain Cash Receipts and Cash Payments, which addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice. ASU 2016-15 became effective for the Company on January 1, 2018. ASU 2016-15 had no material impact on our consolidated financial statements.

In May 2017, the FASB issued ASU No. 2017-09, Compensation—Stock Compensation (Topic 718): Scope of Modification Accounting. The new guidance provides clarity and reduces both (1) diversity in practice and (2) cost and complexity when applying the guidance in Topic 718, Compensation—Stock Compensation, to a change to the terms or conditions of a share-based payment award. The accounting standard update became effective for The Company beginning January 1, 2018. ASU 2017-09 did not have any material impact on our consolidated financial statements.

| F-14 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**2. Marketable Securities**

The Company has classified its marketable securities as available-for-sale securities. These securities are carried at estimated fair value with unrealized holding gains and losses included in accumulated other comprehensive income(loss) in shareholders' equity until realized. Gains and losses on marketable security transactions are reported on the specific-identification method. Dividend and interest income are recognized when earned.

The amortized cost, gross unrealized holding gains, gross unrealized holding losses, and fair value for available-for-sale securities by major security type and class of security at December 31, 2018 and 2017 were as follows:

| | Amortized cost | | Gross unrealized holding gains | | Gross unrealized holding losses | | Estimated fair value | |
|---|---|---|---|---|---|---|---|---|
| **December 31, 2018** | | | | | | | | |
| Available-for-sale securities: | | | | | | | | |
| Corporate bonds and notes | $ | 2,911 | $ | 1 | $ | (31) | $ | 2,881 |
| Municipal bonds | | 1,849 | | — | | (15) | | 1,834 |
| Total available-for-sale securities | $ | 4,760 | $ | 1 | $ | (46) | $ | 4,715 |
| **December 31, 2017** | | | | | | | | |
| Available-for-sale securities: | | | | | | | | |
| Corporate bonds and notes | $ | 8,458 | $ | 19 | $ | (49) | $ | 8,428 |
| Municipal bonds | | 4,637 | | 1 | | (28) | | 4,610 |
| Total available-for-sale securities | $ | 13,095 | $ | 20 | $ | (77) | $ | 13,038 |

Maturities of marketable securities classified as available-for-sale securities were as follows at December 31, 2018:

| | Amortized cost | | Estimated fair value | |
|---|---|---|---|---|
| Due within one year | $ | 955 | $ | 951 |
| Due after one year through five years | | 3,805 | | 3,764 |
| Total available-for-sale securities | $ | 4,760 | $ | 4,715 |

Debt securities in an unrealized loss position as of December 31, 2018 were not deemed impaired at acquisition and subsequent declines in fair value are not deemed attributed to declines in credit quality. Management believes that it is more likely than not that the securities will receive a full recovery of par value. The available-for-sale marketable securities in a gross unrealized loss position as of December 31, 2018 are summarized as follows:

| | Less than 12 months | | | | More than 12 months | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Estimated fair value | | Gross unrealized holding losses | | Estimated fair value | | Gross unrealized holding losses | | Estimated fair value | | Gross unrealized holding losses | |
| **As of December 31, 2018** | | | | | | | | | | | | |
| Corporate bonds and notes | $ | — | $ | — | $ | 2,881 | $ | 31 | $ | 2,881 | $ | 31 |
| Municipal bonds | | — | | — | | 1,834 | | 15 | | 1,834 | | 15 |
| | $ | — | $ | — | $ | 4,715 | $ | 46 | $ | 4,715 | $ | 46 |

| F-15 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

### 3. Business Combinations, Goodwill and Intangible Assets

*Goodwill impairment*

There was a decrease in goodwill of $12,724 during 2017 due to the impairment of goodwill. During the third quarter ended September 30, 2017, there was a decrease in the Company's market capitalization which was determined to be a triggering event for potential goodwill impairment. Accordingly, the Company performed a goodwill impairment analysis. The Company utilized the market capitalization to estimate the fair value. Our total stockholders' equity exceeded the estimated fair value. The failure of step one of the goodwill impairment test triggered a step two impairment test. As a result of step two of the impairment test, the Company determined the implied fair value of goodwill and concluded that the carrying value of goodwill exceeded its implied fair value as of September 30, 2017. Accordingly, an impairment charge of $12,724, which represents a full impairment charge, was recognized in the third quarter ended September 30, 2017. There were no such impairment charges during the year ended December 31, 2018.

*Intangible Assets*

Intangible assets as of December 31, 2018, and 2017 consisted of the following:

| | Estimated useful lives (in years) | As of December 31, | |
| --- | --- | --- | --- |
| | | 2018 | 2017 |
| Tradename | 5 to 7 | $ 555 | $ 555 |
| Patents and technological know-how | 10 | 13,377 | 8,578 |
| Proprietary software | 3 to 15 | 2,981 | 2,981 |
| Other | 3 to 5 | 323 | 323 |
| Total intangible assets, gross | | 17,236 | 12,437 |
| Accumulated amortization | | (6,987) | (5,894) |
| Total intangible assets, net | | $ 10,249 | $ 6,543 |

Intangible assets includes capitalized legal expenses, net of amortization of $6,627 million related to our defense of patents from infringement by our competitors. Legal expenses have been capitalized upon satisfaction of two conditions: (a) a determination being made that a successful defense of this litigation is probable, and (b) that the monetary benefits arising out of such successful defense will be in excess of the costs for the defense. Please refer to Note 8 - Commitments and Contingencies for additional information.

During the years ended December 31, 2018 and 2017, amortization of these intangible assets were $1,093 and $932 respectively.

The estimated future amortization expense of intangible assets is as follows:

| Years ending December 31, | |
| --- | --- |
| 2019 | $ 1,226 |
| 2020 | 1,048 |
| 2021 | 1,048 |
| 2022 | 1,048 |
| 2023 | 866 |
| Thereafter | 5,013 |
| Total | $ 10,249 |

| F-16 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**4. Inventories**

Inventories, net of reserves, consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2018 | 2017 |
| Current: | | |
| Raw materials | $ 1,795 | $ 197 |
| Finished goods | 11,433 | 14,218 |
| Total | $ 13,228 | $ 14,415 |
| Long-term: | | |
| Raw materials | $ 2,165 | $ 2,682 |
| Finished goods | 6,788 | 6,026 |
| Total | $ 8,953 | $ 8,708 |

Long-term inventory represents inventory held in excess of our current (next 12 months) requirements based on our recent sales and forecasted level of sales. We have developed programs to reduce the inventory to normal operating levels in the near future. We expect to sell the above inventory, net of reserves, at or above the stated cost and believe that no loss will be incurred on its sale.

Current finished goods do not include distributor channel inventories in the amounts of approximately $0 and $1,555 as of December 31, 2018 and 2017, respectively. Distributor channel inventories represent inventory at distributors and other customers where revenue recognition criteria had not been achieved.

The losses incurred on valuation of inventory at the lower of cost or market value and write-off of obsolete inventory amounted to $787 and $649 during the years ended December 31, 2018 and 2017, respectively.

**5. Property and Equipment**

Major classifications of property and equipment and estimated useful lives were as follows:

| | Estimated useful lives in years | As of December 31, | |
| --- | --- | --- | --- |
| | | 2018 | 2017 |
| Office furniture and equipment | 3 to 10 | $ 5,041 | $ 4,904 |
| Leasehold improvements | 1 to 6 | 1,570 | 1,509 |
| Vehicles | 5 to 10 | 206 | 160 |
| Manufacturing and test equipment | 2 to 10 | 2,633 | 2,577 |
| | | 9,450 | 9,150 |
| Accumulated depreciation and amortization | | (8,062) | (7,601) |
| Property and equipment, net | | $ 1,388 | $ 1,549 |

Depreciation expense on property and equipment for the years ended December 31, 2018 and 2017 was $497 and $599, respectively. During the twelve months ended December 31, 2017 we recorded $128 for the disposal of fixed assets consisting of software, manufacturing equipment and furniture.

| F-17 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**6. Leases and Deferred Rent**

Rent expense is recognized on a straight-line basis over the period of the lease taking into account future rent escalation and holiday periods. Rent expense was $1,053 and $999, including amortization of deferred rent of $(12) and $44 for the years ended December 31, 2018 and 2017, respectively.

We occupy a 5,000 square-foot facility in Gainesville, Florida under the terms of an operating lease that expires in February 2021 with the possibility of renewing the lease for 10 more years. The Gainesville facility was used primarily to support our research and development activities.

We currently occupy a 21,443 square-foot facility in Salt Lake City, Utah under the terms of an operating lease expiring in March 2024, with an option to extend for additional five years. The facility supports our principal administrative, sales, marketing, customer support, and research and product development activities.

We occupy a 10,700 square-foot warehouse in Shenzhen, China under the terms of an operating lease expiring in September 2019, which serves as manufacturing support center for Asia.

We occupy a 7,070 square-foot facility in Austin, Texas - under the terms of an operating lease expiring in October 2019. This facility support our sales, marketing, customer support, and research and development activities.

We occupy a 3,068 square-foot facility in Zaragoza, Spain under the terms of an operating lease expiring in March 2020.  This office supports our research and development and customer support activities

We occupy a 6,175 square-foot facility in Chennai, India - under the terms of an operating lease expiring in August 2021. This facility support our administrative, marketing, customer support, and research and product development activities.

We occupy a 40,000 square-foot warehouse in Salt Lake City, Utah under the terms of an operating lease expiring in April 2025, which serves as our primary inventory fulfillment and repair center.

Future minimum lease payments under non-cancellable operating leases with initial terms of one year or more are as follows:

| Years ending December 31, | | |
|---|---|---:|
| 2019 | $ | 809 |
| 2020 | | 700 |
| 2021 | | 646 |
| 2022 | | 595 |
| 2023 | | 606 |
| Thereafter | | 375 |
| Total minimum lease payments | $ | 3,731 |

**7. Accrued Liabilities**

Accrued liabilities consist of the following:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2018** | | **2017** | |
| Accrued salaries and other compensation | $ | 882 | $ | 1,072 |
| Sales and marketing programs | | 537 | | 435 |
| Product warranty | | 194 | | 245 |
| Other accrued liabilities | | 383 | | 91 |
| Total | $ | 1,996 | $ | 1,843 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

### 8. Commitments and Contingencies

We establish contingent liabilities when a particular contingency is both probable and estimable. The Company is not aware of any pending claims or assessments, other than as described below, which may have a material adverse impact on the Company's financial position or results of operations.

*Outsource Manufacturers.* We have manufacturing agreements with electronics manufacturing service ("EMS") providers related to the outsourced manufacturing of our products. Certain manufacturing agreements establish annual volume commitments. We are also obligated to repurchase Company-forecasted but unused materials. The Company has non-cancellable, non-returnable, and long-lead time commitments with its EMS providers and certain suppliers for inventory components that will be used in production. The Company's purchase commitments under such agreements is approximately $1,247 as of December 31, 2018.

*Uncertain Tax Positions.* As further discussed in Note 12, we had $679 of uncertain tax positions as of December 31, 2018. Due to the inherent uncertainty of the underlying tax positions, it is not possible to forecast the payment of this liability to any particular year.

*Legal Proceedings.*

Intellectual Property Litigation
The Company is involved in patent infringement against Shure Inc. ("Shure") in the matter styled *Shure Inc. v. ClearOne, Inc.*, 1:17-cv-03078, which is pending in the United States District Court for the Northern District of Illinois, Eastern Division, before the Honorable Edmond E. Chang. Shure initiated this litigation on April 24, 2017. Shure's initial complaint sought a declaratory judgment for non-infringement and invalidity of the Company's U.S. Patent No. 9,635,186 ("'186 Patent") and Patent No. 9,264,553 ("'553 Patent"). In early 2018, Shure added a claim that the '186 Patent is unenforceable. The Court dismissed Shure's request for declaratory judgment relating to the '553 Patent, which at the time in 2017, had not been asserted by the Company against any defendant and had been submitted to the USPTO for reissue. The Company has filed counterclaims against Shure for willful infringement of the Company's '186 Patent and the Company's U.S. Patent No. 9,813,806 ("'806 Patent").

On July 14, 2017, Shure filed a petition with Patent Trial and Appeals Board ("PTAB") for *inter partes* review against the '553 Patent. On January 29, 2018, PTAB decided to institute *inter partes* review.

On August 6, 2017, the Company filed a motion seeking a preliminary injunction to enjoin the Shure from continuing to infringe on the Company's '186 Patent. On March 16, 2018 the Court denied the Company's motion for preliminary injunction. On February 6, 2019, the Company filed a motion for reconsideration of the Court's order denying a preliminary injunction against Shure to enjoin infringement of the '186 Patent. That motion is still pending.

In November 2018, the Court heard argument on the Company's motion seeking a preliminary injunction to enjoin Shure from continuing to infringe the Company's '806 Patent. The Court indicated during a status hearing on March 15, 2019 that it will issue a decision by mid-April 2019. That motion is still pending.

| F-19 |

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
#### (Dollars in thousands, except share and per share amounts)

On January 24, 2019, PTAB issued a final written decision confirming the patentability of all claims of the '553 Patent. The '553 Patent covers aspects of ClearOne's revolutionary innovations in beamforming microphone arrays (BMAs). Shure filed a request for a rehearing, which the PTAB denied on March 25, 2019. Shure filed a notice of appeal of the PTAB's decision on April 8, 2019.

On April 10, 2019, the Company filed a new lawsuit against Shure in the United States District Court for the Northern District of Illinois, Eastern Division, styled *ClearOne, Inc. v. Shure Inc.*, 1:19-cv-02421. In this lawsuit, the Company asserts claims against Shure for infringement of the Company's '553 Patent and for trade secret misappropriation.

The Company intends to continue to vigorously enforce and defend its intellectual property rights in the Illinois Action and the PTAB proceedings.

During the twelve months ended December 31, 2018 and 2017, the Company recorded $0 and $1,111, respectively, of pretax gross expenses related to this intellectual property litigation to prevent infringement of the Company's patents. In addition, the Company also capitalized $4,698 and $2,289 of litigation expenses related to this matter during the twelve months ended December 31, 2018 and 2017, respectively.

Former Employee Litigation

*OSHA Complaint*: On or about October 24, 2016, the Company received written notice from the United States Department of Labor, Occupational Health and Safety Administration ("OSHA") that a complaint had been filed against it by a former employee. Among other things, the former employee's OSHA complaint alleged harassment, retaliation, and violations of 18 U.S.C.A. Section 1514A, et seq. (the "Sarbanes-Oxley Act"), arising out of the termination of his employment with the Company on or about August 17, 2016 (the "OSHA Complaint"). By letter dated March 2, 2017, the Company received notice that the same former employee who initiated the OSHA Complaint filed a complaint with the Utah Labor Commission, Anti-Discrimination & Labor Division ("UALD"), alleging that the employee's termination was discriminatory based upon a disability or, in the alternative, retaliatory for substantially the same reasons alleged in the OSHA Complaint. The charge was also forwarded to the United States Equal Employment and Opportunity Commission ("EEOC") and was also recognized as a charge under the EEOC's federal jurisdiction.

Following negotiations between the parties, the parties executed a settlement agreement on December 7, 2017 ("the Agreement") with respect to the OSHA Complaint. Per the terms of the Agreement, the Company's signing of the Agreement in no way constitutes an admission of a violation of any law or regulation enforced by OSHA. Around the same time in December 2017, the parties executed a side settlement agreement by which the former employee acknowledged that he does not believe that the Company engaged in activities which would be construed as violations of securities-related laws and agreed to withdraw his charge against the Company from the UALD and the EEOC. The charge was effectively withdrawn on December 6, 2017.

During the twelve months ended December 31, 2018 and 2017, the Company recorded $0 and $152, respectively, of pretax gross expenses and settlement costs related to the defense of the OSHA Complaint and review of the allegations underlying the former employee's OSHA complaint. The amount recorded in 2017 is net of recoveries from the insurance company towards this matter.

The Company maintains an Employment Practices Liability policy with Chubb/Federal Insurance Company (the "EPL Policy"). Based on the allegations contained in the OSHA Complaint, the Company has tendered a claim for coverage under the EPL Policy.

In addition, the Company is also involved from time to time in various claims and legal proceedings which arise in the normal course of our business. Such matters are subject to many uncertainties and outcomes that are not predictable. However, based on the information available to us, we do not believe any such other proceedings will have a material adverse effect on our business, results of operations, financial position, or liquidity.

*Conclusion*

We believe there are no other items that will have a material adverse impact on the Company's financial position or results of operations. Legal proceedings are subject to all of the risks and uncertainties of legal proceedings and there can be no assurance as to the probable result of any legal proceedings.

The Company believes it has adequately accrued for the aforementioned contingent liabilities. If adverse outcomes were to occur, our financial position, results of operations and cash flows could be negatively affected materially for the period in which the adverse outcomes are known.

| F-20 |

[Table of Contents](#)

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**9. Share-Based Payments**

*Employee Stock Option Plans*

The Company's share-based incentive plan offering stock options is primarily through 2007 Equity Incentive Plan (the "2007 Plan"). Under this plan, one new share is issued for each stock option exercised. The plan is described below.

The 2007 Plan was restated and approved by the shareholders on December 12, 2016. Provisions of the restated 2007 Plan include the granting of up to 2,000,000 incentive and non-qualified stock options, stock appreciation rights, restricted stock and restricted stock units. Options may be granted to employees, officers, non-employee directors and other service providers and may be granted upon such terms as the Compensation Committee of the Board of Directors determines in their sole discretion.

All vesting schedules for options granted are based on 3 or 4-year vesting schedules, with either one-third or one-fourth vesting on the first anniversary and the remaining options vesting ratably over the remainder of the vesting term. Generally, directors and officers have 3-year vesting schedules and all other employees have 4-year vesting schedules. Additionally, in the event of a change in control or the occurrence of a corporate transaction, the Company's Board of Directors has the authority to elect that all unvested options shall vest and become exercisable immediately prior to the event or closing of the transaction. All options outstanding as of December 31, 2018 had contractual lives of ten years.

As of December 31, 2018, there were 624,256 options outstanding under the 2007 Plan. As of December 31, 2018, the 2007 Plan had 870,838 authorized unissued options, while there were no options remaining that could be granted under the 1998 Plan.

The Company uses judgment in determining the fair value of the share-based payments on the date of grant using an option-pricing model with assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the risk-free interest rate of the awards, the expected life of the awards, the expected volatility over the term of the awards, and the expected dividends of the awards. The Company uses the Black-Scholes option pricing model to determine the fair value of share-based payments granted under the guidelines of ASC Topic 718.

In applying the Black-Scholes methodology to the options granted, the Company used the following assumptions:

|  | Year ended December 31, | |
|  | 2018 | 2017 |
| --- | --- | --- |
| Risk-free interest rate, average | — | 2.21 |
| Expected option life, average (in years) | — | 7.9 |
| Expected price volatility, average | — | 40.71 |
| Expected dividend yield | — | 2.83 |

The risk-free interest rate is determined using the U.S. Treasury rate in effect as of the date of the grant, based on the expected life of the stock option. The expected life of the stock option is determined using historical data.

The expected price volatility is determined using a weighted average of daily historical volatility of the Company's stock price over the corresponding expected option life.

| F-21 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

Under guidelines of ASC Topic 718, the Company recognizes the associated compensation cost for only those awards expected to vest on a straight-line basis over the underlying requisite service period. The Company estimated the forfeiture rates based on its historical experience and expectations about future forfeitures.

The following table shows the stock option activity:

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| As of December 31, 2016 | 850,232 | $ 8.06 | 5.78 | $ 3,001 |
| Granted | 105,000 | 9.90 | | |
| Expired and canceled | (3,144) | 10.29 | | |
| Forfeited prior to vesting | (8,996) | 11.01 | | |
| Exercised | (178,662) | 5.90 | | |
| As of December 31, 2017 | 764,430 | $ 8.78 | 6.48 | $ 1,038 |
| Granted | — | — | | |
| Expired and canceled | (106,108) | 7.56 | | |
| Forfeited prior to vesting | (34,066) | 10.79 | | |
| Exercised | — | — | | |
| As of December 31, 2018 | 624,256 | $ 8.87 | 5.28 | $ — |
| Vested and Expected to Vest at December 31, 2017 | 764,430 | $ 8.78 | 6.48 | $ 1,038 |
| Vested at December 31, 2017 | 529,669 | $ 7.89 | 5.50 | $ 1,033 |
| Vested and Expected to Vest at December 31, 2018 | 624,256 | $ 8.87 | 5.28 | $ — |
| Vested at December 31, 2018 | 548,045 | $ 8.62 | 4.90 | $ — |

The weighted average per share fair value of options granted during the years ending December 31, 2018 and 2017 was $0 and $3.31 respectively. The total intrinsic value of options exercised during the years ended December 31, 2018 and 2017 was $0 and $646 respectively.

The total pre-tax compensation cost related to stock options recognized during the years ended December 31, 2018 and 2017 was $463 and $665, respectively. Tax benefit from compensation cost related to stock options during the years ended December 31, 2018 and 2017 was $0. As of December 31, 2018, the total compensation cost related to stock options not yet recognized and before the effect of any forfeitures was $262, which is expected to be recognized over approximately the next 1.17 years on a straight-line basis.

*Employee Stock Purchase Plan*

During the years ended December 31, 2018 and 2017, the Company issued shares to employees under the Company's 2016 Employee Stock Purchase Plan (the "ESPP"). The ESPP was approved by the Company's shareholders on December 12, 2016. As of December 31, 2018 and December 31, 2017, 442,994 and 466,783, respectively of the originally approved 500,000 shares were available for offerings under the ESPP. Offering periods under the ESPP commence on each Jan 1 and July 1, and continue for a duration of six months. The ESPP is available to all employees who do not own, or are deemed to own, shares of stock making up an excess of 5% of the combined voting power of the Company, its parent or subsidiary.

During each offering period, each eligible employee may purchase shares under the ESPP after authorizing payroll deductions. Under the ESPP, each employee may purchase up to the lesser of 2,500 shares or $25 of fair market value (based on the established purchase price) of the Company's stock for each offering period. Unless the employee has previously withdrawn from the offering, his or her accumulated payroll deductions will be used to purchase common stock on the last business day of the period at a price equal to 85% (or a 15% discount) of the fair market value of the common stock on the first or last day of the offering period, whichever is lower.

| F-22 |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

Shares purchased and compensation expense associated with Employee Stock Purchase Plans were as follows:

|                                  | 2018     | 2017    |
|----------------------------------|----------|---------|
| Shares purchased under ESPP plan |   23,789 |   9,110 |
| Plan compensation expense        | $    10  | $    13 |

### _Stock Repurchase Program and Cash Dividends_

On March 1, 2017, the Board of Directors of the Company renewed and extended the repurchase program for up to an additional $10 million of common stock over the next twelve months. In connection with the repurchase extension authorization, the Company was authorized to complete the repurchase through open market transactions or through an accelerated share repurchase program, in each case to be executed at management's discretion based on business and market conditions, stock price, trading restrictions, acquisition activity and other factors. All the transactions effectuated under this program occurred in open market purchases. This program terminated in March 2018.

During the twelve months ended December 31, 2017, we acquired 551,936 shares at an average price of $9.28 per share under the stock repurchase program authorized by the Board of Directors in March 2016 and renewed and extended in March 2017.

Before the program was terminated in March 2018, we acquired 17,549 shares at an average price of $8.39 per share during 2018.

### *Cash Dividends*

On February 21, 2018, the Company declared a cash dividend of $0.07 per share of ClearOne common stock. The dividend was paid on March 21, 2018 to shareholders of record as of March 7, 2018. On June 13, 2018, the Company announced the suspension of its dividend program.

### _Issuance of Common Stock_

The Company raise additional capital through an oversubscribed subscription rights offering (the "Rights Offering") which closed on December 4, 2018 and which raised $9,883 (net of stock issuance costs). In the Rights Offering, we issued one subscription right to each of our shareholders for each share of our common stock that they held. Each subscription right entitled the shareholder to purchase one share of our common stock at a purchase price of $1.20 per share. At the closing, we sold 8,306,535 shares of our common stock and returned subscriptions for 754,868 shares that were oversubscribed after allocating oversubscribed shares on a pro-rata basis.

### 10. Significant Customers

Sales to significant customers that represented more than 10 percent of total revenues are as follows:

|            | Year ended December 31, | |
|------------|------|-------|
|            | 2018 | 2017  |
| Customer A | *    | 16.1% |
| Total      | —    | 16.1% |

| F-23 |

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Dollars in thousands, except share and per share amounts)

The following table summarizes the percentage of total gross accounts receivable from significant customers:

|  | As of December 31, | |
|  | 2018 | 2017 |
|---|---|---|
| Customer A | * | 20.3% |
| Customer B | 14.5% | 11.0% |
| Customer C | 11.8% | |
| Total | 26.3% | 31.3% |

*   Sales to Customer A (Starin Marketing) in 2018 did not exceed 10% of the revenue. Customer A ceased to be a ClearOne distributor in 2018.

### 11. Fair Value Measurements

The fair value of the Company's financial instruments reflects the amounts that the Company estimates it will receive in connection with the sale of an asset or pay in connection with the transfer of a liability in an orderly transaction between market participants at the measurement date (exit price). The fair value hierarchy prioritizes the use of inputs used in valuation techniques into the following three levels:

Level 1 - Quoted prices in active markets for identical assets and liabilities.

Level 2 - Observable inputs other than quoted prices in active markets for identical assets and liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. This category generally includes U.S. Government and agency securities; municipal securities; mutual funds and securities sold and not yet settled.

Level 3 - Unobservable inputs.

The substantial majority of the Company's financial instruments are valued using quoted prices in active markets or based on other observable inputs. The following tables set forth the fair value of the financial instruments re-measured by the Company as of December 31, 2018 and 2017:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **December 31, 2018** | | | | |
| Corporate bonds and notes | $ — | $ 2,881 | $ — | $ 2,881 |
| Municipal bonds | — | 1,834 | — | 1,834 |
| Total | $ — | $ 4,715 | $ — | $ 4,715 |
| **December 31, 2017** | | | | |
| Corporate bonds and notes | $ — | $ 8,428 | $ — | $ 8,428 |
| Municipal bonds | — | 4,610 | — | 4,610 |
| Total | $ — | $ 13,038 | $ — | $ 13,038 |

| F-24 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

**12. Income Taxes**

Consolidated income before taxes for domestic and foreign operations consisted of the following:

| | Year ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Domestic | $ (7,751) | $ (12,630) |
| Foreign | (2,496) | (3,263) |
| Total | $ (10,247) | $ (15,893) |

The Company's (provision) for income taxes consisted of the following:

| | Year ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Current: | | |
| Federal | $ (71) | $ 577 |
| State | 37 | (66) |
| Foreign | 117 | (682) |
| Total current | 83 | (171) |
| Deferred: | | |
| Federal | 2,233 | 1,497 |
| State | 667 | 480 |
| Foreign | 495 | 748 |
| Total | 3,395 | 2,725 |
| Change in valuation allowance | (9,918) | (833) |
| Total deferred | (6,523) | 1,892 |
| Benefit/(provision) for income taxes | $ (6,440) | $ 1,721 |

The income tax benefit (provision) differs from that computed at the federal statutory corporate income tax rate as follows:

| | Year ended December 31, | |
| | 2018 | 2017 |
|---|---|---|
| Tax benefit (provision) at federal statutory rate | $ 2,152 | $ 5,403 |
| State income tax benefit (provision), net of federal benefit | 413 | 439 |
| Research and development tax credits | 250 | 411 |
| Subpart F inclusion | — | (370) |
| Foreign earnings or losses taxed at different rates | 12 | (540) |
| Tax rate change | 23 | (3,161) |
| Other | 628 | 372 |
| Change in valuation allowance | (9,918) | (833) |
| Tax benefit (provision) | $ (6,440) | $ 1,721 |

| F-25 |

Table of Contents

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Dollars in thousands, except share and per share amounts)**

The tax effects of significant temporary differences representing net deferred tax assets and liabilities consisted of the following:

|  | 2018 | 2017 |
|---|---|---|
| Deferred revenue | $ 50 | $ 738 |
| Basis difference in intangible assets | 3,283 | 3,403 |
| Inventory reserve | 2,235 | 2,089 |
| Net operating loss carryforwards | 4,067 | 1,627 |
| Research and development tax credits | 794 | 163 |
| Accrued expenses | 143 | 75 |
| Stock-based compensation | 362 | 327 |
| Allowance for sales returns and doubtful accounts | 160 | 119 |
| Difference in property and equipment basis | (185) | (212) |
| Other | 551 | 438 |
| Total net deferred income tax asset | 11,460 | 8,767 |
| Less: Valuation allowance | (11,460) | (2,236) |
| Net deferred income tax asset (liability) | $ — | $ 6,531 |

The Company has not provided for foreign withholding taxes on undistributed earnings of its non-U.S. subsidiaries since these earnings are intended to be reinvested indefinitely, in accordance with guidelines contained in ASC Topic 740, *Accounting for Income Taxes*. It is not practical to estimate the amount of additional taxes that might be payable on such undistributed earnings.

The Company routinely evaluates the likelihood of realizing the benefit of its deferred tax assets and may record a valuation allowance if, based on all available evidence, it determines that it is more likely than not some portion of the tax benefit will not be realized. As of December 31, 2018, the Company had an aggregate of approximately $11.5 million in deferred tax assets primarily related to intangible assets, net operating losses, tax credit carryforwards, and inventory basis differences. On a quarterly basis, the Company tests the value of deferred tax assets for impairment at the taxpaying-component level within each tax jurisdiction. Significant judgment and estimates are required in determining whether valuation allowances should be established as well as the amount of such allowances. When making such determination, consideration is given to, among other things, the following:

- sufficient taxable income within the allowed carryback or carryforward periods;
- future reversals of existing taxable temporary differences, including any tax planning strategies that could be utilized;
- nature or character (e.g., ordinary vs. capital) of the deferred tax assets and liabilities; and
- future taxable income exclusive of reversing temporary differences and carryforwards.

Based on the foregoing criteria, the Company determined that it no longer meets the "more likely than not" threshold that net operating losses, tax credits and other deferred tax assets will be realized. Accordingly, the Company recorded a full valuation allowance at September 30, 2018, and continues to be in a full valuation allowance position at December 31, 2018.

The Company has federal and state net operating loss ("NOL") carryforwards of approximately $8.4 million (pre-tax), and Spain NOL carryforwards of approximately $7.5 million. The majority of the federal NOL carryforward and the Spain NOL carryforward do not expire. The state NOL carryforwards expire over various periods.

Effective July 1, 2007, the Company adopted the accounting standards related to uncertain tax positions. This standard requires that tax positions be assessed using a two-step process. A tax position is recognized if it meets a "more likely than not" threshold, and is measured at the largest amount of benefit that is greater than 50 percent likely of being realized. Uncertain tax positions must be reviewed at each balance sheet date. Liabilities recorded as a result of this analysis must generally be recorded separately from any current or deferred income tax accounts.

The total amount of unrecognized tax benefits at December 31, 2018 and 2017, that would favorably impact our effective tax rate if recognized was $679 and $647, respectively. As of December 31, 2018 and 2017, we accrued $15 and $14, respectively, in interest and penalties related to unrecognized tax benefits. We account for interest expense and penalties for unrecognized tax benefits as part of our income tax provision.

Although we believe our estimates are reasonable, we can make no assurance that the final tax outcome of these matters will not be different from that which we have reflected in our historical income tax provisions and accruals. Such difference could have a material impact on our income tax provision and operating results in the period in which we make such determination.

| F-26 |

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### (Dollars in thousands, except share and per share amounts)

A reconciliation of the beginning and ending amount of liabilities associated with uncertain tax positions is as follows:

| | Year ended December 31, | |
|---|---|---|
| | **2018** | **2017** |
| Balance - beginning of year | $ 652 | $ 1,189 |
| Additions based on tax positions related to the current year | 58 | 67 |
| Additions for tax positions of prior years | 118 | 520 |
| Reductions for tax positions of prior years | (53) | - |
| Settlements | - | (165) |
| Lapse in statutes of limitations | (96) | (959) |
| Uncertain tax positions, ending balance | $ 679 | $ 652 |

The Company's U.S. federal income tax returns for 2015 through 2018 are subject to examination. The Company also files in various state and foreign jurisdictions. With few exceptions, the Company is no longer subject to federal, state, or non-U.S. income tax examinations by tax authorities for years prior to 2015. The Company completed its audit by the Internal Revenue Service ("IRS") for its 2012 and 2013 tax returns in 2017. As a result of the audit by the IRS, there were no material adjustments made to the Company's tax return.

The Inland Revenue Department of Hong Kong, a Special Administrative Region (the "IRD"), commenced an examination of the Company's Hong Kong profits tax returns for 2009 through 2011 in the fourth quarter of 2012, which was completed subsequent to December 31, 2017. As a result of the audit, there were no material changes to the Company's financial position. During the next twelve months, it is reasonably possible that the amount of the Company's unrecognized income tax benefits could change significantly. These changes could be the result of our ongoing tax audits or the settlement of outstanding audit issues. However, due to the issues being examined, at the current time, an estimate of the range of reasonably possible outcomes cannot be made, beyond amounts currently accrued.

## 13. Geographic Sales Information

The United States was the only country to contribute more than 10 percent of total revenues in each fiscal year. The Company's revenues are substantially denominated in U.S. dollars and are summarized geographically as follows:

| | Year ended December 31, | |
|---|---|---|
| | **2018** | **2017** |
| United States | $ 14,783 | $ 24,569 |
| All other countries | 13,373 | 17,235 |
| Total | $ 28,156 | $ 41,804 |

| F-27 |

# EXHIBIT F

EX-3.1 2 ex_126578.htm EXHIBIT 3.1 - CERTIFICATE OF INCORPORATION - STATE OF DELAWARE

**Exhibit 3.1**

## Certificate of Incorporation
## of ClearOne, Inc.

The undersigned, for purposes of incorporating a corporation under the General Corporation Law of the State of Delaware ("DGCL"), does hereby certify as follows:

### Article I: Name

The name of the corporation is ClearOne, Inc. (the "Corporation")

### Article II: Purpose

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

### Article III: Capitalization

*(a)* *Authorized Shares.* The total number of shares of stock which the Corporation shall have authority to issue is up to an aggregate of fifty million (50,000,000) shares of common stock, par value $0.001 per share.

*(b)* *Common Stock.* Common stock is the only class of stock of the Corporation.

