

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SHURE INCORPORATED, and
SHURE ACQUISITION HOLDINGS, INC. )
 )
 )
   Plaintiffs, )
 )
   v. )
 )
CLEARONE, INC., )
 )
   Defendant. )
 )

C.A. NO. 19-1343 (RGA) (CJB)

**JURY TRIAL DEMANDED**

PUBLIC VERSION Filed: April 26, 2021

## OPENING BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE AND STRIKE TESTIMONY OF PAUL WAADEVIG



## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................................. 1

II.     FACTUAL BACKGROUND .......................................................................................... 1

III.    LEGAL STANDARD ...................................................................................................... 2

IV.     ARGUMENT ................................................................................................................... 3

        A.      Mr. Waadevig Proudly Admits the Lack of Support for His Opinions on
                Noninfringing Alternatives ................................................................................. 3

        B.      Mr. Waadevig's Incorporation by Reference of His Prior Opinions From Other
                Litigation is Improper ......................................................................................... 3

V.      CONCLUSION ................................................................................................................ 4



**TABLE OF AUTHORITIES**

**CASES**

*Daubert v. Merrell Dow Pharm., Inc*,
509 U.S. 579 (1993)..................................................................................2

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)..................................................................................3

*M2M Sols. LLC v. Enfora, Inc.*,
167 F. Supp. 3d 665 (D. Del. 2016)..........................................................2

*Parallel Networks Licensing, LLC v. Microsoft Corp.*,
No. 13-2073, 2017 WL 11557655 (D. Del. Feb. 22, 2017)..............................2, 3

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d. Cir. 2003)......................................................................2

*Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*,
No. 17-1734, 2021 WL 979307 (D. Del. Mar. 16, 2021) ....................................4

*TASER Int'l, Inc. v. Karbon Arms, LLC*,
No. 11-426, 2013 WL 6773663 (D. Del. Dec. 19, 2013) ....................................3

*Wolfson-Verrichia Group, Inc. v. Metro Com. Real Estate, Inc.*,
No. 5:08-cv-4997, 2013 WL 1286184 (E.D. Pa. Mar. 28, 2013) ........................3

**RULES**

Fed. R. Evid. 702 ...............................................................................................1, 2

Fed. R. Civ. P. 26(a)(2)(B) ...............................................................................1, 3, 4

## I.    INTRODUCTION

ClearOne's market expert, Paul Waadevig, opines on noninfringing alternatives in a single, conclusory paragraph. He admits that this paragraph lacks explanation or methodology, and that he included it "on purpose" out of spite for Shure's market expert, Ira Weinstein. Nothing about this *ipse dixit* paragraph warrants admissibility under Fed. R. Evid. 702.

Mr. Waadevig also attempts to incorporate by reference two of his prior reports from the parties' Northern District of Illinois litigation. Under this Court's precedent, this violates the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B). These prior reports should be stricken.

## II.    FACTUAL BACKGROUND

Mr. Waadevig purports in his opening expert report to "incorporate by reference, for all purposes, [his] past expert reports" from the parties' Illinois litigation. Ex. 1 ¶ 12. Specifically, he attempts to incorporate his October 22, 2019 report associated with ClearOne's allegations of patent infringement (totaling 53 pages, plus exhibits) and his September 24, 2018 report relating to ClearOne's motion for a preliminary injunction (totaling 40 pages, plus exhibits). Mr. Waadevig asserts that his Illinois reports are relevant here because they "provide necessary background" regarding the market, competition, and ClearOne's patents. *Id*. ¶ 11.

In his deposition, Mr. Waadevig was asked whether "there any opinions, specifically, that [he is] attempting to incorporate." Ex. 2 25:24-26:5. Mr. Waadevig explained that he doesn't "think there is anything specific that [he] was targeting here," *id*. at 26:6-8, and that he incorporated the material just for "background," *id*. at 26:8-13.

In his responsive expert report, Mr. Waadevig addresses, in a single paragraph, purported noninfringing alternatives to the '723 patent. Ex. 3 ¶ 39. He states that he "reviewed ClearOne's proposed alternate designs for the front face of its BMA CT, BMA CTH, and BMA 360 products" and, "[i]n [his] opinion, though consumers have different preferences in the market, all

1

████████████

of the [proposed] designs would generally be commercially acceptable to consumers in the

installed audio-conferencing market." *Id*. Other than the front images of the designs shown in his

report, Mr. Waadevig does not recall any information he was given about the designs. Ex. 2

193:5-10. Earlier in his deposition, Mr. Waadevig testified that, when a company would develop

a new product, it would determine the commercial acceptability of the design by conducting

surveys or at least more informally canvassing industry participants. *Id*. at 20:21-22:7. But when

asked whether he did any such work to support his conclusion on the commercial acceptability of

noninfringing alternatives (Ex. 3 ¶ 39), he stated: "*No. I actually kind of put this in on purpose. I

figured that since Mr. Weinstein did his own opinion with no backing for about a hundred times,

I'd throw one in*." Ex. 2 194:7-10 (emphasis added). Mr. Waadevig talked to no integrators,

distributors, or AV managers to form his opinion on commercial acceptability. *Id*. at 195:2-18.

He performed no "[d]ue diligence of any type, other than just looking at" the designs himself,

and again tried to justify that lapse by blaming Mr. Weinstein. *Id*. at 195:12-18.

## III.    LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharm., Inc*, 509 U.S. 579 (1993) and Fed. R. Evid. 702,

expert opinions lacking "any meaningful analysis" are excluded. *M2M Sols. LLC v. Enfora, Inc.*,

167 F. Supp. 3d 665, 678 (D. Del. 2016). To be admissible, expert testimony "must be based on

the methods and procedures of science rather than on subjective belief or unsupported

speculation; the expert must have good grounds for his on her belief." *Schneider ex rel. Estate of

Schneider v. Fried*, 320 F.3d 396, 404 (3d. Cir. 2003) (citation and internal quotations omitted).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Parallel

*Networks Licensing, LLC v. Microsoft Corp.*, No. 13-2073, 2017 WL 11557655, at *3 (D. Del.

Feb. 22, 2017) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## IV.   ARGUMENT

### A.   Mr. Waadevig Proudly Admits the Lack of Support for His Opinions on Noninfringing Alternatives

The single paragraph Mr. Waadevig devotes to noninfringing alternatives lacks any

trappings of a reliable expert opinion. It contains no analysis, identifies no analytical framework,

and provides no explanation of the legal conclusion that the identified designs are "commercially

acceptable." Ex. 3 ¶ 39. Removing any doubt that this is pure *ipse dixit*, Mr. Waadevig openly

admitted that he included it more out of spite for Shure's expert than to set forth any substantive

opinion. Ex. 2 194:7-10. Mr. Waadevig did none of the analysis one would expect for an

assessment of commercial acceptability—he did no due diligence at all. This absence of

methodology, explanation, and seriousness warrant exclusion of Mr. Waadevig's opinions on

noninfringing alternatives. *See TASER Int'l, Inc. v. Karbon Arms, LLC*, No. 11-426, 2013 WL

6773663, at *1 (D. Del. Dec. 19, 2013) (excluding expert's opinion with "almost no basis as to

how he arrived at his royalty rate other than that he considered the above numbers and factors");

*Wolfson-Verrichia Group, Inc. v. Metro Com. Real Estate, Inc*., No. 5:08-cv-4997, 2013 WL

1286184, at *11 (E.D. Pa. Mar. 28, 2013) (excluding expert opinion lacking any "meaningful

explanation as to how it was performed"). At best, Mr. Waadevig's Paragraph 39 is simply his

"subjective belief or unsupported speculation." *Schneider*, 320 F.3d at 404. That is insufficient.

### B.   Mr. Waadevig's Incorporation by Reference of His Prior Opinions From Other Litigation is Improper

Mr. Waadevig's purported incorporation-by-reference of his two prior Illinois reports

violates the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(B). This rule requires a written

report containing "(i) a complete statement of all opinions the witness will express and the basis

█████████████

and reasons for them" and "(ii) the facts or data considered by the witness in forming them"—

not unexplained gesturing to a volume of prior opinions. A similar attempted incorporation-by-

reference was recently rejected by the Court in *Sprint Commc'ns Co. LP v. Charter Commc'ns,

Inc.*, No. 17-1734, 2021 WL 979307 (D. Del. Mar. 16, 2021). There, the defendants moved to

strike an expert's "incorporation of his reports and testimony from prior litigations." *Id*. at *2.

Even though the plaintiff "made some efforts to reduce the extensive incorporation of" his prior

opinions by identifying specific paragraphs being incorporated, *id*., the Court struck the

incorporated material as "purposeful obfuscation (or, hiding the ball) of what the opinions are

that [the expert] intends to express at the trial in this case," *id*. at *3.

Shure casts no aspersions of any purposeful obfuscation by ClearOne or Mr. Waadevig,

but rather moves to strike Mr. Waadevig's incorporation by reference because it deprives Shure

of the clarity called for by Rule 26(a)(2)(B)'s disclosure requirement and would result in wasted

time at trial. This "is not literally in compliance with the rules." *Id*. And as the Court pointed out

in *Sprint*, having to deal with "not disclosed in the expert's report" objections at trial here would

be convoluted if the parties and Court were forced to sift through Mr. Waadevig's substantial

Illinois testimony in search of support for his trial opinions. *Id*. at *4. Indeed, striking

Mr. Waadevig's prior Illinois reports is particularly warranted here since he relies on them

merely for general background. Ex. 2 25:24-26:13. Shure thus requests that Mr. Waadevig's

incorporated Illinois reports be struck as noncompliant with Fed. R. Civ. P. 26(a)(2)(B),

irrelevant, prejudicial to Shure, wasteful for the Court and jury, and not prejudicial to ClearOne.

**V.    CONCLUSION**

For the above reasons, Shure respectfully requests that the Court exclude Mr. Waadevig's

opinions on noninfringing alternatives and strike his purported incorporation by reference of his

prior expert reports from the parties' Illinois litigation.



Dated:  April 16, 2021

MCCARTER & ENGLISH, LLP

/s/ Brian R. Lemon
Michael P. Kelly (#2295)
Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
blemon@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*

*Of Counsel*:

Gerald F. Ivey
Mareesa A. Frederick
Elizabeth D. Ferrill
Sydney English
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Elliot C. Cook
J. Derek McCorquindale
Alexander M. Boyer
David N. Lefcowitz
Luke MacDonald
Joseph M. Schaffner
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER,
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190-5675
(571) 203-2700

# EXHIBIT 1

Highly Confidential – Attorney's Eyes Only

# Opening Expert Report
# of
# Paul Waadevig

*Shure Incorporated et al. v. ClearOne, Inc.*, Case No. 19-01343 (D. Del.)

**January 26, 2021**

Paul Waadevig

**Highly Confidential – Attorney's Eyes Only**

## I.      QUALIFICATIONS

1.      I am an independent market consultant specializing in the conferencing and unified communications markets.   I received my Bachelor of Science Degree from Portland State University in Philosophy of Science in 1991.   I received a Juris Doctorate and Masters of Business Administration from Boston College in 1999.

2.      My specialization is in audio conferencing, a field in which I have 17 years of experience.   That includes 14 years of experience covering the audio conferencing endpoints markets with Frost & Sullivan (a global market research and consulting firm), one year as a product manager with an audio conferencing vendor, and one year as vice-president for Markets and Markets, Inc. (another global market research and consulting firm).   From 2002 to 2014, I was the author of Frost & Sullivan's annual reports covering the installed audio conferencing and table top audio conferencing markets.   During this time, I frequently spoke with top management for all market participants and gave presentations at many audiovisual ("A/V") industry events.

3.      My curriculum vita is attached as **Exhibit A**.   The documents I considered in arriving at my opinions in are included in this Opening Expert Report, including in the footnotes.

4.      I am not opining in this report on the falsity of Shure's statements to the market.

5.      Other than my testimony in this litigation and related cases known to Shure, I have not testified as an expert at any trial or by deposition in any other cases in the previous four years. Specifically, I have provided testimony by deposition in this litigation, a related case in Illinois (*Shure Inc. v. ClearOne, Inc.*, 17-cv-03078 (N.D. Ill.) ("Illinois Litigation")), and an *inter partes* review of ClearOne's Patent No. 9,264,553.

6.      My hourly billing rate is $175 per hour.   My compensation is not contingent on the outcome of this litigation.

**Highly Confidential – Attorney's Eyes Only**

## II.    ASSIGNMENT

7.      I understand that ClearOne, Inc. ("ClearOne") asserts counterclaims against Plaintiffs Shure Incorporated and Shure Acquisition Holdings, Inc. ("Shure") in this case.[1]  As detailed in its filing in this case, ClearOne asserts three claims: (1) violation of Delaware Deceptive Trade Practices Act; (2) Tortious Interference with Business Relations; and (3) Unfair Competition under Delaware Common Law.[2]

8.      I understand that ClearOne claims that Shure made false statements to the market and its customers about its MXA910W-A ("MXA910-A") product announced in November 2019,[3] and sold from December 2019.[4]  And I also understand that ClearOne yesterday filed a supplemental brief relating to the Honorable Edmond E. Chang's order in the Illinois Litigation[5] detailing Shure's alleged false statements about the MXA910-A, including evidence of installations.[6]

9.      My assignment is to outline the market at issue for the products involved in this case, including Shure's MXA910 products like the MXA910-A product; ClearOne's products, like its Beamforming Microphone Array ("BMA"); and Ceiling Tile BMA ("BMA CT").  To do so, I define the market, outline the competition, and discuss the types of advertising at issue in the market.

10.      I was also asked to offer an opinion on what effect, if any, Shure's alleged false

---

[1] D.I. 295 (ClearOne Amended Answer and Counterclaims) at 29-32.

[2] D.I. 295 (ClearOne Amended Answer and Counterclaims) at 29-32.

[3] SHURE783086.

[4] SHURE891681.

[5] Illinois Litigation, D.I. 912 (Order Finding Shure in Contempt).

[6] **Exhibit B** - Illinois Litigation, D.I. 967 (Supplemental Contempt Brief).

**Highly Confidential – Attorney's Eyes Only**

statements would have on purchasers of the MXA910-A products.

## III.    INCORPORATION OF PRIOR EXPERT REPORTS BY REFERENCE

11.    As stated above, I have provided testimony in the Illinois Litigation with Shure. Those reports are relevant here because they provide necessary background about the relevant market and competition relating to the MXA910, BMA products, and ClearOne's Patent No. 9,813,806 ("'806 patent").

12.    I thus hereby incorporate by reference, for all purposes, my past expert reports, including:

- Expert Report of Paul Waadevig, dated October 22, 2019 (attached here as **Exhibit C**); and

- Expert Report of Paul G. Waadevig in Support of ClearOne's Motion for Preliminary Injunction, filed September 24, 2018 (attached here as **Exhibit D**).

## IV.    QUALIFICATIONS AND BACKGROUND RELATING TO MARKETING IN THE A/V INDUSTRY

13.    As a market researcher, I have examined thousands of industry advertisements during my career.  In some instances, this is part of working directly with company's product launches or other marketing activities.  But the majority of my interaction with A/V advertising has been part of the market report production process that I led or participated in multiple times.

14.    The market research process includes several steps that I performed on multiple occasions.

15.    *First*, I conducted secondary research on relevant companies and products, which involved examinations and analyses of available written and multi-media sources referencing major companies and major trends in the market.  These sources included: (1) product catalogs; (2) websites; (3) advertising; (4) legal filings; (5) social media posts; (6) industry websites; (7)

news releases; and (8) third party articles.  As an objective observer and reporter of the market, it is imperative that all secondary resources be examined with a critical eye that understands what is "marketing speak" targeted at a relatively unsophisticated audience, as compared to those claims that are factually verifiable by more sophisticated audiences.  It is the verifiable statements that then become part of the interview questionnaire that would then be used in my primary research phase.

16.     *Second*, I would conduct primary research on relevant companies and products. Conducting primary research involved directly interacting with participants in the market, including through formal and informal interviews.  It often involved asking these participants about statements in their marketing material, which people in the industry acknowledged help drive sales of A/V products.

17.     *Third*, after conducting such research, I would perform my analysis of the products, formulate related projections and forecasting, and draft my conclusions and reporting.  Overall, analyzing and understanding advertisements was important because it formed the basis for my further research and conclusions.

## V.      THE INSTALLED AUDIO CONFERENCING MARKET

4.      At a very general level, this case concerns products involved in enterprise wireline audio telephony, namely the end-to-end transmission of audio (voice) over terrestrial cable (typically made of fiber-optics or copper).  Within the enterprise wireline audio telephony market, there are three major industry segments: (1) audio transport/access (connecting the call from one place to another), (2) audio services (conference bridging, transcription, recording, etc.) and (3) audio endpoints (the appliance used to hear and talk).

5.      The endpoint segment interfaces with the audio transport ("long distance") and services segments ("conference call"), such that endpoint technology must be compatible with

**Highly Confidential – Attorney's Eyes Only**

these other segments' technology to ensure end-to-end quality.[7]  Because ClearOne's BMA, BMA CT, and Shure's MXA910 line of products are audio appliances, they are within a distinct submarket in the endpoint segment: audio conferencing endpoints, specifically installed audio conferencing endpoints.[8]

6.      Audio conferencing is a subset of the larger audio endpoints market, which includes desktop handsets (i.e., desktop telephones).[9]  Audio conferencing is a submarket because it has unique challenges distinct from the desktop handset market.  For instance, unlike in the desktop handset market, in which there is one speaker closely situated to one input mic—such as when an individual is talking into the handset in her own office—audio conferencing typically involves multiple people talking into one or more input mics at a distance, such as in a conference room.