### Article IV: Board of Directors

The number of directors constituting the board of directors shall be not fewer than three (3) and not more than nine (9). The number of directors constituting the board of directors initially shall be four (4). Subject to the previous sentence, the precise number of directors shall be fixed exclusively pursuant to a resolution adopted by the board of directors. Vacancies and newly-created directorships shall be filled exclusively pursuant to a resolution adopted by the board of directors. Any director of the Company's board of directors or the entire board of directors may be removed at any time, with or without cause, by the holders of at least sixty-six and two-thirds percent (66 2/3%) of the shares entitled to vote at an election of directors.

### Article V: Limitation of Director Liability; Indemnification and Advancement of Expenses

(a) *Limitation of Director Liability.* To the fullest extent that the DGCL or any other law of the State of Delaware as it exists on the date hereof or as it may hereafter be amended permits the limitation or elimination of the liability of directors, no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. No amendment to, or modification or repeal of, this Article VII (a) shall adversely affect any right or protection of a director of the Corporation existing hereunder with respect to any act or omission occurring prior to such amendment, modification or repeal.

1

(b) *Indemnification and Advancement of Expenses.* The Corporation shall indemnify and advance expenses to, and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person (an "Indemnitee") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he, or a person for whom he is the legal representative, is or was a director or an officer of the Corporation or, while a director or an officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnitee. Notwithstanding the preceding sentence, the Corporation shall be required to indemnify, or advance expenses to, an Indemnitee in connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the board of directors of the Corporation.

### Article VI: Meetings of Stockholders

(a) *No Action by Written Consent.* Any action required or permitted to be taken by the stockholders of the Corporation may be effected only at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders.

(b) *Special Meetings of Stockholders.* Subject to the requirements of applicable law, special meetings of stockholders may be called only by the board of directors.

(c) *Election of Directors by Written Ballot.* Election of directors need not be by written ballot.

### Article VII: Registered Office and Agent

The address of the Corporation's registered office in the State of Delaware is 1675 South State St., Suite B, in the City of Dover, Kent County, Delaware 19901. The name of the Corporation's registered agent at such address is Capitol Services, Inc.

### Article VIII: Amendments to the Certificate of Incorporation and Bylaws

(a) *Amendments to the Certificate of Incorporation.* Notwithstanding any other provisions of this certificate of incorporation, and notwithstanding that a lesser percentage may be permitted from time to time by applicable law, no provision of Articles IV, V, or VI may be altered, amended or repealed in any respect (including by merger, consolidation or otherwise), nor may any provision inconsistent therewith be adopted, unless such alteration, amendment, repeal or adoption is approved by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66.66%) of the capital stock of the Corporation entitled to vote generally in an election of directors.

(b) *Adoption, Amendment and Repeal of the Bylaws.* In furtherance and not in limitation of the powers conferred by law, the board of directors is expressly authorized to make, alter, amend and repeal the Bylaws of the Corporation subject to the power of the stockholders of the Corporation to alter, amend or repeal the bylaws; provided, however, that with respect to the powers of the stockholders to make, alter, amend or repeal the bylaws, the affirmative vote of the holders of at least sixty-six and two-thirds percent (66.66%) of the capital stock of the corporation entitled to vote generally in an election of directors shall be required to make, alter, amend, or repeal the bylaws of the corporation.

### Article IX: Incorporator

*The name and mailing address of the incorporator of the corporation is*

Name; Katrina Bennett
Mailing Address: 700 Milam, Suite 1400, Houston, TX 77002.

### Article X: Choice of Forum

Unless the Company consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the Company to the Company or the Company's shareholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, the Certificate of Incorporation or the Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein.

IN WITNESS WHEREOF, the undersigned incorporator has executed this Certificate of Incorporation this 25th day of October, 2018.

*/s/ Katrina Benett*
Incorporator
Name: Katrina Bennett

3

CRN 2-18-01-07393-ADV-CSB    D007648A 90    bJH3 330J33B    bJ4DH 725 N 383 bJ4DHJ 6 3909

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHURE INCORPORATED, and<br>SHURE ACQUISITION HOLDINGS, INC. | )<br>)<br>) | C.A. NO. 19-1343 (RGA) (CJB) |
| Plaintiffs, | )<br>) | **JURY TRIAL DEMANDED** |
| v. | )<br>) | |
| CLEARONE, INC., | )<br>) | |
| Defendant. | ) | |

## DECLARATION OF JAMES SCHANZ

I, James Schanz, declare and state as follows:

1.      I am currently an employee of Shure, Inc. ("Shure"), and my job title is VP of Sales, Integrated Systems.

2.      I have been an employee of Shure since November 2005.  Prior to that, I was also employed by Shure between February 1998 and February 2002.

3.      I have been provided a copy of Shure's Amended Complaint, which I understand to be dated September 9, 2019. I have read the Amended Complaint.

4.      At the time of this declaration, I understand that ClearOne has made the types of representations referenced in paragraph 20 of Shure's Amended Complaint to at least the following companies at the following locations:

| Company | Location |
|---|---|
| ███████████ | TX |
| ████████████ | TX |
| █████████████████ | OH |
| ████████ | IL |
| ██████████ | PA |
| █████████████ | NC |
| ████████████ | NC |
| ███████████████ | MD |
| ████████ | TX |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 14, 2019                    Respectfully submitted,

_____

James Schanz

# EXHIBIT H

## United States District Courts — National Judicial Caseload Profile

| | | | 12-Month Periods Ending | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 |
| **Overall Caseload Statistics** | Filings [1] | | 398,462 | 374,791 | 388,042 | 367,157 | 387,190 | 405,236 |
| | Terminations | | 364,233 | 369,842 | 352,704 | 393,885 | 345,155 | 429,308 |
| | Pending | | 420,947 | 423,680 | 456,879 | 428,864 | 488,658 | 461,481 |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 1.7 | 8.1 | 4.4 | 10.4 | 4.7 | |
| | Number of Judgeships | | 677 | 677 | 677 | 677 | 677 | 677 |
| | Vacant Judgeship Months [2] | | 855.7 | 508.0 | 701.5 | 1,115.1 | 1,523.6 | 1,558.7 |
| **Actions per Judgeship** | **Filings** | Total | 589 | 554 | 573 | 542 | 572 | 599 |
| | | Civil | 441 | 414 | 429 | 401 | 415 | 434 |
| | | Criminal Felony | 110 | 104 | 107 | 101 | 116 | 125 |
| | | Supervised Release Hearings | 37 | 36 | 37 | 40 | 41 | 40 |
| | Pending Cases [2] | | 622 | 626 | 675 | 633 | 722 | 682 |
| | Weighted Filings [2] | | 510 | 482 | 492 | 475 | 507 | 528 |
| | Terminations | | 538 | 546 | 521 | 582 | 510 | 634 |
| | Trials Completed | | 18 | 17 | 17 | 17 | 16 | 17 |
| **Median Times (Months)** | From Filing to Disposition | Criminal Felony | 7.4 | 7.5 | 7.4 | 7.7 | 7.2 | 7.0 |
| | | Civil [2] | 8.4 | 8.8 | 8.5 | 10.4 | 7.8 | 12.2 |
| | From Filing to Trial [2] (Civil Only) | | 26.8 | 26.5 | 27.1 | 26.6 | 26.9 | 27.2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 30,208 9.0 | 30,432 8.9 | 53,003 14.3 | 59,375 17.2 | 90,864 22.9 | 58,659 16.1 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.2 |
| | Jurors | Avg. Present for Jury Selection | 50.8 | 48.2 | 48.4 | 49.4 | 52.0 | 52.3 |
| | | Percent Not Selected or Challenged | 37.8 | 36.3 | 38.1 | 37.5 | 37.3 | 38.1 |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | |
|---|---|---|---|
| Total Civil | 293,520 | Total Criminal[1] | 84,225 |
| A-Social Security | 17,903 | A-Marijuana | 1,671 |
| B-Personal Injury/Product Liability | 53,456 | B-All Other Drugs | 22,425 |
| C-Prisoner Petitions | 54,445 | C-Immigration | 29,818 |
| D-Forfeitures and Penalties | 1,148 | D-Firearms and Explosives | 12,406 |
| E-Real Property | 6,966 | E-Fraud | 7,123 |
| F-Labor Suits | 16,840 | F-Violent Offenses | 2,652 |
| G-Contracts | 25,216 | G-Sex Offenses | 3,200 |
| H-Torts (other than Personal Injury/Product Liability) | 27,633 | H-Forgery and Counterfeiting | 338 |
| I-Copyright, Patent, and Trademark | 13,185 | I-Larceny and Theft | 1,094 |
| J-Civil Rights | 43,223 | J-Justice System Offenses | 820 |
| K-Antitrust | 537 | K-Regulatory Offenses | 864 |
| L-All Other Civil | 32,968 | L-All Other Criminal | 1,814 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, whereas filings "by nature of offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**DISTRICT OF COLUMBIA**

| | | | | 12-Month Periods Ending | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 2,747 | 2,554 | 3,134 | 3,071 | 3,678 | 4,206 | | |
| | Terminations | | 2,639 | 2,620 | 2,636 | 2,841 | 3,056 | 3,678 | | |
| | Pending | | 3,365 | 3,276 | 3,767 | 3,985 | 4,581 | 5,091 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | | 53.1 | 64.7 | 34.2 | 37.0 | 14.4 | 16 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months [2] | | 38.7 | 13.4 | 13.8 | 53.9 | 23.0 | 10.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 183 | 170 | 209 | 205 | 245 | 280 | 87 | - |
| | | Civil | 148 | 146 | 181 | 168 | 209 | 240 | 68 | - |
| | | Criminal Felony | 28 | 15 | 20 | 21 | 28 | 30 | 92 | - |
| | | Supervised Release Hearings | 8 | 9 | 8 | 16 | 8 | 11 | 83 | - |
| | Pending Cases [2] | | 224 | 218 | 251 | 266 | 305 | 339 | 79 | - |
| | Weighted Filings [2] | | 198 | 177 | 227 | 213 | 269 | 279 | 85 | - |
| | Terminations | | 176 | 175 | 176 | 189 | 204 | 245 | 88 | - |
| | Trials Completed | | 6 | 7 | 6 | 7 | 6 | 9 | 81 | - |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 12.0 | 11.9 | 17.1 | 11.0 | 12.9 | 9.5 | 42 | - |
| | | Civil [2] | 7.6 | 8.2 | 8.0 | 6.9 | 6.0 | 5.6 | 6 | - |
| | From Filing to Trial [2] (Civil Only) | | 39.8 | 45.1 | 40.2 | 46.0 | 46.1 | 48.7 | 62 | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 389 16.0 | 368 15.1 | 369 12.5 | 393 12.5 | 438 12.3 | 663 16.5 | 81 | - |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.3 | 1.4 | 1.3 | 1.4 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 71.5 | 49.1 | 55.1 | 64.8 | 73.4 | 103.3 | | |
| | | Percent Not Selected or Challenged | 47.5 | 42.8 | 47.7 | 52.2 | 54.4 | 60.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,596 | 49 | 599 | 308 | 14 | 28 | 114 | 220 | 202 | 49 | 559 | 20 | 1,434 |
| Criminal [1] | 451 | 2 | 75 | 6 | 139 | 70 | 22 | 12 | 5 | 2 | 51 | 7 | 60 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MAINE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 768 | 844 | 921 | 847 | 788 | 919 | | |
| | Terminations | | 721 | 862 | 868 | 866 | 814 | 768 | | |
| | Pending | | 630 | 608 | 657 | 640 | 617 | 769 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 19.7 | 8.9 | -0.2 | 8.5 | 16.6 | | 13 | 3 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 9.0 | 0.0 | 0.0 | 0.0 | 12.0 | 3.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 256 | 281 | 307 | 282 | 263 | 306 | 83 | 4 |
| | | Civil | 166 | 180 | 217 | 180 | 172 | 185 | 84 | 5 |
| | | Criminal Felony | 68 | 70 | 62 | 64 | 59 | 96 | 46 | 2 |
| | | Supervised Release Hearings | 22 | 32 | 29 | 38 | 32 | 26 | 60 | 2 |
| | Pending Cases [2] | | 210 | 203 | 219 | 213 | 206 | 256 | 89 | 5 |
| | Weighted Filings [2] | | 245 | 277 | 277 | 254 | 237 | 301 | 82 | 4 |
| | Terminations | | 240 | 287 | 289 | 289 | 271 | 256 | 86 | 5 |
| | Trials Completed | | 21 | 17 | 17 | 22 | 20 | 21 | 30 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.3 | 9.8 | 9.4 | 11.2 | 9.3 | 9.7 | 48 | 2 |
| | | Civil [2] | 8.2 | 7.5 | 6.3 | 6.9 | 7.9 | 7.5 | 20 | 1 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | 19.3 | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 6 / 1.4 | 8 / 2.0 | 7 / 1.5 | 8 / 1.7 | 17 / 3.9 | 23 / 4.9 | 22 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 52.5 | 45.6 | 40.7 | 32.5 | 37.7 | 51.4 | | |
| | | Percent Not Selected or Challenged | 20.6 | 22.4 | 28.2 | 21.8 | 22.7 | 28.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 554 | 86 | 42 | 49 | 4 | 135 | 24 | 40 | 35 | 8 | 89 | 2 | 40 |
| Criminal [1] | 287 | 11 | 133 | 12 | 39 | 33 | 14 | 20 | 4 | 4 | 2 | 5 | 10 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MASSACHUSETTS**

| | | 12-Month Periods Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | Numerical Standing Within |
| | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 5,682 | 6,006 | 4,290 | 3,697 | 3,964 | 4,099 | | |
| | Terminations | 3,597 | 3,905 | 3,894 | 4,706 | 5,037 | 6,004 | | |
| | Pending | 6,349 | 8,444 | 8,824 | 7,813 | 6,725 | 4,853 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -27.9 | -31.8 | -4.5 | 10.9 | 3.4 | | 43 | 5 |
| | Number of Judgeships | 13 | 13 | 13 | 13 | 13 | 13 | | |
| | Vacant Judgeship Months [2] | 32.7 | 13.0 | 12.0 | 0.0 | 17.9 | 24.0 | | |
| **Actions per Judgeship** | **Filings** Total | 437 | 462 | 330 | 284 | 305 | 315 | 81 | 3 |
| | Civil | 385 | 405 | 249 | 224 | 244 | 242 | 65 | 2 |
| | Criminal Felony | 32 | 35 | 54 | 40 | 37 | 51 | 82 | 5 |
| | Supervised Release Hearings | 20 | 22 | 26 | 20 | 23 | 22 | 66 | 4 |
| | Pending Cases [2] | 488 | 650 | 679 | 601 | 517 | 373 | 69 | 3 |
| | Weighted Filings [2] | 357 | 352 | 301 | 283 | 301 | 308 | 79 | 3 |
| | Terminations | 277 | 300 | 300 | 362 | 387 | 462 | 52 | 1 |
| | Trials Completed | 10 | 13 | 10 | 11 | 12 | 12 | 66 | 2 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 16.2 | 15.6 | 14.2 | 12.9 | 14.0 | 12.9 | 75 | 4 |
| | Civil [2] | 9.2 | 10.0 | 10.4 | 16.8 | 19.4 | 27.2 | 92 | 5 |
| | From Filing to Trial [2] (Civil Only) | 27.9 | 26.6 | 30.4 | 30.1 | 34.8 | 30.7 | 41 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 273 / 4.9 | 284 / 3.6 | 449 / 5.6 | 1,627 / 23.3 | 2,266 / 37.7 | 548 / 13.7 | 70 | 5 |
| | Average Number of Felony Defendants Filed per Case | 1.3 | 1.4 | 1.6 | 1.5 | 1.2 | 1.3 | | |
| | Jurors Avg. Present for Jury Selection | 65.0 | 81.3 | 51.9 | 74.1 | 87.7 | 59.7 | | |
| | Percent Not Selected or Challenged | 37.4 | 39.8 | 31.9 | 38.0 | 45.1 | 36.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,149 | 93 | 648 | 362 | 6 | 133 | 298 | 354 | 257 | 133 | 447 | 3 | 415 |
| Criminal [1] | 653 | 2 | 220 | 42 | 67 | 168 | 21 | 35 | 1 | 13 | 12 | 9 | 63 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW HAMPSHIRE**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 746 | 805 | 875 | 822 | 1,350 | 1,661 | | |
| | Terminations | 783 | 815 | 788 | 758 | 786 | 792 | | |
| | Pending | 607 | 606 | 699 | 760 | 1,327 | 2,207 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 122.7 | 106.3 | 89.8 | 102.1 | 23.0 | | 6 | 1 |
| | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | 5.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 249 | 268 | 292 | 274 | 450 | 554 | 28 | 1 |
| | Civil | 172 | 175 | 186 | 175 | 351 | 437 | 24 | 1 |
| | Criminal Felony | 56 | 65 | 80 | 76 | 78 | 93 | 48 | 3 |
| | Supervised Release Hearings | 21 | 28 | 25 | 23 | 20 | 23 | 65 | 3 |
| | Pending Cases [2] | 202 | 202 | 233 | 253 | 442 | 736 | 18 | 1 |
| | Weighted Filings [2] | 220 | 245 | 256 | 251 | 386 | 478 | 38 | 1 |
| | Terminations | 261 | 272 | 263 | 253 | 262 | 264 | 85 | 4 |
| | Trials Completed | 16 | 10 | 11 | 12 | 11 | 9 | 81 | 4 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 9.1 | 7.6 | 7.2 | 9.9 | 10.1 | 8.9 | 37 | 1 |
| | Civil [2] | 8.9 | 8.2 | 8.4 | 8.8 | 10.0 | 10.4 | 67 | 3 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 13 / 2.7 | 29 / 6.3 | 22 / 4.4 | 23 / 4.2 | 34 / 3.1 | 39 / 2.0 | 3 | 1 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.2 | 1.1 | 1.3 | 1.4 | 1.2 | | |
| | Jurors Avg. Present for Jury Selection | 53.3 | 45.3 | 59.8 | 55.0 | 60.5 | 54.6 | | |
| | Jurors Percent Not Selected or Challenged | 33.8 | 24.1 | 41.6 | 24.2 | 41.3 | 35.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,311 | 45 | 825 | 131 | 5 | 22 | 17 | 40 | 58 | 12 | 101 | - | 55 |
| Criminal [1] | 278 | 3 | 161 | 26 | 30 | 25 | 9 | 8 | - | 2 | 3 | 3 | 8 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**RHODE ISLAND**