7.      The two market segments within audio conferencing are: (1) tabletop, and (2) installed.[10]  In the tabletop market, an audio appliance that has one or more microphones and speakers is placed on the conference room table.  Typical terms for this appliance are "speakerphone" or "conference phone."  All audio processing is integrated into the unit.  While extension microphones can be added, the use of tabletop units is typically limited to smaller conference rooms or offices.

---

[7] CLRONE-00339906.

[8] Installed audio conferencing products can, and many times are, integrated with videoconferencing products installed in the space. While it is important to understand this, the focus of this report is on the audio components only.

[9] "Desktop" appliances are "desk phones" that may or may not have "speakerphone" capability. As the name suggests, they are intended to be placed on the desk. The differences between consumer landline telephones and enterprise phones are connectivity to an IP based voice system, IP-PBX or other functionality—including directory access and direct dialing, among other things.

[10] CLRONE-00339989; CLRONE-00339906.

Highly Confidential – Attorney's Eyes Only

8.      In the installed audio conferencing market, microphones (wired or wireless) are integrated into or installed on the conference table and/or the ceiling, with speakers mounted around the room.  Digital signal processing, which includes acoustic echo cancellation, is done in specialized units, usually in a cabinet or otherwise not visible to the end user.  The digital signal processing in installed systems is more powerful than that of a typical tabletop unit, since it must account for multiple microphone inputs and speaker outputs.  The result is higher-quality audio, and the ability to cover a much larger conference room or auditorium.  The products at issue in this case – like the BMA, BMA CT, and MXA910 – are all meant for sale in the installed audio conferencing market and are meant to be high-end, long-lasting audio conferencing products that are permanently or semi-permanently integrated with the conference room design.

## VI.   INSTALLED AUDIO CONFERENCING MARKET ECOSYSTEM

9.      I am defining "ecosystem" here as all the major stakeholders, or participants, in the installed audio conferencing endpoints.  I describe these stakeholders below.

10.     **Vendors**: These are the source of the installed audio conferencing products. While few vendors manufacture their own components, it is the vendor that develops the hardware and intellectual property and originates the final product, for example ClearOne's BMA CT or Shure's MXA910.  Vendors heavily market and promote their products to both the channel partners and purchasers.  Generally speaking, channel partners, purchasers, and end users can all be classified as a vendor's customers, since vendors must convince channel partners to specify or bid the vendor's products to the ultimate end user, including its specialized purchaser.

11.     **Channel Partners**: Generally, vendors do not install their audio conferencing products into the end users' conference rooms.  Instead, channel partners are often the face of the vendor to the ultimate purchaser.  Channel partners respond to requests for proposal (RFPs), determine the various needs of the job, purchase the vendor product, resell it to the end-user, and

## Highly Confidential – Attorney's Eyes Only

install the system.  Vendors do have sales and marketing teams, but they work together with channel partners to promote the use of the vendor's components into any given bid.  They do not sell directly to the end user. Channel partners can be divided into three subgroups: system integrators, consultants, and distributors.[11]

    a.    *System Integrators*: For the installed audio market, system integrators are the largest channel to the purchaser.  They integrate installed audio conferencing products with other systems, such as video conferencing.  Examples of integrators include AVI/SPL and Whitlock Group.

    b.    *Consultants*: Consultants are generally used in more large and complex installed audio conferencing purchases.  Consultants design the system, advise the end user on which installed audio conferencing system to buy, coordinate the purchase of all the needed components, and solicit bids.  Generally, consultants are not in the direct sales channel but they wield tremendous channel power by specifying requirements and making recommendations.

    c.    *Distributors*: Distributors make volume purchases of ClearOne products and then work with system integrators to install them.  While there are distributors in the United States, their importance in the channel is greatest outside of the US where ClearOne (and others) rely on them more heavily.[12]

12.    Channel partners are resistant to changing vendors.  For a channel partner to change vendors, its installers/integrators must usually take days of training on the new hardware and

---

[11] Although channel partners can be divided into these subcategories, the larger channel partners operate across each subcategory depending on the needs of their clients.

[12] It should be noted that while ClearOne does utilize distributors in the US, not all vendors do.

Highly Confidential – Attorney's Eyes Only

software.  Even with this training, there are "tricks" that integrators learn over time, such as knowing how to effectively integrate one vendor's equipment with legacy equipment on-site, or how to optimize audio quality within oddly shaped or divided rooms.  They also tend to reuse configuration files for similar room installs, which means that they are reluctant to learn new software and instead rely on their library of template configurations.  Likewise, consultants over time become more familiar with vendor's product capabilities in unconventional room configurations.  This is not insignificant, as one of the most common problems channel partners encounter is completing an installation in rooms where one of the "walls" is a bank of glass.[13]

13.     In addition, channel partners—particularly integrators and consultants—tend to form long-term relationships with major purchasers, and over the years will perform multiple buildouts and system upgrades for these purchasers.  By always using the same vendor's products, the channel partner can rely on its expertise with these products in later projects for the same purchaser, and thereby save time, effort, and money.  For the channel partner, this greatly simplifies these future installations and upgrades.

14.     Finally, channel partners are ultimately focused on the bottom line.  The two major factors that influence this are the net revenue from a buildout and the speed and ease of installation.  Changing vendors risks prolonging any build for troubleshooting.  Because of this, channel partners tend to remain with one vendor over others unless given some significant reason to change.

15.     Large manufacturers like Shure also offer channel partners lucrative volume promotions.  In exchange for higher annual sales volume of their products, these manufacturers

---

[13] Glass "walls" are difficult to set up correctly because the audio in the room bounces off them at random angles. Given all the conference rooms with one wall looking out over a view or open to some larger internal area, this is a common problem.

Highly Confidential – Attorney's Eyes Only

offer material pricing discounts, annual rebates, marketing funds, and other benefits.  This incentivizes partners to only work with the large company to maximize these volume benefits. When that large company (like Shure) then comes out with a similar product as a smaller company (like ClearOne), the partners have a greater incentive to purchase the large company's product because it helps their entire business with the large company.

16.     Thus, when it comes to installed audio conferencing systems, channel partners will stay with what works unless convinced to change.  This means using trusted components from a trusted vendor and using that same vendor over time.  Differences in price—which affects the amount the channel partner can keep after applying a markup—can change a channel partner's behavior.  However, given channel partners' resistance to changing vendors, a difference in price would need to be significant and even then may not be enough to overcome the large volume incentives offered by large companies.  It is largely for this reason that, historically, the major players in the installed audio conferencing market have not engaged in a price war.  As with price competition, the introduction of new technology that improves call quality could also cause channel partners to change vendors.  But, again, this improvement would need to be significant.

17.     However, channel partners (and end user audio-visual specialists as discussed below) are often technophiles.  When a new product is introduced by a vendor, many want to "play" with the technology and see what the capabilities are.  This tendency works against their natural risk aversion and helps lessen barriers to entry by enticing early adopters.

18.     Finally, channel partners are increasingly consolidated.  Throughout the early 2000s, many integrators merged, increasing the amount of product in the market that is sold and installed by the top five integrators.  This continues today.  The partners are continuing to merge and consolidate, even globally.  For example, AVI-SPL in Canada in 2017 purchased another

Highly Confidential – Attorney's Eyes Only

integration firm and became the first national provider of A/V and collaboration technology solutions in Canada.

19.     **Architects and Interior Designers**: Architects and interior designers create the structure and layout of the boardrooms and conference rooms in which vendors' conferencing products are installed.  They also exert influence over which vendor's products are chosen for a particular installation, especially for high-end clients where office buildouts are meant to impress. When presented with conferencing products possessing comparable audio quality, architects and interior designers will typically choose the more unobtrusive option to better complement the room design.  Thus, architects and interior designers serve as an additional market participant whose preferences will favor more functionally "invisible" designs.

20.     **Purchasers**: Most end user organizations are large corporations or other major entities in medicine, education, and government, among other fields.  The organization must have the need for large conference rooms and the resources to pay for a relatively expensive installed audio conferencing system.

21.     The actual purchaser within these organizations tends to be an A/V specialist who consistently follows market trends and news.  Many attend trade shows, such as the InfoComm Annual Tradeshow, and know the vendors and channel partners.  Indeed, many previously worked for a vendor, integrator, distributor, or consultant.  As such, purchasers are not only sophisticated about the relevant technology, but also as to the market players.

22.     Purchasers, like integrators, have a strong incentive to stick with one vendor over time.  This allows for easier upgrade and integration of equipment that is expected to be in service for multiple years.  For most purchasers, researching, buying, and overseeing the installation of audio components is a major part of their job description.  If the purchaser does the job correctly,

Highly Confidential – Attorney's Eyes Only

it's rarely noticed or acknowledged.  However, if conference calls don't connect or are of low quality, the purchaser's job can be in jeopardy.  In short, purchasers' professional reputation and continued employment depends on their decisions regarding A/V technology.  This leads to a high level of risk aversion.

23.     Purchasers often buy in volume, including, as discussed above, buying in volume for all of a large manufacturer's products.  The usual purchasing pattern is to bulk buy A/V and IT products to retrofit many existing conference rooms and/or outfit newly built rooms with a standardized system.  By buying in volume under one contract, the purchaser receives a better value per room by having integrators on-site for multiple installations.  Because of the durability of installed audio conferencing systems, purchasers tend to buy them infrequently with at least a 4 to 7+ year timeframe between major system upgrades.

24.     Channel partners and purchasers are part of an insulated and networked business community.  Most of the integrators, vendors, consultants, and major purchasers know each other to one degree or another.  It is a relatively small group of people who, through community dynamics (rumors, networking, etc.), influence the sales in the market.

25.     **End Users:** High-end, professional audio conferencing endpoints are generally installed in the conference rooms used by mid- to upper-level management of the company or organization.  This includes conference rooms for mid-level management and board rooms for executive-level conferencing.  As such, not only do the end users want the technology to work seamlessly, but the stakes for any given call could be millions of dollars in revenue, or in the case of government, international negotiations.

26.     Therefore, the end user not only has the justification but the power to make demands and determine the success or failure of everyone in the ecosystem.  This is another factor

causing channel partners and purchasers to stick with vendors whose products they know and trust.

## VII.    THE PRINCIPAL PURCHASERS

27.    The principal purchasers of installed audio conferencing equipment like the MXA910, BMA, and BMA CT are: (1) sophisticated A/V specialists at large organizations who are sophisticated about the relevant technology and market players; and (2) specialized intermediaries, such as distributors, integrators, and installers.

28.    As stated above, most organizations purchasing installed audio conferencing systems are large corporations.  The purchaser within these organizations tends to be an A/V specialist who may be sophisticated about the relevant technology and the market players.  This person knows who the competitors are in the installed audio conferencing space, like Shure and ClearOne, and their product offerings.  To the extent that the A/V specialist is not aware of the specific companies and products, she relies on the channel partner she is working with to obtain that knowledge.

29.    Because the A/V specialist job depends on ensuring that they pick the best-performing product for their employer, it is highly unlikely that the A/V specialist would purchase installed audio conferencing equipment without first becoming sophisticated about the companies and offered products and technologies.  Indeed, it is extremely important that installed audio conferencing systems function properly and so a detailed technical analysis of these devices is required prior to purchase to ensure they will work within the organization's A/V infrastructure.  For example, purchasers will need to make sure any new audio conferencing system will work with other parts of the organization's A/V technology such as loudspeakers, mixers, cameras, and conferencing software.

30.    The channel partners are also intimately familiar with the companies and products in this space.  Indeed, most of them buy installed audio conferencing products directly from

Highly Confidential – Attorney's Eyes Only

manufacturers to then use with their end-user client projects.  Channel partners may receive bundle discounts from manufacturers like Shure and ClearOne, meaning that the price they pay for the manufacturer's products decline as the volume of their purchases increase.  And they also receive marketing and training from manufacturers on product features, specifications, and recommended installation information.

31.    Purchasers who are not themselves sophisticated in audio-visual technology make up a minority of installed audio conferencing systems purchases.  Such less sophisticated purchaser will rely heavily on the help and knowledge of someone with sophistication in this field, such as the channel partners.  In such situations, it is either the sophisticated specialized intermediary who makes the final selection decision, or the less sophisticated purchaser who becomes educated about the companies and product offerings.

32.    The ordinary purchasers of installed audio conferencing systems are not typically the end users of such devices.  End users of this technology are typically members of the purchaser's organization who ultimately use the audio-visual technology that the purchaser has purchased in the organization's conference rooms, such as mid and upper level management.  End users are not typically involved in the purchase of audio-visual technology, nor are they typically interested in it.

VIII.  TYPES OF ADVERTISING IN THE A/V INDUSTRY

33.    Based on my experience, my opinion is that advertising in the audio conferencing industry tends to focus on three primary target groups: (1) Management, Marketing/sales (channel) and users; (2) Technical, installers/integrators (channel) and engineers; and (3) A/V Management, Office Management, Integrator Management and Consultants.

34.    For all three groups, online or social media marketing is, increasingly, the main advertising media for participants in the market.  This is followed by conferences, webinars and

Highly Confidential – Attorney's Eyes Only

print media in industry periodicals.  Neither ClearOne, Shure, nor most of the other competitors in the market generally employ wide media, such as television, because of the specificity of the target audiences.

35.     Since the focus in each group is slightly different, I will address each in turn.

**A.     Management, Marketing/Sales (Channel), and Users**

36.     This audience includes upper and mid-level management and I have in previous contexts classified them as "decision makers/users."   They are decision makers because individually, and as a group, they set annual budgets, approve capital upgrades, etc.  They are the users because, other than approving spending for audio conferencing equipment, their only direct interaction with the market is using the products in corporate conference rooms.  This target audience is generally the least sophisticated in the technology or market dynamics of the installed audio conferencing market.

37.     The focus of is type of advertising is on what an audio conferencing product can do and how it can help improve business processes.  It makes broad positive statement and is the most like consumer advertising.  For example, the phrase "takes microphones off the table while providing superior audio quality" would be targeted at this audience.

38.     The focus is on prompting main management to recognize that the audio equipment they may have now is insufficient and then create a sense of urgency to reach out to A/V management to further explore including the product in future budgeting.  Also, it is general advertising within the market ecosystem (vendors, channels, purchasers and users) to build excitement for the product.

39.     Also, this marketing is intended to generate excitement in the channel partners' sales and marketing force.  While this target audience is generally more sophisticated in the

**Highly Confidential – Attorney's Eyes Only**

technology than users, they are looking for the next thing that will drive sales for them and a large part of that is generating excitement with their end user clients. They will amplify the messaging in the advertising through their contacts if they like the advertisements' marketing message.

**B.     Technical, Installers/Integrators, and Engineers**

40.     The primary target audience are IT and A/V professionals in the channels and at large companies. This includes technicians, integrators and engineers. Their positions and responsibilities are focused on ensuring that A/V products can be installed, operated, and monitored within the overall A/V and IT infrastructure of the company.

41.     This type of advertising can include statements about specifications for operation and installation of equipment. The statements can include, for example, whether the product is Dante compatible or not, what the cable run length limitations, and similar statements to assist this particular audience in their task. What makes this advertising, and not simply technical specifications, is that it will emphasize those specifications that are unique or superior to other products on the market. Ease of installation and integration is also emphasized.

42.     The intent of this advertising is to assure the IT and A/V technicians in the channel that the product will not only be easier than competitive products to install and integrate, but that technical constraints that may limit where the product can be installed have been overcome.

**C.     Advertising to A/V Management, Office Management, Integrator Management, and Consultants**

43.     There are two target audiences: the sophisticated purchasers at large companies and product management at integrators. These two audiences have the responsibility and are held accountable for the overall and long term satisfaction with any product purchased or in the integrator's portfolio.

- 16 -

**Highly Confidential – Attorney's Eyes Only**

44.      Secondarily, A/V consultants are a target audience because many have ongoing contractual relationships that would be in jeopardy if an unforeseen market – legal or support factor – caused issues with previous installations.

45.      This can be testimonials from well-known A/V executives in the channels or at large companies, such as from an IT Director at a Fortune 50 company or a VP of a large integrator or consultant.  While testimonials typically have this type of generalization, other advertising to this audience can have quite specific information that the audience would rely on.  Examples include that the company: is committed to a certain protocol like Dante for the long term; commits to support the product for the next 10 years; has a partnership with other component manufacturers that ensures compatibility; or – in the case at hand – that the product is not in violation or potential violation of current litigation.

46.      The focus of this advertising is assuring the audience that the product is not going to cause any unforeseen or potential issues.  Unlike technical advertising, this type of messaging is about market and use factors.  For example, a simple tag on an advertisement saying "Certified Zoom compatible" assures the audience that Zoom functionality will be available to the user and that the microphones will mute when muted on Zoom.

47.      Likewise, advertising that emphasizes that the product is and will be supported in the future with firmware updates, technical support, and the like are important messaging factors. If a company, such as ClearOne or Shure, has been in the audio market for decades, they will focus on that as a way to tell the audience that they are better to work with than new and smaller companies.

**Highly Confidential – Attorney's Eyes Only**

## IX.   CUSTOMERS IN THE A/V INDUSTRY WERE LIKELY TO RELY ON SHURE'S STATEMENTS ON ISSUES RELATING TO THE LITIGATION

48.     I understand that ClearOne's Counterclaims in this case concern certain Shure statements about the litigation between Shure and ClearOne.  Specifically, I understand that after the U.S. District Court in the Northern District of Illinois issued a preliminary injunction relating to the '806 patent ("PI Order"),[14] Shure employees and agents made representations to Shure customers about Shure's MXA910-A product and its compliance with Judge Chang's PI Order.