| | | | | 12-Month Periods Ending | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 956 | 685 | 835 | 757 | 846 | 886 | | |
| | Terminations | | 2,151 | 1,580 | 831 | 814 | 795 | 830 | | |
| | Pending | | 1,783 | 896 | 884 | 826 | 881 | 939 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -7.3 | 29.3 | 6.1 | 17.0 | 4.7 | | 40 | 4 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 9.0 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 319 | 228 | 278 | 252 | 282 | 295 | 86 | 5 |
| | | Civil | 244 | 180 | 220 | 204 | 216 | 226 | 74 | 3 |
| | | Criminal Felony | 64 | 36 | 45 | 37 | 50 | 52 | 80 | 4 |
| | | Supervised Release Hearings | 11 | 12 | 13 | 11 | 16 | 17 | 78 | 5 |
| | Pending Cases [2] | | 594 | 299 | 295 | 275 | 294 | 313 | 82 | 4 |
| | Weighted Filings [2] | | 285 | 218 | 253 | 239 | 277 | 294 | 83 | 5 |
| | Terminations | | 717 | 527 | 277 | 271 | 265 | 277 | 84 | 3 |
| | Trials Completed | | 7 | 9 | 6 | 7 | 3 | 5 | 93 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.9 | 9.6 | 8.1 | 10.4 | 8.5 | 10.5 | 60 | 3 |
| | | Civil [2] | 25.2 | 25.5 | 14.4 | 10.5 | 8.6 | 8.5 | 33 | 2 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 647 39.8 | 187 24.0 | 65 8.6 | 57 8.2 | 77 10.9 | 74 9.7 | 56 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.2 | 1.3 | 1.1 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 100.6 | 69.1 | 44.2 | 48.1 | 51.3 | 66.3 | | |
| | | Percent Not Selected or Challenged | 65.9 | 43.6 | 38.5 | 37.2 | 32.5 | 45.3 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 679 | 46 | 67 | 51 | 14 | 42 | 58 | 103 | 71 | 11 | 151 | - | 65 |
| Criminal [1] | 154 | 1 | 53 | 15 | 17 | 38 | 2 | 15 | 2 | 5 | 1 | 1 | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**PUERTO RICO**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,118 | 2,749 | 4,183 | 3,478 | 2,342 | 2,862 | | |
| | Terminations | | 2,961 | 2,786 | 3,282 | 3,252 | 2,411 | 3,035 | | |
| | Pending | | 3,566 | 3,522 | 4,453 | 4,700 | 4,582 | 4,472 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -8.2 | 4.1 | -31.6 | -17.7 | 22.2 | | 7 | 2 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months [2] | | 8.1 | 0.0 | 1.0 | 12.0 | 12.0 | 21.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 445 | 393 | 598 | 497 | 335 | 409 | 66 | 2 |
| | | Civil | 137 | 185 | 370 | 263 | 133 | 189 | 83 | 4 |
| | | Criminal Felony | 285 | 182 | 204 | 196 | 172 | 175 | 13 | 1 |
| | | Supervised Release Hearings | 23 | 26 | 24 | 38 | 29 | 45 | 34 | 1 |
| | Pending Cases [2] | | 509 | 503 | 636 | 671 | 655 | 639 | 25 | 2 |
| | Weighted Filings [2] | | 541 | 423 | 543 | 457 | 341 | 366 | 66 | 2 |
| | Terminations | | 423 | 398 | 469 | 465 | 344 | 434 | 65 | 2 |
| | Trials Completed | | 14 | 11 | 12 | 14 | 10 | 10 | 76 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.3 | 12.6 | 13.6 | 14.4 | 16.9 | 18.9 | 91 | 5 |
| | | Civil [2] | 13.2 | 12.1 | 6.0 | 10.0 | 14.7 | 18.4 | 91 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 22.0 | 27.3 | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 105 / 8.0 | 106 / 6.5 | 102 / 4.1 | 117 / 4.6 | 156 / 7.4 | 202 / 10.3 | 60 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 2.2 | 1.7 | 2.0 | 1.8 | 1.8 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 128.4 | 81.4 | 69.1 | 75.2 | 80.1 | 76.0 | | |
| | | Percent Not Selected or Challenged | 65.4 | 48.0 | 45.2 | 41.3 | 41.0 | 42.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,320 | 266 | 11 | 86 | 43 | 409 | 50 | 122 | 172 | 17 | 91 | 5 | 48 |
| Criminal [1] | 1,227 | 27 | 359 | 167 | 448 | 65 | 68 | 37 | - | 11 | 5 | 26 | 14 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CONNECTICUT**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | | Filings [1] | 2,491 | 2,575 | 2,658 | 2,750 | 2,887 | 2,912 | **U.S.** | **Circuit** |
| | | Terminations | 2,540 | 2,605 | 2,584 | 2,778 | 2,881 | 2,943 | | |
| | | Pending | 3,070 | 3,027 | 3,106 | 3,088 | 3,085 | 3,048 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 16.9 | 13.1 | 9.6 | 5.9 | 0.9 | | 53 | 5 |
| | | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | |
| | | Vacant Judgeship Months [2] | 7.8 | 4.7 | 0.0 | 5.9 | 12.0 | 12.2 | | |
| **Actions per Judgeship** | **Filings** | Total | 311 | 322 | 332 | 344 | 361 | 364 | 75 | 5 |
| | | Civil | 253 | 267 | 263 | 277 | 284 | 271 | 60 | 5 |
| | | Criminal Felony | 42 | 35 | 45 | 43 | 53 | 68 | 68 | 4 |
| | | Supervised Release Hearings | 16 | 19 | 24 | 23 | 24 | 26 | 60 | 6 |
| | | Pending Cases [2] | 384 | 378 | 388 | 386 | 386 | 381 | 65 | 5 |
| | | Weighted Filings [2] | 313 | 304 | 309 | 326 | 356 | 365 | 67 | 5 |
| | | Terminations | 318 | 326 | 323 | 347 | 360 | 368 | 74 | 5 |
| | | Trials Completed | 15 | 16 | 16 | 14 | 15 | 12 | 66 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 13.4 | 16.3 | 16.8 | 14.0 | 11.9 | 12.5 | 74 | 2 |
| | | Civil [2] | 9.7 | 9.9 | 10.6 | 9.7 | 10.2 | 9.4 | 49 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 39.2 | 41.5 | 38.7 | 35.1 | 37.9 | 30.6 | 40 | 2 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 238 / 9.9 | 209 / 8.5 | 161 / 6.4 | 168 / 6.7 | 142 / 5.8 | 120 / 5.4 | 29 | 1 |
| | | Average Number of Felony Defendants Filed per Case | 1.7 | 1.4 | 1.7 | 1.5 | 1.7 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 59.5 | 62.1 | 50.6 | 61.2 | 62.4 | 67.4 | | |
| | | Percent Not Selected or Challenged | 10.8 | 14.8 | 19.1 | 20.7 | 15.4 | 28.4 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,164 | 233 | 42 | 421 | 16 | 25 | 114 | 234 | 185 | 192 | 438 | 3 | 261 |
| Criminal [1] | 542 | - | 273 | 21 | 103 | 86 | 18 | 17 | - | 5 | 3 | 4 | 12 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW YORK NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 2,426 | 2,426 | 2,345 | 2,202 | 2,289 | 2,322 | | |
| | | Terminations | 2,660 | 2,555 | 2,330 | 2,386 | 2,396 | 2,289 | | |
| | | Pending | 2,837 | 2,711 | 2,734 | 2,552 | 2,487 | 2,536 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -4.3 | -4.3 | -1.0 | 5.4 | 1.4 | | 52 | 4 |
| | | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | | Vacant Judgeship Months [2] | 12.0 | 4.7 | 5.9 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 485 | 485 | 469 | 440 | 458 | 464 | 53 | 4 |
| | | Civil | 362 | 379 | 354 | 340 | 340 | 348 | 40 | 4 |
| | | Criminal Felony | 77 | 62 | 72 | 60 | 77 | 83 | 55 | 3 |
| | | Supervised Release Hearings | 46 | 45 | 43 | 40 | 41 | 33 | 49 | 3 |
| | Pending Cases [2] | | 567 | 542 | 547 | 510 | 497 | 507 | 41 | 4 |
| | Weighted Filings [2] | | 378 | 363 | 366 | 328 | 339 | 372 | 64 | 4 |
| | Terminations | | 532 | 511 | 466 | 477 | 479 | 458 | 56 | 4 |
| | Trials Completed | | 22 | 17 | 15 | 17 | 15 | 11 | 72 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 12.8 | 12.4 | 12.5 | 10.9 | 12.3 | 10.4 | 57 | 1 |
| | | Civil [2] | 10.5 | 11.0 | 12.1 | 11.1 | 9.8 | 10.1 | 62 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 36.5 | 41.2 | 43.0 | 42.6 | 43.7 | 40.7 | 58 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 173 8.4 | 172 8.4 | 156 7.7 | 167 8.9 | 183 10.2 | 175 9.6 | 54 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.1 | 1.3 | 1.3 | 1.2 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 31.9 | 32.8 | 34.0 | 29.3 | 31.3 | 30.8 | | |
| | | Percent Not Selected or Challenged | 21.1 | 24.1 | 18.4 | 14.3 | 17.4 | 18.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,742 | 310 | 68 | 543 | 21 | 24 | 56 | 87 | 102 | 101 | 315 | 1 | 114 |
| Criminal [1] | 414 | 2 | 131 | 143 | 23 | 38 | 2 | 45 | - | 3 | - | - | 27 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW YORK EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 9,141 | 8,681 | 8,805 | 8,799 | 8,938 | 8,759 | | |
| | | Terminations | 7,843 | 8,738 | 8,545 | 8,575 | 9,423 | 8,917 | | |
| | | Pending | 12,854 | 12,649 | 12,852 | 13,020 | 12,563 | 12,230 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -4.2 | 0.9 | -0.5 | -0.5 | -2.0 | | 66 | 6 |
| | | Number of Judgeships | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | | Vacant Judgeship Months [2] | 5.5 | 28.1 | 23.9 | 35.0 | 48.0 | 49.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 609 | 579 | 587 | 587 | 596 | 584 | 25 | 2 |
| | | Civil | 530 | 500 | 501 | 505 | 505 | 504 | 17 | 2 |
| | | Criminal Felony | 54 | 49 | 57 | 49 | 51 | 50 | 84 | 5 |
| | | Supervised Release Hearings | 26 | 29 | 29 | 33 | 39 | 30 | 54 | 4 |
| | Pending Cases [2] | | 857 | 843 | 857 | 868 | 838 | 815 | 12 | 2 |
| | Weighted Filings [2] | | 602 | 562 | 547 | 521 | 543 | 549 | 25 | 3 |
| | Terminations | | 523 | 583 | 570 | 572 | 628 | 594 | 22 | 2 |
| | Trials Completed | | 17 | 17 | 15 | 17 | 15 | 10 | 76 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 22.3 | 21.9 | 23.2 | 19.7 | 21.6 | 21.1 | 93 | 6 |
| | | Civil [2] | 8.6 | 9.6 | 9.0 | 9.5 | 8.1 | 8.7 | 40 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 32.4 | 31.4 | 36.2 | 34.5 | 33.5 | 43.9 | 60 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 1,236 12.6 | 1,224 12.5 | 1,772 17.6 | 1,942 18.9 | 1,761 18.0 | 1,656 17.7 | 82 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.3 | 1.4 | 1.4 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 116.4 | 113.5 | 112.8 | 99.6 | 125.7 | 143.7 | | |
| | | Percent Not Selected or Challenged | 39.4 | 38.2 | 49.9 | 51.1 | 45.3 | 41.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7,557 | 420 | 206 | 507 | 11 | 233 | 1,102 | 430 | 697 | 542 | 1,459 | 15 | 1,935 |
| Criminal [1] | 750 | 5 | 206 | 92 | 107 | 139 | 57 | 32 | 18 | 8 | 21 | 19 | 46 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW YORK SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 12,179 | 13,013 | 13,074 | 12,526 | 13,727 | 15,085 | | |
| | | Terminations | 12,263 | 13,703 | 12,731 | 13,252 | 12,578 | 14,485 | | |
| | | Pending | 18,545 | 18,069 | 18,341 | 17,030 | 18,152 | 18,709 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 23.9 | 15.9 | 15.4 | 20.4 | 9.9 | | 26 | 2 |
| | | Number of Judgeships | 28 | 28 | 28 | 28 | 28 | 28 | | |
| | | Vacant Judgeship Months [2] | 8.7 | 0.0 | 11.0 | 16.0 | 38.8 | 66.2 | | |
| **Actions per Judgeship** | **Filings** | Total | 435 | 465 | 467 | 447 | 490 | 539 | 36 | 3 |
| | | Civil | 362 | 401 | 382 | 364 | 414 | 462 | 19 | 3 |
| | | Criminal Felony | 49 | 43 | 58 | 52 | 49 | 47 | 86 | 6 |
| | | Supervised Release Hearings | 23 | 21 | 27 | 31 | 28 | 29 | 55 | 5 |
| | Pending Cases [2] | | 662 | 645 | 655 | 608 | 648 | 668 | 21 | 3 |
| | Weighted Filings [2] | | 427 | 442 | 471 | 457 | 512 | 587 | 23 | 2 |
| | Terminations | | 438 | 489 | 455 | 473 | 449 | 517 | 38 | 3 |
| | Trials Completed | | 16 | 14 | 14 | 15 | 14 | 16 | 48 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 15.1 | 16.3 | 14.5 | 13.1 | 14.3 | 14.1 | 82 | 4 |
| | | Civil [2] | 8.1 | 8.9 | 7.9 | 8.4 | 6.4 | 6.5 | 12 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 32.1 | 30.0 | 25.1 | 31.4 | 31.4 | 30.4 | 39 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 3,454 / 25.4 | 2,716 / 20.0 | 2,397 / 17.6 | 2,265 / 18.8 | 2,493 / 18.8 | 2,927 / 20.9 | 86 | 6 |
| | Average Number of Felony Defendants Filed per Case | | 1.7 | 1.7 | 2.0 | 2.2 | 2.0 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 87.5 | 75.8 | 73.1 | 68.7 | 75.7 | 74.8 | | |
| | | Percent Not Selected or Challenged | 56.1 | 55.1 | 55.7 | 48.6 | 51.6 | 52.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 12,948 | 530 | 729 | 1,159 | 26 | 88 | 1,244 | 1,149 | 1,096 | 1,390 | 3,768 | 49 | 1,720 |
| Criminal [1] | 1,317 | 1 | 514 | 52 | 171 | 363 | 44 | 56 | 7 | 19 | 18 | 18 | 54 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW YORK WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | | Filings [1] | 2,846 | 3,072 | 2,857 | 2,876 | 3,529 | 3,812 | **U.S.** | **Circuit** |
| | | Terminations | 2,953 | 2,863 | 2,947 | 2,895 | 2,974 | 3,674 | | |
| | | Pending | 3,576 | 3,784 | 3,686 | 3,655 | 4,205 | 4,334 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 33.9 | 24.1 | 33.4 | 32.5 | 8.0 | | 35 | 3 |
| | | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | | Vacant Judgeship Months [2] | 5.4 | 9.6 | 15.8 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 712 | 768 | 714 | 719 | 882 | 953 | 7 | 1 |
| | | Civil | 455 | 498 | 464 | 490 | 626 | 670 | 6 | 1 |
| | | Criminal Felony | 110 | 129 | 98 | 95 | 114 | 118 | 27 | 1 |
| | | Supervised Release Hearings | 147 | 142 | 153 | 135 | 143 | 165 | 1 | 1 |
| | Pending Cases [2] | | 894 | 946 | 922 | 914 | 1,051 | 1,084 | 10 | 1 |
| | Weighted Filings [2] | | 479 | 530 | 480 | 470 | 569 | 629 | 16 | 1 |
| | Terminations | | 738 | 716 | 737 | 724 | 744 | 919 | 5 | 1 |
| | Trials Completed | | 13 | 10 | 10 | 14 | 14 | 15 | 58 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 16.4 | 13.7 | 16.4 | 18.1 | 12.4 | 14.5 | 83 | 5 |
| | | Civil [2] | 10.2 | 10.6 | 11.6 | 12.4 | 11.3 | 15.0 | 89 | 6 |
| | From Filing to Trial [2] (Civil Only) | | 57.9 | 79.7 | 54.6 | 60.9 | 62.2 | 61.2 | 63 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 360 14.6 | 380 14.3 | 392 14.7 | 383 13.9 | 461 13.7 | 439 12.3 | 66 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.4 | 1.3 | 1.1 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 65.2 | 56.3 | 72.6 | 69.7 | 93.2 | 65.7 | | |
| | | Percent Not Selected or Challenged | 42.0 | 40.5 | 41.9 | 38.9 | 47.3 | 46.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,680 | 1,167 | 96 | 525 | 39 | 36 | 45 | 94 | 111 | 139 | 228 | 6 | 194 |
| Criminal [1] | 471 | 2 | 192 | 69 | 58 | 55 | 12 | 55 | - | 4 | 10 | 5 | 9 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**VERMONT**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 548 | 552 | 604 | 556 | 489 | 554 | | | |
| | Terminations | 559 | 525 | 549 | 633 | 473 | 511 | | | |
| | Pending | 559 | 584 | 640 | 557 | 554 | 593 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 1.1 | 0.4 | -8.3 | -0.4 | 13.3 | | | 19 | 1 |
| | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | | |
| | Vacant Judgeship Months [2] | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | |
| **Actions per Judgeship** | **Filings** Total | 274 | 276 | 302 | 278 | 245 | 277 | | 88 | 6 |
| | Civil | 137 | 149 | 152 | 134 | 124 | 122 | | 90 | 6 |
| | Criminal Felony | 114 | 96 | 108 | 99 | 79 | 108 | | 33 | 2 |
| | Supervised Release Hearings | 24 | 32 | 42 | 46 | 42 | 48 | | 27 | 2 |
| | Pending Cases [2] | 280 | 292 | 320 | 279 | 277 | 297 | | 86 | 6 |
| | Weighted Filings [2] | 283 | 267 | 289 | 260 | 211 | 271 | | 87 | 6 |
| | Terminations | 280 | 263 | 275 | 317 | 237 | 256 | | 86 | 6 |
| | Trials Completed | 27 | 19 | 21 | 26 | 23 | 23 | | 22 | 1 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 10.9 | 11.7 | 10.7 | 11.0 | 14.0 | 12.9 | | 75 | 3 |
| | Civil [2] | 9.8 | 10.9 | 8.9 | 11.0 | 9.7 | 10.0 | | 59 | 4 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 26 9.4 | 25 8.1 | 26 7.5 | 29 10.3 | 35 11.9 | 38 12.0 | | 65 | 3 |
| | Average Number of Felony Defendants Filed per Case | 1.3 | 1.3 | 1.3 | 1.4 | 1.2 | 1.3 | | | |
| | Jurors Avg. Present for Jury Selection | 42.4 | 48.0 | 76.4 | 102.6 | 44.9 | 122.8 | | | |
| | Percent Not Selected or Challenged | 43.4 | 29.5 | 49.0 | 75.5 | 39.1 | 76.7 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 244 | 47 | 8 | 24 | 5 | 12 | 4 | 26 | 37 | 5 | 40 | - | 36 |
| Criminal [1] | 215 | 4 | 116 | 18 | 33 | 12 | 3 | 15 | 2 | 4 | 5 | - | 3 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**DELAWARE**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 2,025 | 1,522 | 1,466 | 1,867 | 2,174 | 2,551 | | |
| | Terminations | 2,220 | 2,143 | 1,697 | 1,611 | 2,037 | 2,244 | | |
| | Pending | 2,709 | 2,090 | 1,856 | 2,112 | 2,250 | 2,558 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 26.0 | 67.6 | 74.0 | 36.6 | 17.3 | | 12 | 2 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 6.8 | 24.0 | 2.0 | | |
| **Actions per Judgeship** | **Filings** Total | 506 | 381 | 367 | 467 | 544 | 638 | 19 | 2 |
| | Civil | 471 | 358 | 334 | 441 | 518 | 600 | 10 | 2 |
| | Criminal Felony | 29 | 15 | 27 | 20 | 21 | 31 | 91 | 6 |
| | Supervised Release Hearings | 7 | 8 | 6 | 5 | 5 | 7 | 88 | 5 |
| | Pending Cases [2] | 677 | 523 | 464 | 528 | 563 | 640 | 24 | 3 |
| | Weighted Filings [2] | 921 | 604 | 526 | 652 | 870 | 1,093 | 3 | 1 |
| | Terminations | 555 | 536 | 424 | 403 | 509 | 561 | 26 | 2 |
| | Trials Completed | 19 | 20 | 13 | 15 | 13 | 16 | 48 | 4 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 9.7 | 12.0 | 12.9 | 12.0 | 12.0 | 9.7 | 48 | 2 |
| | Civil [2] | 8.6 | 10.8 | 12.5 | 8.2 | 5.4 | 5.4 | 5 | 2 |
| | From Filing to Trial [2] (Civil Only) | 28.5 | 34.1 | 24.2 | 25.7 | 26.5 | 32.5 | 43 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 277 11.0 | 287 14.8 | 223 13.3 | 228 11.7 | 204 9.9 | 230 9.6 | 54 | 3 |
| | Average Number of Felony Defendants Filed per Case | 1.6 | 1.3 | 1.4 | 1.2 | 1.2 | 1.1 | | |
| | Jurors Avg. Present for Jury Selection | 43.2 | 61.8 | 44.0 | 51.2 | 98.9 | 43.2 | | |
| | Percent Not Selected or Challenged | 29.7 | 42.8 | 30.1 | 38.6 | 47.6 | 24.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,400 | 21 | 39 | 188 | 4 | 5 | 18 | 128 | 53 | 1,069 | 117 | 9 | 749 |
| Criminal [1] | 124 | 1 | 30 | 41 | 20 | 7 | 9 | 4 | - | 2 | 7 | 1 | 2 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW JERSEY**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 9,880 | 10,435 | 9,609 | 13,140 | 22,554 | 25,179 | | |
| | Terminations | | 9,238 | 9,684 | 9,641 | 11,187 | 10,227 | 14,108 | | |
| | Pending | | 9,260 | 10,041 | 9,960 | 11,911 | 24,750 | 35,832 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 154.8 | 141.3 | 162.0 | 91.6 | 11.6 | | 20 | 3 |
| | Number of Judgeships | | 17 | 17 | 17 | 17 | 17 | 17 | | |
| | Vacant Judgeship Months [2] | | 4.9 | 17.9 | 42.9 | 49.0 | 36.5 | 57.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 581 | 614 | 565 | 773 | 1,327 | 1,481 | 2 | 1 |
| | | Civil | 524 | 565 | 522 | 734 | 1,280 | 1,422 | 2 | 1 |
| | | Criminal Felony | 46 | 38 | 31 | 27 | 36 | 48 | 85 | 4 |
| | | Supervised Release Hearings | 12 | 11 | 12 | 13 | 10 | 11 | 83 | 4 |
| | Pending Cases [2] | | 545 | 591 | 586 | 701 | 1,456 | 2,108 | 2 | 1 |
| | Weighted Filings [2] | | 561 | 607 | 511 | 571 | 987 | 1,031 | 4 | 2 |
| | Terminations | | 543 | 570 | 567 | 658 | 602 | 830 | 6 | 1 |
| | Trials Completed | | 8 | 8 | 12 | 8 | 6 | 8 | 86 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.7 | 10.6 | 13.8 | 13.3 | 8.8 | 8.2 | 30 | 1 |
| | | Civil [2] | 7.7 | 7.8 | 8.0 | 7.1 | 7.5 | 5.0 | 3 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 37.5 | 41.5 | 47.8 | 35.8 | 54.4 | 47.9 | 61 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 455 5.5 | 565 6.2 | 562 6.2 | 663 5.9 | 1,199 5.0 | 1,026 2.9 | 8 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 79.2 | 56.0 | 77.1 | 89.9 | 126.8 | 104.8 | | |
| | | Percent Not Selected or Challenged | 33.6 | 42.5 | 38.3 | 38.8 | 39.7 | 37.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 24,176 | 387 | 16,017 | 1,220 | 12 | 117 | 693 | 871 | 1,061 | 699 | 1,359 | 24 | 1,716 |
| Criminal [1] | 810 | 8 | 266 | 76 | 136 | 197 | 36 | 26 | 2 | 11 | 5 | 16 | 31 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 12,080 | 10,596 | 9,527 | 8,522 | 7,549 | 8,069 | | |
| | | Terminations | 12,198 | 13,333 | 9,953 | 8,910 | 8,010 | 7,500 | | |
| | | Pending | 11,326 | 8,592 | 8,140 | 7,738 | 7,284 | 7,891 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -33.2 | -23.8 | -15.3 | -5.3 | 6.9 | | 38 | 4 |
| | | Number of Judgeships | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | | Vacant Judgeship Months [2] | 66.8 | 41.5 | 29.6 | 38.9 | 57.0 | 67.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 549 | 482 | 433 | 387 | 343 | 367 | 73 | 4 |
| | | Civil | 501 | 431 | 389 | 342 | 300 | 320 | 47 | 4 |
| | | Criminal Felony | 32 | 33 | 29 | 30 | 28 | 35 | 90 | 5 |
| | | Supervised Release Hearings | 16 | 18 | 15 | 15 | 15 | 12 | 82 | 3 |
| | Pending Cases [2] | | 515 | 391 | 370 | 352 | 331 | 359 | 75 | 5 |
| | Weighted Filings [2] | | 371 | 351 | 321 | 318 | 301 | 309 | 78 | 4 |
| | Terminations | | 554 | 606 | 452 | 405 | 364 | 341 | 78 | 4 |
| | Trials Completed | | 12 | 13 | 11 | 9 | 9 | 7 | 88 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 16.1 | 14.5 | 14.1 | 15.3 | 13.7 | 16.3 | 89 | 6 |
| | | Civil [2] | 4.0 | 5.5 | 5.5 | 5.3 | 6.0 | 5.8 | 7 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 21.6 | 24.5 | 18.6 | 21.3 | 19.2 | 21.5 | 12 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 2,269 23.0 | 1,331 18.6 | 1,441 21.4 | 1,401 22.1 | 1,042 17.4 | 1,532 23.6 | 88 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.4 | 1.3 | 1.3 | 1.2 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 76.8 | 61.3 | 70.0 | 61.8 | 62.2 | 59.6 | | |
| | | Percent Not Selected or Challenged | 42.1 | 30.2 | 41.1 | 44.6 | 45.3 | 42.3 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7,046 | 374 | 955 | 1,005 | 3 | 65 | 462 | 797 | 746 | 260 | 1,525 | 28 | 826 |
| Criminal [1] | 766 | - | 274 | 69 | 97 | 141 | 52 | 66 | 9 | 16 | 6 | 15 | 21 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA MIDDLE**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Jun 30 2014** | **Jun 30 2015** | **Jun 30 2016** | **Jun 30 2017** | **Jun 30 2018** | **Jun 30 2019** | | **U.S.** | **Circuit** |
| **Overall Caseload Statistics** | Filings [1] | 3,221 | 3,126 | 3,319 | 3,001 | 3,306 | 2,939 | | | |
| | Terminations | 3,609 | 3,169 | 2,928 | 2,915 | 3,040 | 3,161 | | | |
| | Pending | 3,386 | 3,310 | 3,696 | 3,771 | 4,041 | 3,818 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -8.8 | -6.0 | -11.4 | -2.1 | -11.1 | | | 87 | 6 |
| | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 | | | |
| **Actions per Judgeship** | **Filings** Total | 537 | 521 | 553 | 500 | 551 | 490 | | 48 | 3 |
| | Civil | 443 | 436 | 444 | 402 | 442 | 388 | | 33 | 3 |
| | Criminal Felony | 75 | 70 | 94 | 82 | 91 | 81 | | 59 | 1 |
| | Supervised Release Hearings | 19 | 16 | 16 | 16 | 19 | 22 | | 66 | 1 |
| | Pending Cases [2] | 564 | 552 | 616 | 629 | 674 | 636 | | 26 | 4 |
| | Weighted Filings [2] | 470 | 458 | 496 | 458 | 484 | 432 | | 47 | 3 |
| | Terminations | 602 | 528 | 488 | 486 | 507 | 527 | | 33 | 3 |
| | Trials Completed | 26 | 22 | 21 | 23 | 31 | 22 | | 27 | 2 |
| **Median Time (Months)** | From Filing to Disposition — Criminal Felony | 12.4 | 11.9 | 12.5 | 12.7 | 14.6 | 15.1 | | 85 | 4 |
| | Civil [2] | 9.3 | 9.6 | 9.0 | 9.3 | 10.1 | 10.3 | | 65 | 5 |
| | From Filing to Trial [2] (Civil Only) | 28.2 | 33.2 | 28.8 | 36.7 | 34.4 | 36.1 | | 51 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 157 / 6.0 | 193 / 7.4 | 237 / 8.6 | 250 / 9.2 | 242 / 8.3 | 280 / 10.2 | | 59 | 4 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.4 | 1.7 | 1.4 | 1.4 | 1.2 | | | |
| | Jurors — Avg. Present for Jury Selection | 20.9 | 34.2 | 47.3 | 63.8 | 47.1 | 46.1 | | | |
| | Percent Not Selected or Challenged | 34.6 | 31.9 | 38.7 | 50.9 | 33.8 | 36.9 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,326 | 195 | 64 | 845 | 2 | 56 | 106 | 148 | 196 | 54 | 498 | 8 | 154 |
| Criminal [1] | 483 | 4 | 175 | 111 | 57 | 47 | 22 | 24 | 2 | 3 | 12 | 4 | 22 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,336 | 3,307 | 3,286 | 3,241 | 3,327 | 3,441 | | |
| | Terminations | | 3,409 | 3,403 | 3,056 | 3,330 | 3,148 | 3,350 | | |
| | Pending | | 2,704 | 2,616 | 2,842 | 2,745 | 2,920 | 3,003 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 3.1 | 4.1 | 4.7 | 6.2 | 3.4 | | 43 | 5 |
| | Number of Judgeships | | 10 | 10 | 10 | 10 | 10 | 10 | | |
| | Vacant Judgeship Months [2] | | 31.4 | 36.0 | 36.9 | 48.0 | 61.0 | 59.4 | | |
| **Actions per Judgeship** | **Filings** | Total | 334 | 331 | 329 | 324 | 333 | 344 | 80 | 5 |
| | | Civil | 266 | 259 | 272 | 264 | 256 | 264 | 62 | 5 |
| | | Criminal Felony | 54 | 57 | 43 | 46 | 59 | 64 | 70 | 2 |
| | | Supervised Release Hearings | 14 | 15 | 14 | 13 | 18 | 16 | 79 | 2 |
| | Pending Cases [2] | | 270 | 262 | 284 | 275 | 292 | 300 | 84 | 6 |
| | Weighted Filings [2] | | 294 | 303 | 281 | 296 | 310 | 308 | 79 | 5 |
| | Terminations | | 341 | 340 | 306 | 333 | 315 | 335 | 80 | 5 |
| | Trials Completed | | 21 | 20 | 22 | 16 | 20 | 21 | 30 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 12.5 | 14.8 | 12.7 | 15.5 | 16.0 | 15.1 | 85 | 4 |
| | | Civil [2] | 7.3 | 6.7 | 6.3 | 6.1 | 5.8 | 6.7 | 14 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 26.8 | 35.1 | 31.4 | 31.5 | 32.6 | 32.6 | 44 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 78 4.0 | 80 4.3 | 75 3.6 | 72 3.6 | 70 3.4 | 91 4.7 | 20 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.8 | 1.3 | 1.3 | 1.5 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 54.9 | 49.8 | 48.3 | 48.8 | 43.0 | 62.8 | | |
| | | Percent Not Selected or Challenged | 43.6 | 36.8 | 36.8 | 39.8 | 34.8 | 46.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,640 | 172 | 61 | 900 | 12 | 49 | 198 | 228 | 159 | 51 | 582 | 32 | 196 |
| Criminal [1] | 637 | 2 | 303 | 14 | 75 | 109 | 27 | 34 | 5 | 33 | 4 | 3 | 28 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**VIRGIN ISLANDS**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 328 | 329 | 335 | 339 | 218 | 315 | | |
| | | Terminations | 349 | 324 | 307 | 281 | 214 | 300 | | |
| | | Pending | 1,231 | 1,224 | 1,255 | 1,320 | 1,315 | 1,321 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -4.0 | -4.3 | -6.0 | -7.1 | 44.5 | | 3 | 1 |
| | | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 164 | 165 | 168 | 170 | 109 | 158 | 93 | 6 |
| | | Civil | 107 | 118 | 101 | 83 | 70 | 94 | 92 | 6 |
| | | Criminal Felony | 54 | 37 | 60 | 78 | 35 | 59 | 75 | 3 |
| | | Supervised Release Hearings | 3 | 11 | 7 | 9 | 5 | 5 | 89 | 6 |
| | Pending Cases [2] | | 616 | 612 | 628 | 660 | 658 | 661 | 22 | 2 |
| | Weighted Filings [2] | | - | - | - | - | - | - | - | - |
| | Terminations | | 175 | 162 | 154 | 141 | 107 | 150 | 92 | 6 |
| | Trials Completed | | 21 | 21 | 26 | 28 | 33 | 38 | 8 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.8 | 7.7 | 8.1 | 6.2 | 7.6 | 13.7 | 81 | 3 |
| | | Civil [2] | 14.6 | 13.9 | 16.6 | 19.1 | 17.4 | 13.5 | 85 | 6 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 109 25.1 | 121 27.7 | 117 26.7 | 127 29.0 | 140 33.4 | 169 37.9 | 91 | 6 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.7 | 1.9 | 1.2 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 39.4 | 64.4 | 64.0 | 74.8 | 104.9 | 52.5 | | |
| | | Percent Not Selected or Challenged | 13.8 | 28.6 | 36.5 | 30.4 | 50.3 | 29.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 187 | - | 2 | 7 | 2 | 56 | 1 | 60 | 32 | 1 | 10 | - | 16 |
| Criminal [1] | 118 | - | 31 | 17 | 21 | 7 | 17 | 7 | - | 2 | 4 | 9 | 3 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MARYLAND**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 5,236 | 4,865 | 5,604 | 4,749 | 5,205 | 5,071 | | |
| | | Terminations | 4,903 | 5,071 | 4,979 | 4,903 | 4,775 | 4,632 | | |
| | | Pending | 4,637 | 4,370 | 4,893 | 4,720 | 5,160 | 5,601 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -3.2 | 4.2 | -9.5 | 6.8 | -2.6 | | 68 | 7 |
| | | Number of Judgeships | 10 | 10 | 10 | 10 | 10 | 10 | | |
| | | Vacant Judgeship Months [2] | 13.4 | 8.9 | 16.9 | 24.0 | 24.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 524 | 487 | 560 | 475 | 521 | 507 | 45 | 2 |
| | | Civil | 421 | 394 | 468 | 359 | 411 | 402 | 30 | 2 |
| | | Criminal Felony | 83 | 75 | 71 | 90 | 85 | 80 | 60 | 8 |
| | | Supervised Release Hearings | 20 | 18 | 22 | 27 | 25 | 25 | 63 | 9 |
| | Pending Cases [2] | | 464 | 437 | 489 | 472 | 516 | 560 | 32 | 3 |
| | Weighted Filings [2] | | 499 | 463 | 479 | 441 | 491 | 479 | 37 | 2 |
| | Terminations | | 490 | 507 | 498 | 490 | 478 | 463 | 51 | 5 |
| | Trials Completed | | 17 | 17 | 18 | 17 | 19 | 17 | 44 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.6 | 12.0 | 11.6 | 11.7 | 11.6 | 12.9 | 75 | 9 |
| | | Civil [2] | 7.5 | 7.6 | 7.0 | 8.3 | 7.8 | 7.8 | 27 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 33.3 | 26.7 | 29.4 | 30.6 | 31.5 | 33.2 | 46 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 140 / 4.2 | 148 / 4.6 | 156 / 4.1 | 184 / 5.2 | 195 / 5.0 | 433 / 9.9 | 57 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.6 | 1.5 | 1.4 | 1.7 | 1.5 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 43.2 | 50.6 | 46.4 | 53.7 | 43.2 | 48.2 | | |
| | | Percent Not Selected or Challenged | 30.9 | 30.1 | 29.8 | 31.7 | 24.6 | 31.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4,024 | 310 | 354 | 822 | 25 | 79 | 302 | 453 | 471 | 213 | 473 | 16 | 506 |
| Criminal [1] | 790 | 61 | 280 | 79 | 147 | 112 | 35 | 29 | 2 | 20 | 7 | 4 | 14 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NORTH CAROLINA EASTERN**

| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Overall Caseload Statistics** | | Filings [1] | 2,659 | 2,727 | 3,267 | 2,674 | 2,770 | 3,016 | | |
| | | Terminations | 2,975 | 2,835 | 2,603 | 2,701 | 2,643 | 2,895 | | |
| | | Pending | 2,820 | 2,639 | 3,034 | 2,976 | 3,121 | 3,230 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 13.4 | 10.6 | -7.7 | 12.8 | 8.9 | | 32 | 3 |
| | | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | | Vacant Judgeship Months [2] | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 665 | 682 | 817 | 669 | 693 | 754 | 12 | 1 |
| | | Civil | 492 | 490 | 608 | 457 | 417 | 440 | 22 | 1 |
| | | Criminal Felony | 127 | 149 | 157 | 153 | 204 | 240 | 6 | 1 |
| | | Supervised Release Hearings | 46 | 43 | 52 | 59 | 71 | 75 | 16 | 2 |
| | | Pending Cases [2] | 705 | 660 | 759 | 744 | 780 | 808 | 13 | 2 |
| | | Weighted Filings [2] | 544 | 585 | 639 | 549 | 613 | 695 | 10 | 1 |
| | | Terminations | 744 | 709 | 651 | 675 | 661 | 724 | 12 | 2 |
| | | Trials Completed | 36 | 40 | 32 | 40 | 38 | 39 | 7 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.5 | 8.3 | 8.3 | 9.5 | 9.2 | 9.4 | 41 | 6 |
| | | Civil [2] | 9.0 | 7.9 | 9.2 | 9.1 | 10.3 | 9.9 | 56 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 26.8 | 22.2 | 32.2 | 32.3 | 40.6 | 37.2 | 56 | 6 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 347 / 16.1 | 313 / 16.3 | 49 / 2.2 | 56 / 2.6 | 92 / 4.3 | 394 / 19.4 | 84 | 8 |
| | | Average Number of Felony Defendants Filed per Case | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 45.4 | 26.3 | 40.4 | 31.6 | 36.3 | 37.3 | | |
| | | Percent Not Selected or Challenged | 41.1 | 17.4 | 39.8 | 18.7 | 26.0 | 24.9 | | |

### 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 1,758 | 173 | 34 | 902 | 20 | 32 | 55 | 119 | 90 | 34 | 170 | 1 | 128 |
| Criminal [1] | 957 | 32 | 352 | 123 | 252 | 60 | 26 | 27 | 2 | 6 | 5 | 4 | 68 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NORTH CAROLINA MIDDLE**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,813 | 1,801 | 2,058 | 1,860 | 1,828 | 2,018 | | |
| | Terminations | 2,107 | 1,981 | 1,983 | 1,918 | 1,882 | 1,923 | | |
| | Pending | 1,962 | 1,756 | 1,825 | 1,778 | 1,739 | 1,814 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 11.3 | 12.0 | -1.9 | 8.5 | 10.4 | | 23 | 2 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 0.0 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 453 | 450 | 515 | 465 | 457 | 505 | 46 | 3 |
| | Civil | 297 | 266 | 375 | 296 | 285 | 283 | 56 | 7 |
| | Criminal Felony | 129 | 149 | 101 | 129 | 116 | 145 | 19 | 2 |
| | Supervised Release Hearings | 28 | 36 | 38 | 41 | 57 | 77 | 15 | 1 |
| | Pending Cases [2] | 491 | 439 | 456 | 445 | 435 | 454 | 52 | 5 |
| | Weighted Filings [2] | 407 | 428 | 402 | 418 | 390 | 418 | 52 | 5 |
| | Terminations | 527 | 495 | 496 | 480 | 471 | 481 | 46 | 4 |
| | Trials Completed | 17 | 16 | 14 | 13 | 21 | 27 | 15 | 3 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 6.8 | 6.1 | 7.0 | 6.3 | 6.7 | 7.1 | 14 | 2 |
| | Civil [2] | 11.0 | 11.6 | 10.5 | 9.7 | 9.3 | 11.1 | 74 | 7 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 100 / 6.9 | 157 / 12.7 | 121 / 8.7 | 82 / 6.4 | 83 / 6.7 | 166 / 13.6 | 68 | 6 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.4 | 1.3 | 1.3 | 1.2 | 1.3 | | |
| | Jurors Avg. Present for Jury Selection | 44.2 | 42.1 | 49.9 | 48.7 | 43.8 | 41.6 | | |
| | Jurors Percent Not Selected or Challenged | 40.7 | 24.2 | 48.5 | 43.7 | 46.6 | 28.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,132 | 94 | 20 | 599 | 9 | 7 | 38 | 99 | 43 | 29 | 129 | - | 65 |
| Criminal [1] | 576 | 9 | 163 | 32 | 268 | 38 | 37 | 21 | 1 | 2 | 1 | - | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NORTH CAROLINA WESTERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,995 | 1,942 | 2,309 | 2,214 | 2,204 | 2,063 | | |
| | Terminations | 2,334 | 2,197 | 2,212 | 2,119 | 2,220 | 2,068 | | |
| | Pending | 1,945 | 1,676 | 1,780 | 1,871 | 1,839 | 1,828 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 3.4 | 6.2 | -10.7 | -6.8 | -6.4 | | 76 | 8 |
| | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 9.9 | 10.7 | | |
| **Actions per Judgeship** | **Filings** Total | 399 | 388 | 462 | 443 | 441 | 413 | 65 | 8 |
| | Civil | 241 | 217 | 285 | 247 | 249 | 232 | 72 | 8 |
| | Criminal Felony | 105 | 113 | 120 | 138 | 122 | 113 | 30 | 4 |
| | Supervised Release Hearings | 53 | 58 | 57 | 57 | 70 | 67 | 20 | 4 |
| | Pending Cases [2] | 389 | 335 | 356 | 374 | 368 | 366 | 71 | 8 |
| | Weighted Filings [2] | 353 | 360 | 383 | 438 | 401 | 362 | 68 | 8 |
| | Terminations | 467 | 439 | 442 | 424 | 444 | 414 | 67 | 8 |
| | Trials Completed | 20 | 17 | 14 | 15 | 17 | 16 | 48 | 7 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 15.4 | 15.6 | 11.4 | 9.7 | 9.0 | 10.2 | 55 | 7 |
| | Civil [2] | 9.4 | 8.5 | 9.2 | 8.7 | 8.7 | 9.1 | 45 | 3 |
| | From Filing to Trial [2] (Civil Only) | 24.5 | - | 19.2 | 17.9 | 19.3 | 21.5 | 12 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 36 3.2 | 38 3.9 | 39 3.3 | 45 3.7 | 54 4.5 | 127 10.9 | 64 | 5 |
| | Average Number of Felony Defendants Filed per Case | 1.5 | 1.4 | 1.6 | 1.5 | 1.3 | 1.2 | | |
| | Jurors Avg. Present for Jury Selection | 30.7 | 34.2 | 28.7 | 29.1 | 42.1 | 30.9 | | |
| | Percent Not Selected or Challenged | 17.5 | 22.1 | 29.7 | 20.5 | 40.3 | 26.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,162 | 200 | 24 | 307 | 19 | 14 | 63 | 124 | 56 | 47 | 208 | - | 100 |
| Criminal [1] | 564 | 11 | 182 | 61 | 137 | 73 | 18 | 50 | 4 | 6 | 4 | 4 | 14 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**SOUTH CAROLINA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 5,673 | 5,992 | 6,022 | 4,699 | 5,028 | 4,935 | | |
| | | Terminations | 4,786 | 4,632 | 4,816 | 7,628 | 4,768 | 5,180 | | |
| | | Pending | 5,262 | 6,630 | 7,813 | 4,900 | 5,167 | 4,937 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -13.0 | -17.6 | -18.1 | 5.0 | -1.8 | | 64 | 6 |
| | | Number of Judgeships | 10 | 10 | 10 | 10 | 10 | 10 | | |
| | | Vacant Judgeship Months [2] | 19.9 | 19.4 | 24.0 | 24.0 | 28.5 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 567 | 599 | 602 | 470 | 503 | 494 | 47 | 4 |
| | | Civil | 452 | 488 | 488 | 338 | 354 | 364 | 37 | 3 |
| | | Criminal Felony | 85 | 85 | 86 | 98 | 113 | 97 | 45 | 6 |
| | | Supervised Release Hearings | 31 | 26 | 28 | 34 | 36 | 33 | 49 | 8 |
| | | Pending Cases [2] | 526 | 663 | 781 | 490 | 517 | 494 | 44 | 4 |
| | | Weighted Filings [2] | 411 | 493 | 493 | 422 | 457 | 424 | 49 | 3 |
| | | Terminations | 479 | 463 | 482 | 763 | 477 | 518 | 36 | 3 |
| | | Trials Completed | 19 | 15 | 13 | 15 | 15 | 18 | 40 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.9 | 9.6 | 10.2 | 11.9 | 11.8 | 12.4 | 71 | 8 |
| | | Civil [2] | 9.2 | 9.3 | 8.4 | 17.4 | 8.7 | 9.9 | 56 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 33.5 | 28.0 | 30.7 | 25.7 | 21.6 | 27.5 | 31 | 4 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 323 7.6 | 329 5.9 | 353 5.3 | 406 11.5 | 423 11.6 | 514 14.2 | 75 | 7 |
| | | Average Number of Felony Defendants Filed per Case | 1.7 | 1.8 | 1.6 | 1.6 | 1.5 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 45.0 | 50.3 | 55.1 | 66.4 | 51.5 | 50.1 | | |
| | | Percent Not Selected or Challenged | 18.1 | 18.6 | 24.2 | 35.6 | 37.9 | 40.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,636 | 406 | 113 | 1,149 | 20 | 92 | 263 | 419 | 480 | 53 | 428 | 1 | 212 |
| Criminal [1] | 959 | 16 | 291 | 164 | 214 | 123 | 15 | 20 | 29 | 19 | 10 | 15 | 43 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**VIRGINIA EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 5,039 | 4,915 | 5,085 | 4,776 | 4,799 | 4,884 | | |
| | | Terminations | 4,923 | 4,570 | 4,803 | 4,752 | 4,706 | 4,828 | | |
| | | Pending | 3,392 | 3,230 | 3,486 | 3,543 | 3,631 | 3,359 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -3.1 | -0.6 | -4.0 | 2.3 | 1.8 | | 51 | 5 |
| | | Number of Judgeships | 11 | 11 | 11 | 11 | 11 | 11 | | |
| | | Vacant Judgeship Months [2] | 2.5 | 0.0 | 0.0 | 0.0 | 9.9 | 23.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 458 | 447 | 462 | 434 | 436 | 444 | 59 | 7 |
| | | Civil | 311 | 318 | 335 | 311 | 305 | 312 | 48 | 5 |
| | | Criminal Felony | 104 | 85 | 84 | 81 | 87 | 91 | 49 | 7 |
| | | Supervised Release Hearings | 43 | 44 | 43 | 42 | 44 | 41 | 43 | 6 |
| | Pending Cases [2] | | 308 | 294 | 317 | 322 | 330 | 305 | 83 | 9 |
| | Weighted Filings [2] | | 425 | 426 | 399 | 392 | 406 | 398 | 58 | 7 |
| | Terminations | | 448 | 415 | 437 | 432 | 428 | 439 | 62 | 7 |
| | Trials Completed | | 26 | 22 | 21 | 21 | 23 | 23 | 22 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 5.0 | 5.3 | 5.5 | 5.9 | 5.4 | 5.2 | 6 | 1 |
| | | Civil [2] | 5.6 | 5.3 | 5.2 | 5.3 | 5.2 | 5.8 | 7 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 11.3 | 10.7 | 11.1 | 10.0 | 12.8 | 11.8 | 1 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 32 1.5 | 62 2.6 | 91 3.5 | 348 13.5 | 431 16.3 | 131 5.7 | 32 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 50.5 | 52.5 | 34.3 | 50.2 | 52.0 | 57.1 | | |
| | | Percent Not Selected or Challenged | 39.5 | 39.9 | 41.0 | 39.3 | 36.4 | 43.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,427 | 117 | 47 | 1,189 | 3 | 76 | 183 | 313 | 287 | 233 | 481 | 18 | 480 |
| Criminal [1] | 1,005 | 9 | 254 | 237 | 173 | 147 | 30 | 73 | 14 | 15 | 14 | 13 | 26 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**VIRGINIA WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | | Filings [1] | 1,781 | 1,675 | 1,826 | 1,628 | 1,613 | 1,946 | **U.S.** | **Circuit** |
| | | Terminations | 1,817 | 1,766 | 1,591 | 1,757 | 1,641 | 1,586 | | |
| | | Pending | 1,324 | 1,220 | 1,396 | 1,277 | 1,268 | 1,636 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | | 9.3 | 16.2 | 6.6 | 19.5 | 20.6 | 8 | 1 |
| | | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 11.0 | 0.0 | 0.0 | 6.6 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 445 | 419 | 457 | 407 | 403 | 487 | 50 | 6 |
| | | Civil | 298 | 296 | 345 | 302 | 298 | 342 | 42 | 4 |
| | | Criminal Felony | 108 | 84 | 75 | 71 | 59 | 101 | 40 | 5 |
| | | Supervised Release Hearings | 40 | 40 | 36 | 35 | 46 | 43 | 38 | 5 |
| | Pending Cases [2] | | 331 | 305 | 349 | 319 | 317 | 409 | 60 | 7 |
| | Weighted Filings [2] | | 386 | 355 | 355 | 346 | 337 | 406 | 56 | 6 |
| | Terminations | | 454 | 442 | 398 | 439 | 410 | 397 | 69 | 9 |
| | Trials Completed | | 44 | 33 | 41 | 39 | 43 | 44 | 4 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.7 | 9.4 | 9.1 | 9.9 | 8.9 | 8.1 | 27 | 5 |
| | | Civil [2] | 9.4 | 10.1 | 9.7 | 9.1 | 9.0 | 11.0 | 72 | 6 |
| | From Filing to Trial [2] (Civil Only) | | 14.1 | 19.2 | 15.8 | 20.3 | 20.3 | 19.4 | 7 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 18 2.4 | 17 2.3 | 21 2.1 | 20 2.1 | 20 2.1 | 35 3.0 | 10 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 2.1 | 1.6 | 1.8 | 1.8 | 1.7 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 35.6 | 39.6 | 42.8 | 38.6 | 39.8 | 34.9 | | |
| | | Percent Not Selected or Challenged | 9.7 | 20.0 | 23.8 | 18.1 | 17.0 | 10.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,368 | 172 | 16 | 634 | 4 | 85 | 50 | 75 | 120 | 9 | 128 | - | 75 |
| Criminal [1] | 404 | 1 | 192 | 81 | 53 | 30 | 12 | 3 | - | 13 | 7 | 1 | 11 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WEST VIRGINIA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 1,334 | 1,315 | 1,273 | 1,323 | 1,426 | 1,469 | | |
| | Terminations | | 1,217 | 1,379 | 1,291 | 1,225 | 1,297 | 1,332 | | |
| | Pending | | 1,004 | 940 | 926 | 1,012 | 1,136 | 1,267 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 10.1 | 11.7 | 15.4 | 11.0 | 3.0 | | 46 | 4 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 10.6 | 3.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 445 | 438 | 424 | 441 | 475 | 490 | 48 | 5 |
| | | Civil | 227 | 225 | 261 | 242 | 254 | 293 | 54 | 6 |
| | | Criminal Felony | 152 | 143 | 86 | 111 | 113 | 124 | 26 | 3 |
| | | Supervised Release Hearings | 65 | 70 | 77 | 88 | 108 | 72 | 17 | 3 |
| | Pending Cases [2] | | 335 | 313 | 309 | 337 | 379 | 422 | 57 | 6 |
| | Weighted Filings [2] | | 421 | 395 | 318 | 366 | 380 | 422 | 50 | 4 |
| | Terminations | | 406 | 460 | 430 | 408 | 432 | 444 | 60 | 6 |
| | Trials Completed | | 18 | 15 | 15 | 15 | 19 | 14 | 59 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 5.8 | 6.8 | 7.2 | 6.7 | 6.9 | 8.0 | 24 | 4 |
| | | Civil [2] | 9.2 | 11.9 | 8.9 | 9.9 | 10.3 | 11.2 | 75 | 8 |
| | From Filing to Trial [2] (Civil Only) | | - | 17.0 | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 8 / 1.2 | 10 / 1.8 | 9 / 1.3 | 22 / 3.2 | 33 / 4.2 | 43 / 5.0 | 24 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.7 | 1.8 | 1.3 | 1.6 | 1.6 | 1.9 | | |
| | Jurors | Avg. Present for Jury Selection | 46.2 | 41.8 | 38.3 | 62.1 | 49.5 | 59.4 | | |
| | | Percent Not Selected or Challenged | 29.2 | 36.3 | 17.3 | 34.0 | 25.9 | 36.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 880 | 17 | 11 | 415 | 3 | 140 | 27 | 84 | 62 | 16 | 46 | - | 59 |
| Criminal [1] | 372 | 1 | 254 | 10 | 56 | 19 | 6 | 19 | - | 3 | 1 | 2 | 1 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WEST VIRGINIA SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 37,875 | 21,115 | 13,996 | 10,995 | 2,809 | 1,532 | | |
| | | Terminations | 2,295 | 11,668 | 9,023 | 35,400 | 3,877 | 66,116 | | |
| | | Pending | 63,062 | 72,541 | 77,612 | 53,092 | 71,302 | 6,629 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -96.0 | -92.7 | -89.1 | -86.1 | -45.5 | | 93 | 9 |
| | | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 7,575 | 4,223 | 2,799 | 2,199 | 562 | 306 | 83 | 9 |
| | | Civil | 7,473 | 4,140 | 2,718 | 2,103 | 461 | 195 | 82 | 9 |
| | | Criminal Felony | 68 | 55 | 50 | 56 | 62 | 71 | 65 | 9 |
| | | Supervised Release Hearings | 34 | 29 | 31 | 40 | 38 | 40 | 44 | 7 |
| | Pending Cases [2] | | 12,612 | 14,508 | 15,522 | 10,618 | 14,260 | 1,326 | 7 | 1 |
| | Weighted Filings [2] | | 5,163 | 2,993 | 1,935 | 1,534 | 433 | 263 | 88 | 9 |
| | Terminations | | 459 | 2,334 | 1,805 | 7,080 | 775 | 13,223 | 1 | 1 |
| | Trials Completed | | 15 | 15 | 8 | 9 | 10 | 13 | 62 | 9 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.4 | 6.5 | 6.3 | 6.1 | 6.9 | 7.8 | 21 | 3 |
| | | Civil [2] | 5.5 | 15.4 | 25.3 | 34.2 | 36.1 | 53.1 | 94 | 9 |
| | From Filing to Trial [2] (Civil Only) | | 27.3 | 21.8 | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 1,041 1.7 | 3,139 4.3 | 20,542 26.5 | 25,950 49.1 | 48,986 69.0 | 4,713 75.0 | 94 | 9 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.2 | 1.3 | 1.3 | 1.4 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 28.9 | 39.2 | 94.5 | 28.4 | 40.7 | 40.5 | | |
| | | Percent Not Selected or Challenged | 13.5 | 0.8 | 58.6 | 5.6 | 24.8 | 9.9 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 977 | 77 | 84 | 339 | 10 | 14 | 40 | 130 | 111 | - | 95 | - | 77 |
| Criminal [1] | 352 | - | 181 | 18 | 101 | 22 | 2 | 21 | - | 2 | 3 | 1 | 1 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**LOUISIANA EASTERN**