49.     I have seen at least the following instances of Shure employees and manufacturer representatives making affirmative allegedly factual statements about the PI Order and the MXA910-A:

> a.   On November 4, 2019, Shure posted on their website a statement from VP Global Integrated Systems Sales James Schanz: "We are **confident** this [MXA910-A] is **compliant** with the Court's rulings. . . ."[15]  Shure issued a press release with a similar statement.[16]

> b.   On November 4, 2019, Shure claimed in a post on their website that the MXA910-A "provides a **quick, simple solution** for installation in 24x24 inch ceiling grids in the U.S." even though ClearOne claims that Shure knew at the time that the MXA910-A could not be quickly or simply installed in particular ceiling grids.[17]  They repeated this statement in a press release.[18]

> c.   On November 5, 2019, Shure manufacturer representative Excellence Marketing wrote to customer ████████████████████████████████████████████████████████████████████████████████████████████

---

[14] Illinois Litigation, D.I. 551.

[15] SHURE783086 at 2.

[16] SHURE782946 at 1.

[17] SHURE783086 at 2.

[18] SHURE782946 at 1.

[19] EPAAV_000061.

[20] EPAAV_000061 at 2.

Highly Confidential – Attorney's Eyes Only

d.   On November 5, 2019, Shure posted a Q&A on their website titled "November 5, 2019 Q&A Update-New MXA910 Ceiling Array Microphone Variant available for Pre-Order."[21]   This Q&A stated: "Shure specifically designed the new MXA910W-A to provide a drop-ceiling mounting configuration that **fully complies** with the Court's rulings in the ongoing litigation in U.S. District Court of Northern Illinois."[22]   In the same Q&A, Shure stated: "The Court ruled on November 3, 2019, that the new **MXA910W-A is not included under the preliminary injunction**."[23]

e.   On February 25, 2020, Shure again stated that it "**specifically designed the new MXA910W-A to comply with the court's orders**. . . ."[24]

50.     These types of statements are statements about litigation and compliance with court orders.   They thus fall within the category of Advertising to A/V Management, Office Management, Integrator Management, and Consultants.   Integrators and consultants want to ensure that the products they recommend to end users are not implicated by ongoing litigation and intellectual property issues.   This is especially true when considering Court orders like the PI Order.   It is one thing for a company to claim that another company's product violates its intellectual property rights—it is another thing entirely for a Court to preliminarily find merit to such an allegation and prohibit further sales of a product.   In the latter situation, based on my experience, integrators and consultants would want assurances that the products comply with any operative court orders.   Without such assurances, it is unlikely that the integrator and/or consultant would recommend the product for fear of recommending that their clients purchase and install a product that violates a court order.   The repercussions of such a flawed recommendation can be severe: loss of future opportunities with such clients; negative effect on reputation of the integrator

---

[21] SHURE783069 at 2.

[22] SHURE783069 at 2.

[23] SHURE783069 at 3.

[24] SHURE960287 at 3.

**Highly Confidential – Attorney's Eyes Only**

and/or consultant; and even potential litigation if the end user is forced to remove or return such product.

51.     It is thus unsurprising to me that integrators and end users sought assurances from Shure about the PI Order.  For example, one A/V engineering and installation company that Shure works with – ███████████████████████ – sent Shure a letter demanding that ████████████████████████████████████████████████████████ ████████████████████████████████████ They argued that, by selling ████ an MXA910 product, Shure ████████████████████████ ██████████████████████████████████████ ████ Surely ████ would not have sent this e-mail containing this expectation if it did not believe that Shure represented to ████ at the time of sale that the MXA910 product it bought complied with all legal requirements.  In my opinion and experience, other Shure customers also believed that Shure's sale of the MXA910-A came with an implied or express warranty and implication that the product complied with the PI Order.

52.     In fact, the evidence shows that so many customers had questions about the PI Order that Shure made a ████████████████ to track all such communications.[27]  I have reviewed the spreadsheets Shure produced containing such ████ communications and they show repeated questions from customers about the PI Order.  Some such questions include:

---

[25] SHURE964960.

[26] SHURE964960.

[27] SHURE964600.

Highly Confidential – Attorney's Eyes Only

- "Is the ceiling flush mount currently unavailable? We must use the pole mount? Thanks."[28]

- "Customer's PM was told that they should order the A910HCM to mount this but they need to go into drop ceiling....needs follow up from Sales to discuss injunction and what mounting methods are allowed and related accessories."[29]

- "Customer from consulting firm wanted to work on design for MXA910 and initially called for more info on new firmware but their intent was to flush mount mic into drop ceiling. Pointed them to Q&A online regarding injunction and they will need a call back to figure out how to proceed since many of their designs call for drop ceiling flush mount of MXA910."[30]

53.     In response to such queries, Shure, as expected, made representations to customers who were considering purchasing an MXA910-A product.  Some representations were in widely distributed press releases.  For example, a public relations agency likely engaged by Shure sent Shure's November 4, 2019 press release to all of Shure's manufacturer representatives and noted that it "is being distributed to media targets today, November 4, 2019."[31]  The manufacturer representatives then forwarded it to customers with similar commentary about how the MXA910-A complies with the PI Order.[32]  Indeed, it was common practice for Shure employees to send these types of Q&As to consumers.[33]

54.     Because this market has a robust ecosystem (as described above), vendor assurances and statements can become part of a market "echo chamber" that parrots the vendor statements throughout the eco system.  For example, a purchaser is assured of a fact by the vendor (in this case, Shure) but performs additional due diligence by confirming this fact with consultants

---

[28] SHUREDDEL00140687.

[29] SHUREDDEL00140687.

[30] SHUREDDEL00140687.

[31] EPAAV_000061.

[32] EPAAV_000061.

[33] SHURE943980.

**Highly Confidential – Attorney's Eyes Only**

and/or integrators.  These market participants largely add value by being a knowledgeable and trusted partner and, as such, confirm the vendor's assurance.  However, what no one realizes is that the basis of the confirmation may also be based on statements from the vendor.  Therefore, the echo chamber becomes self-confirming based on the original statements by the vendor.

55.     In other words, a purchaser is assured by both the original source of the alleged false statement (Shure) and a market intermediary whose source is also the original source (Shure). In contrast, if a third party (such as ClearOne) made a comment about Shure, the market participant would ask Shure or its representatives about that claim because the claim is about Shure's product. In this way, a false statement about one's own product can be significantly more impactful and material than a false statement about another company's product.

56.     I understand that ClearOne claims that Shure's statements about the MXA910-A's compliance with the PI Order are false and that the MXA910-A was released and sold in violation of the PI Order.  And ClearOne further claims that available evidence indicates that Shure knew that the MXA910-A did not comply with the PI Order and yet still released it and sold it to customers.[34]  I also understand that the U.S. District Court in the Northern District of Illinois found Shure in contempt of the PI Order and prohibited any further sales of the MXA910-A.[35]

57.     I am not opining in this Report on the truth or falsity of Shure's statements.  But, in my experience, if customers knew that the MXA910-A did not comply with the PI Order and that the sales of the MXA910-A were being made in contempt of the PI Order, it is unlikely that customers would have purchased the MXA910-A.  As discussed above, integrators and consultants want to ensure that products they recommend are free of any legal entanglements.  And installers

---

[34] **Exhibit B** (ClearOne Supplemental Brief re Contempt).

[35] Illinois Litigation, D.I. 912.

**Highly Confidential – Attorney's Eyes Only**

and end users similarly would not want to purchase a product that violates a Court order like the PI Order to avoid liability and any potential, however remote, of a recall or forced uninstallation. Therefore, if Shure had accurately stated to customers that the MXA910-A was not compliant with the PI Order, my opinion is that virtually no customers would have purchased the MXA910-A.

58.     In addition, I understand that Shure sold the MXA910-A and the MXA910-60cm at the same time.  Prior to the release of the MXA910-A, Shure stated to customers that the MXA910-60cm was available for the three configurations other than the enjoined drop ceiling mounting configuration: (1) pole mounting; (2) cable suspension mounting; and (3) hard ceiling/surface mounting.[36]  Shure developed the MXA910-A "to be mounted in a drop ceiling grid."[37]  Indeed, Shure stated upon release of the MXA910-A that it was meant to provide "a quick, simple solution for installation in 24x24 inch ceiling grids in the U.S."[38]  And it specifically noted that the MXA910-60cm was to be used for "pole mount, cable suspension mount, and hard ceiling mount configurations," while the MXA910-A was meant for "24x24-inch drop ceiling grids."[39] Shure's internal correspondence discussing orders for the MXA910-A are inconsistent with this messaging, as Shure appears to have ████████████████████████████████████ ████████████████████████[40]  Shure Sr. Manager, Product Marketing, even claimed in an internal correspondence when providing the estimates: ███████████████████████████ ██████████████████████████████████[41]  He additionally stated: ████████████████

---

[36] PROTECH002176 at 2.

[37] PROTECH002176 at 2.

[38] SHURE783087 at 1.

[39] SHURE783087 at 2.

[40] SHURE881297.

[41] SHURE881297.

**Highly Confidential – Attorney's Eyes Only**

████████████████████████████████████████████████████████

███████████████████████████████████████████████[42]

59.     Based on these facts, my opinion is that customers primarily purchased the MXA910-A, and Shure primarily sold them the MXA910-A, for use in a drop ceiling mounting configuration.  Indeed, if a customer were purchasing an MXA910 product for use in pole mount, cable suspension mount, and hard ceiling mount configurations, it would not matter whether they purchased the MXA910-60cm or MXA910-A because it would not be near-flush with the ceiling.  In fact, I would expect customers to slightly *prefer* the MXA910-60cm in those other configurations because the MXA910-60cm does not have the protruding flanges of the MXA910-A that may have some unpleasing aesthetics for consumers in these other configurations:[43]

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

60.     To be clear, I am not offering an opinion that *no* Shure customer ever purchased the MXA910-A for use in a mounting configuration other than the drop ceiling mounting configuration.  Instead, my opinion is just that without specific data about how MXA910-As were installed (which I understand Shure does not keep in the ordinary course of business[44]), it is

---

[42] SHURE947453.

[43] Supplemental Expert Report of Dan Schonfeld, Ph.D. Regarding MXA910-A, dated February 7, 2019 (**Exhibit E.)**

[44] Illinois Litigation, D.I. 575 at 6 ('████████████████████████████████
████████████████████████████████████ Deposition of Michael Moore (Dec. 10, 2020) at 15:24-16:13; Deposition of Kevin Smith (Dec. 2, 2020) at 107:8-15.

**Highly Confidential – Attorney's Eyes Only**

reasonable to assume based on the available evidence that many, if not the vast majority, of MXA910-As were purchased for use in the drop ceiling mounting configuration.

# EXHIBIT 2

HIGHLY CONFIDENTIAL

Waadevig, Paul                                    April 1, 2021

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------X

SHURE INCORPORATED                    :

    and                               :

SHURE ACQUISITION HOLDINGS, INC., :

                Plaintiffs,        :   Case No.

    v.                                :   19-1343-RGA-CJB

CLEARONE, INC.,                       :

                Defendant.        :

--------------------------------X


HIGHLY CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF PAUL WAADEVIG

Thursday, April 1, 2021

9:01 a.m.


Job No.:  50052

Pages:  1 - 267

STENOGRAPHICALLY REPORTED BY:

GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR

HIGHLY CONFIDENTIAL

Waadevig, Paul

April 1, 2021

6 (Pages 18 to 21)

---

**18**

1     A. Yes.

2     Q. What is that experience?

3     A. I work for Biamp Systems. And was

4 specifically brought on to develop a small to medium

5 sized room appliance that would, basically, be an

6 amplification of BYOD -- which is, Bring Your Own

7 Device.

8     Which is, basically, just bringing a

9 laptop into a room, and then amplifying the -- the

10 existing conferencing capabilities of that laptop,

11 or that computer.

12     And that product was developed, and ended

13 up being the Biamp Devio.

14     Q. What areas of responsibilities did you

15 have for that new product at Biamp?

16     A. When I was hired, it was purely

17 conceptual. And so, with the engineering team, I

18 needed to work on what functionality, what features

19 would be in the product from -- from the technical

20 standpoint. As well as how we were going to run

21 microphones; run speakers; what type of microphone

22 we were going to use.

23     So, that -- that was all on the technical

24 side. Although I'm not an engineer, I worked a lot

25 with the project manager on that end of it. I also

---

**19**

1 worked with marketing and did my own research to

2 find out what kind of IO -- input/output -- would be

3 needed. What kind of features would be needed.

4     So, at the same time as working with the

5 engineers about what was possible, I worked with

6 marketing as to what would be -- what is desired in

7 the market.

8     Then, also, as the product manager, you're

9 really in charge of the product. So, I looked at

10 how we would go to market on this. We also did -- I

11 worked with the executive team on some M&A.

12     We acquired a company called "Microcone"

13 at the -- during my tenure at Biamp. Microcone was

14 a small Australian company that had a multi-element

15 beamforming microphone, that was for, kind of

16 residential small business, or small room use.

17     And so, we acquired them as well, and

18 integrated that into the Devio, which is now the

19 parlé microphone.

20     So, you know, when you're a project

21 manager, you -- or a product manager, you really

22 work on all elements of the development; the launch;

23 and the continued success of a product.

24     And that product, for me -- the major

25 project -- product was Devio. I did have some other

---

**20**

1 smaller ones that I worked on as well.

2     Q. And in your time, Sir, at Biamp, did you

3 work, at all, on industrial design?

4     A. I worked with the engineers, absolutely,

5 on elements of industrial design. Where the

6 product -- what it would look like; where it would

7 fit; how it would integrate; how it would be

8 attached to things in the room. We ended up with an

9 under table design.

10     Am I -- am I an expert? Could I do it

11 myself? No. But I did work with industrial design.

12 Yes.

13     Q. Do you have experience involving

14 industrial design, in terms of the aesthetics of

15 products?

16     A. Yeah --

17     MR. MISHRA: Objection. Vague.

18     A. Yes. In fact, we -- the Devio product, we

19 looked at how we wanted that to look in the room.

20 The parts that were going to be visible.

21     Q. And, in terms of coming up with a new

22 product, how do you determine if the design you're

23 coming up with is going to be commercially

24 acceptable?

25     A. We had three ways that we really looked at

---

**21**

1 it. And this is the reason I was hired out of

2 market research. Is because this was conceptual

3 when I -- when I was brought on.

4     We did direct surveys. But we really

5 focused a lot on the -- the integrators, and the

6 consultants. What they would want to see. Because

7 they obviously deal directly with the purchasers and

8 the end users.

9     So, it's really easier than going out and

10 doing thousands of surveys to, you know, canvass a

11 hundred integrators. That was our -- our major

12 focus was always working with those integrators, and

13 making sure that the needs of the market -- what

14 wasn't being addressed would be addressed, at least

15 in part, by this product.

16     Q. So, to determine if a new design of a

17 product would be commercially acceptable, you would

18 conduct surveys of integrators? Is that fair?

19     A. Well, I wouldn't call them surveys.

20 Because, I mean, that implies there was some kind of

21 scientific method. I mean, you get into the people

22 who really do surveys, and they are very touchy

23 about calling something a survey. I work a lot with

24 those type of people.

25     I would call it a canvass. You know, we

---

HIGHLY CONFIDENTIAL

Waadevig, Paul

April 1, 2021

7 (Pages 22 to 25)

---

**22**

1  went out and interviewed, and talked at shows, for
2  example -- at different industry shows.  What's
3  needed.  What's really missing.
4       You know took those down.  Lots of
5  anecdotal.  So we didn't have any -- any data to go
6  through.  It was pretty much just like I said.  Like
7  a canvass.
8       Q.  You couldn't know if a new product design
9  that you were developing would be commercially
10  acceptable, unless you did that type of canvassing
11  activity.  Correct?
12       MR. MISHRA:  Objection.  Incomplete
13  hypothetical.  Speculation.  Vague.
14       A.  I don't -- I don't think that -- to say
15  that you would have no idea would, I think be an
16  oversimplification.  Certainly, employs -- I mean,
17  Biamp's a company that's been around in audio for
18  decades.
19       There's just institutional memory there
20  with the sales team, et cetera.  You could -- you
21  could come up with a product that I think would be
22  acceptable, without doing that kind of due
23  diligence.
24       But, we had a number of things that we
25  needed to refine, and you want to take as much risk.