| | | | 12-Month Periods Ending | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | |
| | | | | | | | | | U.S. / Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 3,597 | 4,029 | 16,475 | 11,796 | 17,891 | 19,230 | |
| | | Terminations | 4,688 | 3,699 | 4,392 | 4,850 | 5,623 | 7,862 | |
| | | Pending | 6,738 | 6,876 | 18,986 | 26,235 | 38,479 | 49,809 | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 434.6 | 377.3 | 16.7 | 63.0 | 7.5 | | 36 / 4 |
| | | Number of Judgeships | 12 | 12 | 12 | 12 | 12 | 12 | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 12.0 | 22.2 | 25.7 | 24.4 | |
| **Actions per Judgeship** | **Filings** | Total | 300 | 336 | 1,373 | 983 | 1,491 | 1,603 | 1 / 1 |
| | | Civil | 260 | 289 | 1,337 | 954 | 1,454 | 1,567 | 1 / 1 |
| | | Criminal Felony | 33 | 41 | 28 | 23 | 27 | 26 | 93 / 9 |
| | | Supervised Release Hearings | 7 | 6 | 7 | 7 | 11 | 9 | 86 / 8 |
| | | Pending Cases [2] | 562 | 573 | 1,582 | 2,186 | 3,207 | 4,151 | 1 / 1 |
| | | Weighted Filings [2] | 273 | 279 | 1,152 | 775 | 1,258 | 1,279 | 1 / 1 |
| | | Terminations | 391 | 308 | 366 | 404 | 469 | 655 | 15 / 3 |
| | | Trials Completed | 9 | 8 | 9 | 9 | 8 | 7 | 88 / 9 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.2 | 9.4 | 13.3 | 16.0 | 16.2 | 12.4 | 71 / 9 |
| | | Civil [2] | 4.9 | 10.6 | 8.5 | 5.9 | 4.5 | 11.0 | 72 / 7 |
| | From Filing to Trial [2] (Civil Only) | | 18.1 | 15.6 | 18.1 | 19.5 | 17.5 | 21.3 | 11 / 3 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 1,240 / 19.8 | 1,044 / 16.5 | 2,544 / 13.8 | 2,491 / 9.7 | 3,393 / 8.9 | 13,161 / 26.7 | 89 / 8 |
| | | Average Number of Felony Defendants Filed per Case | 1.5 | 1.7 | 1.5 | 1.4 | 1.5 | 1.3 | |
| | Jurors | Avg. Present for Jury Selection | 54.7 | 43.0 | 71.5 | 59.7 | 38.7 | 50.1 | |
| | | Percent Not Selected or Challenged | 56.4 | 44.5 | 66.6 | 54.9 | 42.0 | 47.7 | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 18,805 | 45 | 12,219 | 372 | - | 33 | 112 | 305 | 5,025 | 35 | 278 | 1 | 380 |
| Criminal [1] | 317 | 2 | 102 | 40 | 60 | 64 | 10 | 6 | 1 | 14 | 2 | 10 | 6 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**LOUISIANA MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,049 | 1,110 | 1,134 | 1,098 | 2,361 | 1,094 | | |
| | | Terminations | 1,028 | 1,093 | 1,073 | 1,012 | 1,189 | 1,394 | | |
| | | Pending | 1,163 | 1,172 | 1,232 | 1,307 | 2,477 | 2,176 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 4.3 | -1.4 | -3.5 | -0.4 | -53.7 | | 94 | 9 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 5.9 | 12.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 350 | 370 | 378 | 366 | 787 | 365 | 74 | 7 |
| | | Civil | 287 | 285 | 302 | 291 | 695 | 295 | 53 | 7 |
| | | Criminal Felony | 53 | 73 | 59 | 62 | 78 | 52 | 80 | 8 |
| | | Supervised Release Hearings | 9 | 12 | 16 | 14 | 14 | 18 | 76 | 6 |
| | Pending Cases [2] | | 388 | 391 | 411 | 436 | 826 | 725 | 19 | 4 |
| | Weighted Filings [2] | | 317 | 364 | 357 | 360 | 914 | 353 | 71 | 7 |
| | Terminations | | 343 | 364 | 358 | 337 | 396 | 465 | 50 | 6 |
| | Trials Completed | | 27 | 34 | 49 | 36 | 33 | 42 | 5 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.5 | 8.9 | 9.0 | 11.8 | 9.6 | 9.6 | 45 | 7 |
| | | Civil [2] | 12.3 | 11.2 | 11.7 | 11.6 | 10.0 | 13.0 | 84 | 9 |
| | From Filing to Trial [2] (Civil Only) | | 41.6 | 33.0 | 34.0 | 37.1 | 35.6 | 29.4 | 35 | 7 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 35 3.8 | 33 3.7 | 41 4.2 | 55 5.4 | 42 1.9 | 55 2.9 | 8 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.4 | 1.3 | 1.3 | 1.5 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 30.0 | 32.3 | 29.8 | 29.6 | 41.1 | 34.2 | | |
| | | Percent Not Selected or Challenged | 35.9 | 39.1 | 37.3 | 34.8 | 30.3 | 29.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 885 | 13 | 38 | 234 | 2 | 12 | 43 | 111 | 208 | 7 | 123 | - | 94 |
| Criminal [1] | 156 | 1 | 16 | 22 | 77 | 24 | - | 6 | 1 | 1 | - | 5 | 3 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**LOUISIANA WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,317 | 3,730 | 2,302 | 2,101 | 2,141 | 2,195 | | |
| | Terminations | | 2,275 | 2,268 | 3,171 | 5,973 | 2,499 | 2,133 | | |
| | Pending | | 5,882 | 7,342 | 6,445 | 2,569 | 2,181 | 2,242 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -33.8 | -41.2 | -4.6 | 4.5 | 2.5 | | 48 | 7 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 3.8 | 13.0 | 24.8 | 50.0 | 38.2 | | |
| **Actions per Judgeship** | **Filings** | Total | 474 | 533 | 329 | 300 | 306 | 314 | 82 | 9 |
| | | Civil | 430 | 485 | 279 | 253 | 256 | 242 | 65 | 9 |
| | | Criminal Felony | 30 | 35 | 38 | 38 | 41 | 61 | 73 | 7 |
| | | Supervised Release Hearings | 14 | 14 | 12 | 9 | 9 | 10 | 85 | 7 |
| | Pending Cases [2] | | 840 | 1,049 | 921 | 367 | 312 | 320 | 81 | 8 |
| | Weighted Filings [2] | | 364 | 407 | 281 | 266 | 285 | 293 | 84 | 9 |
| | Terminations | | 325 | 324 | 453 | 853 | 357 | 305 | 82 | 9 |
| | Trials Completed | | 13 | 13 | 11 | 8 | 9 | 8 | 86 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.1 | 10.4 | 10.4 | 10.4 | 9.0 | 8.0 | 24 | 4 |
| | | Civil [2] | 11.5 | 12.0 | 20.3 | 29.2 | 14.6 | 11.3 | 78 | 8 |
| | From Filing to Trial [2] (Civil Only) | | 29.2 | 28.2 | 30.3 | 24.9 | 28.6 | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 151 2.7 | 888 12.5 | 2,075 33.7 | 313 13.7 | 135 7.1 | 142 7.6 | 47 | 6 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.6 | 1.5 | 1.5 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 53.8 | 50.4 | 35.6 | 41.8 | 33.6 | 45.8 | | |
| | | Percent Not Selected or Challenged | 44.0 | 47.4 | 29.1 | 33.4 | 26.2 | 25.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,696 | 52 | 67 | 562 | 4 | 27 | 54 | 192 | 375 | 17 | 258 | - | 88 |
| Criminal [1] | 429 | 5 | 117 | 80 | 115 | 44 | 10 | 25 | 5 | 6 | 4 | 6 | 12 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

### U.S. District Court — Judicial Caseload Profile

**MISSISSIPPI NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 963 | 920 | 959 | 933 | 1,000 | 1,041 | | |
| | | Terminations | 1,135 | 1,076 | 855 | 875 | 1,055 | 1,011 | | |
| | | Pending | 947 | 799 | 900 | 917 | 855 | 889 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 8.1 | 13.2 | 8.6 | 11.6 | 4.1 | | 41 | 6 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 4.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 321 | 307 | 320 | 311 | 333 | 347 | 78 | 8 |
| | | Civil | 263 | 232 | 254 | 237 | 261 | 250 | 63 | 8 |
| | | Criminal Felony | 49 | 66 | 54 | 60 | 58 | 78 | 61 | 6 |
| | | Supervised Release Hearings | 9 | 8 | 11 | 14 | 14 | 19 | 72 | 5 |
| | | Pending Cases [2] | 316 | 266 | 300 | 306 | 285 | 296 | 87 | 9 |
| | | Weighted Filings [2] | 292 | 306 | 300 | 289 | 319 | 334 | 73 | 8 |
| | | Terminations | 378 | 359 | 285 | 292 | 352 | 337 | 79 | 8 |
| | | Trials Completed | 19 | 16 | 21 | 16 | 24 | 25 | 18 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.8 | 9.9 | 9.6 | 10.8 | 9.2 | 8.8 | 35 | 6 |
| | | Civil [2] | 9.9 | 10.3 | 9.0 | 8.9 | 9.3 | 9.0 | 44 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 20.0 | 24.8 | 21.5 | 28.0 | 22.2 | - | - | - |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 22 3.1 | 7 1.2 | 9 1.3 | 12 1.7 | 7 1.0 | 23 3.4 | 15 | 3 |
| | | Average Number of Felony Defendants Filed per Case | 1.2 | 1.6 | 1.3 | 1.4 | 1.3 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 27.7 | 35.1 | 31.5 | 25.4 | 28.5 | 27.6 | | |
| | | Percent Not Selected or Challenged | 25.6 | 43.5 | 26.9 | 37.6 | 35.1 | 26.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 750 | 160 | 20 | 138 | 1 | 13 | 18 | 99 | 116 | 3 | 126 | 1 | 55 |
| Criminal [1] | 234 | 3 | 92 | 2 | 66 | 20 | 14 | 25 | 1 | 6 | - | 3 | 2 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MISSISSIPPI SOUTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | Filings [1] | 2,423 | 2,139 | 2,146 | 2,295 | 2,304 | 2,545 | **U.S.** | **Circuit** |
| | Terminations | 2,416 | 2,270 | 2,197 | 2,257 | 2,325 | 2,183 | | |
| | Pending | 2,190 | 2,037 | 1,976 | 2,009 | 1,981 | 2,333 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 5.0 | 19.0 | 18.6 | 10.9 | 10.5 | 22 | 3 |
| | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 3.2 | 14.0 | | |
| **Actions per Judgeship** | **Filings** Total | 404 | 357 | 358 | 383 | 384 | 424 | 62 | 6 |
| | Civil | 315 | 284 | 292 | 296 | 279 | 302 | 50 | 5 |
| | Criminal Felony | 63 | 53 | 43 | 62 | 85 | 102 | 39 | 5 |
| | Supervised Release Hearings | 26 | 20 | 23 | 24 | 21 | 21 | 70 | 4 |
| | Pending Cases [2] | 365 | 340 | 329 | 335 | 330 | 389 | 63 | 7 |
| | Weighted Filings [2] | 381 | 347 | 326 | 366 | 389 | 419 | 51 | 6 |
| | Terminations | 403 | 378 | 366 | 376 | 388 | 364 | 76 | 7 |
| | Trials Completed | 23 | 20 | 18 | 21 | 20 | 25 | 18 | 2 |
| **Median Time (Months)** | From Filing to Disposition — Criminal Felony | 7.4 | 8.5 | 8.2 | 9.2 | 7.8 | 8.1 | 27 | 5 |
| | From Filing to Disposition — Civil [2] | 10.4 | 10.4 | 10.9 | 10.0 | 9.0 | 9.3 | 48 | 6 |
| | From Filing to Trial [2] (Civil Only) | 22.4 | 21.4 | 19.0 | 27.1 | 21.6 | 23.2 | 17 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 95 / 5.1 | 93 / 5.4 | 76 / 4.5 | 59 / 3.5 | 50 / 3.2 | 54 / 3.1 | 11 | 2 |
| | Average Number of Felony Defendants Filed per Case | 1.6 | 1.6 | 1.5 | 1.5 | 1.3 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 32.4 | 34.7 | 32.0 | 39.1 | 31.8 | 45.8 | | |
| | Jurors — Percent Not Selected or Challenged | 32.5 | 33.6 | 33.9 | 40.1 | 32.8 | 45.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,811 | 50 | 56 | 517 | 10 | 20 | 48 | 273 | 466 | 10 | 261 | - | 100 |
| Criminal [1] | 610 | 1 | 154 | 82 | 213 | 61 | 18 | 29 | 1 | 7 | 7 | 8 | 29 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TEXAS NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 8,732 | 8,263 | 7,920 | 7,207 | 7,712 | 7,622 | | |
| | Terminations | | 6,554 | 6,619 | 6,515 | 6,629 | 7,072 | 7,283 | | |
| | Pending | | 11,583 | 13,176 | 14,495 | 15,043 | 15,697 | 16,027 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -12.7 | -7.8 | -3.8 | 5.8 | -1.2 | | 60 | 8 |
| | Number of Judgeships | | 12 | 12 | 12 | 12 | 12 | 12 | | |
| | Vacant Judgeship Months [2] | | 12.0 | 17.9 | 30.8 | 48.0 | 48.0 | 65.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 728 | 689 | 660 | 601 | 643 | 635 | 21 | 4 |
| | | Civil | 570 | 535 | 495 | 456 | 475 | 450 | 20 | 2 |
| | | Criminal Felony | 130 | 128 | 136 | 115 | 135 | 151 | 18 | 3 |
| | | Supervised Release Hearings | 27 | 26 | 29 | 29 | 33 | 34 | 48 | 3 |
| | Pending Cases [2] | | 965 | 1,098 | 1,208 | 1,254 | 1,308 | 1,336 | 6 | 2 |
| | Weighted Filings [2] | | 620 | 600 | 582 | 519 | 575 | 597 | 20 | 4 |
| | Terminations | | 546 | 552 | 543 | 552 | 589 | 607 | 20 | 4 |
| | Trials Completed | | 19 | 20 | 18 | 21 | 17 | 21 | 30 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.4 | 7.4 | 7.1 | 7.8 | 7.1 | 7.6 | 19 | 3 |
| | | Civil [2] | 6.5 | 6.4 | 6.5 | 7.3 | 6.9 | 6.7 | 14 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 23.1 | 23.8 | 26.9 | 20.1 | 24.8 | 21.2 | 10 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 220 2.2 | 1,679 14.7 | 4,527 35.9 | 6,478 48.7 | 7,936 57.3 | 8,752 62.2 | 93 | 9 |
| | Average Number of Felony Defendants Filed per Case | | 1.6 | 1.5 | 1.7 | 1.5 | 1.6 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 40.9 | 40.5 | 59.0 | 51.4 | 66.3 | 52.1 | | |
| | | Percent Not Selected or Challenged | 35.1 | 40.8 | 48.1 | 45.7 | 46.9 | 46.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 5,404 | 155 | 472 | 1,667 | 15 | 242 | 220 | 637 | 414 | 335 | 631 | 2 | 614 |
| Criminal [1] | 1,810 | 110 | 664 | 277 | 304 | 141 | 78 | 96 | 12 | 53 | 23 | 25 | 27 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TEXAS EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 5,281 | 5,296 | 5,919 | 4,880 | 3,856 | 4,102 | | |
| | | Terminations | 4,896 | 5,408 | 5,901 | 5,486 | 4,220 | 3,931 | | |
| | | Pending | 6,000 | 5,794 | 5,810 | 5,220 | 4,881 | 5,064 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -22.3 | -22.5 | -30.7 | -15.9 | 6.4 | | 39 | 5 |
| | | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | |
| | | Vacant Judgeship Months [2] | 24.0 | 29.2 | 29.7 | 36.0 | 40.0 | 35.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 660 | 662 | 740 | 610 | 482 | 513 | 43 | 5 |
| | | Civil | 528 | 564 | 620 | 517 | 373 | 382 | 36 | 3 |
| | | Criminal Felony | 131 | 97 | 119 | 93 | 109 | 131 | 25 | 4 |
| | | Supervised Release Hearings | 1 | 1 | 1 | 1 | 1 | 1 | 93 | 9 |
| | Pending Cases [2] | | 750 | 724 | 726 | 653 | 610 | 633 | 27 | 5 |
| | Weighted Filings [2] | | 977 | 1,023 | 1,090 | 864 | 565 | 595 | 21 | 5 |
| | Terminations | | 612 | 676 | 738 | 686 | 528 | 491 | 43 | 5 |
| | Trials Completed | | 18 | 14 | 15 | 14 | 12 | 11 | 72 | 7 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 12.2 | 14.3 | 11.6 | 12.7 | 10.6 | 9.6 | 45 | 7 |
| | | Civil [2] | 9.0 | 8.1 | 6.5 | 7.1 | 8.5 | 8.6 | 38 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 27.9 | 22.9 | 20.7 | 22.0 | 19.2 | 17.5 | 3 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 227 5.4 | 240 5.5 | 270 6.3 | 264 6.8 | 243 7.0 | 275 8.3 | 50 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 2.2 | 1.8 | 2.1 | 1.8 | 2.0 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 35.3 | 41.6 | 37.1 | 37.9 | 48.8 | 37.8 | | |
| | | Percent Not Selected or Challenged | 30.5 | 36.4 | 29.8 | 32.3 | 38.7 | 32.3 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,053 | 127 | 54 | 1,027 | 8 | 91 | 130 | 320 | 244 | 523 | 203 | 4 | 322 |
| Criminal [1] | 1,044 | 22 | 517 | 136 | 147 | 46 | 59 | 40 | 3 | 17 | 11 | 6 | 40 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TEXAS SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 14,674 | 14,159 | 15,183 | 14,140 | 14,135 | 16,792 | | |
| | | Terminations | 14,896 | 13,934 | 14,379 | 14,613 | 13,793 | 15,234 | | |
| | | Pending | 11,833 | 12,074 | 12,942 | 12,561 | 12,879 | 14,246 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 14.4 | 18.6 | 10.6 | 18.8 | 18.8 | | 10 | 1 |
| | | Number of Judgeships | 19 | 19 | 19 | 19 | 19 | 19 | | |
| | | Vacant Judgeship Months [2] | 37.7 | 47.2 | 15.0 | 24.0 | 27.0 | 30.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 772 | 745 | 799 | 744 | 744 | 884 | 8 | 3 |
| | | Civil | 322 | 318 | 327 | 320 | 308 | 364 | 37 | 4 |
| | | Criminal Felony | 347 | 340 | 380 | 330 | 344 | 427 | 3 | 2 |
| | | Supervised Release Hearings | 103 | 88 | 92 | 94 | 92 | 93 | 10 | 2 |
| | Pending Cases [2] | | 623 | 635 | 681 | 661 | 678 | 750 | 16 | 3 |
| | Weighted Filings [2] | | 573 | 538 | 577 | 554 | 569 | 657 | 12 | 3 |
| | Terminations | | 784 | 733 | 757 | 769 | 726 | 802 | 9 | 2 |
| | Trials Completed | | 25 | 22 | 28 | 24 | 25 | 23 | 22 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 4.9 | 5.1 | 5.1 | 5.1 | 5.0 | 4.6 | 4 | 2 |
| | | Civil [2] | 6.9 | 7.2 | 7.3 | 8.1 | 7.8 | 7.0 | 18 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 21.8 | 21.3 | 23.4 | 21.6 | 20.4 | 22.0 | 14 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 420 8.2 | 397 7.8 | 389 7.2 | 405 7.4 | 382 7.2 | 373 6.5 | 40 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 51.1 | 48.5 | 45.8 | 47.2 | 45.5 | 46.2 | | |
| | | Percent Not Selected or Challenged | 38.6 | 40.9 | 37.8 | 37.7 | 38.7 | 39.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6,908 | 118 | 108 | 1,323 | 23 | 484 | 581 | 1,592 | 839 | 299 | 678 | 1 | 862 |
| Criminal [1] | 8,107 | 139 | 928 | 6,007 | 338 | 284 | 94 | 97 | 17 | 20 | 38 | 94 | 51 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TEXAS WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 12,010 | 11,076 | 12,393 | 11,611 | 13,261 | 15,119 | | |
| | Terminations | | 12,242 | 10,828 | 11,153 | 11,872 | 12,310 | 14,540 | | |
| | Pending | | 6,308 | 6,330 | 7,219 | 6,651 | 7,517 | 7,989 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 25.9 | 36.5 | 22.0 | 30.2 | 14.0 | | 18 | 2 |
| | Number of Judgeships | | 13 | 13 | 13 | 13 | 13 | 13 | | |
| | Vacant Judgeship Months [2] | | 12.0 | 4.5 | 12.0 | 21.5 | 24.3 | 14.2 | | |
| **Actions per Judgeship** | **Filings** | Total | 924 | 852 | 953 | 893 | 1,020 | 1,163 | 5 | 2 |
| | | Civil | 268 | 250 | 329 | 279 | 266 | 302 | 50 | 5 |
| | | Criminal Felony | 523 | 489 | 508 | 493 | 644 | 749 | 1 | 1 |
| | | Supervised Release Hearings | 132 | 113 | 117 | 121 | 109 | 112 | 6 | 1 |
| | Pending Cases [2] | | 485 | 487 | 555 | 512 | 578 | 615 | 28 | 6 |
| | Weighted Filings [2] | | 688 | 662 | 753 | 696 | 734 | 800 | 6 | 2 |
| | Terminations | | 942 | 833 | 858 | 913 | 947 | 1,118 | 2 | 1 |
| | Trials Completed | | 22 | 21 | 20 | 19 | 20 | 22 | 27 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 4.9 | 5.2 | 5.5 | 5.6 | 4.4 | 4.3 | 2 | 1 |
| | | Civil [2] | 6.6 | 7.1 | 6.1 | 7.3 | 7.8 | 7.5 | 20 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 21.8 | 17.9 | 20.4 | 20.8 | 19.1 | 27.4 | 30 | 6 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 75 3.2 | 91 3.7 | 71 2.3 | 80 2.8 | 87 3.2 | 153 5.2 | 26 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 59.9 | 59.9 | 54.4 | 53.2 | 50.8 | 65.5 | | |
| | | Percent Not Selected or Challenged | 46.8 | 46.2 | 46.7 | 40.9 | 43.1 | 39.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,928 | 82 | 278 | 982 | 18 | 210 | 292 | 470 | 357 | 319 | 471 | 7 | 442 |
| Criminal [1] | 9,733 | 498 | 907 | 7,441 | 307 | 263 | 51 | 98 | 7 | 17 | 35 | 57 | 52 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**KENTUCKY EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| | | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 2,398 | 1,860 | 2,020 | 2,292 | 2,301 | 2,206 | | |
| | Terminations | | 2,295 | 2,226 | 1,924 | 2,059 | 2,142 | 2,168 | | |
| | Pending | | 2,217 | 1,845 | 1,946 | 2,178 | 2,343 | 2,391 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -8.0 | 18.6 | 9.2 | -3.8 | -4.1 | | 72 | 7 |
| | Number of Judgeships | | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | 5.5 | | |
| | Vacant Judgeship Months [2] | | 12.0 | 12.0 | 12.0 | 13.2 | 24.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 436 | 338 | 367 | 417 | 418 | 401 | 68 | 8 |
| | | Civil | 283 | 222 | 252 | 305 | 298 | 241 | 67 | 7 |
| | | Criminal Felony | 114 | 81 | 82 | 74 | 85 | 115 | 29 | 3 |
| | | Supervised Release Hearings | 39 | 35 | 33 | 39 | 35 | 45 | 34 | 4 |
| | Pending Cases [2] | | 403 | 335 | 354 | 396 | 426 | 435 | 55 | 7 |
| | Weighted Filings [2] | | 374 | 300 | 314 | 330 | 338 | 357 | 69 | 8 |
| | Terminations | | 417 | 405 | 350 | 374 | 389 | 394 | 70 | 8 |
| | Trials Completed | | 18 | 15 | 15 | 22 | 18 | 21 | 30 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.6 | 10.2 | 8.3 | 9.3 | 10.1 | 9.5 | 42 | 3 |
| | | Civil [2] | 8.8 | 10.1 | 10.5 | 8.9 | 8.1 | 9.2 | 47 | 4 |
| | From Filing to Trial [2] (Civil Only) | | 25.1 | - | 41.0 | - | 27.3 | 24.3 | 21 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 137 9.7 | 142 11.5 | 141 10.8 | 131 8.6 | 133 8.3 | 170 10.8 | 61 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 2.2 | 1.8 | 1.8 | 1.6 | 1.7 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 50.1 | 51.5 | 48.1 | 53.0 | 51.4 | 52.2 | | |
| | | Percent Not Selected or Challenged | 36.4 | 37.5 | 35.1 | 35.4 | 36.3 | 37.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,325 | 73 | 125 | 410 | 10 | 106 | 63 | 115 | 141 | 19 | 126 | - | 137 |
| Criminal [1] | 634 | 8 | 295 | 84 | 84 | 56 | 22 | 29 | - | 12 | 5 | 7 | 32 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**KENTUCKY WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 2,050 | 2,051 | 1,667 | 1,842 | 1,731 | 2,012 | | |
| | Terminations | | 1,584 | 1,617 | 1,627 | 2,850 | 1,730 | 1,793 | | |
| | Pending | | 2,447 | 2,849 | 2,892 | 1,892 | 1,880 | 2,096 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -1.9 | -1.9 | 20.7 | 9.2 | 16.2 | | 14 | 2 |
| | Number of Judgeships | | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | | |
| | Vacant Judgeship Months [2] | | 27.0 | 24.7 | 12.0 | 12.0 | 12.0 | 12.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 456 | 456 | 370 | 409 | 385 | 447 | 57 | 6 |
| | | Civil | 370 | 381 | 296 | 316 | 305 | 324 | 46 | 5 |
| | | Criminal Felony | 66 | 59 | 58 | 74 | 62 | 101 | 40 | 5 |
| | | Supervised Release Hearings | 20 | 16 | 17 | 20 | 17 | 22 | 66 | 8 |
| | Pending Cases [2] | | 544 | 633 | 643 | 420 | 418 | 466 | 49 | 6 |
| | Weighted Filings [2] | | 400 | 384 | 331 | 372 | 352 | 416 | 53 | 6 |
| | Terminations | | 352 | 359 | 362 | 633 | 384 | 398 | 68 | 7 |
| | Trials Completed | | 12 | 12 | 14 | 16 | 14 | 18 | 40 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.0 | 13.0 | 13.5 | 12.3 | 13.1 | 12.4 | 71 | 9 |
| | | Civil [2] | 8.5 | 8.4 | 9.3 | 23.6 | 9.4 | 8.5 | 33 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 27.3 | 28.1 | - | 29.8 | 44.7 | 35.1 | 47 | 9 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 62 3.1 | 77 3.1 | 471 18.8 | 121 8.4 | 123 8.6 | 109 7.3 | 44 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.4 | 1.5 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 36.9 | 42.0 | 49.5 | 44.0 | 44.1 | 52.9 | | |
| | | Percent Not Selected or Challenged | 28.1 | 33.1 | 44.2 | 35.6 | 26.2 | 37.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,456 | 95 | 42 | 300 | 4 | 86 | 107 | 135 | 145 | 17 | 197 | 5 | 323 |
| Criminal [1] | 451 | - | 150 | 32 | 160 | 47 | 11 | 31 | 3 | 7 | 3 | 3 | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MICHIGAN EASTERN**