---

**23**

1  I mean, there is a lot of time, money and effort in
2  a company -- especially a smaller company like
3  Biamp -- in a new product launch.
4       You want to make sure that you've taken as
5  much risk out of it as you possibly can.  So, what
6  we did was one way of doing that.  But there are
7  multiple ways that you can minimize risk in a
8  product launch, other than what we did.
9       Q.  And then, in terms of developing a new
10  product design at Biamp, have you ever concluded
11  that a design would be commercially acceptable,
12  without performing some kind of canvassing of
13  integrators?
14       A.  Yes.
15       Q.  When did you do that?
16       A.  I'd mentioned earlier that I had some
17  smaller projects.  One of the issues that we had
18  with the Tesira Forte was just something you don't
19  really think about.
20       Which is you go into a conference room.
21  There's all this audio components.  And it basically
22  goes into the infrastructure -- the IT
23  infrastructure; the LAN at the company.  But there
24  was no way to actually call somebody.
25       So, one of the things that I worked on,

---

**24**

1  without doing really much research -- it was just
2  brought to me and -- and dropped on my desk, "We
3  need a dialer."
4       And I worked with the engineering team to
5  come up with an acceptable dialer pad that,
6  basically, sat on the table top, and you could just
7  dial a cellphone number and get somebody on the
8  other end.
9       Not a big project, but we didn't do -- we
10  really -- we knew, from the sales team, this was
11  absolutely needed.  We were getting a lot of
12  requests.  And we just went ahead with it, without
13  doing much of that due diligence.
14       Q.  Was that a brand new product design that
15  you came up with, with that dialer?
16       A.  Yes.  As far as I recall, I don't believe
17  that Biamp had ever done a dialer in the past.
18       Q.  And so, did you do any analysis to
19  determine if that dialer would be commercially
20  acceptable?
21       A.  Well, as I recall, it was minimal.  I
22  believe I talked to some integrators that I -- you
23  know, just have contacts with, and that Biamp had
24  contacts with about.
25       We had already -- it had already been put

---

**25**

1  on the schedule, as far as the engineering team was
2  concerned.  And this is coming directly from the
3  sales team.
4       So, I did look at sales team -- you know,
5  the sales team puts in reports about what's being
6  asked, and so on.  They do this regularly.  I did go
7  through and just do a search on dialer, and look at
8  what was being requested.  What was being asked for.
9       And then, as we were going through the
10  mockup of different -- what the dialer would look
11  like, it's a pretty simple -- you know, I mean, this
12  is a pretty simple product.
13       We just wanted to make sure that it was
14  acceptable, aesthetically, in the room.  So we did
15  run it by some integrators.  But it was pretty
16  minimum.
17       Q.  And, Sir, if you could please take a look
18  at paragraph 11 of your report here?  I'll bring us
19  there.  Do you see paragraph 11?
20       A.  Yes.
21       Q.  You refer here to your previous testimony
22  in the Illinois litigation with Shure.  Correct?
23       A.  Yes.
24       And, in paragraph 12, you tell us that
25  you're incorporating, for all purposes, your prior

---

HIGHLY CONFIDENTIAL

Waadevig, Paul

April 1, 2021

8 (Pages 26 to 29)

---

**26**

1 reports. Correct?

2 　　A.　Yes.

3 　　Q.　Are there any opinions, specifically, that

4 you're attempting to incorporate?  Or is this just

5 general background information?

6 　　**A.　It's my recollection right now, I don't**

7 **think there is anything specific that I was**

8 **targeting here.  Just simply that, you know, didn't**

9 **want -- there's pages and pages of history of the**

10 **market -- background of the market.  Other things**

11 **that we wanted to just incorporate.**

12 　　**So, I don't recall anything specific at**

13 **this point.**

14 　　Q.　Excellent.

15 　　MR. COOK:  Let's take a look at

16 Exhibit 2.  I've just uploaded Exhibit 2 into the

17 chat feature of Zoom.  And, Mr. Waadevig, I'm going

18 to share my screen so you can see this.

19 　　THE WITNESS:  Okay.

20 　　(Exhibit 2 marked for identification)

21 　　THE COURT REPORTER:  Excuse me.  Could I

22 just ask the witness to slow down just a little,

23 please.  Can you hear me?

24 　　MR. COOK:  Sure.

25 　　THE COURT REPORTER:  Yes.  I just need the

---

**27**

1 witness to slow down a little, please.

2 　　THE WITNESS:  Yep.  Okay.

3 　　THE COURT REPORTER:  Thank you.

4 BY MR. COOK:

5 　　Q.　And, Mr. Waadevig, please take a look at

6 paragraph three of Exhibit 2.  Do you see paragraph

7 three?

8 　　A.　Yes.

9 　　Q.　And, Sir, let me -- let me ask you a

10 different question, first.  Going to the first page

11 of Exhibit 2, just so you can see where we are.

12 This is the expert report of Ira Weinstein.

13 Correct?

14 　　A.　Yes.

15 　　Q.　And, taking a look at paragraph three --

16 do you see paragraph three?

17 　　A.　Yes.

18 　　Q.　Mr. Weinstein is being compensated for his

19 time in this case on an hourly basis.  Correct?

20 　　A.　Yes.

21 　　Q.　As are you?

22 　　A.　Yes, I am.

23 　　Q.　And looking at paragraph 25 -- do you see

24 paragraph 25 here?

25 　　A.　Yes.

---

**28**

1 　　Q.　We see a reference to Mr. Weinstein

2 providing services to Shure, on and off, for the

3 last seven years.  Do you see that?

4 　　A.　Yes, I do.

5 　　Q.　And, similarly, in paragraph 26,

6 Mr. Weinstein mentions that he's also provided

7 services to ClearOne, on and off, for the last seven

8 years.  Right?

9 　　A.　Yes.

10 　　Q.　Mr. Weinstein has provided services to --

11 to both parties.  Correct?

12 　　A.　That's correct?

13 　　MR. MISHRA:  Objection.  Foundation.

14 Speculation.

15 BY MR. COOK:

16 　　Q.　Do you have any sense as to whether he's

17 provided more services in the past, outside of this

18 litigation, to Shure or to ClearOne?

19 　　MR. MISHRA:  Objection.  Foundation.

20 Speculation.

21 　　A.　Honestly, I have -- I have no idea.

22 　　Q.　The fact that Mr. Weinstein is being

23 compensated on an hourly basis for his time doesn't

24 demonstrate that he has any bias in his expert

25 opinions, does it?

---

**29**

1 　　MR. MISHRA:  Objection.  Speculation.

2 　　A.　I'm sorry.  Could you repeat the question?

3 　　Q.　Yes, Sir.  The fact that Mr. Weinstein is

4 being compensated on an hourly basis for his time as

5 an expert in this case, doesn't demonstrate that he

6 has any bias in his expert opinions, does it?

7 　　MR. MISHRA:  Objection.  Speculation.

8 　　A.　That -- that particular fact alone, in an

9 isolation, does not indicate any bias, in my

10 opinion.

11 　　Q.　And in paragraphs 25 and 26 of his report

12 here, the fact that he's provided services to both

13 Shure and ClearOne does not allow us to conclude

14 that he has any bias in favor of either party.

15 Correct?

16 　　MR. MISHRA:  Objection.  Foundation.

17 Speculation.

18 　　A.　Given what's here, I'm not sure if there

19 is a bias.  Because, as I said, based on what's

20 here, it could be that he's worked every day for

21 Shure, sporadically, you know, and not for ClearOne,

22 or vice versa.  I have no idea.

23 　　Q.　You, Sir, have no basis to believe that

24 Mr. Weinstein is biased as an expert in this case.

25 Correct?

---

HIGHLY CONFIDENTIAL

Waadevig, Paul                                                        April 1, 2021

49 (Pages 190 to 193)

---

190

1  The question was asked -- I asked several
2  question that I needed to know, for my information.
3  And one of those questions was -- and I had
4  previewed some of this with Zee. So she, I believe,
5  was able to kind of gather this information.
6  One of those was, "Have you guys run into
7  Yamaha or Sennheiser?" And she had basically said
8  no, that wasn't the case in 2020.
9  Now, again, I don't remember if there were
10  this confirmed previous things, you know, years
11  before. Would there have been, you know, a number
12  of conversations, both with the sales team,
13  directly, and through the C-level management to
14  them. This is the most recent.
15  Q. Did Ms. Hakimoglu give you anything in
16  writing, regarding the idea that Sennheiser and
17  Yamaha don't compete much in the market?
18  MR. MISHRA: Objection. Misstates the
19  document. And the testimony.
20  A. Not to my -- I don't recall her giving me
21  anything in writing. I don't believe I asked her
22  for anything in writing as well.
23  Q. And when Ms. Hakimoglu told you that
24  ClearOne had not encountered Sennheiser or Yamaha
25  products much in the market, what did she mean by

---

191

1  "much?"
2  A. As -- my recollection is that this is --
3  obviously, this is not her exact wording. My
4  recollection is that she had said the sales team
5  says they don't encounter them.
6  I added "much," as a -- you know, this
7  is -- it was a very small sample size. She had
8  asked some salespeople. And my assumption was that
9  somewhere, somehow, they probably had run into one
10  or two of these somewhere.
11  So, I believe -- and again, believing
12  meaning that, my recollection is, I put "much" in
13  here as a way -- as I said before, I don't like
14  absolutes. I don't like "I never saw those. I
15  always get this." So I put in "products much."
16  That's my recollection.
17  Q. Do you know where Ms. Hakimoglu got the
18  information that she gave you, that you cite in
19  footnote 22?
20  MR. MISHRA: Objection. Asked and
21  answered.
22  A. My understanding is that she got that from
23  the sales team, through both reports, and when I had
24  kind of previewed this. And she's been looking at
25  this, because obviously, it's part of this

---

192

1  litigation.
2  My understanding is that she had asked
3  directly to the sales team, at ClearOne.
4  Q. Do you know which sales personnel, if any,
5  Ms. Hakimoglu asked about that.
6  A. No. I did not ask, specifically, who had
7  given -- who or -- you know, how many had given --
8  how many salespeople had given this opinion.
9  Q. And continuing on, I'd like to take a look
10  at paragraph 39 of Exhibit 16. Do you see paragraph
11  39, Sir?
12  A. Yes.
13  Q. And here, you refer to ClearOne's proposed
14  alternate designs for the front face of the BMA CT,
15  BMA CTH, and BMA 360 products. Right?
16  A. Yes.
17  Q. And if we go on down to the next page, we
18  see the different images of these alternative
19  products. The alternative product designs that you
20  considered. Right?
21  A. Yes.
22  Q. What, if any information, were you given
23  about these alternative designs?
24  A. Basically, what was -- what I stated in
25  39. I just was reviewing what their proposed

---

193

1  designs for the front face were, for the BMA line of
2  products. There was -- as I recall, there may have
3  been some additional commentary about these, but I
4  don't -- I don't recall what that would have been.
5  Q. Do you recall any information you were
6  given about these alternative designs, other than
7  what's shown here on page 17?
8  A. I don't. This was a simply -- you know,
9  the aesthetic of different possibilities. I really
10  don't recall a big long dialogue about it.
11  Q. And in paragraph 39, you said that you
12  have reviewed these proposed alternate designs. And
13  in the second sentence, you say:
14  "In my opinion, though consumers have
15  different preferences in the market all of
16  those below designs would generally be commercially
17  acceptable to consumers in the installed audio
18  conferencing market."
19  Right?
20  A. Yes.
21  Q. And what do you mean by "consumers?"
22  A. Again, you know, with the same caveat I
23  said before. It's a little more loose than what I
24  should have been. It's basically not only the
25  purchasers, meaning the sophisticated AV/IT people.

---

Henderson Legal Services, Inc.

HIGHLY CONFIDENTIAL

Waadevig, Paul

April 1, 2021

50 (Pages 194 to 197)

194

1          Also, end users who may see this.  Again,
2   it's a visible thing in the room, as well as those
3   in the channel.
4       Q.  You don't site any survey work that you
5   did to support your statement here, in paragraph 39,
6   do you?
7       A.  No.  I actually kind of put this in on
8   purpose.  I figured that since Mr. Weinstein did his
9   own opinion with no backing for about a hundred
10  times, I'd throw one in.
11      Q.  So you have no backing for the statement
12  you have here in paragraph 39?
13      A.  No.  As I said, this is -- this is my
14  opinion, because -- I mean, the basis of this
15  opinion is the fact that, in general, with the
16  exception of the one that has the "C," if you look
17  down at the bottom -- with the exception of that
18  one, the rest are what I laid out kind of before in
19  this deposition, and in the other thing -- that it
20  looks like something that would be in the ceiling.
21  It looks like a HVAC or a speaker.
22          And, in that way, it's pretty unobtrusive.
23      MR. COOK:  Sourabh, did you miss an
24  objection?
25      MR. MISHRA:  No.  I'm fine.

195

1   BY MR. COOK:
2       Q.  And, Mr. Waadevig, did you talk to any
3   integrators, or distributors, or AV managers, to
4   determine whether these alternative designs would be
5   commercially acceptable?
6       A.  Not specifically -- no, I did not.
7       Q.  Other than considering these designs
8   yourself, did you do any due diligence to consider
9   whether they would be commercially acceptable?
10      A.  Due diligence, as in what you just
11  previously asked?  Which is surveys or interviews?
12      Q.  Due diligence of any type, other than just
13  looking at them yourself.
14      A.  No.  And, again, I guess I could have put
15  in as my backing, my 20 years of experience, et
16  cetera, et cetera.  You know, as Mr. Weinstein has
17  done numerous times.  But I decided to just stay in
18  my opinion.
19      Q.  Do you blame Mr. Weinstein for citing his
20  experience in his report?
21      MR. MISHRA:  Objection.  Misstates
22  witness' testimony.
23      A.  No.  The line of questioning you're going
24  down -- I want to make sure I'm clear on this -- is
25  that if we're going to throw out all of those

196

1   opinions that are solely based on experience, then
2   throw this out on line, and throw out 90 percent of
3   Mr. Weinstein's report, and we'll see where we
4   stand.
5       Q.  Is that a legal argument you're making?
6       A.  No.
7       MR. MISHRA:  Objection.
8       THE WITNESS:  I'm not.
9       MR. MISHRA:  Objection.  Objection.
10  Harassing.  Please move on, counsel.
11  BY MR. COOK:
12      Q.  And, Mr. Waadevig, let's take a look next
13  at paragraph 99, please.  And feel free to get your
14  bearings, Mr. Weinstein.  We're here at paragraph
15  99.  Do you see that?
16      MR. MISHRA:  And you called him
17  Mr. Weinstein.
18      MR. COOK:  Okay --
19      MR. MISHRA:  I'm not sure how he will take
20  that.
21      MR. COOK:  I've done that many times.
22  Mr. Waadevig, feel free to --
23      THE WITNESS:  And that's okay, counsel.  I
24  get where we're -- I get where we're at.  That's
25  fine.

197

1       MR. COOK:  Thank you.
2   BY MR. COOK:
3       Q.  And here in paragraph 99, you're referring
4   to Mr. Weinstein citing deposition testimony from
5   Mr. Schanz, about certain end users and integrators,
6   "cooling" on purchasing the MXA910.  Correct?
7       A.  I'm sorry.  Let me -- let me get to that.
8   I'm actually -- I'm using my copy, just because it's
9   on a bigger monitor.  It makes it easier.
10      MR. MISHRA:  Mr. Waadevig, again, if you
11  need to review, because we're moving into, it looks
12  like a different section --
13      THE WITNESS:  Yes.
14      MR. MISHRA:  If you need to review, please
15  take your time.
16      [Witness perused document.]
17      THE WITNESS:  Counsel, go ahead.  I'm
18  sorry.  What was your question here?
19  BY MR. COOK:
20      Q.  Sure.  Do you see where we are, in terms
21  of paragraph 99?
22      A.  Yes.
23      Q.  And here, you are addressing
24  Mr. Weinstein's citation to testimony from
25  Jim Schanz at Shure.  Correct?

# EXHIBIT 3

Highly Confidential – Attorney's Eyes Only

# Responsive Expert Report
# of
# Paul Waadevig

*Shure Incorporated et al. v. ClearOne, Inc.*, Case No. 19-01343 (D. Del.)

**February 22, 2021**


Paul Waadevig

**Highly Confidential – Attorney's Eyes Only**

## TABLE OF CONTENTS

I.     QUALIFICATIONS .................................................................................. 3

II.    ASSIGNMENT ........................................................................................ 4

III.   RESPONSES TO WEINSTEIN'S PROFESSIONAL AUDIO-VISUAL MARKET ANALYSIS ............................................................................... 5

IV.   RESPONSES TO WEINSTEIN'S MARKET PARTICIPANTS AND DECISION-MAKING PROCESS ............................................................... 8

V.    RESPONSES TO MR. WEINSTEIN'S MARKET SEGMENT OF INTEREST .............................................................................................. 12

      A.      Meeting Room Microphone Market ................................................. 12

      B.      Unobstrusive Ceiling Microphones with Various Mounting Options ............................................................................................. 14

VI.   RESPONSES TO WEINSTEIN'S SECTION ADDRESSING CLEARONE'S ALLEGED FALSE AND MISLEADING STATEMENTS TO THE MARKET .................................................... 18

      A.      Mr. Weinstein Provides a Biased Analysis of ClearOne's Statements ....................................................................................... 18

      B.      It is Very Unlikely that Customers Would Rely on ClearOne Comments About Shure Products ...................................................... 19

      C.      The Weinstein Opening Report Has Not Proven that ClearOne's Statements to Third Parties Were False ............................................ 22

      D.      Weinstein Does Not Show How the False Statements Caused Harm Independent of the Litigation Generally ................................... 37

VII.   RESPONSES TO WEINSTEIN'S SECTION REGARDING SIMILARITIES BETWEEN CLEARONE PRODUCTS AND THE MXA910 .......................................................................................... 44

**Highly Confidential – Attorney's Eyes Only**

## I.       QUALIFICATIONS

1.        I am an independent market consultant specializing in the conferencing and unified communications markets.  I received my Bachelor of Science Degree from Portland State University in Philosophy of Science in 1991.  I received a Juris Doctorate and Masters of Business Administration from Boston College in 1999.

2.        My specialization is in audio conferencing, a field in which I have 17 years of experience.  That includes 14 years of experience covering the audio conferencing endpoints markets with Frost & Sullivan (a global market research and consulting firm), one year as a product manager with an audio conferencing vendor, and one year as vice-president for Markets and Markets, Inc. (another global market research and consulting firm).  From 2002 to 2014, I was the author of Frost & Sullivan's annual reports covering the installed audio conferencing and table top audio conferencing markets.  During this time, I frequently spoke with top management for all market participants and gave presentations at many audiovisual ("A/V") industry events.

3.        I attached my CV to my Opening Expert Report in this case.  The documents I considered in arriving at my opinions are included herein in this Responsive Expert Report, including in the footnotes.