| | | | 12-Month Periods Ending | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | Numerical Standing Within |
| | | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 6,387 | 6,080 | 5,946 | 5,400 | 5,528 | 5,170 | | |
| | Terminations | | 6,775 | 6,057 | 5,960 | 5,580 | 5,556 | 5,495 | | |
| | Pending | | 6,756 | 6,745 | 6,689 | 6,478 | 6,401 | 5,295 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -19.1 | -15.0 | -13.1 | -4.3 | -6.5 | | 77 | 8 |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months [2] | | 33.3 | 0.0 | 0.0 | 8.1 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 426 | 405 | 396 | 360 | 369 | 345 | 79 | 9 |
| | | Civil | 345 | 327 | 315 | 284 | 279 | 268 | 61 | 6 |
| | | Criminal Felony | 66 | 62 | 66 | 58 | 68 | 58 | 76 | 9 |
| | | Supervised Release Hearings | 15 | 16 | 15 | 19 | 22 | 20 | 71 | 9 |
| | Pending Cases [2] | | 450 | 450 | 446 | 432 | 427 | 353 | 77 | 9 |
| | Weighted Filings [2] | | 401 | 365 | 364 | 342 | 336 | 328 | 75 | 9 |
| | Terminations | | 452 | 404 | 397 | 372 | 370 | 366 | 75 | 9 |
| | Trials Completed | | 15 | 13 | 13 | 13 | 12 | 12 | 66 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.5 | 10.4 | 11.7 | 10.9 | 10.8 | 10.4 | 57 | 6 |
| | | Civil [2] | 8.5 | 8.6 | 8.2 | 9.3 | 9.3 | 8.7 | 40 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 28.4 | 28.0 | 29.6 | 25.9 | 25.8 | 29.1 | 34 | 6 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 465 8.7 | 667 12.4 | 1,004 19.2 | 1,085 21.1 | 1,035 20.6 | 337 8.3 | 50 | 6 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.4 | 1.3 | 1.3 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 57.5 | 72.1 | 49.6 | 44.5 | 63.4 | 63.1 | | |
| | | Percent Not Selected or Challenged | 52.6 | 50.7 | 48.7 | 45.4 | 51.5 | 51.3 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4,013 | 247 | 68 | 844 | 18 | 61 | 283 | 488 | 325 | 287 | 745 | 25 | 622 |
| Criminal [1] | 859 | - | 205 | 160 | 186 | 139 | 33 | 38 | 1 | 32 | 13 | 17 | 35 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MICHIGAN WESTERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 2,277 | 2,070 | 2,365 | 2,058 | 2,152 | 2,143 | | |
| | Terminations | 2,208 | 2,208 | 2,292 | 2,354 | 2,047 | 2,100 | | |
| | Pending | 1,865 | 1,711 | 1,777 | 1,484 | 1,584 | 1,609 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -5.9 | 3.5 | -9.4 | 4.1 | -0.4 | | 58 | 6 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 4.9 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** Total | 569 | 518 | 591 | 515 | 538 | 536 | 40 | 3 |
| | Civil | 427 | 398 | 451 | 378 | 379 | 386 | 35 | 4 |
| | Criminal Felony | 103 | 82 | 100 | 85 | 110 | 107 | 35 | 4 |
| | Supervised Release Hearings | 40 | 38 | 41 | 52 | 50 | 43 | 38 | 5 |
| | Pending Cases [2] | 466 | 428 | 444 | 371 | 396 | 402 | 61 | 8 |
| | Weighted Filings [2] | 477 | 421 | 475 | 407 | 466 | 483 | 34 | 4 |
| | Terminations | 552 | 552 | 573 | 589 | 512 | 525 | 34 | 3 |
| | Trials Completed | 17 | 16 | 23 | 18 | 15 | 20 | 35 | 5 |
| **Median Time (Months)** | From Filing to Disposition — Criminal Felony | 7.4 | 7.5 | 6.6 | 7.3 | 6.6 | 6.5 | 11 | 1 |
| | Civil [2] | 8.1 | 9.0 | 9.7 | 8.2 | 7.8 | 7.2 | 19 | 1 |
| | From Filing to Trial [2] (Civil Only) | 34.9 | 28.6 | 28.5 | 39.0 | 34.4 | 29.8 | 37 | 7 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 76 / 4.9 | 64 / 4.2 | 98 / 6.4 | 70 / 5.5 | 47 / 3.6 | 45 / 3.4 | 15 | 1 |
| | Average Number of Felony Defendants Filed per Case | 1.5 | 1.3 | 1.4 | 1.2 | 1.4 | 1.3 | | |
| | Jurors — Avg. Present for Jury Selection | 34.5 | 37.8 | 33.9 | 31.8 | 38.2 | 39.1 | | |
| | Jurors — Percent Not Selected or Challenged | 32.5 | 30.4 | 35.4 | 35.3 | 34.6 | 42.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,545 | 125 | 19 | 562 | 1 | 26 | 101 | 91 | 56 | 80 | 320 | 1 | 163 |
| Criminal [1] | 428 | 6 | 136 | 78 | 66 | 56 | 26 | 24 | 4 | 8 | 8 | 8 | 8 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**OHIO NORTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 5,126 | 6,144 | 4,826 | 4,321 | 5,343 | 5,846 | | |
| | Terminations | 4,363 | 8,362 | 8,106 | 5,569 | 4,560 | 4,937 | | |
| | Pending | 12,012 | 9,774 | 6,455 | 5,184 | 5,974 | 6,737 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 14.0 | -4.9 | 21.1 | 35.3 | 9.4 | | 28 | 5 |
| | Number of Judgeships | 11 | 11 | 11 | 11 | 11 | 11 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 12.0 | 11.3 | | |
| **Actions per Judgeship** | **Filings** Total | 466 | 559 | 439 | 393 | 486 | 531 | 42 | 4 |
| | Civil | 366 | 457 | 339 | 290 | 352 | 388 | 33 | 3 |
| | Criminal Felony | 65 | 61 | 60 | 53 | 83 | 95 | 47 | 7 |
| | Supervised Release Hearings | 35 | 40 | 40 | 50 | 51 | 48 | 27 | 3 |
| | Pending Cases [2] | 1,092 | 889 | 587 | 471 | 543 | 612 | 30 | 2 |
| | Weighted Filings [2] | 389 | 358 | 342 | 319 | 362 | 439 | 44 | 5 |
| | Terminations | 397 | 760 | 737 | 506 | 415 | 449 | 58 | 4 |
| | Trials Completed | 13 | 10 | 12 | 12 | 11 | 13 | 62 | 7 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 8.5 | 8.7 | 7.8 | 8.8 | 7.9 | 8.4 | 31 | 2 |
| | Civil [2] | 8.3 | 27.6 | 16.8 | 12.9 | 10.3 | 9.9 | 56 | 6 |
| | From Filing to Trial [2] (Civil Only) | 18.9 | 35.4 | 30.6 | 26.7 | 21.4 | 18.6 | 5 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 1,325 / 11.7 | 2,622 / 28.5 | 1,725 / 29.4 | 1,145 / 24.9 | 1,317 / 25.4 | 1,057 / 18.2 | 83 | 9 |
| | Average Number of Felony Defendants Filed per Case | 1.7 | 1.6 | 1.6 | 1.5 | 1.5 | 1.4 | | |
| | Jurors Avg. Present for Jury Selection | 47.8 | 43.0 | 37.9 | 40.9 | 53.1 | 45.9 | | |
| | Percent Not Selected or Challenged | 42.1 | 37.0 | 35.4 | 36.3 | 45.6 | 40.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 4,273 | 360 | 310 | 629 | 25 | 37 | 384 | 258 | 382 | 243 | 458 | 1 | 1,186 |
| Criminal [1] | 1,046 | 34 | 403 | 106 | 247 | 92 | 32 | 62 | 11 | 17 | 12 | 5 | 25 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**OHIO SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 3,672 | 6,849 | 3,731 | 3,320 | 3,295 | 6,197 | | |
| | | Terminations | 3,670 | 3,599 | 3,275 | 3,428 | 2,797 | 6,600 | | |
| | | Pending | 3,374 | 6,614 | 7,045 | 6,917 | 7,397 | 7,039 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 68.8 | -9.5 | 66.1 | 86.7 | 88.1 | | 1 | 1 |
| | | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 1.9 | 12.0 | 25.0 | 39.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 459 | 856 | 466 | 415 | 412 | 775 | 11 | 1 |
| | | Civil | 346 | 746 | 363 | 312 | 290 | 658 | 8 | 1 |
| | | Criminal Felony | 81 | 81 | 74 | 72 | 96 | 91 | 49 | 8 |
| | | Supervised Release Hearings | 33 | 29 | 29 | 31 | 27 | 26 | 60 | 7 |
| | Pending Cases [2] | | 422 | 827 | 881 | 865 | 925 | 880 | 11 | 1 |
| | Weighted Filings [2] | | 426 | 436 | 401 | 374 | 403 | 642 | 14 | 1 |
| | Terminations | | 459 | 450 | 409 | 429 | 350 | 825 | 7 | 1 |
| | Trials Completed | | 32 | 22 | 21 | 26 | 24 | 35 | 9 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.5 | 7.5 | 8.2 | 9.0 | 8.4 | 10.7 | 61 | 7 |
| | | Civil [2] | 9.6 | 9.1 | 9.2 | 8.8 | 9.6 | 41.6 | 93 | 9 |
| | From Filing to Trial [2] (Civil Only) | | 27.6 | 29.5 | 33.0 | 33.1 | 32.4 | 31.4 | 42 | 8 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 146 5.3 | 156 2.6 | 200 3.2 | 309 5.0 | 3,612 56.3 | 365 6.2 | 37 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.5 | 1.4 | 1.3 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 55.3 | 51.7 | 72.1 | 55.0 | 45.4 | 63.8 | | |
| | | Percent Not Selected or Challenged | 42.5 | 39.8 | 33.8 | 40.7 | 35.4 | 47.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 5,260 | 279 | 2,835 | 392 | 14 | 73 | 308 | 242 | 225 | 51 | 542 | 7 | 292 |
| Criminal [1] | 729 | 6 | 310 | 64 | 127 | 107 | 22 | 33 | 5 | 6 | 9 | 10 | 30 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TENNESSEE EASTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings ¹ | 2,431 | 2,312 | 2,511 | 2,099 | 2,044 | 2,339 | | |
| | | Terminations | 2,681 | 2,377 | 2,233 | 2,531 | 2,180 | 2,162 | | |
| | | Pending | 2,632 | 2,559 | 2,835 | 2,419 | 2,287 | 2,457 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -3.8 | 1.2 | -6.8 | 11.4 | 14.4 | | 16 | 3 |
| | | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | | Vacant Judgeship Months ² | 7.1 | 7.9 | 5.2 | 0.0 | 0.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 486 | 462 | 502 | 420 | 409 | 468 | 52 | 5 |
| | | Civil | 300 | 268 | 340 | 260 | 231 | 234 | 71 | 8 |
| | | Criminal Felony | 153 | 164 | 134 | 128 | 148 | 205 | 10 | 1 |
| | | Supervised Release Hearings | 34 | 30 | 28 | 32 | 30 | 29 | 55 | 6 |
| | Pending Cases ² | | 526 | 512 | 567 | 484 | 457 | 491 | 45 | 4 |
| | Weighted Filings ² | | 499 | 486 | 459 | 411 | 428 | 504 | 32 | 3 |
| | Terminations | | 536 | 475 | 447 | 506 | 436 | 432 | 66 | 6 |
| | Trials Completed | | 11 | 11 | 11 | 15 | 9 | 11 | 72 | 9 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.4 | 9.6 | 10.5 | 10.8 | 9.9 | 9.6 | 45 | 4 |
| | | Civil ² | 11.7 | 13.1 | 12.1 | 12.7 | 12.2 | 11.8 | 80 | 8 |
| | From Filing to Trial ² (Civil Only) | | 29.6 | 33.4 | 24.9 | 25.5 | 28.7 | 25.6 | 27 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 113 6.1 | 103 6.1 | 72 3.5 | 101 6.0 | 63 4.3 | 81 5.7 | 32 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.9 | 1.7 | 1.7 | 1.6 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 56.2 | 53.1 | 37.1 | 36.3 | 26.3 | 38.0 | | |
| | | Percent Not Selected or Challenged | 47.5 | 53.0 | 27.8 | 29.0 | 38.2 | 36.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,170 | 58 | 37 | 315 | 9 | 21 | 88 | 120 | 152 | 15 | 230 | 3 | 122 |
| Criminal ¹ | 1,026 | 6 | 513 | 117 | 266 | 42 | 22 | 31 | 1 | 7 | 8 | 1 | 12 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TENNESSEE MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 2,976 | 2,431 | 3,085 | 3,492 | 2,051 | 2,272 | | |
| | | Terminations | 3,215 | 2,573 | 3,049 | 3,585 | 2,186 | 2,279 | | |
| | | Pending | 2,267 | 2,122 | 2,143 | 2,049 | 1,901 | 1,892 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -23.7 | -6.5 | -26.4 | -34.9 | 10.8 | | 21 | 4 |
| | | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 6.9 | 9.3 | 9.4 | 18.3 | 3.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 744 | 608 | 771 | 873 | 513 | 568 | 26 | 2 |
| | | Civil | 647 | 505 | 662 | 758 | 364 | 401 | 31 | 2 |
| | | Criminal Felony | 52 | 61 | 56 | 66 | 88 | 98 | 43 | 6 |
| | | Supervised Release Hearings | 46 | 43 | 54 | 50 | 61 | 70 | 18 | 1 |
| | Pending Cases [2] | | 567 | 531 | 536 | 512 | 475 | 473 | 47 | 5 |
| | Weighted Filings [2] | | 598 | 513 | 595 | 719 | 462 | 508 | 31 | 2 |
| | Terminations | | 804 | 643 | 762 | 896 | 547 | 570 | 25 | 2 |
| | Trials Completed | | 31 | 24 | 20 | 31 | 23 | 29 | 11 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 15.2 | 18.9 | 18.6 | 17.6 | 15.5 | 12.0 | 68 | 8 |
| | | Civil [2] | 12.0 | 12.3 | 12.4 | 11.1 | 11.7 | 10.8 | 70 | 7 |
| | From Filing to Trial [2] (Civil Only) | | 36.2 | 31.5 | 37.1 | 26.8 | 27.6 | 26.0 | 28 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 161 / 9.0 | 87 / 5.3 | 91 / 5.3 | 61 / 3.8 | 52 / 3.7 | 64 / 4.7 | 20 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.6 | 1.3 | 1.4 | 1.4 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 33.1 | 32.5 | 36.1 | 43.5 | 40.5 | 55.4 | | |
| | | Percent Not Selected or Challenged | 29.4 | 22.0 | 18.1 | 43.2 | 17.3 | 33.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,602 | 54 | 29 | 619 | 4 | 23 | 137 | 132 | 122 | 33 | 322 | 2 | 125 |
| Criminal [1] | 392 | 5 | 94 | 40 | 184 | 32 | 19 | 8 | - | 3 | 5 | - | 2 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TENNESSEE WESTERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 2,130 | 2,176 | 2,060 | 2,036 | 2,263 | 2,091 | | |
| | Terminations | 2,343 | 2,147 | 2,070 | 1,964 | 2,127 | 2,213 | | |
| | Pending | 2,532 | 2,564 | 2,550 | 2,638 | 2,792 | 2,695 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -1.8 | -3.9 | 1.5 | 2.7 | -7.6 | | 81 | 9 |
| | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months [2] | 8.2 | 0.0 | 12.0 | 15.4 | 18.3 | 3.3 | | |
| **Actions per Judgeship** | **Filings** Total | 426 | 435 | 412 | 407 | 453 | 418 | 63 | 7 |
| | Civil | 268 | 271 | 259 | 242 | 237 | 231 | 73 | 9 |
| | Criminal Felony | 97 | 109 | 96 | 97 | 142 | 118 | 27 | 2 |
| | Supervised Release Hearings | 60 | 55 | 57 | 69 | 74 | 69 | 19 | 2 |
| | Pending Cases [2] | 506 | 513 | 510 | 528 | 558 | 539 | 35 | 3 |
| | Weighted Filings [2] | 369 | 384 | 343 | 346 | 414 | 371 | 65 | 7 |
| | Terminations | 469 | 429 | 414 | 393 | 425 | 443 | 61 | 5 |
| | Trials Completed | 29 | 39 | 30 | 28 | 28 | 29 | 11 | 2 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 9.2 | 9.8 | 9.7 | 8.8 | 9.2 | 9.9 | 54 | 5 |
| | Civil [2] | 10.9 | 10.6 | 9.9 | 9.0 | 9.3 | 9.5 | 50 | 5 |
| | From Filing to Trial [2] (Civil Only) | 18.6 | 20.7 | 26.2 | 24.1 | - | 20.1 | 9 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 142 8.6 | 128 7.7 | 176 10.4 | 185 10.9 | 163 10.1 | 208 13.8 | 71 | 8 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.5 | 1.4 | 1.4 | 1.5 | 1.3 | | |
| | Jurors Avg. Present for Jury Selection | 41.2 | 43.8 | 40.6 | 56.1 | 52.4 | 58.9 | | |
| | Percent Not Selected or Challenged | 49.5 | 51.3 | 40.7 | 53.6 | 48.7 | 51.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,156 | 54 | 16 | 383 | 14 | 43 | 67 | 114 | 143 | 8 | 230 | - | 84 |
| Criminal [1] | 587 | 12 | 159 | 34 | 228 | 50 | 24 | 16 | 2 | 35 | 8 | 9 | 10 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ILLINOIS NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 11,058 | 12,809 | 14,326 | 11,238 | 10,491 | 10,068 | | |
| | Terminations | | 10,639 | 11,260 | 10,862 | 11,276 | 11,009 | 10,443 | | |
| | Pending | | 12,603 | 14,099 | 17,534 | 17,480 | 16,981 | 16,611 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -9.0 | -21.4 | -29.7 | -10.4 | -4.0 | | 71 | 5 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months [2] | | 22.5 | 7.4 | 0.0 | 12.2 | 29.9 | 49.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 503 | 582 | 651 | 511 | 477 | 458 | 54 | 6 |
| | | Civil | 456 | 538 | 615 | 469 | 436 | 404 | 28 | 5 |
| | | Criminal Felony | 33 | 33 | 28 | 34 | 33 | 45 | 88 | 7 |
| | | Supervised Release Hearings | 13 | 11 | 8 | 7 | 8 | 9 | 86 | 6 |
| | Pending Cases [2] | | 573 | 641 | 797 | 795 | 772 | 755 | 15 | 2 |
| | Weighted Filings [2] | | 439 | 445 | 430 | 461 | 444 | 433 | 45 | 5 |
| | Terminations | | 484 | 512 | 494 | 513 | 500 | 475 | 48 | 6 |
| | Trials Completed | | 12 | 12 | 12 | 10 | 11 | 9 | 81 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 17.5 | 19.4 | 19.1 | 19.3 | 16.9 | 19.8 | 92 | 7 |
| | | Civil [2] | 6.9 | 7.3 | 7.3 | 8.2 | 7.5 | 7.6 | 23 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 35.4 | 33.0 | 38.4 | 40.0 | 36.3 | 36.7 | 53 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 973 9.0 | 1,282 10.4 | 1,317 8.3 | 1,467 9.4 | 2,957 19.5 | 5,433 37.5 | 90 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.4 | 1.4 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 42.0 | 44.0 | 46.1 | 49.2 | 50.1 | 49.1 | | |
| | | Percent Not Selected or Challenged | 34.4 | 36.3 | 37.8 | 41.6 | 38.4 | 43.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 8,881 | 531 | 356 | 1,454 | 17 | 74 | 860 | 804 | 793 | 798 | 1,335 | 77 | 1,782 |
| Criminal [1] | 992 | 8 | 313 | 101 | 250 | 128 | 80 | 31 | 1 | 10 | 15 | 16 | 39 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ILLINOIS CENTRAL**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,927 | 1,775 | 1,996 | 2,026 | 2,027 | 1,831 | | |
| | Terminations | 1,909 | 1,852 | 1,938 | 2,055 | 1,999 | 1,847 | | |
| | Pending | 2,020 | 1,939 | 1,992 | 1,963 | 2,001 | 1,984 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -5.0 | 3.2 | -8.3 | -9.6 | -9.7 | | 85 | 6 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 3.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 482 | 444 | 499 | 507 | 507 | 458 | 54 | 6 |
| | Civil | 366 | 347 | 388 | 396 | 382 | 343 | 41 | 7 |
| | Criminal Felony | 84 | 61 | 72 | 66 | 78 | 73 | 63 | 5 |
| | Supervised Release Hearings | 32 | 36 | 40 | 45 | 46 | 42 | 40 | 3 |
| | Pending Cases [2] | 505 | 485 | 498 | 491 | 500 | 496 | 43 | 6 |
| | Weighted Filings [2] | 411 | 360 | 397 | 401 | 423 | 378 | 60 | 7 |
| | Terminations | 477 | 463 | 485 | 514 | 500 | 462 | 52 | 7 |
| | Trials Completed | 32 | 30 | 35 | 30 | 29 | 30 | 10 | 1 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 13.5 | 12.4 | 11.2 | 11.5 | 10.5 | 12.3 | 70 | 6 |
| | Civil [2] | 9.2 | 10.8 | 10.4 | 10.2 | 9.0 | 10.0 | 59 | 6 |
| | From Filing to Trial [2] (Civil Only) | 36.7 | 35.1 | 36.6 | 34.3 | 42.8 | 43.1 | 59 | 6 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 78 4.8 | 91 5.5 | 105 6.2 | 102 6.2 | 92 5.6 | 77 4.9 | 22 | 2 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.2 | 1.1 | 1.2 | 1.4 | 1.2 | | |
| | Jurors Avg. Present for Jury Selection | 33.3 | 30.6 | 31.4 | 30.4 | 30.4 | 23.5 | | |
| | Percent Not Selected or Challenged | 35.7 | 31.7 | 35.7 | 31.9 | 36.8 | 38.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,372 | 138 | 13 | 656 | 2 | 47 | 67 | 63 | 54 | 13 | 221 | 1 | 97 |
| Criminal [1] | 289 | 1 | 118 | 19 | 58 | 26 | 6 | 45 | 8 | 2 | - | 3 | 3 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ILLINOIS SOUTHERN**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | 4,124 | 2,015 | 1,950 | 1,807 | 2,595 | 2,158 | | | |
| | Terminations | 4,122 | 10,329 | 3,100 | 2,750 | 2,353 | 2,441 | | | |
| | Pending | 12,910 | 4,595 | 3,443 | 2,498 | 2,734 | 2,454 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -47.7 | 7.1 | 10.7 | 19.4 | -16.8 | | | 89 | 7 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | | |
| | Vacant Judgeship Months ² | 8.3 | 0.0 | 0.0 | 0.0 | 0.0 | 8.7 | | | |
| **Actions per Judgeship** | **Filings** Total | 1,031 | 504 | 488 | 452 | 649 | 540 | | 35 | 3 |
| | Civil | 881 | 375 | 366 | 340 | 516 | 403 | | 29 | 6 |
| | Criminal Felony | 112 | 90 | 74 | 65 | 71 | 82 | | 58 | 4 |
| | Supervised Release Hearings | 38 | 39 | 48 | 47 | 62 | 55 | | 23 | 1 |
| | Pending Cases ² | 3,228 | 1,149 | 861 | 625 | 684 | 614 | | 29 | 4 |
| | Weighted Filings ² | 787 | 412 | 378 | 349 | 518 | 441 | | 43 | 4 |
| | Terminations | 1,031 | 2,582 | 775 | 688 | 588 | 610 | | 19 | 3 |
| | Trials Completed | 23 | 17 | 18 | 16 | 14 | 19 | | 39 | 3 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 8.3 | 10.1 | 9.8 | 10.7 | 9.0 | 9.3 | | 40 | 2 |
| | Civil ² | 27.9 | 35.5 | 30.6 | 35.8 | 18.2 | 8.3 | | 29 | 5 |
| | From Filing to Trial ² (Civil Only) | 34.4 | 30.1 | 29.0 | 38.6 | 38.4 | 38.6 | | 57 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | 4,935 | 1,637 | 1,215 | 654 | 254 | 279 | | | |
| | | 39.4 | 38.8 | 38.5 | 29.2 | 10.4 | 13.2 | | 67 | 6 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.5 | 1.4 | 1.3 | 1.2 | 1.4 | | | |
| | Jurors Avg. Present for Jury Selection | 27.7 | 26.5 | 24.3 | 12.5 | 29.4 | 26.6 | | | |
| | Percent Not Selected or Challenged | 21.5 | 8.6 | 10.6 | 13.2 | 30.0 | 18.2 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,611 | 101 | 27 | 634 | 10 | 44 | 54 | 47 | 494 | 12 | 110 | 2 | 76 |
| Criminal ¹ | 327 | 1 | 159 | 34 | 54 | 26 | 10 | 30 | 2 | 1 | 6 | 1 | 3 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**INDIANA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | | 3,877 | 2,071 | 2,394 | 2,588 | 2,455 | 2,682 | | |
| | Terminations | | 2,311 | 2,657 | 2,632 | 3,096 | 2,554 | 2,707 | | |
| | Pending | | 4,434 | 3,847 | 3,622 | 3,117 | 3,030 | 3,009 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -30.8 | 29.5 | 12.0 | 3.6 | 9.2 | | 30 | 2 |
| | Number of Judgeships | | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months ² | | 0.0 | 0.0 | 5.6 | 12.0 | 21.0 | 21.3 | | |
| **Actions per Judgeship** | **Filings** | Total | 775 | 414 | 479 | 518 | 491 | 536 | 40 | 4 |
| | | Civil | 687 | 338 | 388 | 419 | 393 | 438 | 23 | 3 |
| | | Criminal Felony | 65 | 57 | 72 | 80 | 79 | 83 | 55 | 3 |
| | | Supervised Release Hearings | 24 | 19 | 18 | 19 | 18 | 16 | 79 | 5 |
| | Pending Cases ² | | 887 | 769 | 724 | 623 | 606 | 602 | 31 | 5 |
| | Weighted Filings ² | | 589 | 360 | 425 | 454 | 433 | 467 | 40 | 3 |
| | Terminations | | 462 | 531 | 526 | 619 | 511 | 541 | 30 | 4 |
| | Trials Completed | | 23 | 17 | 17 | 16 | 15 | 16 | 48 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.9 | 10.8 | 10.8 | 11.2 | 11.5 | 10.8 | 63 | 3 |
| | | Civil ² | 10.6 | 12.2 | 17.0 | 22.1 | 13.0 | 14.1 | 87 | 7 |
| | From Filing to Trial ² (Civil Only) | | 25.4 | 44.1 | - | 52.1 | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 123 3.1 | 107 3.1 | 243 7.8 | 331 13.2 | 265 11.1 | 158 6.7 | 41 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.3 | 1.4 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 29.7 | 7.7 | 12.4 | 34.0 | 32.6 | 33.3 | | |
| | | Percent Not Selected or Challenged | 28.5 | 30.6 | 25.9 | 28.6 | 30.8 | 31.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,191 | 356 | 95 | 742 | 14 | 40 | 79 | 125 | 170 | 56 | 354 | - | 160 |
| Criminal ¹ | 411 | 2 | 125 | 13 | 166 | 32 | 22 | 20 | 4 | 8 | 2 | 2 | 15 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**INDIANA SOUTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 3,373 | 3,274 | 4,284 | 5,538 | 6,163 | 6,669 | | |
| | Terminations | 3,279 | 3,405 | 3,123 | 3,970 | 3,940 | 4,806 | | |
| | Pending | 2,978 | 2,826 | 3,966 | 5,522 | 7,743 | 9,612 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 97.7 | 103.7 | 55.7 | 20.4 | 8.2 | | 34 | 3 |
| | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | Vacant Judgeship Months [2] | 0.0 | 5.0 | 12.0 | 12.0 | 12.0 | 15.3 | | |
| **Actions per Judgeship** | **Filings** Total | 675 | 655 | 857 | 1,108 | 1,233 | 1,334 | 3 | 1 |
| | Civil | 583 | 574 | 757 | 1,011 | 1,119 | 1,186 | 3 | 1 |
| | Criminal Felony | 84 | 73 | 93 | 88 | 108 | 144 | 20 | 1 |
| | Supervised Release Hearings | 8 | 8 | 7 | 9 | 6 | 5 | 89 | 7 |
| | Pending Cases [2] | 596 | 565 | 793 | 1,104 | 1,549 | 1,922 | 3 | 1 |
| | Weighted Filings [2] | 598 | 584 | 717 | 915 | 1,009 | 1,125 | 2 | 1 |
| | Terminations | 656 | 681 | 625 | 794 | 788 | 961 | 3 | 1 |
| | Trials Completed | 18 | 18 | 21 | 17 | 16 | 18 | 40 | 4 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 10.9 | 12.8 | 12.5 | 12.7 | 13.2 | 11.5 | 66 | 5 |
| | Civil [2] | 9.2 | 8.5 | 8.8 | 8.2 | 7.8 | 8.1 | 28 | 4 |
| | From Filing to Trial [2] (Civil Only) | 33.0 | 33.9 | 29.0 | 25.2 | 24.5 | 35.3 | 48 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 51 2.1 | 44 1.8 | 56 1.6 | 60 1.2 | 140 2.0 | 637 7.3 | 44 | 5 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.4 | 1.8 | 1.5 | 1.4 | 1.3 | | |
| | Jurors Avg. Present for Jury Selection | 47.2 | 40.3 | 37.4 | 40.7 | 38.9 | 36.1 | | |
| | Percent Not Selected or Challenged | 41.1 | 44.0 | 33.8 | 42.0 | 37.4 | 32.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 5,928 | 226 | 2,083 | 1,390 | 43 | 32 | 186 | 187 | 546 | 75 | 591 | 3 | 566 |
| Criminal [1] | 718 | 8 | 265 | 40 | 232 | 49 | 9 | 60 | 6 | 3 | 16 | 3 | 27 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WISCONSIN EASTERN**

| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Overall Caseload Statistics** | | Filings [1] | 2,143 | 2,289 | 2,155 | 2,369 | 2,550 | 2,563 | **Numerical Standing Within** | | |
| | | Terminations | 2,008 | 2,057 | 2,112 | 2,262 | 2,351 | 2,413 | | | |
| | | Pending | 1,616 | 1,845 | 1,885 | 1,983 | 2,175 | 2,291 | | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 19.6 | 12.0 | 18.9 | 8.2 | 0.5 | | | 56 | 4 |
| | | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | | |
| | | Vacant Judgeship Months [2] | 12.0 | 4.7 | 4.8 | 12.0 | 12.0 | 12.0 | | | |
| **Actions per Judgeship** | **Filings** | Total | 429 | 458 | 431 | 474 | 510 | 513 | | 43 | 5 |
| | | Civil | 308 | 342 | 333 | 368 | 391 | 410 | | 27 | 4 |
| | | Criminal Felony | 80 | 79 | 57 | 65 | 64 | 57 | | 78 | 6 |
| | | Supervised Release Hearings | 40 | 37 | 41 | 41 | 56 | 46 | | 32 | 2 |
| | Pending Cases [2] | | 323 | 369 | 377 | 397 | 435 | 458 | | 51 | 7 |
| | Weighted Filings [2] | | 369 | 384 | 342 | 392 | 415 | 402 | | 57 | 6 |
| | Terminations | | 402 | 411 | 422 | 452 | 470 | 483 | | 44 | 5 |
| | Trials Completed | | 7 | 12 | 9 | 9 | 8 | 6 | | 92 | 7 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.5 | 7.7 | 9.4 | 11.7 | 10.9 | 11.1 | | 65 | 4 |
| | | Civil [2] | 6.2 | 6.2 | 7.1 | 6.3 | 6.0 | 6.2 | | 11 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 31.8 | 30.2 | 27.6 | 33.7 | 35.6 | 25.4 | | 26 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 55 | 57 | 68 | 74 | 88 | 108 | | | |
| | | | 4.6 | 4.3 | 4.8 | 5.0 | 5.3 | 6.1 | | 36 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.7 | 1.8 | 1.4 | 1.8 | 1.5 | 1.5 | | | |
| | Jurors | Avg. Present for Jury Selection | 34.1 | 33.8 | 32.1 | 31.8 | 39.5 | 40.8 | | | |
| | | Percent Not Selected or Challenged | 28.9 | 37.9 | 34.8 | 31.2 | 28.5 | 35.7 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,050 | 242 | 16 | 759 | 17 | 21 | 140 | 107 | 77 | 40 | 263 | 1 | 367 |
| Criminal [1] | 279 | 6 | 79 | 17 | 75 | 44 | 21 | 12 | - | 8 | 1 | 6 | 10 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WISCONSIN WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,138 | 1,087 | 1,125 | 1,108 | 1,215 | 1,395 | | |
| | | Terminations | 1,144 | 1,094 | 1,035 | 1,029 | 1,092 | 1,268 | | |
| | | Pending | 986 | 982 | 1,074 | 1,152 | 1,275 | 1,403 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 22.6 | 28.3 | 24.0 | 25.9 | 14.8 | | 15 | 1 |
| | | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | |
| | | Vacant Judgeship Months [2] | 10.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 569 | 544 | 563 | 554 | 608 | 698 | 16 | 2 |
| | | Civil | 471 | 439 | 465 | 462 | 489 | 571 | 13 | 2 |
| | | Criminal Felony | 72 | 68 | 71 | 66 | 85 | 88 | 52 | 2 |
| | | Supervised Release Hearings | 27 | 37 | 27 | 27 | 34 | 39 | 46 | 4 |
| | | Pending Cases [2] | 493 | 491 | 537 | 576 | 638 | 702 | 20 | 3 |
| | | Weighted Filings [2] | 500 | 453 | 464 | 481 | 519 | 582 | 24 | 2 |
| | | Terminations | 572 | 547 | 518 | 515 | 546 | 634 | 16 | 2 |
| | | Trials Completed | 17 | 23 | 22 | 17 | 20 | 27 | 15 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.0 | 6.5 | 6.7 | 8.0 | 7.4 | 7.2 | 15 | 1 |
| | | Civil [2] | 7.8 | 8.3 | 7.0 | 7.2 | 7.7 | 7.5 | 20 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 19.6 | 21.1 | 20.1 | 22.0 | 20.5 | 24.1 | 20 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 11 / 1.4 | 10 / 1.3 | 11 / 1.3 | 22 / 2.4 | 49 / 4.9 | 37 / 3.2 | 13 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.1 | 1.2 | 1.3 | 1.2 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 21.8 | 29.1 | 20.7 | 28.8 | 25.2 | 13.1 | | |
| | | Percent Not Selected or Challenged | 11.9 | 23.9 | 14.8 | 9.0 | 8.9 | 11.5 | | |