4.        Other than my testimony in this litigation and related cases known to Plaintiffs Shure Incorporated and Shure Acquisition Holdings, Inc. ("Shure"), I have not testified as an expert at any trial or by deposition in any other cases in the previous four years.  Specifically, I have provided testimony by deposition in this litigation, a related case in Illinois (*Shure Inc. v. ClearOne, Inc.*, 17-cv-03078 (N.D. Ill.) ("Illinois Litigation")), and an *inter partes* review of ClearOne's Patent No. 9,264,553 ("*Inter Partes* Review").

5.        My hourly billing rate is $175 per hour.  My compensation is not contingent on the outcome of this litigation.

**Highly Confidential – Attorney's Eyes Only**

## II.    ASSIGNMENT

6.      I understand that Shure asserts patent infringement and false advertising claims against Defendant ClearOne, Inc. ("ClearOne").  Specifically, I understand that Shure claims that: (1) ClearOne infringes Shure's design patent No. D865723 ("'723 Patent");[1] and (2) ClearOne is liable for false advertising, deceptive trade practices, tortious interference, and unfair competition by allegedly making false statements about the various litigations between Shure and ClearOne.[2] I also understand that Shure alleges infringement of another patent – U.S. Patent No. 9,565,493 – but that discovery and case deadlines are stayed with respect to that claim until after conclusion of an appeals process.[3]

7.      Shure expert witness Ira M. Weinstein submitted an expert report on January 26, 2021 ("Weinstein Opening Report").  My assignment in this Responsive Expert Report is to analyze the Weinstein Opening Report and offer my opinions on certain of his statements.  I am not offering any technical opinions on infringement or validity relating to the '723 Patent.

8.      Because of the overlap between this Responsive Expert Report and my Opening Expert Report dated January 26, 2021 in this case, I incorporate by reference, for all purposes, my Opening Expert Report into this Responsive Expert Report.  I refer in the below analysis to certain background and facts discussed in my Opening Expert Report, including the market and products at issue.

9.      For ease of reference, I have also generally organized this Responsive Expert Report with the same headings as the Weinstein Opening Report.

---

[1] D.I. 64 (Shure Second Amended Complaint) at 24-28.

[2] D.I. 64 (Shure Second Amended Complaint) at 18-24.

[3] D.I. 391.

**Highly Confidential – Attorney's Eyes Only**

## III.   RESPONSES TO WEINSTEIN'S PROFESSIONAL AUDIO-VISUAL MARKET ANALYSIS

10.    The Weinstein Opening Report first begins a high-level background of the "Professional Audio Visual (Pro AV)" market, which it claims "includes products for audio, unified communications, and collaboration, display, video, control, digital signage, home automation, security, VR, and live events."[4]  It then discusses the "Pro Audio equipment market" which it claims "includes wired and wireless microphones, microphone mixers, digital signal processors (DSPs), and conference systems (not to be confused with conferencing systems)."[5]

11.    I do not disagree that there may be a broad market for Pro AV products.  But that broad market has minimal to no relevance to the products in this case.  A customer who is considering purchasing an MXA910 or BMA CT product is very unlikely to also be considering a "security" or "VR" solution.   It is important in this case, and in market research generally, to properly identify the market and the relevant segments within that market.

12.    Factors that should be considered when identifying the market are: (a) commonality of competition (do the companies that are being identified in the market consider each other competitors); (b) commonality in type of purchaser; (c) commonality of channel to market; (d) commonality of technology and/or use case; (e) commonality of region; and (f) price and positioning.

13.    Given these factors, Mr. Weinstein's broad brush top level analysis is much too wide on a number of factors – particularly use case and channels.  On the other hand, his narrowing the market to the "meeting room microphone market" is much too restrictive.  It's important to note that he states, "[I]t is important to remember that these different types of microphones all

---

[4] Weinstein Opening Report ¶ 36.
[5] Weinstein Opening Report ¶ 41.

offer the <u>same basic functionality</u>. . . ."[6]  He also states that one of the most important parts of the purchasing process is the formation of the bill of materials ("BOM") that lists all the components needed for an install.[7]  Components routinely listed together on BOMs (such as the microphone and the DSP) make up the conferencing system and thus those components must be considered together as part of the market in which they compete – or, as I have stated – the Installed Audio Conferencing Market.  Mr. Weinstein, in comparison, selectively pulls one component out of the BOM to develop his market.  Additionally, this component, by his own statements is not even a specialized component for audio conferencing but microphones that can be used in multiple applications.  Finally, Mr. Weinstein is fond of stating that he is making his declarations based on his personal experience – a sample size of one – but gives little or no independent authority that has classified the "Meeting Room Microphone Market" as a separate market.  I have offered multiple yearly reports from Frost & Sullivan in my past reports that should carry more weight with the court as they were completed wholly outside any litigation.

14.     The better description of the relevant market, in my experience and opinion, is thus the Installed Audio Conferencing Endpoints.  It is within this market that various audio options

---

[6] Weinstein Opening Report ¶ 81.
[7] Weinstein Opening Report ¶ 49.

## Highly Confidential – Attorney's Eyes Only

exist, including beamforming microphone arrays ("BFMAs") like the MXA910 and BMA CT. The below graphic shows this market, though obviously not to scale.



Summary Of Market Segmentation

15.    Mr. Weinstein's offered segmentation – the "Meeting Room Microphone Market" – inexplicably seems to exclude products that are in that marketplace.  For example, Mr. Weinstein claims that "stand-alone DSPs" are not included.[8]  But what are "stand-alone DSPs?"  Digital signal processors work *with* microphones—audio input is needed to make a DSP unit viable.  That is not to say that all microphone installations need DSPs but it is strange to exclude "stand-alone DSPs" without a further explanation of why that would be excluded from Mr. Weinstein's segmentation.

16.    In addition, Mr. Weinstein refers to Avixa's analysis of the Pro AV market.  But he fails to mention that no independent organization has ever adopted Mr. Weinstein's "Meeting Room Microphone Market."   In fact, the first time anyone ever defined this market and what products are included in it was when Mr. Weinstein submitted an expert report as a paid expert for Shure in *Shure Inc. v. ClearOne, Inc.*, No. 17-cv-03078 (N.D. Ill.) in November 2019.  The fact

---

[8] Weinstein Opening Report ¶ 43.

**Highly Confidential – Attorney's Eyes Only**

that Mr. Weinstein cannot cite any independent organization that had previously discussed this made-for-litigation market is telling.

## IV.     RESPONSES TO WEINSTEIN'S MARKET PARTICIPANTS AND DECISION-MAKING PROCESS

17.     The Weinstein Opening Report discusses market participants and their decision-making process in the context of the products in the Pro AV market.[9]  Though I largely agree with the general statements in this section of the Weinstein Opening Report, I disagree with Mr. Weinstein's characterization of who is making the purchasing decisions for products like the MXA910 and BMA CT.

18.     The principal purchasers of equipment like the MXA910, BMA CT, and BMA CTH are: (1) sophisticated AV specialists at large organizations who are sophisticated about the relevant technology and market players; and (2) specialized intermediaries, such as distributors, integrators, and installers.[10]  Before I explain why, it appears that Shure has taken the same position as my opinion—and contrary to the Weinstein Opening Report—in its appeal brief filed in a case in Illinois against ClearOne: [11]

---

[9] Weinstein Opening Report ¶ 44.

[10] In my declaration filed in connection with ClearOne's opposition to Shure's motion for a temporary restraining order (D.I. 171-1, Exhibit E), I stated that "I understand that an ordinary observer for the purposes of evaluating infringement of a design patent is the principal purchaser of the articles to which designs have been given novel appearances." (*Id.* at 2.)  I now understand that, under the law, the "principal purchaser" can be intermediaries if they are the individuals who can make the purchasing decision.  This declaration incorporates that new understanding of the law.

[11] **Exhibit I** (Shure Appeal Brief) at 18 n.7.

Highly Confidential – Attorney's Eyes Only

---

7      Inasmuch as Shure does not typically sell to end users, its primary purchasers for the MXA910 and the MXA910-A are the integrators who procure and install the product for the eventual end users (that is to say, the entities in whose facilities audio-conferencing systems are installed). Appx5080-5081 (¶¶ 6-9). Shure's sales representatives interact with integrators to make the sales and are generally not involved in any installations at the end user's location. *Id.*; *accord* Appx11-12.

19.    Most organizations purchasing installed audio conferencing systems are large corporations. The purchaser within these organizations tends to be an AV specialist who may be sophisticated about the relevant technology and the market players. This person knows who the competitors are in the installed audio conferencing space, like Shure and ClearOne, and their product offerings. To the extent that the AV specialist is not aware of the specific companies and products, she relies on the channel partner she is working with to obtain that knowledge.

20.    Because the AV specialist's job depends on ensuring that they pick the best-performing product for their employer, it is highly unlikely that the AV specialist would purchase installed audio conferencing equipment without first becoming sophisticated about the companies and offered products and technologies. Indeed, it is extremely important that installed audio conferencing systems function properly and so a detailed technical analysis of these devices is required prior to purchase to ensure they will work within the organization's AV infrastructure. For example, purchasers will need to make sure any new audio conferencing system will work with other parts of the organization's AV technology such as loudspeakers, mixers, cameras, and conferencing software. Mr. Weinstein's opinion appears to be that billion dollar corporations entrust large purchases of critical company communication equipment to generalists rather than: (1) hiring an AV specialist; (2) having their current IT people become certified; or (3) outsourcing to a specialist. That is just not how this industry works.

- 9 -

**Highly Confidential – Attorney's Eyes Only**

21.     The channel partners are also intimately familiar with the companies and products in this space.  Indeed, most of them buy installed audio conferencing products directly from manufacturers to then use with their end-user client projects.  Channel partners may receive bundle discounts from manufacturers like Shure and ClearOne, meaning that the price they pay for the manufacturer's products decline as the volume of their purchases increase.  And they also receive marketing and training from manufacturers on product features, specifications, and recommended installation information.  It is important to note that even when the purchaser is not sophisticated in smaller companies that do not have a AV specialist, there is a trusted sophisticated gatekeeper in the channel – either a consultant, integrator or both – and the result is the same for our analysis: the number of purchases in this market wholly by unsophisticated consumers is de minimis.

22.     Purchasers who are not themselves sophisticated in audio-visual technology make up a minority of installed audio conferencing systems purchases.  Such less sophisticated purchaser will rely heavily on the help and knowledge of someone with sophistication in this field, such as the channel partners.  In such situations, it is either the sophisticated specialized intermediary who makes the final selection decision, or the less sophisticated purchaser who becomes educated about the companies and product offerings.

23.     The ordinary purchasers of installed audio conferencing systems are not typically the end users of such devices.  End users of this technology are typically members of the purchaser's organization who ultimately use the audio-visual technology that the purchaser has purchased in the organization's conference rooms, such as mid and upper level management.  End users are not typically involved in the purchase of audio-visual technology, nor are they typically interested in it.

- 10 -

**Highly Confidential – Attorney's Eyes Only**

24.     To show that the purchasers are largely integrators, I had examined Shure's and ClearOne's detailed sales records relating to the MXA910, BMA CT, and BMA CTH back in May 2020.  I developed the below chart by doing the following with ClearOne's sales records: (1) sorting the ClearOne BMA CT and CTH 2019 and 2020 unit sales data by purchaser name; (2) classifying each purchaser as distributor, integrator, or other based on my own knowledge and, if needed, secondary research (web search, company page, press releases, etc.); (3) classifying any purchasing entity that I could not identify as other; and (4) comparing purchasing entities for ClearOne with those listed in Shure's sales records.   As the chart below details, ClearOne sells the vast majority of its multi-element beamforming microphone products to ████████

████.[12]  Shure sales data pattern for the MXA910 is generally the same as for ClearOne's BMA CT and CTH products.[13]



------

[12] CLRONEDE-00048650.
[13] SHUREDDEL00141450.

**Highly Confidential – Attorney's Eyes Only**

## V.      RESPONSES TO MR. WEINSTEIN'S MARKET SEGMENT OF INTEREST

25.      Section 7 of the Weinstein Opening Report discusses two issues: (1) Mr. Weinstein's made-for-litigation "Meeting Room Microphone Market"; and (2) the sub-market that Mr. Weinstein admits the products in this litigation compete in.  I will address each in turn.

### A.      Meeting Room Microphone Market

26.      As mentioned above, Mr. Weinstein does not provide any evidence that any independent publication referred to the "Meeting Room Microphone Market" before he developed it in the context of a litigation in Illinois between ClearOne and Shure.  That alone should cause a factfinder to be skeptical of Mr. Weinstein's definition of the market.

27.      Mr. Weinstein's made-for-litigation "Meeting Room Microphone Market" has multiple significant issues.  For example, Mr. Weinstein does not define all of the different "types of microphones" that are "suitable for use in meeting rooms."   Does his definition include microphones for paging?  Sound amplification?  Mobile?  Auto (cars)?  Why or why not?

28.      Mr. Weinstein also claims that "these microphone types are all alternatives to one each other."[14]   But he does not explain what "alternatives" means, stating only that the microphones he's referring to all offer the functionality of being able to "capture the speech (talker) audio within a meeting room or space."   The speaker on an iPhone could be considered an alternative to a professionally-installed BFMA but no reasonable analyst in this industry would say that iPhones and BFMAs are direct competitors.  Likewise, many of the microphones Mr. Weinstein includes in his market definition cost in the low hundreds of dollars[15]—it is not credible

---

[14] Weinstein Opening Report ¶ 81.

[15] **Exhibit F** (2020-09-10 Supplemental Expert Report of Paul Waadevig) at 8-9.

**Highly Confidential – Attorney's Eyes Only**

to claim that those cheaper microphones compete directly with BFMA systems that can cost over $5,000.

29.     Mr. Weinstein essentially admits that his made-for-litigation market is, from a practical perspective, useless for a factfinder.  He says that "in ***many cases***, these microphone types differ significantly in terms of their aesthetics, suitability for and performance in specific situations, and cost."[16]  In other words, an analyst must examine many factors to determine which microphone types actually compete with one another and are thus alternatives—it cannot just look at what is in Mr. Weinstein's made-for-litigation market.

30.     To be clear, is it possible that some end user somewhere at some time may consider both a $100 microphone and a $5,000 BFMA system for a project?  Perhaps.  But, in my experience, that would be extremely rare.  End users, and thus channel partners, have very specific requirements for projects.  They have a budget, they have aesthetic requirements, and they have performance needs (especially due to the size of the conference room at issue).  An analyst in this industry needs to consider all of those factors—only then can they determine what the actual competing products are.  Mr. Weinstein's made-for-litigation market improperly tries to simplify that analysis by failing to account for those routine factors.

31.     I have not included an exhaustive list of the issues with Mr. Weinstein's made-for-litigation market definition because Mr. Weinstein admits, as discussed in the next subsection, that the relevant submarket for the purposes of this case is much narrower.[17]

---

[16] Weinstein Opening Report ¶ 81 (emphasis added).
[17] Weinstein Opening Report ¶ 81.

Highly Confidential – Attorney's Eyes Only

B.      **Unobstrusive Ceiling Microphones with Various Mounting Options**

32.      I agree with Mr. Weinstein that "if the end user is concerned about the aesthetics of the room and desires to have the microphones be unobtrusive and/or mostly hidden from view, products are available that can be suspended from the ceiling, mounted to the ceiling, or can act as a replacement for a ceiling tile within an overhead grid . . . [r]elatively few microphone products" are available.[18]

33.      I generally agree that the competitive products currently that have been available for such consumers are the Shure MXA910/US;[19] the ClearOne BMA CT/CTH360; and Sennheiser TC2.[20] But I disagree with Mr. Weinstein on a few of his points.

34.      *First*, the ClearOne BMA and BMA2 would certainly be competitive for end users who want products "that can be suspended from the ceiling" or "mounted to the ceiling." Though Mr. Weinstein claims that the BMA and BMA2 look visually different from the MXA910, BMA, and TC2 products, consumers have purchased the BMA and BMA2 for use off the table and in suspension and mount configurations since the BMA was first available in 2012.[21] Mr. Weinstein offers no explanation for why the BMA and BMA2 would not then be competitive for consumers who desire a product in those two installation configurations. I do agree, however, that if a consumer requires a product that "can act as a replacement for a ceiling tile in a ceiling tile grid," the BMA and BMA2 would not fulfill that need.

---

[18] Weinstein Opening Report ¶ 82.

[19] Mr. Weinstein includes the MXA910-A in his list but my understanding is that the MXA910-A is no longer available for sale. (**Exhibit J** at 34-35.)

[20] Weinstein Opening Report ¶ 83.

[21] CLRONE-00048650 (listing sales); Exhibit C to the 2021-01-26 Opening Expert Report of Paul Waadevig at 28-36 (describing direct competition between the BMA and BMA2 and MXA910 products).

Highly Confidential – Attorney's Eyes Only

35.  *Second*, I want to note that just because a microphone product has multiple elements with some form of beamforming and can be mounted in particular ways, that does not mean that it is immediately a direct competitor to Shure's and ClearOne's offerings.  Regional channel partners present barriers to entry to the United States market.  Regional integrators and consultants provide preference to same region vendors, if as in the case with ClearOne and Shure, they are established in the market.

36.  Evidence indicates that the Sennheiser and Yamaha products have not achieved sufficient sales to become competitive products.  I understand from ClearOne that they have not encountered the Sennheiser or Yahama products much in the market in 2020.[22]  Deposition testimony also supports the fact that Sennheiser has not penetrated the market much.[23]  Without such evidence, it is only in theory that the Sennheiser and Yamaha products can be considered direct competitors—in practice, they still are not.