### 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 1,141 | 144 | 18 | 424 | 4 | 57 | 74 | 66 | 34 | 37 | 141 | 1 | 141 |
| Criminal [1] | 175 | - | 56 | 23 | 49 | 11 | 8 | 16 | - | 3 | 4 | - | 5 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ARKANSAS EASTERN**

| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
| **Overall Caseload Statistics** | Filings [1] | | 2,330 | 2,476 | 2,562 | 2,445 | 2,567 | 2,760 | | | |
| | Terminations | | 5,335 | 2,537 | 2,472 | 2,503 | 2,451 | 2,355 | | | |
| | Pending | | 2,230 | 2,164 | 2,250 | 2,174 | 2,280 | 2,681 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | | 18.5 | 11.5 | 7.7 | 12.9 | 7.5 | | 36 | 3 |
| | Number of Judgeships | | 5 | 5 | 5 | 5 | 5 | 5 | | | |
| | Vacant Judgeship Months [2] | | 6.1 | 0.0 | 0.0 | 0.0 | 3.0 | 12.0 | | | |
| **Actions per Judgeship** | **Filings** | Total | 466 | 495 | 512 | 489 | 513 | 552 | | 29 | 3 |
| | | Civil | 370 | 378 | 404 | 394 | 371 | 396 | | 32 | 3 |
| | | Criminal Felony | 74 | 95 | 88 | 77 | 122 | 137 | | 23 | 8 |
| | | Supervised Release Hearings | 22 | 23 | 21 | 19 | 21 | 19 | | 72 | 10 |
| | Pending Cases [2] | | 446 | 433 | 450 | 435 | 456 | 536 | | 36 | 2 |
| | Weighted Filings [2] | | 389 | 432 | 438 | 415 | 462 | 504 | | 32 | 4 |
| | Terminations | | 1,067 | 507 | 494 | 501 | 490 | 471 | | 49 | 6 |
| | Trials Completed | | 26 | 22 | 26 | 19 | 17 | 17 | | 44 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 14.7 | 17.0 | 17.0 | 19.8 | 18.6 | 15.4 | | 87 | 9 |
| | | Civil [2] | 58.9 | 10.8 | 9.5 | 10.3 | 10.1 | 10.3 | | 65 | 7 |
| | From Filing to Trial [2] (Civil Only) | | 20.3 | 20.6 | 25.1 | 25.8 | 25.9 | 23.8 | | 19 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 68 4.2 | 32 2.2 | 31 2.0 | 29 1.9 | 27 1.9 | 37 2.4 | | 5 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.8 | 2.5 | 1.7 | 1.7 | 1.7 | 1.3 | | | |
| | Jurors | Avg. Present for Jury Selection | 52.1 | 46.8 | 43.2 | 48.4 | 43.0 | 42.7 | | | |
| | | Percent Not Selected or Challenged | 48.8 | 43.9 | 39.1 | 45.5 | 44.8 | 41.1 | | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,980 | 184 | 33 | 1,038 | 1 | 17 | 169 | 120 | 102 | 14 | 227 | - | 75 |
| Criminal [1] | 682 | 43 | 156 | 62 | 267 | 54 | 15 | 27 | 2 | 20 | 1 | 1 | 34 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ARKANSAS WESTERN**

| | | | 12-Month Periods Ending | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | Numerical Standing Within | |
| | | | | | | | | | **U.S.** | **Circuit** |
| **Overall Caseload Statistics** | Filings [1] | | 1,511 | 1,361 | 1,461 | 1,251 | 1,330 | 1,292 | | |
| | Terminations | | 1,573 | 1,508 | 1,299 | 1,503 | 1,427 | 1,355 | | |
| | Pending | | 1,535 | 1,385 | 1,543 | 1,281 | 1,179 | 1,115 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -14.5 | -5.1 | -11.6 | 3.3 | -2.9 | | 70 | 7 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 8.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 504 | 454 | 487 | 417 | 443 | 431 | 61 | 9 |
| | | Civil | 384 | 349 | 375 | 329 | 352 | 296 | 52 | 5 |
| | | Criminal Felony | 97 | 83 | 100 | 74 | 73 | 110 | 32 | 9 |
| | | Supervised Release Hearings | 22 | 21 | 12 | 14 | 18 | 25 | 63 | 9 |
| | Pending Cases [2] | | 512 | 462 | 514 | 427 | 393 | 372 | 70 | 8 |
| | Weighted Filings [2] | | 406 | 362 | 404 | 338 | 353 | 374 | 63 | 9 |
| | Terminations | | 524 | 503 | 433 | 501 | 476 | 452 | 57 | 8 |
| | Trials Completed | | 13 | 13 | 14 | 15 | 11 | 13 | 62 | 9 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.5 | 8.8 | 7.4 | 9.7 | 9.6 | 8.6 | 34 | 3 |
| | | Civil [2] | 12.6 | 11.9 | 11.6 | 11.7 | 11.3 | 11.2 | 75 | 8 |
| | From Filing to Trial [2] (Civil Only) | | 22.7 | 26.5 | 24.7 | 23.6 | 20.1 | 14.3 | 2 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 23 2.0 | 22 2.0 | 33 2.8 | 19 2.1 | 24 2.9 | 18 2.6 | 7 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.3 | 1.2 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 46.9 | 41.0 | 48.1 | 38.3 | 50.5 | 52.0 | | |
| | | Percent Not Selected or Challenged | 45.3 | 40.2 | 30.7 | 44.9 | 49.2 | 42.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 888 | 261 | 11 | 292 | 7 | 9 | 60 | 77 | 51 | 12 | 69 | 1 | 38 |
| Criminal [1] | 328 | 1 | 161 | 46 | 30 | 16 | 4 | 37 | 3 | 18 | 3 | 2 | 7 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**IOWA NORTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,066 | 1,213 | 1,511 | 1,177 | 1,182 | 1,088 | | |
| | Terminations | 1,132 | 1,175 | 1,290 | 1,358 | 1,195 | 1,007 | | |
| | Pending | 616 | 651 | 876 | 681 | 660 | 749 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 2.1 | -10.3 | -28.0 | -7.6 | -8.0 | | 82 | 9 |
| | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 7.4 | 12.0 | 20.9 | 14.2 | | |
| **Actions per Judgeship** | **Filings** Total | 533 | 607 | 756 | 589 | 591 | 544 | 32 | 5 |
| | Civil | 263 | 305 | 433 | 252 | 240 | 212 | 76 | 7 |
| | Criminal Felony | 188 | 193 | 202 | 191 | 221 | 214 | 8 | 1 |
| | Supervised Release Hearings | 83 | 110 | 121 | 146 | 131 | 119 | 4 | 2 |
| | Pending Cases [2] | 308 | 326 | 438 | 341 | 330 | 375 | 67 | 7 |
| | Weighted Filings [2] | 421 | 498 | 570 | 452 | 479 | 472 | 39 | 6 |
| | Terminations | 566 | 588 | 645 | 679 | 598 | 504 | 41 | 5 |
| | Trials Completed | 93 | 124 | 88 | 87 | 81 | 84 | 1 | 1 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 5.8 | 6.0 | 6.0 | 6.8 | 6.9 | 7.9 | 23 | 1 |
| | Civil [2] | 8.4 | 5.0 | 3.5 | 9.2 | 7.3 | 8.7 | 40 | 5 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 12 / 3.1 | 13 / 3.2 | 12 / 2.1 | 11 / 2.6 | 7 / 1.9 | 5 / 1.2 | 1 | 1 |
| | Average Number of Felony Defendants Filed per Case | 1.1 | 1.2 | 1.2 | 1.2 | 1.2 | 1.2 | | |
| | Jurors Avg. Present for Jury Selection | 41.9 | 48.6 | 46.6 | 36.4 | 38.4 | 43.5 | | |
| | Percent Not Selected or Challenged | 31.4 | 44.0 | 30.6 | 27.5 | 30.0 | 34.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 424 | 81 | 17 | 144 | 2 | 14 | 11 | 41 | 27 | 14 | 51 | - | 22 |
| Criminal [1] | 427 | 2 | 129 | 48 | 144 | 38 | 12 | 20 | 2 | 7 | 16 | 3 | 6 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**IOWA SOUTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,143 | 1,163 | 1,470 | 1,310 | 1,334 | 1,333 | | |
| | Terminations | 1,203 | 1,198 | 1,290 | 1,384 | 1,295 | 1,382 | | |
| | Pending | 858 | 812 | 991 | 914 | 951 | 894 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | 16.6 | 14.6 | -9.3 | 1.8 | -0.1 | | 57 | 5 |
| | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | 0.0 | 4.0 | 7.3 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 381 | 388 | 490 | 437 | 445 | 444 | 59 | 8 |
| | Civil | 218 | 214 | 279 | 207 | 187 | 196 | 81 | 8 |
| | Criminal Felony | 105 | 112 | 130 | 162 | 187 | 169 | 15 | 5 |
| | Supervised Release Hearings | 58 | 62 | 81 | 68 | 70 | 79 | 13 | 4 |
| | Pending Cases [2] | 286 | 271 | 330 | 305 | 317 | 298 | 85 | 10 |
| | Weighted Filings [2] | 332 | 341 | 378 | 399 | 416 | 415 | 54 | 8 |
| | Terminations | 401 | 399 | 430 | 461 | 432 | 461 | 54 | 7 |
| | Trials Completed | 35 | 33 | 31 | 31 | 39 | 48 | 2 | 2 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 9.5 | 9.1 | 8.7 | 9.0 | 9.3 | 9.2 | 39 | 4 |
| | Civil [2] | 10.0 | 8.4 | 10.1 | 9.7 | 9.8 | 8.6 | 38 | 4 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 23 / 4.1 | 27 / 5.3 | 23 / 3.4 | 20 / 4.0 | 19 / 4.2 | 23 / 5.3 | 27 | 6 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.3 | 1.3 | 1.4 | 1.3 | 1.4 | | |
| | Jurors Avg. Present for Jury Selection | 43.9 | 39.2 | 40.3 | 41.5 | 37.6 | 40.3 | | |
| | Percent Not Selected or Challenged | 33.9 | 23.1 | 26.8 | 23.8 | 24.6 | 23.4 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 589 | 49 | 12 | 250 | 8 | 5 | 28 | 53 | 42 | 8 | 92 | - | 42 |
| Criminal [1] | 506 | 4 | 268 | 33 | 106 | 20 | 5 | 49 | 5 | 2 | 5 | 5 | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MINNESOTA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 5,047 | 6,243 | 4,684 | 5,452 | 5,797 | 4,152 | | |
| | | Terminations | 5,138 | 4,682 | 4,639 | 4,140 | 4,051 | 3,854 | | |
| | | Pending | 4,427 | 5,981 | 6,001 | 7,305 | 9,061 | 9,358 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -17.7 | -33.5 | -11.4 | -23.8 | -28.4 | | 91 | 10 |
| | | Number of Judgeships | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 6.6 | 31.9 | 36.0 | 16.1 | | |
| **Actions per Judgeship** | **Filings** | Total | 721 | 892 | 669 | 779 | 828 | 593 | 24 | 2 |
| | | Civil | 638 | 777 | 572 | 651 | 709 | 482 | 18 | 1 |
| | | Criminal Felony | 52 | 84 | 50 | 57 | 51 | 58 | 76 | 10 |
| | | Supervised Release Hearings | 30 | 31 | 47 | 71 | 68 | 53 | 25 | 6 |
| | Pending Cases [2] | | 632 | 854 | 857 | 1,044 | 1,294 | 1,337 | 5 | 1 |
| | Weighted Filings [2] | | 590 | 807 | 520 | 593 | 627 | 482 | 36 | 5 |
| | Terminations | | 734 | 669 | 663 | 591 | 579 | 551 | 28 | 1 |
| | Trials Completed | | 13 | 14 | 12 | 11 | 12 | 9 | 81 | 10 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.4 | 10.7 | 11.7 | 12.2 | 9.7 | 10.2 | 55 | 7 |
| | | Civil [2] | 13.2 | 2.3 | 14.8 | 9.3 | 11.2 | 9.1 | 45 | 6 |
| | From Filing to Trial [2] (Civil Only) | | 22.7 | 27.9 | 27.7 | 36.6 | 32.4 | 24.9 | 23 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 253 / 6.3 | 198 / 3.7 | 187 / 3.4 | 765 / 11.0 | 1,102 / 12.7 | 1,821 / 20.4 | 85 | 10 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.7 | 1.4 | 1.6 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 39.6 | 49.9 | 61.8 | 56.3 | 62.4 | 55.9 | | |
| | | Percent Not Selected or Challenged | 29.8 | 38.0 | 42.3 | 39.2 | 44.1 | 36.6 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,373 | 96 | 1,228 | 402 | 30 | 40 | 391 | 296 | 138 | 70 | 308 | 16 | 358 |
| Criminal [1] | 402 | 1 | 182 | 17 | 46 | 46 | 38 | 46 | 2 | 9 | 5 | 5 | 5 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MISSOURI EASTERN**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 3,923 | 3,350 | 3,498 | 4,583 | 3,990 | 4,988 | | | |
| | Terminations | 3,767 | 3,249 | 4,015 | 5,314 | 3,837 | 4,391 | | | |
| | Pending | 4,363 | 4,469 | 3,957 | 3,233 | 3,333 | 3,875 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 27.1 | 48.9 | 42.6 | 8.8 | 25.0 | | 5 | 1 |
| | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | | |
| | Vacant Judgeship Months [2] | 9.0 | 0.5 | 0.0 | 0.0 | 9.9 | 16.6 | | | |
| **Actions per Judgeship** | **Filings** Total | 490 | 419 | 437 | 573 | 499 | 624 | | 22 | 1 |
| | Civil | 363 | 282 | 302 | 414 | 309 | 411 | | 26 | 2 |
| | Criminal Felony | 87 | 94 | 99 | 111 | 149 | 171 | | 14 | 4 |
| | Supervised Release Hearings | 41 | 43 | 36 | 47 | 40 | 42 | | 40 | 8 |
| | Pending Cases [2] | 545 | 559 | 495 | 404 | 417 | 484 | | 46 | 3 |
| | Weighted Filings [2] | 381 | 390 | 382 | 533 | 474 | 593 | | 22 | 1 |
| | Terminations | 471 | 406 | 502 | 664 | 480 | 549 | | 29 | 2 |
| | Trials Completed | 28 | 19 | 17 | 23 | 24 | 25 | | 18 | 5 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 8.1 | 8.8 | 8.8 | 9.2 | 10.1 | 9.7 | | 48 | 6 |
| | Civil [2] | 8.6 | 8.2 | 13.5 | 6.2 | 6.2 | 2.7 | | 1 | 1 |
| | From Filing to Trial [2] (Civil Only) | 22.9 | 35.7 | 36.2 | 26.4 | 30.4 | 35.3 | | 48 | 6 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 768 20.5 | 990 26.9 | 716 22.7 | 281 12.4 | 66 3.3 | 87 3.7 | | 18 | 4 |
| | Average Number of Felony Defendants Filed per Case | 1.5 | 1.5 | 1.3 | 1.5 | 1.2 | 1.2 | | | |
| | Jurors Avg. Present for Jury Selection | 34.4 | 38.1 | 39.5 | 30.8 | 37.1 | 33.3 | | | |
| | Percent Not Selected or Challenged | 26.0 | 22.8 | 30.8 | 23.4 | 25.5 | 16.3 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,289 | 227 | 613 | 523 | 25 | 91 | 164 | 259 | 837 | 35 | 309 | 1 | 205 |
| Criminal [1] | 1,364 | 22 | 327 | 56 | 695 | 91 | 42 | 57 | 9 | 24 | 18 | 6 | 17 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MISSOURI WESTERN**

| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
| **Overall Caseload Statistics** | | Filings [1] | 3,510 | 3,422 | 3,647 | 3,232 | 3,299 | 3,236 | | |
| | | Terminations | 3,583 | 3,633 | 3,569 | 3,629 | 3,426 | 3,110 | | |
| | | Pending | 3,346 | 3,137 | 3,206 | 2,821 | 2,699 | 2,799 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -7.8 | -5.4 | -11.3 | 0.1 | -1.9 | | 65 | 6 |
| | | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | | Vacant Judgeship Months [2] | 14.6 | 0.0 | 9.7 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 585 | 570 | 608 | 539 | 550 | 539 | 36 | 6 |
| | | Civil | 390 | 380 | 421 | 352 | 366 | 339 | 43 | 4 |
| | | Criminal Felony | 150 | 149 | 135 | 126 | 127 | 153 | 17 | 6 |
| | | Supervised Release Hearings | 46 | 42 | 53 | 61 | 57 | 47 | 29 | 7 |
| | Pending Cases [2] | | 558 | 523 | 534 | 470 | 450 | 467 | 48 | 4 |
| | Weighted Filings [2] | | 519 | 523 | 504 | 462 | 489 | 509 | 30 | 3 |
| | Terminations | | 597 | 606 | 595 | 605 | 571 | 518 | 36 | 3 |
| | Trials Completed | | 22 | 32 | 36 | 34 | 33 | 27 | 15 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 14.5 | 16.9 | 15.3 | 15.9 | 16.4 | 16.1 | 88 | 10 |
| | | Civil [2] | 10.6 | 9.9 | 8.7 | 8.8 | 6.6 | 6.8 | 16 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 16.4 | 25.7 | 20.7 | 21.5 | 27.0 | 23.6 | 18 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 50 / 2.6 | 62 / 3.5 | 76 / 3.9 | 83 / 5.1 | 82 / 5.5 | 112 / 7.8 | 48 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 65.0 | 46.0 | 38.9 | 43.1 | 39.0 | 43.2 | | |
| | | Percent Not Selected or Challenged | 36.8 | 30.9 | 30.5 | 27.3 | 29.8 | 19.5 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,036 | 305 | 76 | 552 | 12 | 28 | 122 | 207 | 199 | 30 | 263 | 8 | 234 |
| Criminal [1] | 915 | 5 | 278 | 38 | 374 | 71 | 16 | 80 | 4 | 14 | 11 | 2 | 22 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

### U.S. District Court — Judicial Caseload Profile

**NEBRASKA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| | | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,618 | 1,495 | 1,643 | 1,529 | 1,616 | 1,654 | | |
| | | Terminations | 1,622 | 1,547 | 1,514 | 1,704 | 1,592 | 1,538 | | |
| | | Pending | 1,187 | 1,125 | 1,252 | 1,084 | 1,141 | 1,237 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 2.2 | 10.6 | 0.7 | 8.2 | 2.4 | | 49 | 4 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 8.9 | 12.0 | 12.0 | 12.0 | 18.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 539 | 498 | 548 | 510 | 539 | 551 | 30 | 4 |
| | | Civil | 213 | 214 | 254 | 217 | 247 | 240 | 68 | 6 |
| | | Criminal Felony | 227 | 192 | 201 | 190 | 184 | 206 | 9 | 2 |
| | | Supervised Release Hearings | 99 | 93 | 92 | 103 | 108 | 105 | 7 | 3 |
| | | Pending Cases [2] | 396 | 375 | 417 | 361 | 380 | 412 | 59 | 5 |
| | | Weighted Filings [2] | 486 | 458 | 534 | 474 | 505 | 510 | 29 | 2 |
| | | Terminations | 541 | 516 | 505 | 568 | 531 | 513 | 39 | 4 |
| | | Trials Completed | 17 | 18 | 18 | 21 | 20 | 20 | 35 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.9 | 8.0 | 9.0 | 9.0 | 9.2 | 8.5 | 32 | 2 |
| | | Civil [2] | 8.8 | 7.7 | 7.9 | 9.9 | 7.5 | 8.3 | 29 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 25.9 | 31.4 | 32.6 | 28.0 | - | 24.4 | 22 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 27 | 36 | 43 | 30 | 23 | 33 | 25 | 5 |
| | | | 4.7 | 6.2 | 6.3 | 5.6 | 3.9 | 5.1 | | |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.3 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 31.8 | 34.5 | 35.0 | 28.6 | 32.7 | 30.4 | | |
| | | Percent Not Selected or Challenged | 18.7 | 18.9 | 21.1 | 9.4 | 11.7 | 9.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 721 | 24 | 13 | 180 | 10 | 21 | 39 | 72 | 105 | 17 | 175 | 1 | 64 |
| Criminal [1] | 616 | 1 | 201 | 142 | 75 | 55 | 49 | 58 | - | 5 | 7 | 2 | 21 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NORTH DAKOTA**

| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | **Numerical Standing Within** | |
| **Overall Caseload Statistics** | Filings [1] | 861 | 901 | 991 | 878 | 762 | 706 | | |
| | Terminations | 817 | 816 | 856 | 1,007 | 822 | 786 | | |
| | Pending | 779 | 939 | 1,057 | 921 | 848 | 752 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -18.0 | -21.6 | -28.8 | -19.6 | -7.3 | | 79 | 8 |
| | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 9.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** Total | 431 | 451 | 496 | 439 | 381 | 353 | 76 | 10 |
| | Civil | 143 | 153 | 206 | 158 | 141 | 132 | 89 | 9 |
| | Criminal Felony | 213 | 220 | 213 | 191 | 173 | 144 | 20 | 7 |
| | Supervised Release Hearings | 75 | 78 | 77 | 91 | 68 | 78 | 14 | 5 |
| | Pending Cases [2] | 390 | 470 | 529 | 461 | 424 | 376 | 66 | 6 |
| | Weighted Filings [2] | 423 | 440 | 482 | 433 | 402 | 340 | 72 | 10 |
| | Terminations | 409 | 408 | 428 | 504 | 411 | 393 | 71 | 10 |
| | Trials Completed | 34 | 34 | 33 | 23 | 23 | 18 | 40 | 7 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 7.5 | 8.7 | 11.4 | 10.0 | 13.6 | 13.4 | 79 | 8 |
| | Civil [2] | 13.1 | 10.0 | 11.2 | 21.6 | 13.0 | 12.4 | 83 | 10 |
| | From Filing to Trial [2] (Civil Only) | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 19 6.5 | 18 3.9 | 102 18.0 | 41 9.5 | 44 12.1 | 49 13.6 | 68 | 8 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.3 | 1.5 | 1.5 | 1.6 | 1.4 | | |
| | Jurors Avg. Present for Jury Selection | 37.3 | 38.1 | 39.8 | 41.2 | 17.6 | 40.6 | | |
| | Percent Not Selected or Challenged | 24.4 | 22.7 | 30.7 | 33.8 | 23.6 | 26.9 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 263 | 15 | 7 | 48 | 1 | 20 | 11 | 35 | 35 | 7 | 40 | - | 44 |
| Criminal [1] | 287 | - | 139 | 48 | 10 | 9 | 36 | 24 | - | 8 | 9 | - | 4 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**SOUTH DAKOTA**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,038 | 1,133 | 1,513 | 1,370 | 1,312 | 1,434 | | | |
| | Terminations | 1,088 | 1,041 | 1,428 | 1,264 | 1,328 | 1,316 | | | |
| | Pending | 876 | 914 | 969 | 1,034 | 972 | 1,083 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 38.2 | 26.6 | -5.2 | 4.7 | 9.3 | | 29 | 2 |
| | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | |
| **Actions per Judgeship** | **Filings** Total | 346 | 378 | 504 | 457 | 437 | 478 | | 51 | 7 |
| | Civil | 102 | 128 | 214 | 124 | 105 | 118 | | 91 | 10 |
| | Criminal Felony | 188 | 177 | 192 | 200 | 181 | 199 | | 11 | 3 |
| | Supervised Release Hearings | 56 | 73 | 98 | 133 | 151 | 161 | | 2 | 1 |
| | Pending Cases [2] | 292 | 305 | 323 | 345 | 324 | 361 | | 73 | 9 |
| | Weighted Filings [2] | 370 | 399 | 495 | 441 | 379 | 429 | | 48 | 7 |
| | Terminations | 363 | 347 | 476 | 421 | 443 | 439 | | 62 | 9 |
| | Trials Completed | 30 | 38 | 37 | 46 | 37 | 47 | | 3 | 3 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 8.5 | 8.6 | 8.5 | 9.5 | 9.8 | 9.5 | | 42 | 5 |
| | Civil [2] | 14.6 | 8.7 | 1.2 | 12.2 | 11.7 | 11.9 | | 81 | 9 |
| | From Filing to Trial [2] (Civil Only) | 29.8 | 21.0 | - | - | - | - | | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 49 12.6 | 58 13.8 | 57 13.5 | 53 12.4 | 54 13.3 | 59 14.1 | | 72 | 9 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.1 | 1.2 | 1.2 | 1.2 | 1.2 | | | |
| | Jurors Avg. Present for Jury Selection | 39.0 | 39.6 | 41.6 | 46.5 | 37.7 | 42.3 | | | |
| | Percent Not Selected or Challenged | 18.9 | 16.6 | 21.1 | 26.1 | 20.6 | 21.5 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 353 | 23 | 4 | 119 | 2 | 4 | 5 | 56 | 54 | 4 | 61 | 1 | 20 |
| Criminal [1] | 598 | - | 198 | 36 | 77 | 22 | 85 | 97 | - | 21 | 24 | 17 | 21 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ALASKA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 518 | 510 | 653 | 585 | 676 | 644 | | |
| | | Terminations | 511 | 503 | 553 | 594 | 575 | 695 | | |
| | | Pending | 541 | 550 | 639 | 628 | 727 | 676 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 24.3 | 26.3 | -1.4 | 10.1 | -4.7 | | 75 | 11 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 6.0 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 173 | 170 | 218 | 195 | 225 | 215 | 90 | 13 |
| | | Civil | 105 | 100 | 123 | 120 | 120 | 137 | 87 | 13 |
| | | Criminal Felony | 60 | 66 | 66 | 63 | 90 | 73 | 63 | 8 |
| | | Supervised Release Hearings | 7 | 4 | 29 | 11 | 15 | 5 | 89 | 13 |
| | Pending Cases [2] | | 180 | 183 | 213 | 209 | 242 | 225 | 93 | 14 |
| | Weighted Filings [2] | | 187 | 200 | 207 | 204 | 253 | 234 | 89 | 12 |
| | Terminations | | 170 | 168 | 184 | 198 | 192 | 232 | 90 | 13 |
| | Trials Completed | | 9 | 11 | 8 | 11 | 14 | 7 | 88 | 14 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.2 | 10.0 | 10.5 | 10.0 | 9.5 | 11.5 | 66 | 9 |
| | | Civil [2] | 8.5 | 9.4 | 9.4 | 8.4 | 8.4 | 8.5 | 33 | 5 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | 26.6 | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 37 11.1 | 37 11.6 | 50 12.9 | 40 10.2 | 48 11.8 | 54 14.1 | 72 | 10 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.4 | 1.3 | 1.1 | 1.3 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 53.7 | 53.7 | 78.2 | 48.8 | 54.1 | 72.8 | | |
| | | Percent Not Selected or Challenged | 35.4 | 33.0 | 46.8 | 38.1 | 24.6 | 37.1 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 410 | 48 | 14 | 102 | 2 | 8 | 14 | 48 | 74 | - | 56 | 3 | 41 |
| Criminal [1] | 219 | 8 | 77 | - | 74 | 12 | 12 | 20 | | 3 | 3 | 3 | 7 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ARIZONA**

| | | | | 12-Month Periods Ending | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 13,745 | 9,458 | 11,213 | 11,718 | 12,105 | 15,509 | | |
| | Terminations | | 13,677 | 9,610 | 9,506 | 10,740 | 9,512 | 10,527 | | |
| | Pending | | 5,762 | 5,403 | 6,922 | 7,787 | 10,291 | 15,072 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 12.8 | 64.0 | 38.3 | 32.4 | 28.1 | | 4 | 2 |
| | Number of Judgeships | | 13 | 13 | 13 | 13 | 13 | 13 | | |
| | Vacant Judgeship Months [2] | | 60.4 | 0.0 | 0.0 | 21.9 | 26.8 | 32.4 | | |
| **Actions per Judgeship** | **Filings** | Total | 1,057 | 728 | 863 | 901 | 931 | 1,193 | 4 | 1 |
| | | Civil | 573 | 282 | 373 | 429 | 448 | 663 | 7 | 2 |
| | | Criminal Felony | 366 | 341 | 378 | 347 | 369 | 413 | 4 | 1 |
| | | Supervised Release Hearings | 118 | 105 | 112 | 125 | 114 | 117 | 5 | 2 |
| | Pending Cases [2] | | 443 | 416 | 532 | 599 | 792 | 1,159 | 9 | 2 |
| | Weighted Filings [2] | | 780 | 559 | 685 | 686 | 699 | 819 | 5 | 1 |
| | Terminations | | 1,052 | 739 | 731 | 826 | 732 | 810 | 8 | 2 |
| | Trials Completed | | 17 | 14 | 12 | 15 | 14 | 10 | 76 | 10 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 4.7 | 4.9 | 4.9 | 5.3 | 5.1 | 4.9 | 5 | 2 |
| | | Civil [2] | 7.9 | 7.8 | 6.8 | 6.8 | 7.4 | 7.6 | 23 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 30.9 | 30.0 | 34.2 | 32.6 | 31.3 | 36.9 | 54 | 8 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 75 2.3 | 92 3.1 | 98 2.5 | 107 2.0 | 140 1.9 | 762 6.4 | 39 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 48.4 | 57.3 | 54.8 | 53.5 | 54.9 | 57.2 | | |
| | | Percent Not Selected or Challenged | 24.5 | 32.3 | 29.4 | 27.0 | 29.6 | 31.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 8,619 | 304 | 4,653 | 1,964 | 14 | 47 | 194 | 305 | 184 | 96 | 411 | 5 | 442 |
| Criminal [1] | 5,363 | 119 | 663 | 3,791 | 181 | 115 | 203 | 114 | 6 | 24 | 38 | 58 | 51 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CALIFORNIA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 7,239 | 6,884 | 7,981 | 8,532 | 8,659 | 8,924 | | |
| | | Terminations | 7,751 | 7,085 | 6,650 | 7,178 | 7,795 | 8,231 | | |
| | | Pending | 6,611 | 6,424 | 7,689 | 9,020 | 9,850 | 10,503 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 23.3 | 29.6 | 11.8 | 4.6 | 3.1 | | 45 | 5 |
| | | Number of Judgeships | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | | Vacant Judgeship Months [2] | 23.8 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 517 | 492 | 570 | 609 | 619 | 637 | 20 | 5 |
| | | Civil | 430 | 406 | 495 | 533 | 536 | 546 | 15 | 4 |
| | | Criminal Felony | 56 | 49 | 38 | 39 | 37 | 45 | 88 | 14 |
| | | Supervised Release Hearings | 31 | 38 | 37 | 38 | 45 | 46 | 32 | 8 |
| | Pending Cases [2] | | 472 | 459 | 549 | 644 | 704 | 750 | 16 | 4 |
| | Weighted Filings [2] | | 524 | 486 | 504 | 538 | 594 | 607 | 18 | 4 |
| | Terminations | | 554 | 506 | 475 | 513 | 557 | 588 | 23 | 6 |
| | Trials Completed | | 11 | 12 | 11 | 10 | 9 | 10 | 76 | 10 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.9 | 13.7 | 13.2 | 17.3 | 19.0 | 14.7 | 84 | 13 |
| | | Civil [2] | 8.2 | 7.8 | 7.4 | 7.4 | 7.0 | 8.5 | 33 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 31.0 | 31.6 | 24.6 | 26.1 | 29.7 | 25.3 | 25 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 411 7.6 | 477 9.1 | 496 7.6 | 501 6.4 | 550 6.3 | 1,341 14.4 | 77 | 12 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.5 | 1.4 | 1.4 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 62.5 | 60.8 | 72.9 | 57.6 | 67.2 | 74.7 | | |
| | | Percent Not Selected or Challenged | 38.5 | 42.9 | 49.1 | 38.9 | 26.7 | 53.4 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7,649 | 279 | 1,092 | 1,315 | 12 | 205 | 437 | 534 | 418 | 697 | 1,673 | 28 | 959 |
| Criminal [1] | 632 | 15 | 155 | 44 | 168 | 106 | 39 | 29 | 8 | 16 | 19 | 10 | 23 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CALIFORNIA EASTERN**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | | |
| **Overall Caseload Statistics** | Filings [1] | 6,024 | 5,772 | 5,477 | 5,457 | 5,870 | 5,124 | | **U.S.** | **Circuit** |
| | Terminations | 6,210 | 6,068 | 5,487 | 5,727 | 5,394 | 5,552 | | | |
| | Pending | 7,920 | 7,611 | 7,586 | 7,336 | 7,812 | 7,251 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -14.9 | -11.2 | -6.4 | -6.1 | -12.7 | | | 88 | 14 |
| | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | | |
| | Vacant Judgeship Months [2] | 12.0 | 3.0 | 3.1 | 0.0 | 0.0 | 0.0 | | | |
| **Actions per Judgeship** | **Filings** Total | 1,004 | 962 | 913 | 910 | 978 | 854 | | 9 | 2 |
| | Civil | 829 | 797 | 773 | 777 | 824 | 701 | | 5 | 1 |
| | Criminal Felony | 119 | 106 | 94 | 83 | 99 | 98 | | 43 | 7 |
| | Supervised Release Hearings | 57 | 59 | 46 | 50 | 56 | 55 | | 23 | 6 |
| | Pending Cases [2] | 1,320 | 1,269 | 1,264 | 1,223 | 1,302 | 1,209 | | 8 | 1 |
| | Weighted Filings [2] | 864 | 826 | 770 | 785 | 834 | 740 | | 8 | 2 |
| | Terminations | 1,035 | 1,011 | 915 | 955 | 899 | 925 | | 4 | 1 |
| | Trials Completed | 16 | 15 | 14 | 19 | 14 | 16 | | 48 | 3 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 16.3 | 20.0 | 21.7 | 23.0 | 20.4 | 18.5 | | 90 | 14 |
| | Civil [2] | 8.4 | 8.5 | 9.4 | 9.0 | 9.5 | 8.7 | | 40 | 7 |
| | From Filing to Trial [2] (Civil Only) | 47.8 | 38.8 | 41.7 | 44.1 | 44.8 | 32.6 | | 44 | 7 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 796 13.9 | 814 14.4 | 814 14.1 | 754 13.3 | 801 13.3 | 766 14.2 | | 75 | 11 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.5 | 1.7 | 1.6 | 1.5 | 1.6 | | | |
| | Jurors Avg. Present for Jury Selection | 38.7 | 40.9 | 35.0 | 39.2 | 40.9 | 35.7 | | | |
| | Percent Not Selected or Challenged | 40.0 | 35.4 | 39.2 | 36.5 | 33.3 | 37.4 | | | |