37.  *Third*, if a consumer truly wants a near-invisible solution with a product that is flush with the drop ceiling, a "noticeable bubble-type profile" (like the Yamaha product) or an "exten[sion] into the room slightly instead of being completely flush-mounted" (like the MXA910-US) can be dealbreakers.  Indeed, Shure's own document supports the claim that certain prospective consumers of BFMA products wanted complete flush-mounted products.[24]

---

[22] February 22, 2021 Call with Z. Hakimoglu.

[23] 2020-06-08 Deposition Transcript of Jon Bullard at 51:11-52:2 ("███████████████████████████ *see also id.* at 62:10-16; 2020-07-22 Deposition Transcript of Jason DiCampello at 41:22-42:10 (██████████████████████████ 2020-05-07 Deposition of Bill Payne at 81:21-23 (█████████████ Richard Kessler at 16:12-18 ("Q. ████

[24] SHUREDDEL00140687 ("Customer called for availability of A910-25mm and would like (Continued...)

Highly Confidential – Attorney's Eyes Only

38.     *Fourth*, Mr. Weinstein notes the "distinctive 'X' pattern / design on its front grill" of the TC2 as compared to the design of the MXA910.[25]  As I have stated in previous reports, the most important factor for consumers is audio quality.  The next most important factor is aesthetics: how does the product appear in the room?  As I have written before, many consumers want "invisible" or "near invisible" solutions where the microphone disappears from view for the end user.  The BMA and BMA2 achieved that by taking the microphone off the table.  The BMA CT improved on that by being mounted flush in the ceiling.  It is the ability of being able to be off the table and mount flush that creates that "invisible" look—in my opinion, the specific design can *assist* with that "invisible look" but it is not necessary.  While a particularly gaudy or colorful design could detract from that "invisible look," the large majority of designs would not.

39.     I have reviewed ClearOne's proposed alternate designs for the front face of its BMA CT, BMA CTH, and BMA 360 products (reproduced below).  In my opinion, though consumers have different preferences in the market, all of the below designs would generally be

---

information on flush mounting MXA910."); *id.* ("This customer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮) called looking for A910-25mm to flush mount MXA910. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ when I advised them that Shure does not currently sell the MXA910 in a flush-mount configuration and that the A910-25mm is not available for sale. Customer asked to speak to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and I offered a callback."); *id.* ("Customer from consulting firm wanted to work on design for MXA910 and initially called for more info on new firmware but their intent was to flush mount mic into drop ceiling.  Pointed them to Q&A online regarding injunction and they will need a call back to figure out how to proceed since many of their designs call for drop ceiling flush mount of MXA910."); *id.* ("We started discussion on new feature of 4.0.12 firmware and how it might affect designs but it became clear they needed to drop ceiling flush mount and I pointed them to some of the info but he began asking questions we really can't answer.").

[25] Weinstein Opening Report ¶ 91.

Highly Confidential – Attorney's Eyes Only

commercially acceptable to consumers in the installed audio-conferencing market.



**Highly Confidential – Attorney's Eyes Only**

## VI.     RESPONSES TO WEINSTEIN'S SECTION ADDRESSING CLEARONE'S ALLEGED FALSE AND MISLEADING STATEMENTS TO THE MARKET

40.     In Section 8 of the Weinstein Opening Report, Mr. Weinstein purports to provide his "evaluation" of "statements from ClearOne and its manufacturer representatives to market participants" in order to explain "how and why ClearOne's statements would have misled market participants as to the availability of the MXA910 product."[26]  But, as discussed further below, he does far more: (1) provides a biased interpretation of ClearOne's statements to try to show that they are false; (2) does not account for the fact that the customers would have likely checked with Shure about the truth of the statements if they were in fact confused; (3) fails to provide convincing showings of the falsity of the statements; and (4) does not connect any Shure lost sales to the alleged statements.

### A.     Mr. Weinstein Provides a Biased Analysis of ClearOne's Statements

41.     As an analyst in this industry, it is important to approach issues in a neutral manner. What I mean by that is that an analyst looks at companies and products objectively, without bias. This is important because companies who hire analysts or rely on their reports would not want an analysis that is predetermined or biased.

42.     For example, ███████████████████████████████████.[27]  If he only provided biased feedback to Shure, it would be unlikely that his ███████████ would be of much use to them.  The same is true for the Frost & Sullivan reports I worked on for many years. I approached the analysis objectively and tried to look at all of the available information from an unbiased perspective so that our reports would be of value to people in the industry.   While I do not deny that Mr. Weinstein has worked in the industry for many years, as he states numerous

---

[26] Weinstein Opening Report ¶¶ 107, 110.

[27] 2020-06-15 Deposition Transcript of Ira Weinstein at 13:25-16:13.

**Highly Confidential – Attorney's Eyes Only**

times in his report, this does not eliminate his clear bias in many of his conclusions where he offers no authority outside of this litigation process.

43.     In the context of this section in the Weinstein Opening Report, Mr. Weinstein does not take an objective view of the advertising and statements at issue.  He instead assumes the worst, that customers would be confused by ClearOne's statements, by ignoring relevant context and common sense that would show that customers would not have in fact been confused or misled.  I discuss this further below in the context of those particular statements.

**B.      It is Very Unlikely that Customers Would Rely on ClearOne Comments About Shure Products**

44.     Inherent in Mr. Weinstein's analysis is that Shure customers or potential customers believed ClearOne's alleged false statements and thus decided not to purchase Shure's products.  The problem with this assumption is that this is not the way that market intermediaries and end users in this market make decisions.

45.     Because this market has a robust ecosystem (as described in my Opening Expert Report), vendor assurances and statements can become part of a market "echo chamber" that parrots the vendor statements throughout the eco system.  For example, a purchaser is assured of a fact by the vendor (in this case, Shure) but performs additional due diligence by confirming this fact with consultants and/or integrators.  These market participants largely add value by being a knowledgeable and trusted partner and, as such, confirm the vendor's assurance.  However, what no one realizes is that the basis of the confirmation may also be based on statements from the vendor.  Therefore, the echo chamber becomes self-confirming based on the original statements by the vendor.  In other words, a purchaser is assured by both the original source of the alleged false statement (Shure) and a market intermediary whose source is also the original source (Shure).

**Highly Confidential – Attorney's Eyes Only**

46.     In contrast, if a third party (such as ClearOne) made a comment about Shure, the market participant would ask Shure or its representatives about that claim because the claim is about Shure's product.  Indeed, evidence produced by Shure in this litigation proves that this is exactly what happened: if third parties were confused by ClearOne statements, they reached out to Shure to confirm whether their understanding was true or false.

47.     For example, in January 2019, ███████ (an integrator) asked whether Shure or its representatives ████████████████████████████████████████████████ ██████████████████████████ and its assumption that ███████████████████ ███████[28]  In March 2019, ██████ from ████████ called ███████ of ███ (a Shure manufacturer representative) to discuss comments allegedly made by ClearOne about the MXA910.[29]  HWP then contacted Shure with details of that communication.[30]  And in July 2019, ███████ (an integrator) contacted Shure when its client ████████ had questions about ████████ ████████████████████████████[31]  The same is true when people other than ClearOne made statements about the litigation: in one document, a customer e-mailed a Shure manufacturer representative after receiving an update from a *Sennheiser* rep and asked: "Does this mean Shure can't sell the A version?"[32]  Shure also produced multiple spreadsheets containing

---

[28] SHURE864865.

[29] SHUREDDEL00005092.

[30] SHUREDDEL00005092.

[31] SHUREDDEL00005098.

[32] SHURE947478 (indicating that Shure did not even know who sent the original message); DOBBS00000073 (showing that the message was from a Sennheiser rep).

Highly Confidential – Attorney's Eyes Only

references to communications between it and market participants based on questions about the litigation between Shure and ClearOne.[33]

48.     The other important point that Mr. Weinstein does not mention is that large purchasers and large integrators have resources and access to inhouse and outside legal counsel. While I agree with Mr. Weinstein that purchasers likely do not have legal expertise, they certainly have *access* to lawyers and legal advice.  Developments in multiple litigations between ClearOne and Shure have been widely reported in the industry and any legal department would look at both ClearOne *and* Shure statements in analyzing any "we won" press release or statement by ClearOne.  Further, because the ClearOne statements were made by legally unsophisticated persons, any "we won" statement by such people would have surely been vetted, whether by contacting lawyers or Shure.

49.     The products in this case are expensive and the projects they are involved in are even more expensive.  Mr. Weinstein's assumption that these types of purchasers would just rely on one-off statements by biased salespersons and then make critical purchasing decisions based on such statements is wrong.  That is just not how people in this industry operate.  Essentially, Mr. Weinstein is attempting to argue that purchasers in this market are like consumers walking into a big box store to purchase a microphone from the electronics department.  For example, he argues that only IT generalists who have no specific knowledge of audio equipment are involved in the purchase and here he is claiming that a Fortune 50 company wouldn't have access to legal advice.  This is not a consumer market.  It is a business-to-business market with sophisticated and knowledgeable people at virtually every level of the process.

---

[33] SHUREDDEL000140687; SHUREDDEL00140692; *see also* SHURE858589; SHUREDDEL080021.

Highly Confidential – Attorney's Eyes Only

C.     **The Weinstein Opening Report Has Not Proven that ClearOne's Statements to Third Parties Were False**

50.     In this section, I address many of the ClearOne statements that Mr. Weinstein claims are false.  As shown further below, Mr. Weinstein ignores the truth of the statements, ignores relevant context, and/or fails to show any evidence of deception.

i.     *Statement #1—January 28, 2019*

51.     In paragraph 113, Mr. Weinstein refers to a January 28, 2019, ClearOne e-mail that has the subject line "ClearOne Shure Patent Case Win Media Coverage."[34]  He claims that market participants "would have understandably interpreted this statement as referring to the parties' *litigation*."  But Mr. Weinstein offers no support for the assumption that any market participants actually interpreted this e-mail in the way he describes.

52.     In fact, the e-mail contains **two links** that make clear that it refers to the *Inter Partes* Review for the '553 Patent.[35]  The first is an article by a third party AV media source that is titled: "ClearOne Wins Patent Case Against Shure for Beamforming Technology" and notes that it is referring to the fact that the "U.S. Patent and Trademark Office Patent Trial and Appeal Board upholds ClearOne's beamforming array patent in case brought by Shure."[36]  The second is another article from a third party AV source titled: "ClearOne Prevails Against Shure in Trial Before the U.S. Patent and Trademark Office."[37]  Moreover, I am not sure why Mr. Weinstein believes that referring to the *Inter Partes* Review for the '553 Patent as a "patent case" is false: it involves a

---

[34] Weinstein Opening Report ¶ 113.

[35] CLRONEDE-00004501.

[36] https://www.commercialintegrator.com/av/audio/microphones/clearone-patent-shure-beamforming/#

[37] https://www.svconline.com/the-wire/clearone-prevails-against-shure-in-trial-before-the-u-s-patent-and-trademark-office

**Highly Confidential – Attorney's Eyes Only**

patent and is a case between Shure and ClearOne.  Mr. Weinstein also states that this e-mail "conflated a decision by the patent office with the availability of the MXA910" even though the e-mail *does not mention the availability of the MXA910 at all.*

53.      Finally, I understand that the "ClearOne News" distribution list includes ████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████[38]  Therefore, it is unclear how these statements could have affected third parties' purchases of the MXA910 products.

*ii.      Statement Category #2—ClearOne Won a Case*

54.      In paragraph 114, Mr. Weinstein refers to a conversation between ClearOne, its manufacturer representative ██████, and ████████████████, an AV integrator, in February 2019.  He claims that ClearOne representatives made false statements by claiming that ClearOne had "won the lawsuit" and that "Shure would not be able to continue selling the MXA910."

55.      The only contemporaneous evidence that Mr. Weinstein refers to is an e-mail sent by ██████ to others at ██████ after a call made by ███████████████████  I understand that ██████████ is counsel of record for Shure in this litigation.  In that e-mail, ██████ ████████ states that "[t]he topic of the ongoing lawsuit between ClearOne and Shure came up because there was an announcement that ClearOne had won the lawsuit that week" and that the "ClearOne rep made comments that they had won."[39]

---

[38] February 22, 2021 Call with Z. Hakimoglu.
[39] UNIFIED_008802.

## Highly Confidential – Attorney's Eyes Only

56.      I do not see what is false about those statements.  ClearOne did win a lawsuit – the *Inter Partes* Review – in January 2019.  In fact, the e-mail specifically refers to an "announcement" made the week prior, which I assume refers to the ClearOne press release about the win.  That press release stated clearly: "ClearOne Prevails Against Shure in Trial Before the U.S. Patent & Trademark Office."  It does not refer to a win in the civil litigation in Illinois.

57.      Indeed, even the ████ corporate designee ████ admitted that there was nothing false about that statement: he stated that he was not "aware" of anything false about that statement.[40]  With respect to engineer ████, he testified only that ClearOne allegedly told him that "it wasn't going to be an option."[41]  But he clarified that it was "their [ClearOne's] belief that the product wasn't going to be available" and was specifically referring to winning "the injunction" and hoping to "make sure it was carried out."[42]  The first part of that statement seems like an opinion: it was ClearOne's "belief" the same way that Shure believes that it is going to win its lawsuits with ClearOne and its product will continue to be available.  The second part is accurate: ClearOne eventually won an injunction and wanted to make sure it was carried out.

58.      Mr. Weinstein cites no evidence showing that ClearOne ever said during that February 2019 meeting that the MXA910 was then unavailable.  And his claim that ClearOne lied by saying that it won "court proceedings" plural is inaccurate: nowhere did any witness claim that ClearOne said it won anything other than the subject of its January 2019 press release, the *Inter Partes* Review.

---

[40] 2020-05-07 Deposition Transcript of Bill Payne at 42:20-44:7.

[41] 2020-06-08 Deposition Transcript of Jon Bullard at 60:7-11.

[42] 2020-06-08 Deposition Transcript of Jon Bullard at 60:14-22.

- 24 -

## Highly Confidential – Attorney's Eyes Only

59.     Finally, after the meeting with Shure, ███ spoke with a Shure representative about ClearOne's statements.  The Shure representative "didn't know" the answer but then had "a ██████████████████████████████████████████████████████████[43] Shure's attorney ██████ also called ██████ to discuss this issue.[44]  Shure had every opportunity to correct any potential misunderstanding, regardless of the truth and intention of ClearOne's representatives, and so it is difficult to imagine that any misunderstanding materially affected Shure's sales.  If ██████ decided not to purchase Shure products, it likely did so because of the presence of the litigation generally, not ClearOne statements at this meeting.

60.     As shown in the table below, many of Mr. Weinstein's other alleged examples of false statements also rely on the similar assumption that ClearOne could not claim that winning the *Inter Partes* Review constituted a "win" in a case against Shure.  Mr. Weinstein concludes, without evidence, that a market participant would assume from that statement that Shure "may no longer be available moving forward."  As discussed above, there is no support for that leap.

| Source | Statement | Any Comment on Current Availability of MXA910? |
|---|---|---|
| ████ | ████ | No |
| | | No |
| | | No |
| | | No |

---

[43] 2020-06-08 Deposition Transcript of Jon Bullard at 43:8-12.

[44] 2020-06-08 Deposition Transcript of Jon Bullard at 49:8-50:12.

**Highly Confidential – Attorney's Eyes Only**

| Source | Statement | Any Comment on Current Availability of MXA910? |
|---|---|---|
| ███████ | ████████████████ | No |
| | | No |
| | | No |

> iii.     Statement Category #3—That the MXA910 Units Will Stop Shipping

61.     Mr. Weinstein includes various statements allegedly made by ClearOne employees or representatives that express the belief that the MXA910 units will stop shipping at some point because of the lawsuits between ClearOne and Shure.

62.     Mr. Weinstein ignores entirely that there is nothing inaccurate in ClearOne having the opinion that MXA910 units will have to stop shipping because ClearOne believes that they will win an injunction or civil litigation against Shure.  In fact, multiple witnesses Mr. Weinstein cites in his report testified under oath that they believed that ClearOne's statements about MXA910 products soon becoming unavailable were ClearOne's opinion.  For example, when asked whether he believed a ClearOne representative "to be expressing his opinion about the lawsuit," █████ ██████ responded: "Correct."[45]  When ████████████ was similarly asked whether a ClearOne salesperson's statement was ClearOne's "opinion about how the court was going to rule in the litigation," ██████████ admitted: Yes."[46]  In fact, Shure has cited *no first-hand evidence from any customer* stating that they believed these types of forward-looking statements to be fact, not

---

[45] 2020-06-10 Deposition of Jason Staples at 34:1-3.

[46] 2020-06-05 Deposition of Richard Kessler at 60:2-5.

opinion.  Indeed, in my experience, I don't see a way that a statement about what will happen in the future could ever be interpreted as a statement of fact, unless the person making the statement also claims to be in possession of a time machine.  And, as seen in the below table, these statements were all framed as ClearOne's opinions about what it believed could or would happen in its litigation with Shure:

| Source | Statement | First Hand? |
|---|---|---|
|  |  | No |
|  |  | No |
|  |  | Yes |
|  |  | No |
|  |  | Yes |
|  |  | Yes |
|  |  | Yes |

63.     In fact, ClearOne employees and representatives ended up being *correct* that Shure would not be able to sell the version of the MXA910 they were selling at that time because Judge

**Highly Confidential – Attorney's Eyes Only**

Chang in Illinois later that year granted an injunction ("PI Order") prohibiting further sales of the MXA910 product in a way that infringed ClearOne's Patent No. 9,813,806 ("'806 Patent").[47]

64.    ClearOne's statements thus arguably provided value to the marketplace. ███ ███ – a witness Mr. Weinstein cites heavily to – testified that he was concerned about the 910 potentially not being available because projects can be up to "a year" out and so knowing about *future* unavailability is very important.[48]  If an integrator was not able to advise a client about such future unavailability, "that doesn't look good for us, and we lose credibility with our customer."[49] ClearOne's statement informing the market that the MXA910 may become available due to court action was thus directly relevant to integrators' concerns relating to present and future projects— it was not irrelevant as Mr. Weinstein seems to imply.

        iv.    *Statement Category #4—The Narayanan Letter*

65.    The Weinstein Opening Report next refers to an August 29, 2019 letter that was sent by ClearOne employee Narsi Narayanan to market participants ("Narayanan Letter") and titled "Installation of Shure MXA910 in a Drop-Ceiling Mounting Configuration."[50]   Mr. Weinstein claims that the letter included information that was "false and misleading."[51]  I disagree.