### 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 4,205 | 424 | 83 | 1,697 | 12 | 127 | 155 | 262 | 173 | 92 | 747 | 3 | 430 |
| Criminal [1] | 582 | 16 | 255 | 61 | 89 | 61 | 18 | 25 | 2 | 14 | 5 | 4 | 32 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CALIFORNIA CENTRAL**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 16,952 | 16,275 | 16,810 | 16,551 | 17,347 | 18,056 | | |
| | | Terminations | 17,015 | 16,913 | 16,719 | 16,583 | 16,253 | 16,960 | | |
| | | Pending | 13,243 | 12,453 | 12,539 | 12,488 | 13,597 | 14,682 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 6.5 | 10.9 | 7.4 | 9.1 | 4.1 | | 41 | 4 |
| | | Number of Judgeships | 28 | 28 | 28 | 28 | 28 | 28 | | |
| | | Vacant Judgeship Months [2] | 3.6 | 11.6 | 25.1 | 48.9 | 68.7 | 85.8 | | |
| **Actions per Judgeship** | **Filings** | Total | 605 | 581 | 600 | 591 | 620 | 645 | 18 | 4 |
| | | Civil | 521 | 511 | 532 | 518 | 536 | 553 | 14 | 3 |
| | | Criminal Felony | 51 | 38 | 40 | 41 | 50 | 60 | 74 | 10 |
| | | Supervised Release Hearings | 33 | 32 | 28 | 33 | 33 | 32 | 51 | 12 |
| | Pending Cases [2] | | 473 | 445 | 448 | 446 | 486 | 524 | 38 | 7 |
| | Weighted Filings [2] | | 551 | 537 | 566 | 567 | 618 | 669 | 11 | 3 |
| | Terminations | | 608 | 604 | 597 | 592 | 580 | 606 | 21 | 5 |
| | Trials Completed | | 14 | 14 | 10 | 13 | 11 | 12 | 66 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 13.5 | 14.2 | 17.9 | 14.7 | 13.2 | 13.3 | 78 | 11 |
| | | Civil [2] | 5.6 | 5.5 | 5.0 | 4.8 | 5.0 | 5.0 | 3 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 21.3 | 19.8 | 19.8 | 20.0 | 20.0 | 22.0 | 14 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 612 / 5.9 | 573 / 5.8 | 556 / 5.7 | 540 / 5.5 | 552 / 5.2 | 612 / 5.5 | 30 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.7 | 1.6 | 1.6 | 1.5 | 1.6 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 39.3 | 41.8 | 54.7 | 48.1 | 42.6 | 48.5 | | |
| | | Percent Not Selected or Challenged | 41.2 | 41.0 | 55.2 | 44.9 | 43.3 | 47.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 15,490 | 891 | 601 | 1,680 | 87 | 721 | 781 | 1,783 | 798 | 1,307 | 4,930 | 13 | 1,898 |
| Criminal [1] | 1,674 | 24 | 537 | 224 | 161 | 403 | 70 | 37 | 16 | 72 | 13 | 44 | 73 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**CALIFORNIA SOUTHERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | 9,522 | 8,527 | 8,169 | 7,885 | 10,436 | 9,474 | | |
| | Terminations | 9,483 | 8,096 | 8,466 | 7,438 | 8,372 | 8,925 | | |
| | Pending | 5,878 | 5,974 | 5,305 | 5,545 | 5,794 | 5,759 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -0.5 | 11.1 | 16.0 | 20.2 | -9.2 | | 84 | 13 |
| | Number of Judgeships | 13 | 13 | 13 | 13 | 13 | 13 | | |
| | Vacant Judgeship Months ² | 9.9 | 0.0 | 0.0 | 9.0 | 22.7 | 49.1 | | |
| **Actions per Judgeship** | **Filings** Total | 732 | 656 | 628 | 607 | 803 | 729 | 13 | 3 |
| | Civil | 272 | 244 | 271 | 233 | 227 | 222 | 75 | 10 |
| | Criminal Felony | 348 | 311 | 268 | 291 | 483 | 413 | 4 | 1 |
| | Supervised Release Hearings | 112 | 101 | 90 | 83 | 93 | 94 | 8 | 3 |
| | Pending Cases ² | 452 | 460 | 408 | 427 | 446 | 443 | 54 | 8 |
| | Weighted Filings ² | 612 | 554 | 546 | 522 | 649 | 605 | 19 | 5 |
| | Terminations | 729 | 623 | 651 | 572 | 644 | 687 | 14 | 3 |
| | Trials Completed | 18 | 16 | 14 | 14 | 15 | 16 | 48 | 3 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 4.8 | 4.6 | 5.0 | 4.6 | 4.6 | 4.4 | 3 | 1 |
| | Civil ² | 6.8 | 6.5 | 9.2 | 6.6 | 6.4 | 6.1 | 10 | 2 |
| | From Filing to Trial ² (Civil Only) | 29.1 | 33.0 | 28.7 | 36.5 | 35.9 | 27.7 | 32 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | 313 9.8 | 311 9.1 | 196 6.4 | 311 10.5 | 411 14.3 | 621 23.0 | 87 | 14 |
| | Average Number of Felony Defendants Filed per Case | 1.2 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | | |
| | Jurors Avg. Present for Jury Selection | 50.5 | 49.2 | 53.6 | 51.5 | 50.3 | 52.3 | | |
| | Percent Not Selected or Challenged | 40.6 | 40.2 | 45.9 | 42.6 | 41.7 | 41.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,882 | 108 | 96 | 739 | 15 | 70 | 106 | 251 | 207 | 140 | 637 | 5 | 508 |
| Criminal ¹ | 5,363 | 29 | 1,702 | 3,023 | 46 | 353 | 58 | 33 | 1 | 15 | 42 | 40 | 21 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**HAWAII**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | Filings [1] | 1,197 | 997 | 1,051 | 1,090 | 933 | 955 | **U.S.** | **Circuit** |
| | Terminations | 1,295 | 1,135 | 1,007 | 1,011 | 1,038 | 935 | | |
| | Pending | 1,004 | 864 | 908 | 986 | 889 | 907 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -20.2 | -4.2 | -9.1 | -12.4 | 2.4 | | 49 | 6 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 7.8 | 12.0 | 12.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** Total | 299 | 249 | 263 | 273 | 233 | 239 | 89 | 12 |
| | Civil | 181 | 146 | 178 | 177 | 149 | 156 | 86 | 12 |
| | Criminal Felony | 75 | 46 | 32 | 48 | 40 | 47 | 86 | 13 |
| | Supervised Release Hearings | 44 | 57 | 53 | 47 | 44 | 36 | 47 | 11 |
| | Pending Cases [2] | 251 | 216 | 227 | 247 | 222 | 227 | 92 | 13 |
| | Weighted Filings [2] | 305 | 213 | 211 | 242 | 215 | 219 | 90 | 13 |
| | Terminations | 324 | 284 | 252 | 253 | 260 | 234 | 89 | 12 |
| | Trials Completed | 12 | 13 | 12 | 13 | 14 | 14 | 59 | 6 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 10.4 | 10.3 | 10.8 | 11.0 | 12.3 | 9.8 | 53 | 8 |
| | Civil [2] | 6.5 | 9.5 | 8.9 | 8.3 | 8.1 | 10.1 | 62 | 10 |
| | From Filing to Trial [2] (Civil Only) | - | 27.3 | - | - | 24.6 | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 23 4.1 | 33 6.2 | 22 3.6 | 32 4.9 | 28 5.1 | 37 6.8 | 42 | 5 |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.3 | 1.2 | 1.7 | 1.4 | 1.3 | | |
| | Jurors Avg. Present for Jury Selection | 151.3 | 69.5 | 67.4 | 63.7 | 68.7 | 112.9 | | |
| | Percent Not Selected or Challenged | 51.2 | 34.7 | 45.0 | 46.2 | 37.8 | 59.3 | | |

### 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense

| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 623 | 25 | 14 | 112 | - | 39 | 35 | 67 | 96 | 21 | 139 | 1 | 74 |
| Criminal [1] | 188 | - | 126 | 7 | 10 | 18 | 5 | 7 | 1 | 2 | 3 | 7 | 2 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**IDAHO**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 889 | 960 | 1,083 | 991 | 1,130 | 1,099 | | |
| | | Terminations | 951 | 953 | 945 | 1,022 | 1,131 | 1,040 | | |
| | | Pending | 995 | 989 | 1,116 | 1,076 | 1,069 | 1,119 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 23.6 | 14.5 | 1.5 | 10.9 | -2.7 | | 69 | 8 |
| | | Number of Judgeships | 2 | 2 | 2 | 2 | 2 | 2 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 12.0 | 12.0 | 0.4 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 445 | 480 | 542 | 496 | 565 | 550 | 31 | 6 |
| | | Civil | 268 | 278 | 337 | 282 | 285 | 272 | 59 | 9 |
| | | Criminal Felony | 133 | 162 | 161 | 164 | 221 | 227 | 7 | 3 |
| | | Supervised Release Hearings | 44 | 41 | 44 | 51 | 59 | 51 | 26 | 7 |
| | Pending Cases [2] | | 498 | 495 | 558 | 538 | 535 | 560 | 32 | 5 |
| | Weighted Filings [2] | | 420 | 469 | 520 | 464 | 547 | 545 | 27 | 6 |
| | Terminations | | 476 | 477 | 473 | 511 | 566 | 520 | 35 | 9 |
| | Trials Completed | | 19 | 15 | 17 | 23 | 18 | 16 | 48 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.2 | 8.2 | 8.5 | 8.1 | 7.2 | 8.1 | 27 | 5 |
| | | Civil [2] | 11.9 | 10.8 | 11.2 | 11.9 | 14.2 | 9.8 | 55 | 9 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 52 7.5 | 63 9.3 | 77 10.0 | 64 8.4 | 57 8.4 | 71 10.8 | 61 | 9 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.4 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 56.3 | 40.4 | 51.6 | 47.8 | 39.4 | 35.2 | | |
| | | Percent Not Selected or Challenged | 41.5 | 27.7 | 43.2 | 17.0 | 33.3 | 24.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 544 | 56 | 10 | 140 | 1 | 16 | 25 | 73 | 30 | 14 | 85 | - | 94 |
| Criminal [1] | 453 | 10 | 143 | 101 | 71 | 43 | 28 | 35 | 3 | 8 | 1 | - | 10 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**MONTANA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,377 | 1,166 | 1,342 | 1,171 | 1,357 | 1,255 | | |
| | | Terminations | 1,294 | 1,239 | 1,163 | 1,151 | 1,278 | 1,346 | | |
| | | Pending | 936 | 857 | 1,027 | 1,043 | 1,112 | 1,030 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -8.9 | 7.6 | -6.5 | 7.2 | -7.5 | | 80 | 12 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 10.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 459 | 389 | 447 | 390 | 452 | 418 | 63 | 11 |
| | | Civil | 270 | 193 | 231 | 213 | 254 | 197 | 79 | 11 |
| | | Criminal Felony | 147 | 127 | 149 | 116 | 128 | 137 | 23 | 4 |
| | | Supervised Release Hearings | 41 | 68 | 67 | 61 | 70 | 84 | 12 | 5 |
| | Pending Cases [2] | | 312 | 286 | 342 | 348 | 371 | 343 | 78 | 11 |
| | Weighted Filings [2] | | 460 | 381 | 437 | 375 | 398 | 383 | 59 | 10 |
| | Terminations | | 431 | 413 | 388 | 384 | 426 | 449 | 58 | 11 |
| | Trials Completed | | 40 | 44 | 30 | 33 | 31 | 42 | 5 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.7 | 7.8 | 7.8 | 8.8 | 8.5 | 8.0 | 24 | 4 |
| | | Civil [2] | 9.2 | 9.9 | 8.6 | 11.0 | 9.5 | 10.6 | 68 | 11 |
| | From Filing to Trial [2] (Civil Only) | | - | 22.5 | - | 25.8 | - | 19.5 | 8 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 48 8.4 | 46 8.7 | 58 9.5 | 57 8.6 | 53 7.4 | 59 9.9 | 57 | 8 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 44.2 | 45.1 | 45.8 | 46.7 | 51.9 | 32.9 | | |
| | | Percent Not Selected or Challenged | 35.0 | 31.8 | 35.2 | 33.8 | 29.7 | 28.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 592 | 28 | 20 | 211 | 7 | 26 | 36 | 83 | 65 | 2 | 55 | - | 59 |
| Criminal [1] | 409 | 3 | 170 | 19 | 89 | 19 | 43 | 47 | 2 | 6 | 2 | - | 9 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEVADA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 3,707 | 3,742 | 4,258 | 4,822 | 3,953 | 3,787 | | |
| | Terminations | | 3,726 | 3,631 | 3,394 | 3,973 | 4,230 | 4,290 | | |
| | Pending | | 4,456 | 4,532 | 5,368 | 6,170 | 5,892 | 5,378 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 2.2 | 1.2 | -11.1 | -21.5 | -4.2 | | 73 | 9 |
| | Number of Judgeships | | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | Vacant Judgeship Months [2] | | 11.5 | 0.0 | 4.9 | 12.0 | 12.0 | 24.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 530 | 535 | 608 | 689 | 565 | 541 | 34 | 8 |
| | | Civil | 417 | 432 | 502 | 575 | 442 | 428 | 25 | 6 |
| | | Criminal Felony | 80 | 71 | 72 | 75 | 83 | 71 | 65 | 9 |
| | | Supervised Release Hearings | 32 | 32 | 34 | 39 | 40 | 42 | 40 | 10 |
| | Pending Cases [2] | | 637 | 647 | 767 | 881 | 842 | 768 | 14 | 3 |
| | Weighted Filings [2] | | 484 | 497 | 534 | 636 | 520 | 483 | 34 | 7 |
| | Terminations | | 532 | 519 | 485 | 568 | 604 | 613 | 17 | 4 |
| | Trials Completed | | 20 | 15 | 13 | 13 | 11 | 17 | 44 | 2 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.7 | 13.8 | 11.7 | 12.6 | 12.9 | 13.5 | 80 | 12 |
| | | Civil [2] | 8.9 | 9.0 | 9.3 | 8.5 | 8.6 | 10.8 | 70 | 12 |
| | From Filing to Trial [2] (Civil Only) | | 40.7 | 36.4 | 47.4 | 43.7 | 52.5 | 37.1 | 55 | 9 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 361 10.9 | 364 10.5 | 401 9.4 | 419 8.3 | 526 11.2 | 671 15.8 | 80 | 13 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.3 | 1.4 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 56.0 | 56.3 | 50.9 | 53.9 | 58.3 | 56.8 | | |
| | | Percent Not Selected or Challenged | 30.8 | 41.3 | 29.4 | 37.4 | 31.6 | 28.0 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,994 | 79 | 46 | 774 | 34 | 87 | 80 | 391 | 305 | 124 | 468 | 10 | 596 |
| Criminal [1] | 495 | - | 150 | 104 | 156 | 26 | 22 | 22 | - | 3 | 4 | 1 | 7 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**OREGON**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | Filings [1] | 3,342 | 3,183 | 3,577 | 3,068 | 3,241 | 3,228 | **U.S.** | **Circuit** |
| | Terminations | 3,427 | 3,317 | 3,284 | 3,217 | 3,131 | 3,052 | | |
| | Pending | 2,938 | 2,810 | 3,084 | 2,949 | 3,058 | 3,188 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -3.4 | 1.4 | -9.8 | 5.2 | -0.4 | | 58 | 7 |
| | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 11.1 | 12.0 | | |
| **Actions per Judgeship** | **Filings** Total | 557 | 531 | 596 | 511 | 540 | 538 | 38 | 9 |
| | Civil | 383 | 376 | 432 | 351 | 368 | 351 | 39 | 7 |
| | Criminal Felony | 112 | 86 | 98 | 81 | 83 | 100 | 42 | 6 |
| | Supervised Release Hearings | 62 | 69 | 67 | 79 | 89 | 87 | 11 | 4 |
| | Pending Cases [2] | 490 | 468 | 514 | 492 | 510 | 531 | 37 | 6 |
| | Weighted Filings [2] | 473 | 440 | 498 | 422 | 426 | 433 | 45 | 9 |
| | Terminations | 571 | 553 | 547 | 536 | 522 | 509 | 40 | 10 |
| | Trials Completed | 18 | 11 | 12 | 11 | 8 | 9 | 81 | 13 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 10.2 | 11.2 | 12.7 | 11.3 | 13.5 | 12.2 | 69 | 10 |
| | Civil [2] | 11.4 | 10.8 | 9.8 | 10.9 | 10.7 | 11.2 | 75 | 13 |
| | From Filing to Trial [2] (Civil Only) | 22.8 | 23.4 | 20.5 | 22.7 | 27.3 | 28.3 | 33 | 6 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 103 4.7 | 108 4.9 | 106 4.4 | 112 4.9 | 158 6.6 | 184 7.4 | 46 | 7 |
| | Average Number of Felony Defendants Filed per Case | 1.3 | 1.3 | 1.4 | 1.3 | 1.1 | 1.2 | | |
| | Jurors Avg. Present for Jury Selection | 28.2 | 26.1 | 27.6 | 33.6 | 30.7 | 37.3 | | |
| | Percent Not Selected or Challenged | 22.0 | 16.3 | 23.9 | 23.1 | 24.3 | 24.4 | | |

| **2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,107 | 487 | 34 | 523 | 20 | 48 | 120 | 175 | 143 | 48 | 314 | 1 | 194 |
| Criminal [1] | 600 | 9 | 177 | 110 | 96 | 67 | 43 | 45 | 4 | 7 | 12 | 5 | 25 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WASHINGTON EASTERN**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | 1,887 | 1,736 | 1,942 | 1,856 | 1,981 | 2,175 | | |
| | Terminations | 2,074 | 1,837 | 1,803 | 1,848 | 1,897 | 2,132 | | |
| | Pending | 1,186 | 1,090 | 1,235 | 1,224 | 1,285 | 1,297 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 15.3 | 25.3 | 12.0 | 17.2 | 9.8 | 27 | 3 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months ² | 17.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 472 | 434 | 486 | 464 | 495 | 544 | 32 | 7 |
| | Civil | 205 | 196 | 241 | 238 | 251 | 293 | 54 | 8 |
| | Criminal Felony | 123 | 92 | 99 | 97 | 100 | 103 | 38 | 5 |
| | Supervised Release Hearings | 144 | 146 | 146 | 130 | 145 | 148 | 3 | 1 |
| | Pending Cases ² | 297 | 273 | 309 | 306 | 321 | 324 | 80 | 12 |
| | Weighted Filings ² | 315 | 269 | 298 | 299 | 304 | 302 | 81 | 11 |
| | Terminations | 519 | 459 | 451 | 462 | 474 | 533 | 32 | 8 |
| | Trials Completed | 19 | 20 | 18 | 20 | 14 | 13 | 62 | 7 |
| **Median Time (Months)** | From Filing to Disposition — Criminal Felony | 8.1 | 11.8 | 10.4 | 9.0 | 8.5 | 9.7 | 48 | 7 |
| | From Filing to Disposition — Civil ² | 12.2 | 9.9 | 9.6 | 9.1 | 9.8 | 9.7 | 52 | 8 |
| | From Filing to Trial ² (Civil Only) | 29.3 | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | 36 / 5.2 | 43 / 6.3 | 41 / 5.1 | 43 / 5.4 | 49 / 5.8 | 50 / 5.8 | 34 | 3 |
| | Average Number of Felony Defendants Filed per Case | 1.6 | 1.4 | 1.4 | 1.3 | 1.3 | 1.2 | | |
| | Jurors — Avg. Present for Jury Selection | 37.6 | 44.6 | 74.9 | 43.1 | 43.5 | 54.5 | | |
| | Jurors — Percent Not Selected or Challenged | 26.2 | 28.0 | 47.5 | 36.2 | 28.8 | 36.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,171 | 600 | 12 | 254 | 2 | 11 | 18 | 46 | 32 | 5 | 99 | 3 | 89 |
| Criminal ¹ | 413 | 5 | 96 | 142 | 52 | 40 | 25 | 35 | 1 | 3 | 5 | 4 | 5 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WASHINGTON WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 4,198 | 3,887 | 3,931 | 3,775 | 3,934 | 3,766 | | |
| | | Terminations | 4,429 | 3,921 | 3,875 | 3,808 | 3,657 | 3,762 | | |
| | | Pending | 2,792 | 2,755 | 2,800 | 2,738 | 3,016 | 2,991 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -10.3 | -3.1 | -4.2 | -0.2 | -4.3 | | 74 | 10 |
| | | Number of Judgeships | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 9.9 | 36.0 | 36.0 | 40.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 600 | 555 | 562 | 539 | 562 | 538 | 38 | 9 |
| | | Civil | 486 | 446 | 450 | 432 | 443 | 442 | 21 | 5 |
| | | Criminal Felony | 69 | 66 | 62 | 55 | 72 | 51 | 82 | 12 |
| | | Supervised Release Hearings | 45 | 43 | 50 | 52 | 47 | 45 | 34 | 9 |
| | Pending Cases [2] | | 399 | 394 | 400 | 391 | 431 | 427 | 56 | 9 |
| | Weighted Filings [2] | | 489 | 483 | 475 | 462 | 494 | 458 | 41 | 8 |
| | Terminations | | 633 | 560 | 554 | 544 | 522 | 537 | 31 | 7 |
| | Trials Completed | | 17 | 16 | 18 | 18 | 14 | 12 | 66 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.1 | 8.6 | 8.2 | 8.6 | 8.7 | 9.1 | 38 | 6 |
| | | Civil [2] | 7.0 | 7.0 | 6.5 | 6.7 | 6.7 | 7.6 | 23 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 20.5 | 18.6 | 17.2 | 19.0 | 19.5 | 19.3 | 6 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 77 3.5 | 69 3.2 | 65 3.0 | 67 3.1 | 76 3.2 | 73 3.1 | 11 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.3 | 1.4 | 1.4 | 1.5 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 34.8 | 33.3 | 47.1 | 40.4 | 38.0 | 36.7 | | |
| | | Percent Not Selected or Challenged | 31.1 | 28.9 | 36.3 | 36.7 | 30.3 | 23.4 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,094 | 661 | 80 | 531 | - | 70 | 236 | 367 | 268 | 108 | 409 | 8 | 356 |
| Criminal [1] | 354 | 1 | 140 | 39 | 57 | 39 | 10 | 31 | 1 | 10 | 10 | 3 | 13 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**GUAM**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 85 | 118 | 157 | 152 | 126 | 190 | | |
| | Terminations | | 134 | 122 | 117 | 135 | 113 | 106 | | |
| | Pending | | 159 | 155 | 182 | 208 | 258 | 366 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 123.5 | 61.0 | 21.0 | 25.0 | 50.8 | | 2 | 1 |
| | Number of Judgeships | | 1 | 1 | 1 | 1 | 1 | 1 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 85 | 118 | 157 | 152 | 126 | 190 | 92 | 14 |
| | | Civil | 20 | 38 | 81 | 98 | 82 | 133 | 88 | 14 |
| | | Criminal Felony | 56 | 78 | 74 | 50 | 43 | 57 | 78 | 11 |
| | | Supervised Release Hearings | 9 | 2 | 2 | 4 | 1 | 0 | 94 | 15 |
| | Pending Cases [2] | | 159 | 155 | 182 | 208 | 258 | 366 | 71 | 10 |
| | Weighted Filings [2] | | - | - | - | - | - | - | - | - |
| | Terminations | | 134 | 122 | 117 | 135 | 113 | 106 | 93 | 14 |
| | Trials Completed | | 16 | 6 | 6 | 8 | 9 | 10 | 76 | 10 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 18.2 | 21.8 | 8.3 | 20.0 | 30.1 | 32.0 | 94 | 15 |
| | | Civil [2] | 22.7 | 20.5 | 8.0 | 10.9 | 17.6 | 14.7 | 88 | 15 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 10 20.0 | 9 14.8 | 10 11.5 | 13 10.2 | 13 7.5 | 19 6.8 | 42 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.5 | 1.5 | 1.1 | 1.3 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 257.0 | 132.5 | 113.3 | 218.0 | 355.5 | 154.8 | | |
| | | Percent Not Selected or Challenged | 78.6 | 46.8 | 50.1 | 61.0 | 78.0 | 67.0 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 133 | - | 1 | 4 | 1 | - | 3 | 5 | 109 | - | 6 | - | 4 |
| Criminal [1] | 57 | - | 26 | 5 | 8 | 1 | 1 | 3 | 2 | 9 | 1 | - | 1 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NORTHERN MARIANAS**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 90 | 60 | 80 | 62 | 60 | 38 | | |
| | Terminations | | 96 | 53 | 75 | 65 | 72 | 48 | | |
| | Pending | | 94 | 98 | 95 | 88 | 78 | 68 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -57.8 | -36.7 | -52.5 | -38.7 | -36.7 | | 92 | 15 |
| | Number of Judgeships | | 1 | 1 | 1 | 1 | 1 | 1 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 90 | 60 | 80 | 62 | 60 | 38 | 94 | 15 |
| | | Civil | 34 | 25 | 34 | 22 | 33 | 22 | 94 | 15 |
| | | Criminal Felony | 29 | 17 | 22 | 24 | 14 | 13 | 94 | 15 |
| | | Supervised Release Hearings | 27 | 18 | 24 | 16 | 13 | 3 | 92 | 14 |
| | Pending Cases [2] | | 94 | 98 | 95 | 88 | 78 | 68 | 94 | 15 |
| | Weighted Filings [2] | | - | - | - | - | - | - | - | - |
| | Terminations | | 96 | 53 | 75 | 65 | 72 | 48 | 94 | 15 |
| | Trials Completed | | 11 | 6 | 13 | 2 | 4 | 3 | 94 | 15 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.4 | 11.1 | 8.7 | 8.1 | 12.0 | 7.4 | 16 | 3 |
| | | Civil [2] | 12.6 | 14.8 | 17.0 | 10.6 | 12.6 | 13.9 | 86 | 14 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 16 27.1 | 20 30.8 | 22 33.3 | 24 42.9 | 20 46.5 | 15 45.5 | 92 | 15 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.2 | 1.5 | 1.3 | 1.7 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 65.3 | 263.5 | 53.0 | 69.0 | 54.0 | | | |
| | | Percent Not Selected or Challenged | 38.3 | 59.0 | 11.3 | 16.7 | 11.1 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 22 | - | - | 4 | - | - | 3 | 3 | 3 | - | 6 | - | 3 |
| Criminal [1] | 13 | - | 2 | 7 | - | 2 | - | - | - | - | - | - | 2 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**COLORADO**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 4,353 | 3,829 | 3,807 | 3,771 | 3,984 | 4,346 | | |
| | | Terminations | 4,252 | 3,933 | 3,682 | 3,747 | 3,789 | 4,046 | | |
| | | Pending | 3,298 | 3,155 | 3,096 | 3,093 | 3,283 | 3,561 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -0.2 | 13.5 | 14.2 | 15.2 | 9.1 | | 31 | 2 |
| | | Number of Judgeships | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 2.6 | 12.0 | 12.0 | 13.1 | | |
| **Actions per Judgeship** | **Filings** | Total | 622 | 547 | 544 | 539 | 569 | 621 | 23 | 2 |
| | | Civil | 518 | 441 | 453 | 452 | 461 | 509 | 16 | 1 |
| | | Criminal Felony | 76 | 77 | 63 | 69 | 84 | 90 | 51 | 4 |
| | | Supervised Release Hearings | 28 | 29 | 27 | 18 | 24 | 22 | 66 | 7 |
| | Pending Cases [2] | | 471 | 451 | 442 | 442 | 469 | 509 | 40 | 1 |
| | Weighted Filings [2] | | 566 | 512 | 498 | 542 | 567 | 635 | 15 | 1 |
| | Terminations | | 607 | 562 | 526 | 535 | 541 | 578 | 24 | 2 |
| | Trials Completed | | 22 | 19 | 21 | 17 | 21 | 20 | 35 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.8 | 9.5 | 9.6 | 8.6 | 8.5 | 10.4 | 57 | 7 |
| | | Civil [2] | 5.7 | 7.8 | 8.3 | 7.0 | 7.7 | 7.7 | 26 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 29.3 | 27.0 | 25.9 | 25.0 | 27.8 | 30.3 | 38 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 87 3.4 | 68 2.9 | 53 2.1 | 57 2.3 | 75 2.8 | 99 3.5 | 17 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.4 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 34.0 | 30.5 | 33.4 | 36.2 | 44.8 | 34.1 | | |
| | | Percent Not Selected or Challenged | 42.8 | 38.8 | 31.6 | 40.3 | 43.9 | 26.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,564 | 223 | 49 | 836 | 33 | 34 | 192 | 689 | 266 | 227 | 646 | 6 | 363 |
| Criminal [1] | 624 | 46 | 179 | 103 | 120 | 56 | 50 | 19 | 1 | 17 | 7 | 8 | 18 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**KANSAS**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings ¹ | 2,306 | 5,081 | 3,079 | 2,184 | 2,292 | 2,238 | | |
| | | Terminations | 2,469 | 3,920 | 2,544 | 2,410 | 3,105 | 2,878 | | |
| | | Pending | 2,157 | 3,321 | 3,850 | 3,622 | 2,820 | 2,138 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -2.9 | -56.0 | -27.3 | 2.5 | -2.4 | | 67 | 6 |
| | | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | | Vacant Judgeship Months ² | 12.2 | 3.0 | 12.0 | 14.0 | 24.0 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 384 | 847 | 513 | 364 | 382 | 373 | 72 | 5 |
| | | Civil | 239 | 696 | 368 | 236 | 247 | 245 | 64 | 3 |
| | | Criminal Felony | 108 | 107 | 103 | 82 | 92 | 83 | 55 | 5 |
| | | Supervised Release Hearings | 37 | 44 | 42 | 47 | 44 | 45 | 34 | 4 |
| | Pending Cases ² | | 360 | 554 | 642 | 604 | 470 | 356 | 76 | 5 |
| | Weighted Filings ² | | 367 | 726 | 382 | 330 | 356 | 330 | 74 | 4 |
| | Terminations | | 412 | 653 | 424 | 402 | 518 | 480 | 47 | 3 |
| | Trials Completed | | 22 | 22 | 22 | 19 | 21 | 23 | 22 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.1 | 9.5 | 10.6 | 11.3 | 11.2 | 11.0 | 64 | 8 |
| | | Civil ² | 9.0 | 2.0 | 8.7 | 8.2 | 17.9 | 18.2 | 90 | 8 |
| | From Filing to Trial ² (Civil Only) | | 26.6 | 24.3 | 25.5 | 23.8 | 24.5 | 25.0 | 24 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 136 | 119 | 75 | 65 | 352 | 158 | | |
| | | | 10.2 | 4.6 | 2.5 | 2.2 | 16.9 | 10.8 | 61 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.4 | 1.5 | 1.3 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 52.0 | 36.0 | 39.3 | 42.9 | 50.2 | 36.7 | | |
| | | Percent Not Selected or Challenged | 46.2 | 25.2 | 32.5 | 37.2 | 44.0 | 27.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,470 | 104 | 34 | 397 | 28 | 69 | 70 | 146 | 191 | 24 | 282 | - | 125 |
| Criminal ¹ | 497 | 27 | 147 | 47 | 125 | 53 | 21 | 19 | 13 | 15 | 15 | 4 | 11 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW MEXICO**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| **Overall Caseload Statistics** | | Filings [1] | 6,148 | 6,240 | 7,479 | 5,596 | 5,913 | 5,813 | **U.S.** | **Circuit** |
| | | Terminations | 6,017 | 6,423 | 7,022 | 5,992 | 6,029 | 5,496 | | |
| | | Pending | 3,072 | 2,843 | 3,345 | 2,939 | 2,825 | 3,124 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -5.4 | -6.8 | -22.3 | 3.9 | -1.7 | | 63 | 5 |
| | | Number of Judgeships | 7 | 7 | 7 | 7 | 7 | 7 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 4.7 | 23.1 | | |
| **Actions per Judgeship** | **Filings** | Total | 878 | 891 | 1,068 | 799 | 845 | 830 | 10 | 1 |
| | | Civil | 181 | 165 | 201 | 194 | 175 | 175 | 85 | 7 |
| | | Criminal Felony | 603 | 634 | 782 | 508 | 581 | 561 | 2 | 1 |
| | | Supervised Release Hearings | 94 | 93 | 85 | 97 | 89 | 94 | 8 | 1 |
| | Pending Cases [2] | | 439 | 406 | 478 | 420 | 404 | 446 | 53 | 3 |
| | Weighted Filings [2] | | 604 | 577 | 695 | 531 | 530 | 547 | 26 | 2 |
| | Terminations | | 860 | 918 | 1,003 | 856 | 861 | 785 | 10 | 1 |
| | Trials Completed | | 15 | 14 | 14 | 16 | 16 | 16 | 48 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 1.2 | 1.0 | 1.0 | 1.4 | 1.0 | 1.1 | 1 | 1 |
| | | Civil [2] | 10.2 | 11.2 | 10.5 | 10.3 | 9.8 | 10.1 | 62 | 6 |
| | From Filing to Trial [2] (Civil Only) | | 24.8 | 27.4 | - | - | - | 26.1 | 29 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 66 4.9 | 78 6.2 | 94 6.7 | 81 5.9 | 75 6.0 | 102 7.9 | 49 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.1 | 1.1 | 1.1 | 1.0 | 1.0 | | |
| | Jurors | Avg. Present for Jury Selection | 49.8 | 43.5 | 56.4 | 44.7 | 59.7 | 53.9 | | |
| | | Percent Not Selected or Challenged | 26.2 | 24.8 | 23.1 | 24.4 | 25.7 | 23.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,228 | 208 | 24 | 294 | 19 | 20 | 37 | 181 | 153 | 9 | 207 | 1 | 75 |
| Criminal [1] | 3,929 | 38 | 333 | 3,035 | 167 | 91 | 141 | 53 | - | 25 | 10 | 13 | 23 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**OKLAHOMA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,156 | 1,180 | 1,111 | 1,158 | 1,043 | 1,236 | | |
| | | Terminations | 1,123 | 1,117 | 1,100 | 1,284 | 1,074 | 1,051 | | |
| | | Pending | 962 | 1,019 | 1,013 | 887 | 847 | 1,023 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 6.9 | 4.7 | 11.3 | 6.7 | 18.5 | | 11 | 1 |
| | | Number of Judgeships | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 330 | 337 | 317 | 331 | 298 | 353 | 76 | 6 |
| | | Civil | 237 | 229 | 232 | 211 | 189 | 201 | 78 | 6 |
| | | Criminal Felony | 74 | 81 | 50 | 49 | 63 | 105 | 37 | 3 |
| | | Supervised Release Hearings | 19 | 27 | 35 | 71 | 47 | 47 | 29 | 3 |
| | Pending Cases [2] | | 275 | 291 | 289 | 253 | 242 | 292 | 88 | 6 |
| | Weighted Filings [2] | | 298 | 308 | 260 | 263 | 260 | 327 | 76 | 5 |
| | Terminations | | 321 | 319 | 314 | 367 | 307 | 300 | 83 | 7 |
| | Trials Completed | | 12 | 12 | 12 | 4 | 7 | 12 | 66 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.2 | 5.8 | 8.0 | 6.9 | 7.0 | 5.6 | 8 | 2 |
| | | Civil [2] | 9.4 | 10.7 | 10.3 | 10.2 | 9.4 | 9.7 | 52 | 4 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 29 3.6 | 28 3.5 | 34 4.0 | 35 4.7 | 51 7.6 | 46 6.3 | 38 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.4 | 1.4 | 1.3 | 1.3 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 41.3 | 50.8 | 42.2 | 40.2 | 41.4 | 42.0 | | |
| | | Percent Not Selected or Challenged | 35.8 | 25.3 | 20.9 | 23.4 | 30.0 | 35.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 704 | 172 | 25 | 93 | 4 | 17 | 39 | 107 | 75 | 10 | 107 | - | 55 |
| Criminal [1] | 369 | 2 | 182 | 34 | 62 | 26 | 7 | 25 | 3 | 10 | 5 | 2 | 11 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**OKLAHOMA EASTERN**

| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
| **Overall Caseload Statistics** | | Filings [1] | 662 | 682 | 728 | 663 | 630 | 564 | | |
| | | Terminations | 693 | 698 | 689 | 708 | 695 | 576 | | |
| | | Pending | 661 | 647 | 688 | 650 | 597 | 584 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -14.8 | -17.3 | -22.5 | -14.9 | -10.5 | | 86 | 8 |
| | | Number of Judgeships | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 10.9 | 12.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 441 | 455 | 485 | 442 | 420 | 376 | 71 | 4 |
| | | Civil | 360 | 373 | 382 | 366 | 295 | 281 | 57 | 2 |
| | | Criminal Felony | 63 | 63 | 85 | 50 | 105 | 75 | 62 | 6 |
| | | Supervised Release Hearings | 18 | 19 | 19 | 26 | 19 | 19 | 72 | 8 |
| | Pending Cases [2] | | 441 | 431 | 459 | 433 | 398 | 389 | 63 | 4 |
| | Weighted Filings [2] | | 355 | 367 | 388 | 350 | 396 | 321 | 77 | 6 |
| | Terminations | | 462 | 465 | 459 | 472 | 463 | 384 | 72 | 5 |
| | Trials Completed | | 10 | 14 | 13 | 12 | 8 | 16 | 48 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 8.7 | 7.9 | 6.6 | 7.5 | 6.5 | 7.6 | 19 | 4 |
| | | Civil [2] | 13.8 | 13.8 | 13.3 | 12.7 | 11.1 | 11.9 | 81 | 7 |
| | From Filing to Trial [2] (Civil Only) | | - | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 10 / 1.8 | 12 / 2.1 | 14 / 2.3 | 10 / 1.7 | 13 / 2.7 | 15 / 3.2 | 13 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.3 | 1.4 | 1.2 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 29.4 | 38.3 | 30.1 | 31.1 | 23.6 | 26.3 | | |
| | | Percent Not Selected or Challenged | 19.9 | 23.3 | 27.8 | 27.6 | 19.5 | 14.2 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 422 | 171 | 7 | 70 | 1 | 9 | 5 | 42 | 36 | 1 | 65 | - | 15 |
| Criminal [1] | 112 | 7 | 32 | 1 | 40 | 9 | 5 | 3 | 4 | 2 | - | - | 9 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