66.    Before I get into the specifics of the Narayanan Letter, I want to say that it is normal for companies to issue guidance to consumers about issues relating to their products.  Indeed, there

---

[47] **Exhibit G** (2019-08-04 Memorandum Opinion and Order).

[48] 2020-06-08 Deposition Transcript of Jon Bullard at 20:1-15.

[49] 2020-06-08 Deposition Transcript of Jon Bullard at 20:1-15.

[50] CLRONEDE-00036642.

[51] Weinstein Opening Report ¶ 157.

**Highly Confidential – Attorney's Eyes Only**

is evidence of at least one market participant sending a letter to at least one consumer about the litigation.[52]

67.      From my review of the Narayanan Letter and related deposition testimony, it appears that ClearOne sent this letter to inform the market about the PI Order and ClearOne's beliefs about the effects and implications of the PI Order.[53]  This appears to have been prescient. Shure's own documents show that there was a lot of confusion in the marketplace about the PI Order and so having ClearOne's opinion about the PI Order would help inform consumers of the downside risks in purchasing the MXA910 line of products.[54]  Indeed, if ClearOne did not issue a letter, the market would be reliant on Shure's interpretation of the '806 Patent and PI Order which—as we have seen due to the PI Order and Contempt Order[55]—may not be correct.[56]

68.      I will next address each of Mr. Weinstein's concerns about the Narayanan Letter.

69.      *First*, Mr. Weinstein claims that it was deceptive to refer to a "drop-ceiling mounting configuration" because it "could be understood by those in this market to mean any installation of a microphone array in, attached to, or attached through a drop ceiling."[57]  He claims that ClearOne should have instead said that only the "flush mount" configuration was prohibited.

70.      A critical issue with Mr. Weinstein's analysis is that he ignores that *Shure itself* often referred to the "flush mount" configuration as the "drop-ceiling mounting configuration." For example, on August 8, 2019, Shure issued a statement from its Vice President, Global

---

[52] SHUREDDEL00005105; SHUREDDEL00005108.

[53] February 22, 2021 Call with Z. Hakimoglu.

[54] SHUREDDEL00140687; SHUREDDEL00140692.

[55] The "Contempt Order" refers to **Exhibit J** (2020-09-01 Memorandum of Opinion and Order).

[56] My Opening Expert Report addresses the likely impact of Shure's statements about the MXA910-A and the PI Order.

[57] Weinstein Opening Report ¶ 159.

## Highly Confidential – Attorney's Eyes Only

Integrated System Sales, that stated: "a U.S. District Court judge in Illinois granted a preliminary injunction that requires Shure to 'cease manufacturing, marketing, and selling the MXA910 [Ceiling Array Microphone] . . . in a ***drop-ceiling mounting configuration***."[58]  It did not use the term "drop ceiling" for any of the other three configurations: "suspension mount, pole mount, or hard ceiling installation."[59]  A Shure Q&A used the same language multiple times: (1) "A federal court in the United States has preliminary found that MXA910 Ceiling Arrays purchased after August 26, 2019 cannot be lawfully used in a ***drop-ceiling mounting configuration*** within the United States, and Shure cannot presently shop MXA910s from the United States to other countries if they are to be used in such a configuration"; and (2) "This slightly smaller version . . . is not lawful for use in a ***drop ceiling mounted configuration*** in the United States . . . . "[60]  Another notice said the same: "This model is fully certified and lawful to use anywhere in the world but is not lawful to be used in the United States in a ***drop ceiling mounting configuration*** such as shown."[61]  Even Shure's manual for its MXA910 products uses that same language: "This model is fully certified and lawful to use anywhere in the world but is not lawful to be used in the United States ***in a drop ceiling mounting configuration as shown below***."[62]

71.    Third party publications also used the same term before ClearOne issued the Narayanan Letter: "The U.S. District Court in the Northern District of Illinois has granted ClearOne's request for a preliminary injunction preventing Shure Inc. from manufacturing,

---

[58] SHUREDDEL00040045.

[59] SHURE939389.

[60] SHURE940594.

[61] SHUREDDEL093811.

[62] SHUREDDEL00052016.

**Highly Confidential – Attorney's Eyes Only**

marketing, and selling the Shure MXA910 Ceiling Array Microphone for use in its '***drop ceiling mounting configuration*.'"[63]

72.     I disagree with Mr. Weinstein that the Narayanan Letter suggested that the MXA910 could not be installed in *other* configurations.  The language is clear that the PI Order applied only to drop ceiling mounting configurations, just like Shure's and third party communications made clear.  In fact, the Narayanan Letter *quoted from* and linked the PI Order in using the phrase "drop ceiling mounting configuration."  Despite Mr. Weinstein's proclamation that market participants would need to read the entire PI Order to understand the significance of the term "drop ceiling mounting configuration," my opinion is that consumers are aware of the difference between a "drop ceiling" configuration and "suspension mount, pole mount, or hard ceiling installation" configurations.  These are very different and so it is difficult for me to imagine any consumers who would be confused by that term.  Indeed, Shure's own graphic about the PI

---

[63] SHUREDDEL093354.

Highly Confidential – Attorney's Eyes Only

Order uses the term "drop ceiling"—if consumers would be confused by that term, why would Shure use it in a graphic to clarify issues for consumers?[64]



73.     I have also reviewed deposition testimony of Shure employees that supports this understanding.  For example, Kevin Smith testified that "drop ceiling mount configuration" refers to "mounting *in* a drop ceiling."[65]  And James Schanz testified that "drop ceiling mounting – when we refer to drop ceiling mounting, that means that we typically are mounting on the T-bars within a drop ceiling grid," the mounting configuration that customers could not mount the MXA910 in after the preliminary injunction was effective (until Shure offered its design around).[66]  And Cassie Berger agreed that the three mounting configurations with the checkmarks above are **not** drop ceiling mounting configurations, only the configuration with the "X" is.[67]

74.     *Second*, Mr. Weinstein claims that the Narayanan Letter claims that the 60-cm versions of the MXA910 were prohibited by the PI Order.  This is clearly wrong.

---

[64] SHURE939389.

[65] 2020-12-02 Deposition Transcript of Kevin Smith at 103:7-12 (emphasis added).

[66] 2020-11-23 Deposition Transcript of James Schanz at 187:1-88:20.

[67] 2020-11-11 Deposition Transcript of Cassie Berger at 267:6-22.

**Highly Confidential – Attorney's Eyes Only**

75.     The Narayanan Letter states only that "it is **likely** an act of **infringement** to install a Shure MXA910 product (Model Nos. MXA910B, MXA910W, MXA910AL, MXA910B-60CM, and MXA910AL-60CM) in a drop-ceiling mounting configuration."[68]  By saying "it is likely," ClearOne clearly is not referring to the PI Order and is instead referring just to its *own opinion* of **infringement**.  Surely Mr. Weinstein does not contend that ClearOne did not have the opinion that "it is likely an act of infringement" to sell all versions of the MXA910 in the drop-ceiling mounting configuration in the United States.

76.     Nowhere does ClearOne state that the Court or PI Order held that the PI Order prohibited sales of the 60cm versions of the MXA910 overseas.  But I now understand that ClearOne has obtained evidence of: (1) a Shure customer installing a 60cm version of the MXA910 in a drop ceiling mounting configuration in the United States; and (2) Shure ██████████ ████████████████████ that assist in installing the 60cm version flush.[69]  If that is true, it was very important for ClearOne to then identify the 60cm version in this letter so as not to give the impression to consumers that the 60cm version could be installed in a drop ceiling mounting configuration.

77.     *Third*, Mr. Weinstein claims that it was "false and misleading" to threaten consumers with "infringement" or "willful patent infringement."[70]  He again ignores the facts.

78.     I understand that the law does not prohibit ClearOne from seeking infringement from a joint infringer *even if it alleges liability against Shure*.  In other words, ClearOne can file suit against both the manufacturer (Shure) and any installing company for the same instance of

---

[68] CLRONEDE-00036642.

[69] Exhibit B to the Opening Expert Report of Paul Waadevig at 20 (ClearOne learned of "1 flush-mounted MXA910-60CM); *see also id.* at 16-19, 20, 22.

[70] Weinstein Opening Report ¶ 169.

Highly Confidential – Attorney's Eyes Only

infringement.[71]  If that is true, I do not see what is inaccurate about ClearOne's statement.  And nowhere does Mr. Weinstein address the fact that ClearOne has the legal right to sue both Shure and its customers for infringement and willful infringement.  I think it was important for ClearOne to make this point because Shure can claim that it should not be responsible for how end users installed the MXA910-60cm (including potentially in an infringing manner) since it claimed it took remedial measures to provide warnings to end users to not install the MXA910-60cm in an infringing manner and designed the MXA910-A to comply with the PI Order.  Under Shure and Mr. Weinstein's view, ClearOne could not hold Shure responsible for infringing installations of the MXA910-A, nor end users.

79.     Mr. Weinstein also again tries to blur the line between the PI Order and ClearOne's opinions in the third paragraph of the Narayanan Letter.  The third paragraph clearly refers to ClearOne's opinion about future actions, not the PI Order.  And if the question is whether the PI Order applies to third parties, the first paragraph of the Narayanan Letter makes clear that it does: "applies to Shure's officers, agents, servants, employees, and attorneys, as well as anyone who is in active concert or participation with those listed persons."[72]

80.     *Fourth*, Mr. Weinstein claims that the Narayanan Letter is false and misleading because it claims that that installers cannot install the MXA910 in a "drop-ceiling mounting configuration" "regardless of when, or how, the installing company received the MXA910 that it installs."[73]

---

[71] I understand that ClearOne cannot *recover* twice for the same infringement, but, to my knowledge, ClearOne has not yet recovered anything from Shure for any infringement.

[72] CLRONEDE-00036642.

[73] Weinstein Opening Report ¶¶ 170-71.

Highly Confidential – Attorney's Eyes Only

81.     Based on the evidence I have reviewed and my understanding of the PI Order, this is true.  The PI Order only allows consumers to continue to use the MXA910 in a drop-ceiling mounting configuration if they "have already installed the MXA910" in that configuration.  It does not say that *installing companies* who purchased the MXA910, but have not yet installed it, can then install the MXA910 in a drop-ceiling mounting configuration without violating the PI Order. If Mr. Weinstein believes that to be the case, I believe that he misunderstands the scope of the PI Order.

82.     *Fifth*, Mr. Weinstein claims that the Narayanan Letter would make consumers believe that they could "not install the MXA910 outside of the United States."[74] But the Narayanan Letter never says that.  In fact, it instead refers to a *U.S.* patent, meaning a patent in the United States.  It also quotes and attaches a court opinion from a court in the United States.  I have not seen any evidence of any consumer who actually believed, based solely on the Narayanan Letter, that they could not install products outside of the United States due to the PI Order.

83.     Mr. Weinstein also appears to imply that that mere fact of mentioning the 60-cm version of the MXA910 gives the false impression that the PI applies internationally.[75] I disagree. It was important for ClearOne to mention that the 60-cm version could not be installed in a drop ceiling mounting configuration both because Shure intended to sell that version in the United States pursuant to the Bond Order; and because Shure had sold the 60-cm version in the United States **before the PI Order**.[76]  It was thus not only sold internationally, even if it was initially designed as such.

---

[74] Weinstein Opening Report ¶ 172.
[75] Weinstein Opening Report ¶ 167.
[76] SHUREDDEL00141450.

- 35 -

Highly Confidential – Attorney's Eyes Only

> *v.    Statement Category #5—Statements After the Preliminary Injunction*

84.    The Weinstein Opening Report also refers to some statements made after the issuance of the PI Order.  Again, I disagree with Mr. Weinstein's analysis of these statements.

85.    Mr. Weinstein first takes issue with ███████████ statement to *ClearOne's* manufacturer representatives that the PI Order is █████████████████████████████████ ████████████████████████████████████[7]  This is obviously ███████████ opinion about how the PI Order will help ClearOne's business.  And where does ██████████ here say that the PI Order prohibits all installations?  He is just saying that the PI Order will put ClearOne driver's seat for such installations.  And even Shure communications with the market recognized that "[s]oon we will have to pause making the 2' x 2' version of the 910, though not the 60 cm x. 60 cm version."[78]  I'm not sure why Mr. Weinstein uses this communication between ClearOne and its own manufacturer representative in such a misleading way.

86.    Mr. Weinstein next comments on ██████████████ use of the term "drop-ceiling mounting configuration."[79]  For the reasons expressed above, this is not false or misleading.

87.    Mr. Weinstein then refers to two comments from ███████████  In the first, ██████ ██████ simply refers to Shure not being able to sell the MXA910 as a "ceiling tile mic array design," *i.e.*, in the flush mount or drop ceiling mounting configuration.[80]  There is nothing inaccurate about that.  In the second, ██████████ states that "Shure cannot, sell, market, promote MXA910 to their partners and customers."[81]  Though maybe inarticulate, ███████████: (1) links

---

[77] Weinstein Opening Report ¶ 180.  "Ceiling tile mic" also arguably refers to the drop ceiling mounting configuration, the subject of the PI Order.

[78] SHURE957221.

[79] Weinstein Opening Report ¶ 181.

[80] Weinstein Opening Report ¶ 182.

[81] CLRONEDE-00013934; Weinstein Opening Report ¶ 183.

Highly Confidential – Attorney's Eyes Only

an article that clarifies the scope of the injunction;[82] and (2) is right that Shure stopped selling, marketing, and promoting the MXA910 in the United States and began selling only the MXA910-60cm variant.[83]  Moreover, Mr. Weinstein provides no evidence that CDW stopped working with Shure because of this initial comment.

88.     Finally, Mr. Weinstein takes issue with ███████ comment on March 11 that "courts say Shure still violates our patents."[84]  Though the press release referred to in this letter is not about infringement,[85] ███████ is right that multiple court decisions held that Shure was infringing ClearOne's patents.  As discussed previously, Judge Chang found that a reasonable likelihood of ClearOne succeeding on its claim that the MXA910 infringes ClearOne's U.S. Patent No. 9,635,186 ("'186 Patent") and separately found the same for the '806 Patent.  Though maybe inarticulate, ███████ was not wrong.

### D.     Weinstein Does Not Show How the False Statements Caused Harm Independent of the Litigation Generally

89.     Interspersed in Mr. Weinstein's analysis of ClearOne's statements are conclusions about the effect of those statements on Shure consumers and potential consumers.  But almost all of these conclusions have a fundamental flaw: they do not differentiate between the alleged impact of the false statements and the presence of the litigation generally.  Mr. Weinstein's effort to then say that *all ClearOne sales* are implicated by these alleged false statements is erroneous.  Rather than actually analyze which statements are false and then determine the specific impact of those

---

[82] CLRONEDE-00013934.

[83] **Exhibit H** (Bond Order).

[84] Weinstein Opening Report ¶ 184.

[85] CLRONEDE-00013774.

## Highly Confidential – Attorney's Eyes Only

false statements, he just throws up his hands and concludes that it is impossible.  That is not proper for an analyst in this industry to do.

90.    Indeed, an analysis of Mr. Weinstein's opinions shows that he is ignoring reality to reach the conclusion that ClearOne's allegedly false statements alone had a broad effect on Shure sales.

91.    In paragraph 120, Mr. Weinstein admits that Shure could learn of potential lost opportunities "based on ClearOne's statements if a channel partner cancelled an existing order, was already in discussions with Shure about a product discount, or if Shure was already aware of a very large project for an end user that later fell through."  That is the analysis Mr. Weinstein should have done with Shure.   And James Schanz admitted at his deposition that Shure's manufacturer representatives ███████████████████████████████████████

████████████████████████████████[86]  The conclusion from the fact that they were not able to identify many examples is not that it is impossible to do so, but rather that there were not many examples to find.

92.    In paragraph 121, Mr. Weinstein claims that "many customers who were persuaded by ClearOne's false and misleading statements would likely cease buying the MXA910 without explaining the reason to Shure or notifying Shure at all."  The evidence indicates otherwise.  As discussed above, many customers who wanted to hear Shure's side of the story relating to the litigation reached out to Shure to ask them for their position.  Mr. Weinstein's assumption that there were "many customers" who never did is pure speculation, without any evidence in support.

93.    Other statements by Mr. Weinstein show that he is conflating statements about the litigation with the alleged false statements.  For example, in paragraph 122, Mr. Weinstein claims

---

[86] 2020-11-23 Deposition Transcript of James Schanz at 85:2-14.