### U.S. District Court — Judicial Caseload Profile

**OKLAHOMA WESTERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,936 | 2,002 | 1,929 | 1,958 | 1,865 | 1,838 | | |
| | | Terminations | 1,862 | 1,887 | 2,011 | 1,941 | 1,928 | 1,834 | | |
| | | Pending | 1,496 | 1,609 | 1,516 | 1,527 | 1,464 | 1,463 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -5.1 | -8.2 | -4.7 | -6.1 | -1.4 | | 61 | 4 |
| | | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | | Vacant Judgeship Months [2] | 12.0 | 9.9 | 26.6 | 36.0 | 27.8 | 21.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 323 | 334 | 322 | 326 | 311 | 306 | 83 | 7 |
| | | Civil | 239 | 251 | 246 | 248 | 226 | 209 | 77 | 5 |
| | | Criminal Felony | 58 | 56 | 46 | 48 | 61 | 69 | 67 | 7 |
| | | Supervised Release Hearings | 26 | 27 | 30 | 31 | 25 | 29 | 55 | 6 |
| | | Pending Cases [2] | 249 | 268 | 253 | 255 | 244 | 244 | 90 | 7 |
| | | Weighted Filings [2] | 293 | 309 | 279 | 291 | 289 | 279 | 85 | 7 |
| | | Terminations | 310 | 315 | 335 | 324 | 321 | 306 | 81 | 6 |
| | | Trials Completed | 23 | 24 | 23 | 19 | 21 | 23 | 22 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.2 | 6.5 | 9.6 | 8.8 | 8.6 | 8.8 | 35 | 6 |
| | | Civil [2] | 8.4 | 7.8 | 9.0 | 7.7 | 8.4 | 8.5 | 33 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 20.9 | 23.6 | 14.5 | 17.3 | 20.9 | - | - | - |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 33 2.9 | 63 5.1 | 47 3.9 | 36 3.0 | 49 4.5 | 52 5.3 | 27 | 3 |
| | | Average Number of Felony Defendants Filed per Case | 1.3 | 1.6 | 1.4 | 1.4 | 1.4 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 28.1 | 29.4 | 29.8 | 26.4 | 27.9 | 51.9 | | |
| | | Percent Not Selected or Challenged | 28.6 | 26.4 | 29.9 | 40.3 | 29.0 | 45.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,252 | 205 | 40 | 264 | 2 | 32 | 43 | 212 | 143 | 12 | 213 | 1 | 85 |
| Criminal [1] | 411 | - | 174 | 67 | 97 | 11 | 20 | 23 | 3 | 5 | 1 | 3 | 7 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**UTAH**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 2,104 | 2,055 | 2,327 | 2,522 | 2,463 | 2,253 | | |
| | | Terminations | 2,288 | 2,138 | 1,967 | 2,355 | 2,505 | 2,305 | | |
| | | Pending | 2,102 | 2,008 | 2,343 | 2,474 | 2,401 | 2,331 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 7.1 | 9.6 | -3.2 | -10.7 | -8.5 | | 83 | 7 |
| | | Number of Judgeships | 5 | 5 | 5 | 5 | 5 | 5 | | |
| | | Vacant Judgeship Months [2] | 5.9 | 11.6 | 3.0 | 12.0 | 12.0 | 15.6 | | |
| **Actions per Judgeship** | **Filings** | Total | 421 | 411 | 465 | 504 | 493 | 451 | 56 | 3 |
| | | Civil | 235 | 217 | 272 | 295 | 263 | 235 | 70 | 4 |
| | | Criminal Felony | 124 | 131 | 151 | 155 | 175 | 157 | 16 | 2 |
| | | Supervised Release Hearings | 61 | 63 | 42 | 55 | 55 | 59 | 22 | 2 |
| | Pending Cases [2] | | 420 | 402 | 469 | 495 | 480 | 466 | 49 | 2 |
| | Weighted Filings [2] | | 413 | 379 | 464 | 520 | 506 | 457 | 42 | 3 |
| | Terminations | | 458 | 428 | 393 | 471 | 501 | 461 | 54 | 4 |
| | Trials Completed | | 19 | 13 | 14 | 16 | 15 | 11 | 72 | 7 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.5 | 5.7 | 5.5 | 6.0 | 6.4 | 7.8 | 21 | 5 |
| | | Civil [2] | 11.1 | 12.3 | 10.7 | 9.6 | 8.4 | 10.0 | 59 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 38.0 | 37.3 | 31.9 | 31.2 | 43.9 | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 109 7.1 | 138 9.6 | 143 8.3 | 153 8.3 | 155 9.4 | 213 14.1 | 72 | 8 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.1 | 1.2 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 45.1 | 48.5 | 53.7 | 53.5 | 47.2 | 41.9 | | |
| | | Percent Not Selected or Challenged | 33.9 | 39.7 | 37.9 | 40.1 | 25.1 | 19.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,173 | 83 | 32 | 103 | 2 | 19 | 146 | 179 | 104 | 111 | 219 | 1 | 174 |
| Criminal [1] | 781 | 8 | 266 | 156 | 179 | 33 | 39 | 55 | 3 | 5 | 16 | 5 | 16 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**WYOMING**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 726 | 633 | 737 | 718 | 582 | 587 | | |
| | | Terminations | 745 | 620 | 681 | 691 | 605 | 523 | | |
| | | Pending | 632 | 646 | 703 | 735 | 716 | 693 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -19.1 | -7.3 | -20.4 | -18.2 | 0.9 | | 53 | 3 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 242 | 211 | 246 | 239 | 194 | 196 | 91 | 8 |
| | | Civil | 96 | 79 | 108 | 86 | 70 | 88 | 93 | 8 |
| | | Criminal Felony | 94 | 86 | 77 | 93 | 71 | 68 | 68 | 8 |
| | | Supervised Release Hearings | 52 | 46 | 61 | 61 | 53 | 40 | 44 | 5 |
| | | Pending Cases [2] | 211 | 215 | 234 | 245 | 239 | 231 | 91 | 8 |
| | | Weighted Filings [2] | 224 | 197 | 202 | 212 | 165 | 179 | 91 | 8 |
| | | Terminations | 248 | 207 | 227 | 230 | 202 | 174 | 91 | 8 |
| | | Trials Completed | 13 | 13 | 12 | 13 | 7 | 7 | 88 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 5.6 | 5.1 | 5.4 | 5.7 | 5.0 | 5.7 | 9 | 3 |
| | | Civil [2] | 10.8 | 12.2 | 10.8 | 9.5 | 11.4 | 9.5 | 50 | 3 |
| | From Filing to Trial [2] (Civil Only) | | - | 15.6 | - | - | - | - | - | - |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 2 .8 | 5 2.4 | 4 1.5 | 8 3.4 | 10 4.8 | 21 8.6 | 53 | 6 |
| | | Average Number of Felony Defendants Filed per Case | 1.3 | 1.4 | 1.2 | 1.3 | 1.2 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 36.7 | 33.9 | 40.2 | 30.4 | 36.1 | 39.6 | | |
| | | Percent Not Selected or Challenged | 34.2 | 38.5 | 37.5 | 37.2 | 34.8 | 30.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 265 | 4 | 9 | 53 | 4 | 6 | 4 | 36 | 81 | 2 | 33 | - | 33 |
| Criminal [1] | 199 | 2 | 51 | 31 | 45 | 14 | 10 | 33 | - | 4 | 4 | - | 5 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ALABAMA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| | | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 2,988 | 2,872 | 3,036 | 2,843 | 2,845 | 3,089 | | |
| | | Terminations | 6,335 | 2,956 | 3,093 | 2,680 | 2,852 | 2,955 | | |
| | | Pending | 3,137 | 3,057 | 3,007 | 3,178 | 3,187 | 3,313 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 3.4 | 7.6 | 1.7 | 8.7 | 8.6 | | 33 | 4 |
| | | Number of Judgeships | 8 | 8 | 8 | 8 | 8 | 8 | | |
| | | Vacant Judgeship Months [2] | 13.4 | 4.7 | 24.0 | 24.0 | 24.3 | 14.7 | | |
| **Actions per Judgeship** | **Filings** | Total | 374 | 359 | 380 | 355 | 356 | 386 | 70 | 9 |
| | | Civil | 310 | 297 | 314 | 274 | 268 | 275 | 58 | 8 |
| | | Criminal Felony | 49 | 45 | 48 | 64 | 69 | 84 | 53 | 6 |
| | | Supervised Release Hearings | 15 | 17 | 18 | 17 | 19 | 27 | 59 | 6 |
| | Pending Cases [2] | | 392 | 382 | 376 | 397 | 398 | 414 | 58 | 6 |
| | Weighted Filings [2] | | 340 | 323 | 342 | 340 | 339 | 376 | 61 | 7 |
| | Terminations | | 792 | 370 | 387 | 335 | 357 | 369 | 73 | 8 |
| | Trials Completed | | 22 | 21 | 17 | 28 | 16 | 20 | 35 | 6 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.1 | 6.5 | 7.0 | 7.3 | 6.9 | 7.4 | 16 | 5 |
| | | Civil [2] | 22.7 | 11.0 | 10.2 | 10.6 | 10.6 | 11.3 | 78 | 9 |
| | From Filing to Trial [2] (Civil Only) | | 22.2 | 26.0 | 34.8 | 14.8 | 35.5 | 36.6 | 52 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 223 8.3 | 230 8.9 | 259 10.3 | 289 11.2 | 348 13.7 | 395 15.7 | 79 | 9 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.2 | 1.3 | 1.2 | 1.2 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 35.1 | 33.7 | 41.8 | 39.8 | 34.3 | 42.9 | | |
| | | Percent Not Selected or Challenged | 29.3 | 31.9 | 38.9 | 38.9 | 35.9 | 40.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,198 | 199 | 69 | 560 | 5 | 47 | 129 | 213 | 188 | 19 | 585 | 5 | 179 |
| Criminal [1] | 671 | 15 | 118 | 47 | 313 | 92 | 20 | 25 | 4 | 17 | 3 | 5 | 12 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ALABAMA MIDDLE**

| | | 12-Month Periods Ending | | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings ¹ | 1,447 | 1,391 | 1,308 | 1,226 | 1,492 | 1,180 | | | |
| | Terminations | 1,390 | 1,572 | 1,231 | 1,168 | 1,340 | 1,304 | | | |
| | Pending | 1,560 | 1,370 | 1,442 | 1,491 | 1,652 | 1,507 | | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -18.5 | -15.2 | -9.8 | -3.8 | -20.9 | | | 90 | 9 |
| | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | | |
| | Vacant Judgeship Months ² | 10.2 | 3.0 | 23.0 | 24.0 | 24.0 | 15.9 | | | |
| **Actions per Judgeship** | Filings — Total | 482 | 464 | 436 | 409 | 497 | 393 | | 69 | 8 |
| | Filings — Civil | 388 | 370 | 359 | 306 | 369 | 312 | | 48 | 7 |
| | Filings — Criminal Felony | 75 | 69 | 59 | 81 | 105 | 62 | | 72 | 9 |
| | Filings — Supervised Release Hearings | 19 | 25 | 18 | 22 | 23 | 19 | | 72 | 7 |
| | Pending Cases ² | 520 | 457 | 481 | 497 | 551 | 502 | | 42 | 5 |
| | Weighted Filings ² | 433 | 429 | 390 | 384 | 465 | 354 | | 70 | 9 |
| | Terminations | 463 | 524 | 410 | 389 | 447 | 435 | | 64 | 7 |
| | Trials Completed | 22 | 19 | 15 | 19 | 21 | 29 | | 11 | 1 |
| **Median Time (Months)** | From Filing to Disposition — Criminal Felony | 8.8 | 9.5 | 9.7 | 9.7 | 8.9 | 9.7 | | 48 | 8 |
| | From Filing to Disposition — Civil ² | 10.6 | 8.7 | 9.2 | 9.7 | 10.1 | 10.6 | | 68 | 8 |
| | From Filing to Trial ² (Civil Only) | - | - | - | - | - | - | | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | 76 6.1 | 78 7.4 | 96 8.6 | 104 9.5 | 126 10.9 | 174 15.2 | | 78 | 8 |
| | Average Number of Felony Defendants Filed per Case | 1.3 | 1.5 | 1.4 | 1.4 | 1.4 | 1.1 | | | |
| | Jurors — Avg. Present for Jury Selection | 55.8 | 41.4 | 39.3 | 37.7 | 40.7 | 49.5 | | | |
| | Jurors — Percent Not Selected or Challenged | 52.9 | 29.8 | 33.2 | 29.8 | 23.3 | 32.0 | | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 937 | 36 | 12 | 417 | 6 | 12 | 26 | 69 | 63 | 7 | 223 | - | 66 |
| Criminal ¹ | 187 | 11 | 23 | 40 | 62 | 17 | 7 | 7 | 1 | 4 | 1 | 4 | 10 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**ALABAMA SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 1,177 | 1,131 | 1,171 | 1,126 | 1,101 | 1,213 | | |
| | | Terminations | 1,299 | 1,108 | 1,115 | 1,181 | 1,052 | 1,066 | | |
| | | Pending | 889 | 917 | 969 | 912 | 939 | 1,079 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 3.1 | 7.3 | 3.6 | 7.7 | 10.2 | | 24 | 2 |
| | | Number of Judgeships | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 3.8 | 12.0 | 24.0 | 2.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 392 | 377 | 390 | 375 | 367 | 404 | 67 | 7 |
| | | Civil | 211 | 219 | 232 | 202 | 190 | 197 | 79 | 9 |
| | | Criminal Felony | 138 | 113 | 113 | 113 | 124 | 141 | 22 | 2 |
| | | Supervised Release Hearings | 44 | 45 | 46 | 60 | 52 | 66 | 21 | 1 |
| | Pending Cases [2] | | 296 | 306 | 323 | 304 | 313 | 360 | 74 | 9 |
| | Weighted Filings [2] | | 384 | 347 | 352 | 337 | 350 | 375 | 62 | 8 |
| | Terminations | | 433 | 369 | 372 | 394 | 351 | 355 | 77 | 9 |
| | Trials Completed | | 29 | 18 | 16 | 21 | 17 | 29 | 11 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.4 | 6.0 | 6.7 | 7.1 | 6.4 | 5.9 | 10 | 2 |
| | | Civil [2] | 8.6 | 7.8 | 8.0 | 9.2 | 8.7 | 9.7 | 52 | 7 |
| | From Filing to Trial [2] (Civil Only) | | 18.1 | - | - | 21.3 | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 23 / 4.7 | 25 / 4.6 | 32 / 5.4 | 21 / 4.0 | 20 / 3.8 | 27 / 4.4 | 19 | 4 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.3 | 1.3 | 1.3 | 1.2 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 45.1 | 9.0 | 37.5 | 50.9 | 46.8 | 43.4 | | |
| | | Percent Not Selected or Challenged | 35.1 | 33.2 | 26.7 | 30.7 | 41.7 | 23.7 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 591 | 56 | 12 | 123 | 2 | 9 | 21 | 67 | 141 | 7 | 90 | - | 63 |
| Criminal [1] | 423 | 8 | 135 | 56 | 153 | 24 | 13 | 15 | - | 6 | - | - | 13 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**FLORIDA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | | |
| | | | | | | | | | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings ¹ | 2,188 | 2,367 | 2,508 | 2,532 | 3,616 | 4,336 | | |
| | | Terminations | 2,381 | 2,308 | 2,281 | 2,469 | 2,357 | 2,218 | | |
| | | Pending | 1,874 | 1,929 | 2,154 | 2,231 | 3,475 | 5,579 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 98.2 | 83.2 | 72.9 | 71.2 | 19.9 | | 9 | 1 |
| | | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | | Vacant Judgeship Months ² | 0.0 | 0.0 | 6.0 | 19.7 | 24.0 | 24.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 547 | 592 | 627 | 633 | 904 | 1,084 | 6 | 1 |
| | | Civil | 452 | 490 | 519 | 535 | 793 | 969 | 4 | 1 |
| | | Criminal Felony | 66 | 72 | 65 | 63 | 72 | 84 | 53 | 6 |
| | | Supervised Release Hearings | 30 | 30 | 43 | 35 | 39 | 31 | 52 | 3 |
| | | Pending Cases ² | 469 | 482 | 539 | 558 | 869 | 1,395 | 4 | 1 |
| | | Weighted Filings ² | 472 | 549 | 537 | 530 | 709 | 728 | 9 | 2 |
| | | Terminations | 595 | 577 | 570 | 617 | 589 | 555 | 27 | 4 |
| | | Trials Completed | 29 | 31 | 36 | 33 | 32 | 24 | 21 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 6.3 | 6.5 | 7.2 | 7.2 | 7.2 | 7.0 | 13 | 4 |
| | | Civil ² | 7.4 | 7.1 | 7.9 | 7.5 | 7.7 | 6.8 | 16 | 4 |
| | From Filing to Trial ² (Civil Only) | | 15.1 | 16.5 | 17.7 | 24.6 | 23.0 | 35.8 | 50 | 4 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 47 3.0 | 53 3.4 | 51 2.8 | 64 3.4 | 62 2.0 | 68 1.3 | 2 | 1 |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.4 | 1.4 | 1.3 | 1.4 | 1.2 | | |
| | Jurors | Avg. Present for Jury Selection | 34.9 | 32.3 | 34.0 | 34.4 | 36.8 | 32.4 | | |
| | | Percent Not Selected or Challenged | 28.0 | 22.7 | 17.1 | 18.3 | 16.1 | 18.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,875 | 37 | 2,145 | 749 | 13 | 9 | 95 | 130 | 288 | 15 | 322 | 1 | 71 |
| Criminal ¹ | 336 | - | 102 | 68 | 87 | 34 | 5 | 19 | 1 | 8 | 1 | 3 | 8 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**FLORIDA MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 10,314 | 10,352 | 10,998 | 10,617 | 10,491 | 10,775 | | |
| | | Terminations | 10,683 | 10,932 | 10,490 | 11,620 | 10,717 | 10,871 | | |
| | | Pending | 9,072 | 8,597 | 9,161 | 8,336 | 8,271 | 8,261 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 4.5 | 4.1 | -2.0 | 1.5 | 2.7 | | 47 | 5 |
| | | Number of Judgeships | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | | Vacant Judgeship Months [2] | 20.4 | 0.9 | 23.0 | 24.0 | 34.0 | 32.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 688 | 690 | 733 | 708 | 699 | 718 | 15 | 3 |
| | | Civil | 565 | 567 | 608 | 574 | 554 | 579 | 12 | 4 |
| | | Criminal Felony | 95 | 96 | 96 | 99 | 109 | 108 | 33 | 4 |
| | | Supervised Release Hearings | 27 | 28 | 29 | 36 | 37 | 31 | 52 | 3 |
| | | Pending Cases [2] | 605 | 573 | 611 | 556 | 551 | 551 | 34 | 3 |
| | | Weighted Filings [2] | 588 | 619 | 619 | 595 | 610 | 648 | 13 | 3 |
| | | Terminations | 712 | 729 | 699 | 775 | 714 | 725 | 11 | 1 |
| | | Trials Completed | 19 | 20 | 19 | 18 | 19 | 16 | 48 | 8 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.3 | 7.0 | 7.4 | 7.4 | 6.9 | 6.9 | 12 | 3 |
| | | Civil [2] | 7.7 | 8.3 | 6.8 | 7.3 | 6.3 | 6.0 | 9 | 2 |
| | From Filing to Trial [2] (Civil Only) | | 24.7 | 21.7 | 21.3 | 24.7 | 21.7 | 22.3 | 16 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 1,193 | 438 | 422 | 307 | 364 | 387 | 35 | 6 |
| | | | 16.1 | 6.4 | 5.7 | 4.6 | 5.6 | 6.0 | | |
| | Average Number of Felony Defendants Filed per Case | | 1.2 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 37.2 | 38.1 | 35.9 | 37.0 | 45.5 | 45.1 | | |
| | | Percent Not Selected or Challenged | 28.9 | 27.3 | 23.7 | 26.0 | 36.0 | 34.9 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 8,682 | 638 | 276 | 1,891 | 14 | 85 | 979 | 1,046 | 599 | 455 | 1,286 | 7 | 1,406 |
| Criminal [1] | 1,619 | 6 | 640 | 401 | 187 | 164 | 16 | 91 | 19 | 43 | 8 | 16 | 28 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**FLORIDA SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 11,467 | 11,782 | 12,638 | 12,314 | 11,856 | 13,051 | | |
| | Terminations | | 11,229 | 12,165 | 12,187 | 12,651 | 11,982 | 12,916 | | |
| | Pending | | 7,025 | 6,595 | 7,051 | 6,667 | 6,551 | 6,735 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | | 13.8 | 10.8 | 3.3 | 6.0 | 10.1 | 25 | 3 |
| | Number of Judgeships | | 18 | 18 | 18 | 18 | 18 | 18 | | |
| | Vacant Judgeship Months [2] | | 31.9 | 12.7 | 12.0 | 27.7 | 58.9 | 55.1 | | |
| **Actions per Judgeship** | **Filings** | Total | 637 | 655 | 702 | 684 | 659 | 725 | 14 | 2 |
| | | Civil | 486 | 500 | 538 | 515 | 496 | 584 | 11 | 3 |
| | | Criminal Felony | 128 | 133 | 137 | 138 | 134 | 112 | 31 | 3 |
| | | Supervised Release Hearings | 23 | 22 | 27 | 32 | 28 | 29 | 55 | 5 |
| | Pending Cases [2] | | 390 | 366 | 392 | 370 | 364 | 374 | 68 | 8 |
| | Weighted Filings [2] | | 647 | 677 | 694 | 679 | 679 | 765 | 7 | 1 |
| | Terminations | | 624 | 676 | 677 | 703 | 666 | 718 | 13 | 2 |
| | Trials Completed | | 24 | 26 | 28 | 25 | 25 | 22 | 27 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 5.7 | 5.3 | 5.3 | 5.4 | 5.3 | 5.2 | 6 | 1 |
| | | Civil [2] | 4.6 | 4.7 | 4.3 | 4.1 | 4.1 | 3.7 | 2 | 1 |
| | From Filing to Trial [2] (Civil Only) | | 16.4 | 21.4 | 17.2 | 17.0 | 14.9 | 18.3 | 4 | 1 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 111 2.2 | 114 2.5 | 107 2.1 | 93 2.0 | 96 2.1 | 121 2.4 | 5 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 49.0 | 46.6 | 45.6 | 45.4 | 43.1 | 45.0 | | |
| | | Percent Not Selected or Challenged | 22.0 | 21.3 | 18.8 | 20.1 | 18.0 | 19.1 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 10,505 | 173 | 147 | 994 | 19 | 95 | 1,243 | 1,790 | 1,171 | 545 | 2,864 | 19 | 1,445 |
| Criminal [1] | 2,005 | 18 | 495 | 479 | 220 | 461 | 70 | 68 | 3 | 41 | 20 | 55 | 75 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**GEORGIA NORTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings ¹ | 6,063 | 6,204 | 6,441 | 6,573 | 8,045 | 7,503 | | |
| | | Terminations | 6,001 | 5,990 | 6,025 | 6,702 | 6,983 | 6,741 | | |
| | | Pending | 5,024 | 5,220 | 5,628 | 5,484 | 6,547 | 7,258 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 23.8 | 20.9 | 16.5 | 14.1 | -6.7 | | 78 | 8 |
| | | Number of Judgeships | 11 | 11 | 11 | 11 | 11 | 11 | | |
| | | Vacant Judgeship Months ² | 36.0 | 14.5 | 12.0 | 15.0 | 24.0 | 21.6 | | |
| **Actions per Judgeship** | **Filings** | Total | 551 | 564 | 586 | 598 | 731 | 682 | 17 | 4 |
| | | Civil | 465 | 487 | 504 | 528 | 647 | 601 | 9 | 2 |
| | | Criminal Felony | 67 | 60 | 64 | 53 | 67 | 63 | 71 | 8 |
| | | Supervised Release Hearings | 19 | 18 | 18 | 17 | 17 | 18 | 76 | 8 |
| | | Pending Cases ² | 457 | 475 | 512 | 499 | 595 | 660 | 23 | 2 |
| | | Weighted Filings ² | 488 | 506 | 534 | 534 | 632 | 614 | 17 | 4 |
| | | Terminations | 546 | 545 | 548 | 609 | 635 | 613 | 17 | 3 |
| | | Trials Completed | 21 | 21 | 20 | 23 | 19 | 17 | 44 | 7 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 10.1 | 9.2 | 10.2 | 9.7 | 10.7 | 8.5 | 32 | 7 |
| | | Civil ² | 6.5 | 6.7 | 6.3 | 5.8 | 6.6 | 6.5 | 12 | 3 |
| | From Filing to Trial ² (Civil Only) | | 29.8 | 29.8 | 29.9 | 30.3 | 24.8 | 29.4 | 35 | 3 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old ² | | 95 2.4 | 137 3.3 | 250 5.5 | 437 10.0 | 83 1.6 | 121 2.0 | 3 | 2 |
| | Average Number of Felony Defendants Filed per Case | | 1.4 | 1.4 | 1.6 | 1.4 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 40.1 | 34.9 | 37.0 | 38.9 | 34.1 | 34.4 | | |
| | | Percent Not Selected or Challenged | 37.2 | 28.7 | 31.9 | 30.7 | 26.7 | 37.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6,612 | 326 | 1,171 | 923 | 37 | 736 | 355 | 531 | 519 | 158 | 976 | 1 | 879 |
| Criminal ¹ | 693 | 6 | 178 | 105 | 128 | 133 | 15 | 43 | 1 | 22 | 7 | 17 | 38 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

¹ Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

² See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**GEORGIA MIDDLE**

| | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|
| | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | 1,888 | 1,758 | 1,974 | 1,944 | 1,808 | 1,783 | | |
| | Terminations | 1,810 | 1,786 | 1,871 | 2,012 | 1,953 | 1,931 | | |
| | Pending | 1,830 | 1,801 | 1,900 | 1,833 | 1,715 | 1,603 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | -5.6 | 1.4 | -9.7 | -8.3 | -1.4 | | 61 | 7 |
| | Number of Judgeships | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | 2.6 | 4.6 | 0.0 | 9.9 | 8.1 | 0.0 | | |
| **Actions per Judgeship** | **Filings** Total | 472 | 440 | 494 | 486 | 452 | 446 | 58 | 6 |
| | Civil | 374 | 324 | 382 | 374 | 334 | 326 | 45 | 6 |
| | Criminal Felony | 85 | 105 | 95 | 97 | 101 | 107 | 35 | 5 |
| | Supervised Release Hearings | 13 | 11 | 17 | 15 | 18 | 13 | 81 | 9 |
| | Pending Cases [2] | 458 | 450 | 475 | 458 | 429 | 401 | 62 | 7 |
| | Weighted Filings [2] | 359 | 399 | 407 | 417 | 405 | 412 | 55 | 6 |
| | Terminations | 453 | 447 | 468 | 503 | 488 | 483 | 44 | 6 |
| | Trials Completed | 16 | 16 | 19 | 14 | 16 | 14 | 59 | 9 |
| **Median Time (Months)** | From Filing to Disposition Criminal Felony | 9.7 | 8.5 | 11.1 | 11.3 | 10.4 | 10.7 | 61 | 9 |
| | Civil [2] | 9.9 | 12.1 | 13.5 | 12.0 | 9.7 | 8.3 | 29 | 5 |
| | From Filing to Trial [2] (Civil Only) | 25.4 | 24.4 | 24.5 | 20.8 | 32.0 | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | 26 | 53 | 37 | 37 | 49 | 59 | 31 | 5 |
| | | 1.8 | 3.9 | 2.6 | 2.8 | 4.2 | 5.6 | | |
| | Average Number of Felony Defendants Filed per Case | 1.4 | 1.5 | 2.0 | 1.7 | 1.4 | 1.6 | | |
| | Jurors Avg. Present for Jury Selection | 51.5 | 79.2 | 20.8 | 33.1 | 40.6 | 48.3 | | |
| | Percent Not Selected or Challenged | 42.1 | 62.4 | 42.6 | 35.8 | 38.2 | 39.5 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,305 | 79 | 27 | 609 | 6 | 12 | 59 | 74 | 120 | 8 | 186 | - | 125 |
| Criminal [1] | 425 | 56 | 142 | 44 | 87 | 35 | 7 | 19 | 2 | 6 | 2 | 13 | 12 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**GEORGIA SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2014 | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 1,664 | 1,561 | 1,632 | 1,466 | 1,665 | 1,677 | | |
| | Terminations | | 1,599 | 1,693 | 1,457 | 1,660 | 1,499 | 1,510 | | |
| | Pending | | 1,366 | 1,237 | 1,406 | 1,213 | 1,389 | 1,544 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 0.8 | 7.4 | 2.8 | 14.4 | 0.7 | | 55 | 6 |
| | Number of Judgeships | | 3 | 3 | 3 | 3 | 3 | 3 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 4.0 | 12.0 | 1.9 | | |
| **Actions per Judgeship** | **Filings** | Total | 555 | 520 | 544 | 489 | 555 | 559 | 27 | 5 |
| | | Civil | 359 | 374 | 377 | 338 | 351 | 330 | 44 | 5 |
| | | Criminal Felony | 142 | 97 | 120 | 111 | 160 | 182 | 12 | 1 |
| | | Supervised Release Hearings | 53 | 49 | 47 | 40 | 44 | 47 | 29 | 2 |
| | Pending Cases [2] | | 455 | 412 | 469 | 404 | 463 | 515 | 39 | 4 |
| | Weighted Filings [2] | | 523 | 457 | 465 | 429 | 497 | 538 | 28 | 5 |
| | Terminations | | 533 | 564 | 486 | 553 | 500 | 503 | 42 | 5 |
| | Trials Completed | | 46 | 41 | 39 | 23 | 23 | 21 | 30 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.7 | 7.3 | 7.0 | 8.3 | 7.7 | 7.5 | 18 | 6 |
| | | Civil [2] | 9.4 | 9.4 | 10.1 | 9.5 | 8.5 | 8.4 | 32 | 6 |
| | From Filing to Trial [2] (Civil Only) | | 22.5 | - | - | - | - | - | - | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 32 / 3.8 | 34 / 3.8 | 44 / 4.4 | 54 / 6.7 | 64 / 7.2 | 81 / 8.5 | 52 | 7 |
| | Average Number of Felony Defendants Filed per Case | | 1.8 | 1.3 | 1.6 | 1.4 | 1.4 | 1.6 | | |
| | Jurors | Avg. Present for Jury Selection | 41.7 | 52.2 | 42.6 | 46.6 | 43.7 | 40.9 | | |
| | | Percent Not Selected or Challenged | 36.3 | 40.8 | 46.6 | 48.3 | 37.8 | 31.8 | | |

| 2019 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 989 | 42 | 24 | 449 | 9 | 34 | 33 | 55 | 107 | 11 | 140 | 1 | 84 |
| Criminal [1] | 545 | 4 | 232 | 56 | 151 | 35 | 10 | 26 | 1 | 8 | 7 | - | 15 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing

document were caused to be served on October 15, 2019 on the following counsel in the manner

indicated:

**BY EMAIL:**

Michael J. Flynn
Jeffrey J. Lyons
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
Wilmington, DE 19899
(302) 658-9200
mflynn@mnat.com
jlyons@mnat.com

John C. Hueston
Douglas J. Dixon
Christina V. Rayburn
Sourabh Mishra
HUESTON HENNIGAN LLP
620 Newport Center Drive. Ste. 1300
Newport Beach, CA 92660
(949) 226-6741

*Attorneys for ClearOne, Inc.*

Dated: October 15, 2019                                    /s/ Brian R. Lemon
                                                                        Brian R. Lemon (#4730)