**Highly Confidential – Attorney's Eyes Only**

that ███████ later admitted that referencing the lawsuit only helped sales of ClearOne's products." But referencing the lawsuit is not false—there are two pending lawsuits in Illinois in which ClearOne alleges that Shure infringes ClearOne's patents. If a customer did not want to buy the MXA910 because of the existence of those lawsuits and ClearOne's strong position in those lawsuits (winning a preliminary injunction relating to the '806 Patent and a finding of infringement as part of a preliminary injunction ruling relating to the '186 Patent), I do not see why that would be a lost sale that ClearOne should have to compensate Shure for. Similarly, if a customer did not want to purchase an MXA910-A product because they lost trust in the ability of Shure's offered solution to comply with the PI Order in the parties' litigation—as described in, for example, the deposition of ███████████████████—why is that resulting loss of sales attributable to ClearOne? By not accounting for these types of impacts, Mr. Weinstein essentially implies that all litigation-related harms are due to alleged false statements.

94.     Mr. Weinstein similarly does not account for allegedly misleading statements by persons in the industry *other* than ClearOne or its representatives. For example, ███████ from ███████████████ (a Shure manufacturer representative) stated on December 19, 2019 that: "It has been reported to me that another microphone Rep is telling dealers that Shure cannot sell the MXA910 ceiling microphone array. This appears to be another attempt to confuse and deceive dealers in the hopes of selling their own ceiling microphone (that is butt ugly)."[88] He then testified at his deposition that he was referring to "Sennheiser" and that the Sennheiser "rep" was

---

[87] 2021-01-26 Deposition Transcript of Daniel Coward at 13:11-14:8 ("████████████████████████████████████ ; Exhibit B to the Opening Expert Report of Paul Waadevig at 11-13.

[88] HIGHWAY_0112.

**Highly Confidential – Attorney's Eyes Only**

"spreading this information about the MXA910 that appeared to be false."[89]  He also claimed that

he "may have" heard other Sennheiser reps make similar statements about the availability of the

MXA910.[90]  Indeed, Sennheiser manufacturer representative ████████ produced multiple

e-mail communications referring to the litigation between ClearOne and Shure.[91]

      95.     In paragraph 128, Mr. Weinstein cites the example of ████████ and states that

the integrator quoted and chose the BMA CT product in May 2019 because of a fear that the Shure

product may not be available because of the lawsuit months in the future when they were ready to

"cut PO's."  Mr. Weinstein states that this "indicates that ClearOne was using 'the lawsuit' and its

own narrative of the litigation as a sales technique to drive sales away from the MXA910 and

towards ClearOne's BMA CT product."  But, again, Mr. Weinstein does not differentiate between

using the existence of the lawsuit and ClearOne's beliefs and allegations (which I understand is

permissible) and any alleged false statements.  Mr. Weinstein improperly conflates the two to try

to show lost sales.

      96.     In paragraph 142, Mr. Weinstein cites directives from ████████ about

emphasizing ClearOne's ████████ as part of its pitch and, in paragraph 143, discusses Mr.

Long's reference to them as "████████  Mr. Weinstein does not identify what the issue

with this is.  Certainly ClearOne can talk about its valid patents and discuss with customers the

fact that it alleges that Shure infringes them.  Mr. Weinstein mentions these statements by

ClearOne but does not show why they are false or misleading.

---

[89] 2020-05-15 Deposition of Glenn Yates at 81:4-16.
[90] 2020-05-15 Deposition of Glenn Yates at 84:10-18.
[91] DOBBS00000073.

Highly Confidential – Attorney's Eyes Only

97.     In paragraph 146, Mr. Weinstein again refers to ClearOne's statements about Shure "infringing" ClearOne's patents.  Mr. Weinstein calls this "misleading," but does not explain why it is misleading for ClearOne to say that Shure is infringing its patents.  Not only is that clearly ClearOne's opinion—and market participants would recognize it as such—but ClearOne had a good basis to say so because Judge Chang found in his preliminary injunction orders that Shure was likely infringing both the '186 Patent and '806 Patent.  Mr. Weinstein's claim in paragraph 147 that "participants would understand" these statements "to be factual" is absurd and defies logic—if parties are in a pending litigation and one side alleges infringement, any reasonable person in this industry would understand that Shure would not agree and would contest that infringement.  Indeed, I understand that Shure has issued many such public statements about its belief that it does not infringe and that ClearOne's patents are invalid.

98.     To his credit, Mr. Weinstein does try to identify one specific lost sale due to the alleged false statements.  In paragraph 118, he cites Mr. Oates's testimony that Shure lost roughly ███████████ of the MXA910 to ████████.  But Mr. Weinstein ignores the significant problems with this testimony.  *First,* as discussed above, the alleged four false statements are all opinion.[92]   And even if one or more were not opinion, neither Mr. Oates nor Mr. Weinstein identifies why the lost sales are due to those false statement(s) of fact and not the opinions or litigation generally.  *Second*, Mr. Oates admits that the alleged ██████ project was not finalized. He specifically testified: ███████████████████████████████████████████

_____

[92] 2020-05-13 Deposition Transcript of Patrick Oates at 26:20 ("Shure was going to lose"); *id.* at 26:20-23 (Shure "will have to actually buy the rights for – to be able to sell – to be able to make this microphone, and be able to sell it."); *id.* at 26:24-25 ("ClearOne was going to tell them to kick rocks and pound sand"); *id.* at 27:9-19 ("we're going to win").

Highly Confidential – Attorney's Eyes Only

████████████████████████████████████.[93]   In other words, Mr. Weinstein

tries to claim that this is a lost sale when it is still up for grabs and the customer is still considering

Shure as a potential vendor.  If the false statements were as material as Mr. Weinstein wants them

to be, why would the customer still be considering Shure for this project?  *Third*, as I have written

about many times in my prior reports, purchasers consider many factors in making purchasing

decisions, including audio quality, cost, and technical support.  Mr. Weinstein does not offer any

firsthand testimony from anyone associated with ███████ that the critical factor in choosing

███████ over Shure were alleged "false statements" by ClearOne.  Mr. Weinstein also does not

try to account for any of the other issues I've discussed above, including whether: (1) ██████

made any false statements to the decisionmakers for this project; (2) the existence of the litigation

affected the purchaser's decision; (3) the customer lost trust with Shure for any reason; and (4) the

customer sought clarification about the parties' litigation from Shure and whether that clarification

resolved any issues.  *Fourth*, without more evidence in support, Mr. Oates's biased retelling is not

credible.  He claims that this single sale from ███████████████ and yet Shure's

sales information shows that since *2016* when the MXA910 was released, ██████ has purchased

█████████████ of the MXA910 products.[94]

99.      Mr. Weinstein also cites deposition testimony from Mr. Schanz where he claimed

that there were examples of end users and integrators "cooling" on purchasing the MXA910.  But

Mr. Weinstein fails to provide important context from Mr. Schanz's deposition.  For example, with

respect to ███████ Mr. Schanz admitted that he did not know whether ███████ "cooled"

on Shure after the injunction or the Narayanan Letter and did not know the scope of the potential

---

[93] 2020-05-13 Deposition Transcript of Patrick Oates at 30:12-18.
[94] SHUREDDEL0014150.

Highly Confidential – Attorney's Eyes Only

loss.[95]   And, in any event, ███████████ has now gone back to purchasing MXA910 products, showing that the impact of any statements are not felt to the present time (even though Shure seeks damages to the present).[96]   Other examples – including ███████████ – also occurred "after the litigation"—Mr. Schanz claims that that the end users "want nothing to do with any ongoing litigation" but could not provide any firsthand knowledge to show that such a reaction was due to any particular false statements.[97]   The same is true for ████████████████, who has also warmed back up to MXA910 products, and is another example of a company for which Shure never tried to find out how many sales they potentially lost..[98]   In fact, Mr. Schanz admitted at his deposition that these examples of lost sales were solely based on statements by his "team"—he did not actually speak with any of the alleged customers nor provide any documentary evidence in support.[99]

100.     In short, Mr. Schanz assumed that because he sent an e-mail asking for examples of lost sales relating to ClearOne's allegedly false statements and his "team" responded with some examples, those lost sales must have been due to the false statements without any documented evidence in support.  Mr. Weinstein then relies on that testimony to claim that Shure suffered many examples of lost sales due to the alleged false statements.  In my opinion and experience, Mr. Weinstein's reliance on Mr. Schanz's testimony without independent support is unreliable and improper.

---

[95] 2020-11-23 Deposition of James Schanz at 68:5-19.

[96] 2020-11-23 Deposition of James Schanz at 68:20-23, 68:24-69:5.

[97] 2020-11-23 Deposition of James Schanz at 71:8-72:3.

[98] 2020-11-23 Deposition of James Schanz at 72:22-74:5.

[99] 2020-11-23 Deposition of James Schanz at 76:19-77:14.

**Highly Confidential – Attorney's Eyes Only**

## VII.    RESPONSES TO WEINSTEIN'S SECTION REGARDING SIMILARITIES BETWEEN CLEARONE PRODUCTS AND THE MXA910

101.    The Weinstein Opening Report ends by claiming that ClearOne made a "very clear and consistent effort to mimic and emulate the features of the MXA910, and thereby benefit from its success."[100]  As an initial matter, it is not rare for companies to mimic features in competitive products.  As long as the companies are legally allowed to do so, it is normal for companies to see what features work in the market and then consider incorporating those features in their existing or new products.

102.    Moreover, I am surprised by Mr. Weinstein's discussion of mimicking and copying because he completely ignores the greater timeline that shows that Shure *mimicked and copied ClearOne for years*.[101]

103.    The below timeline shows the history and effect of Shure's conduct on ClearOne's sales:[102]

---

[100] Weinstein Opening Report ¶ 227.

[101] As a market expert, I am not going to compare technical and mechanical differences between products and then make assumptions about mimicking and copying like Mr. Weinstein does.

[102] The information from the below table and labels are from: CLRONEDE-00048650 (sales data); U.S. Patent No. 9,813,806 (provisional application filed in 2013); U.S. Patent No. 9,635,186 (provisional application filed in 2011); SHURE000597 (March 2014 preview of ceiling array microphone); SHURE000784 (September 2014 preview of ceiling array microphone); SHURE000875 (June 2015 preview of ceiling array microphone); SHUREDDEL00141450 (first sale of MXA910 on June 10, 2016).

- 44 -

**Highly Confidential – Attorney's Eyes Only**



104.     Shure's initial mimicking of ClearOne's BMA Products was significantly more important and impactful than anything Mr. Weinstein describes.  A recounting of the history of the installed audio conferencing market will explain why.

Highly Confidential – Attorney's Eyes Only

105.     The goal of installed audio conferencing is to enable conference participants to speak naturally and move freely during a call, such that all listeners can hear and respond to each speaker as if they were all in the same room.  For this reason, audio quality has always been the most important factor in a product's success.    Therefore, an aesthetically-pleasing audio conferencing product that delivers inferior audio will not succeed over the long-term.

106.     But the visual integration of such a product into a conference room is important as well.  That is because installed audio end users prefer conferencing products that not only provide superior audio, but are also unobtrusive once installed.   Indeed, such end users have long sought microphones that are remote from conference participants and functionally invisible to them.   But because microphones are notorious for producing lower quality audio when placed farther away from the speaker, vendors in the installed audio conferencing market have long struggled to meet this demand.

107.     A significant reason for this delay in meeting the demand is likely that, as I have previously explained, major innovations in the installed audio conferencing endpoints market are relatively rare when compared to other communication technology markets.  For example, the rate of innovation in the mobile phone industry is many factors faster than in this market.  Also, many of the recent innovations in installed audio conferencing products before the BMA involved marginal improvements to audio quality.   While these innovations were valuable, they were also difficult to promote because there is no product to see—the improvement is aural—and may only be noticeable to the trained ear of the channel partner and purchaser, but not to the end-user at an organization, such as the CEO, who must sign off on a purchase.   At the same time, innovation regarding the integration of visible components of audio conferencing equipment largely stalled after the introduction of integrated loudspeakers and hanging ceiling microphones.

Highly Confidential – Attorney's Eyes Only

108.     In this context, ClearOne's BMA was revolutionary when it was released in 2012. By practicing the '186 Patent, the BMA provides improved audio while reducing background noise and eliminating acoustic echo.   And the device itself is less obtrusive than traditional microphones on the table or hanging from the ceiling (especially as compared with multiple microphones hanging from the ceiling).  Therefore, channel partners, purchasers, and end users can both see and hear the difference between ClearOne's product and those of its competitors.

109.     In other words, the release of the BMA constituted a significant step toward installed audio conferencing's gold standard: a microphone that provided superior audio, all while maintaining a relatively low profile.

110.     Shure recognized the success of the BMA and analyzed it as part of its development of the MXA910 product:

- In 2013, a Shure dealer forwarded an e-mail announcing the BMA and remarked: ███████

███████████████████████████████████████

███████████████████████████████████████

- In 2013, a Shure Regional Sales Manager stated: ████████████████

███████████████████████████████████████

████████████████████████████ [04]

- Development documents for the product released as the MXA910 show that a step in developing Shure's microphone array was to ████████████████ [05]

---

[103] SHURE292938.

[104] SHURE108282.

[105] SHURE271673; SHURE282861; SHURE283156.

Highly Confidential – Attorney's Eyes Only

111.     In 2016, Shure released its MXA910 product, the first competing product to the BMA that ClearOne alleges practices the '186 Patent.  By utilizing this technology, Shure was also able to provide improved audio quality without being as obtrusive as traditional microphones.  The MXA910 product became a true competitor and substitute for the BMA.

112.     Significantly, the MXA910 had one critical differentiating feature: its ceiling tile mounting configuration that ClearOne claims infringes the '806 Patent.  This configuration allowed the MXA910 to become truly invisible, as it could blend into a conference room by looking like other ceiling tiles in the room.

113.     ClearOne's BMA began immediately losing sales, customers, and business opportunities to the MXA910.  ClearOne and Shure were the only two installed audio conferencing participants that offered beamforming microphone array technology with comparable marketing factors (price, target market, target use case) and practiced the '186 Patent.  Consumers thus could choose between the competing BMA and MXA910 products, rather than only having the BMA as an option.

114.     Plus, the MXA910 differentiated itself from the BMA by incorporating the '806 Patent's integrated ceiling tile-beamforming microphone array technology.   Because this technology finally satisfied the demand for a seamlessly-integrated, high-quality installed audio microphone, consumers rightly believed that it was highly innovative.  Indeed, Shure's internal documents confirm that many of its customers—including technically-proficient system integrators and end-user AV specialists—were excited about the MXA910's form factor, but skeptical that such technology could be feasible.

115.     At the time Shure announced its MXA910 product with its flush mount capability in January 2016, ClearOne was in the later stages of development of the BMA 2 and CONVERGE

## Highly Confidential – Attorney's Eyes Only

Pro 2 products.   Even though ClearOne noticed the commercial appeal of the flush mount feature, it could not immediately divert resources from its current products to develop that flush mount product.   ClearOne is a small company and so a project like developing the CONVERGE Pro 2 takes all of ClearOne's engineering resources.   It is extremely difficult to begin another major project until the first one is complete.  I understand from past conversations with ClearOne that it believed that it could wait to develop its BMA CT product because it expected to obtain a patent for the flush mount feature.   But this wait allowed Shure to release the MXA910 product first and obtain the first mover advantages for the ceiling tile array.

116.    This history shows that Shure obtained its success in the first place by mimicking ClearOne's audio technology and flush mount technology.   Any claim that ClearOne has been more recently mimicking Shure is not only ironic, but far less important than Shure's willful actions years ago in the nascent stages of the competition between the parties.   And Shure's mimicking was certainly more impactful, as Shure is a billion dollar company that dwarfs ClearOne in total revenue.[106]

---

[106] SHUREDDEL00029201 (predicted revenue in FY20 of $787.4 million); D.I. 303-2, Ex. 55 (ClearOne 2019 total global revenue of $25 million).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHURE INCORPORATED, and | ) | |
| SHURE ACQUISITION HOLDINGS, INC. | ) | |
| | ) | C.A. No. 19-1343 (RGA) (CJB) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLEARONE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>RULE 7.1.1 CERTIFICATION</u>

Pursuant to D. Del. L.R. 7.1.1, the undersigned counsel hereby certifies that counsel for Plaintiffs conferred with counsel for Defendant, including verbally by teleconference involving Delaware counsel for all parties, regarding the relief sought in the foregoing motion and that the parties were unable to reach agreement on the relief sought therein.


DATED:  April 16, 2021

OF COUNSEL:

*Of Counsel:*

Gerald F. Ivey
Mareesa A. Frederick
Elizabeth D. Ferrill
Sydney English
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

MCCARTER & ENGLISH, LLP

/s/ *Brian R. Lemon*
Michael P. Kelly (#2295)
Brian R. Lemon (#4730)
Alexandra M. Joyce (#6423)
405 N. King St., 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
blemon@mccarter.com
ajoyce@mccarter.com

*Counsel for Plaintiffs*

Elliot C. Cook
J. Derek McCorquindale
Alexander M. Boyer
David N. Lefcowitz
Joseph M. Schaffner
Luke H. MacDonald
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER,
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
(571) 203-2700

2

ME1 36298067v.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that true and correct copies of the foregoing

document were caused to be served on April 16, 2021 on the following counsel in the manner

indicated:

### <u>BY EMAIL:</u>

Michael J. Flynn
Andrew M. Moshos
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE 19899
(302) 658-9200
mflynn@morrisnichols.com
amoshos@morrisnichols.com

Douglas J. Dixon
Christina V. Rayburn
HUESTON HENNIGAN LLP
620 Newport Center Drive, Ste. 1300
Newport Beach, CA 92660

Sourabh Mishra
Karen Younkins
Michael Acquah
HUESTON HENNIGAN LLP
523 West 6th St., Suite 400
Los Angeles, California CA 90014

*Attorneys for ClearOne, Inc.*

Dated: April 16, 2021

/s/ *Brian R. Lemon*
Brian R. Lemon (#4730)

ME1 36297952v.1