IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHURE INCORPORATED and SHURE ACQUISITION HOLDINGS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-1343-RGA-CJB |
| CLEARONE, INC., | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM ORDER**

Presently before the Court in this patent infringement action is Plaintiffs Shure Incorporated and Shure Acquisition Holdings, Inc.'s ("Plaintiffs" or "Shure") *Daubert* motion, filed pursuant to Federal Rule of Evidence 702, which seeks to exclude the damages opinions of Defendant ClearOne, Inc.'s ("Defendant" or "ClearOne") expert Julia R. Rowe (the "*Daubert* Motion"). (D.I. 437) For the reasons that follow, the Court DENIES Shure's *Daubert* Motion.

**I.   BACKGROUND**

  **A.   Factual Background**

The Court incorporates by reference its summary of the factual background of this case set out in its September 16, 2021 Report and Recommendation ("September 16 R&R"). (D.I. 541 at 1-5)

Any additional facts relevant to this Memorandum Order will be discussed in Section II below.

  **B.   Procedural Background**

The *Daubert* Motion was filed on April 16, 2021, (D.I. 437), and briefing was completed on June 2, 2021, (D.I. 501). The Court held oral argument on the *Daubert* Motion (as well as

other motions) on June 9, 2021. (D.I. 527 ("Tr.")) A 5-day trial is set to begin on November 1, 2021. (D.I. 62 at ¶ 16)[1]

## II. DISCUSSION

### A. Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of qualified expert testimony, providing that an expert witness may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702's requirements were examined in detail in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010).

As to this Motion, at issue is the reliability and "fit" of the proposed expert testimony. With regard to the requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Such testimony should amount to "more than subjective belief or unsupported speculation[,]" and a court's focus in examining this factor must be on "principles and methodology" rather than on the expert's conclusions. *Daubert*, 509 U.S. at 590, 595; *see*

---

[1] The Court has been referred the instant case for all purposes, up through the case dispositive motions deadline, by United States District Judge Richard G. Andrews. (D.I. 9)

*also Daddio v. Nemours Found.*, 399 F. App'x 711, 713 (3d Cir. 2010).  As to the "fit" requirement, it "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92; *see also Schneider*, 320 F.3d at 404.  The standard for fit, however, is "not high; it is met when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citations omitted).[2]

### B. Analysis

ClearOne's damages expert, Ms. Rowe, has submitted opening, rebuttal and reply reports in this action.  (*See* D.I. 476 at 2; *see also* D.I. 438, exs. 1, 7)  Ms. Rowe has provided affirmative opinions regarding damages associated with ClearOne's counterclaims (i.e., claims for violation of the Delaware Deceptive Trade Practices Act, tortious interference with business relations and unfair competition), (D.I. 438, ex. 1), as well as rebuttal opinions relating to Shure's claims, (*id.*, ex. 7).

Shure's *Daubert* Motion seeks to exclude Ms. Rowe's opinions regarding:  (1) damages for ClearOne's counterclaims; (2) the timeframe for considering ClearOne's costs of switching to a non-infringing alternative; and (3) apportionment as applied to an infringer's profits under 35

---

[2] The Court has fairly wide discretion in determining whether to admit or exclude expert testimony.  *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).  Overall, "Rule 702 embodies a 'liberal policy of admissibility.'" *B. Braun*, 749 F. Supp. 2d at 222 (quoting *Pineda*, 520 F.3d at 243).  The burden is placed on the party offering expert testimony (here, ClearOne) to show that it meets each of the standards for admissibility.  *Id.* (citing *Daubert*, 509 U.S. at 592 n.10).

U.S.C. § 289 ("Section 289"). (D.I. 438 at 12)  The Court will take up these issues in turn (while first setting out the relevant law, where appropriate).

### 1.     Damages for ClearOne's counterclaims

In calculating damages for ClearOne's counterclaims, Ms. Rowe focuses on the "December 2019 to June 2020 timeframe, when [Shure's] MXA910-A [product] was sold." (D.I. 438, ex. 1 at ¶ 85)  ClearOne's damages are based on Shure's sales of MXA910-A products in the relevant period; ClearOne asserts that these sales were made possible by Shure's conduct at issue in the counterclaims. (*Id.* at ¶¶ 12-13, 60, 99)  Ms. Rowe asserts two forms of damages for ClearOne's counterclaims: lost profits, (*id.* at ¶¶ 13, 75-119), and unjust enrichment, (*id.* at ¶¶ 14, 120-24).

Ms. Rowe's damages analysis calculated lost sales with respect to 19 customers that had purchased Shure's MXA910-A products and ClearOne's BMA products in the 2019-2020 timeframe. (*Id.* at ¶¶ 94-95)  With regard to one of her two damages theories, Ms. Rowe provided an "allowance [of 50%] for sales of the MXA910-A that were installed in drop ceilings with 9/16-inch T-bars [as opposed to in drop ceilings with 15/16 inch T-bars] to the extent those installations are found not to infringe" ClearOne's United States Patent No. 9,813,806 (the "'806 patent"). (*Id.* at ¶ 99; *id.*, ex. 3 at 158)  In other words, pursuant to this theory, Ms. Rowe did not include the above-referenced 50% of Shure sales for the relevant time period in her damages projection, because those sales involved MXA910-A products that were installed in a manner that ClearOne does not consider to infringe its intellectual property (i.e., sales that, pursuant to this theory, ClearOne would not argue were influenced by the misconduct at issue in its

counterclaims).³ As the Court described in the September 16 R&R, Ms. Rowe also calculates lost profits damages based on an alternative theory. (D.I. 541 at 21-22) This alternative theory assumes that Shure, knowing that the MXA910-A product did not comply with the PI Order when it was installed in certain ways, would simply not have sold the MXA910-A at all. (*Id.*; *see also* D.I. 476 at 6-7, 9 n.11; Tr. at 125-26; D.I. 438, ex. 1 at ¶¶ 43, 120-23; *id.*, ex. 4 at ¶ 22)

In its Motion, Shure asserts that Ms. Rowe's lost profits and unjust enrichment opinions must be excluded because Ms. Rowe's 50% allowance "is [u]nexplained and [u]njustifiable[.]" (D.I. 438 at 7-10 (emphasis omitted); D.I. 501 at 3-4; Tr. at 112) Shure contends that Ms. Rowe failed to articulate any basis supporting the use of this 50% figure, and that Ms. Rowe acknowledged that she did not know how many MXA910-A units had actually been installed in an infringing "flush mount" configuration during the relevant time period. (D.I. 501 at 3)⁴

---

   ³   As the September 16 R&R explains, ClearOne has accused Shure's MXA910 product of infringing, *inter alia*, the '806 patent in the United States District Court for the Northern District of Illinois (the "Northern District of Illinois Action"). (*See* D.I. 541 at 2) In that action, the Northern District of Illinois Court has issued a preliminary injunction with respect to the '806 patent, which enjoined Shure from manufacturing, selling and marketing its MXA910 product to be used "in its drop-ceiling mounting configuration, including marketing and selling the MXA910 in a way that encourages or allows integrators to install it in a drop-ceiling mounting configuration" (the "PI Order"). (*Id.* at 2-3 (internal quotation marks and citation omitted))

   MXA910-A units installed in ceiling grids with 9/16 inch T-bars are suspended via their "flanges" (i.e., a "flange mount") on the T-bars, such that the unit extends below the T-bars and into the room; this configuration does not violate the PI Order. (D.I. 452, ex. 29 at 6-8) However, the Northern District of Illinois Court ruled that installers could easily install the MXA910-A unit in a configuration in ceilings with 15/16 inch T-bars, and that in such a configuration, the unit could sit entirely inside the drop space of the ceiling grid (or sit "flush" against the grid, i.e., a "flush mount"); this amounts to a violation of the PI Order. (*Id.*, at 8-9, 34)

   ⁴   Shure also argues in its *Daubert* Motion that Ms. Rowe's lost profits and unjust enrichment opinions must be excluded because ClearOne seeks the same damages here that it seeks in the Northern District of Illinois Action, and because double recovery of damages is

5

As an initial matter, the Court agrees with ClearOne that Shure offers no reason why Ms. Rowe's calculations regarding her alternative damages theory are improper or unreliable. (D.I. 476 at 6-7) Indeed, Shure's reply brief offers no reply to this point. (*See* D.I. 501 at 3-4) The Court, therefore, will not exclude Ms. Rowe's opinion based on the theory that all sales of the MXA910-A product were improper sales.

Turning to Ms. Rowe's 50% allowance theory, her report explains that "Shure estimated that up to 50% of drop ceilings have 9/16-inch T-bars.[]" (D.I. 438, ex. 1 at ¶¶ 99, 124) In a footnote, Ms. Rowe cites to a Shure document in support of this proposition. (*Id.* at ¶ 99 n.305; *id.* at ¶ 124 n.353) This document is a slide presentation and it includes a slide in which a Shure employee writes that: (1) it is unknown how many ceilings have 9/16 inch T-bars as opposed to 15/16 inch T-bars; (2) "[a]nyone you ask gives you a different answer" on that question; and (3) Shure (or at least the Shure employee who put together the slide deck) "think[s] it is in the 50/50 range—[m]ay vary by region." (D.I. 479, ex. 87 at SHURE864005) Ms. Rowe's footnote further explains that "[t]here are several documents showing that less than 50% of drop ceilings have 9/16-inch T-bars"; she goes on to detail evidence showing that a 50% allowance for installations in ceilings with 9/16-inch T-bars would actually be a conservative figure (i.e., one favorable to Shure, not ClearOne). (D.I. 438, ex. 1 at ¶ 99 n.305) For instance, the footnote

---

impermissible. (D.I. 438 at 5-7; D.I. 501 at 1-3) However, in its motion for summary judgment regarding ClearOne's business tort counterclaims, Shure similarly argued that ClearOne's tortious interference and unfair competition counterclaims must fail as a matter of law because ClearOne seeks the same damages here that it seeks in the Northern District of Illinois Action. (*See* D.I. 541 at 6-9) There, the Court recommended denial of that portion of Shure's motion for summary judgment on the basis that "the issue of double recovery is premature at the summary judgment stage." (*Id.* at 8-9) The Court DENIES this portion of Shure's *Daubert* Motion for the same reason; it would be improper to exclude Ms. Rowe's damages opinions due to this "double recovery" argument when there has been no recovery yet in the Northern District of Illinois Action. (*Id.*; *see also* D.I. 476 at 3-5)

explains that ClearOne's technical expert stated that the "most commonly used T shapes are 15/16," and that the expert cited to a study that bore this out. (*Id.* (internal quotation marks and citation omitted); *see also* D.I. 479, ex. 85 at Schonfeld003053) The footnote also cites to an e-mail sent by a Shure customer, who reported that "apparently the 15/16 version makes up the vast majority of wat *[sic]* is installed in our territory" and that a "couple of [project managers] mentioned 'like 90%' when asked what the ratio is." (D.I. 438, ex. 1 at ¶ 99 n.305 (internal quotation marks and citation omitted); *see also* D.I. 478, ex. 86 at SHURE864055) Thus, even a cursory look at Ms. Rowe's report reveals that she *did* provide a factual basis for the 50% figure; it is not as if she plucked it out of thin air. (D.I. 476 at 7 & n.8; Tr. at 127-28)

Shure's next point with respect to Ms. Rowe's 50% allowance theory is that Ms. Rowe assumes that *all* of the 15/16-inch ceiling installations at issue were mounted in a manner that infringes ClearOne's '806 patent; Shure argues that this assumption is not correct.[5] (D.I. 438 at 8; D.I. 501 at 3-4; *see also* Tr. at 113) And it is true that during her deposition, Ms. Rowe testified that she did not have an understanding of how many Shure installations of the MXA910-A product in 15/16 inch ceiling grids during the relevant time period were actually mounted in a "flange" configuration (i.e., a non-infringing configuration). (D.I. 438, ex. 3 at 181-84)

But Ms. Rowe's 50% allowance theory appears to be based on the assumption that, in a "but for" world where Shure never made the allegedly false statements at issue in the

---

[5] According to Shure, ClearOne has found only 46 MXA910-A products that were installed in an infringing "flush mount" manner out of 2,500 units surveyed. (D.I. 438, ex. 5 at 1 (*cited in* D.I. 438 at 8)) As proof of this, Shure cited only to one page of a brief that it prepared in the Northern District of Illinois Action. (*Id.*) For its part, ClearOne retorted that it has found evidence indicating that roughly 25% of the installations in 15/16 inch ceiling grids were improper. (D.I. 479, ex. 88 at 6 (*cited in* D.I. 476 at 8 n.9))

7

counterclaims, Shure would not have sold its MXA910-A product at all to customers with 15/16 inch ceiling grids. (D.I. 476 at 6) This is purportedly because: (1) Shure would have been hesitant to sell, and customers hesitant to buy, an MXA910-A product that would violate the PI Order if installed "flush"; and (2) it would have been "burdensome" for Shure's customers to have the product installed in a non-violative way (i.e., "flange") in a 15/16 inch grid. (*Id.*, ex. 1 at ¶¶ 99-102; *see also id.*, ex. 3 at 181-82; D.I. 476 at 6, 8; Tr. at 125-27) The first point is pretty self-explanatory. And as to the latter point about burden, Ms. Rowe cites to some evidence in support of her position. (D.I. 438, ex. 1 at ¶¶ 99-101 & nn.208, 310-12) To the extent that Shure believes that Ms. Rowe should have made different assumptions based on the available evidence, it can make that argument at trial (and cross-examine Ms. Rowe accordingly). (D.I. 476 at 8 & n.10); *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 2. Timeframe for considering ClearOne's costs of switching to a non-infringing alternative

Damages in a patent infringement action may be awarded based on a "reasonable royalty" for use of the patented invention. *See* 35 U.S.C. § 284 ("Section 284").[6] A reasonable royalty "may be based upon . . . the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995). A

---

[6] The holder of a design patent may seek relief for infringement under Section 284 (where damages could take the form of lost profits or a reasonable royalty) or under Section 289, which will be discussed further below in connection with Shure's third argument for exclusion. *See, e.g.*, *Nordock, Inc. v. Systems, Inc.*, 803 F.3d 1344, 1352-53 (Fed. Cir. 2015), *vacated on other grounds*, 137 S. Ct. 589 (2016); *Nordock, Inc. v. Systems, Inc.*, Case No. 11-CV-118, 2017 WL 5633114, at *6 (E.D. Wis. Nov. 21, 2017).

factfinder uses the hypothetical negotiation to "attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (brackets and internal quotation marks and citation omitted). Thus, the hypothetical negotiation date is the date that the infringement began, even if that is the same date that the patent issued. *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993). Here, the hypothetical negotiation date is in November 2019—the month when Shure's asserted United States Design Patent No. D865,723 (the "'723 patent") issued. (D.I. 438, ex. 7 at ¶ 30; *see also id.*, ex. 3 at 193)

In analyzing the non-infringing alternative products that ClearOne might have utilized in the time period of the hypothetical negotiation, Ms. Rowe opines, *inter alia*, that "before ClearOne made a commitment to the accused design, [it] would have had several options for non-infringing designs that it could have implemented instead, with no incremental costs." (*Id.*, ex. 7 at ¶ 42; *see also id.* at ¶¶ 45, 50, 51) However, Shure notes that ClearOne introduced the accused BMA CT product in February 2019. (*Id.* at ¶ 30; *see also* D.I. 513, Slide 134) Shure then argues that because Ms. Rowe is relying on data about possible ClearOne alternative designs drawn from a time period *prior* to the hypothetical negotiation date (i.e., November 2019), then her opinion must be excluded. (D.I. 438 at 10-11; D.I. 501 at 4-5; Tr. at 116)

The Court is not persuaded. Ms. Rowe is clear that she utilized the correct November 2019 hypothetical negotiation date. (D.I. 438, ex. 7 at ¶ 30; *see also id.*, ex. 3 at 193) And although she discusses facts relating to ClearOne's pre-November 2019 development of the accused product in this portion of her opinion, Ms. Rowe seems to be doing so in order to explain what non-infringing design paths ClearOne would have considered *at the time of the*

9

*negotiation*. (*See, e.g.*, *id.*, ex. 7 at ¶ 51 ("Based on the foregoing, ClearOne had several non-infringing designs that could have been implemented at the time leading up to the hypothetical negotiation.")) There is nothing inappropriate about this. (D.I. 476 at 10; Tr. at 130-31) Indeed, as ClearOne points out, Shure's damages expert, Thomas D. Vander Veen, Ph.D. ("Dr. Vander Veen"), also refers to facts occurring during ClearOne's development of the accused product in his own reasonable royalty analysis. (D.I. 451, ex. 25 at 99 (citing to ClearOne's Chief Executive Officer's view of Shure's competing product during the design of ClearOne's product))[7]

Shure complains that Ms. Rowe justified focusing on an earlier timeframe (i.e., one earlier than November 2019) by citing to irrelevant material addressing RAND licensing for

---

[7] The cases that Shure cites in its opening brief do not counsel otherwise. (D.I. 438 at 11) In two of them, the courts excluded certain of the damages experts' opinions in which they asserted that the hypothetical negotiation would take place on the wrong date. *Vectura Ltd. v. GlaxoSmithKline LLC*, Civil Action No. 16-638-RGA, 2019 WL 1352767, at *3-4 (D. Del. Mar. 26, 2019) (excluding certain of a damages expert's opinions, where the expert asserted that the date of the hypothetical negotiation occurred in 2013, but the Court found that the date of the hypothetical negotiation was July 25, 2016); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 324 F. Supp. 3d 470, 488-89 (D. Del. 2018) (excluding expert's testimony that "uses the date of the filing of the complaint as the date of the hypothetical negotiation" when the correct date was the date that infringement began). Here, as discussed above, Ms. Rowe's report correctly states that the hypothetical negotiation date was in November 2019. In the third case Shure relies upon, the court excluded the opinions of the damages expert where the expert focused his analysis on facts occurring *after* the first date of infringement. *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, CIV.A. CV-03-S-2875-NE, 2006 WL 2109503, at *22 (N.D. Ala. July 28, 2006). Indeed, the opinion in that case suggests that facts occurring before the date of the hypothetical negotiation can be relevant to the analysis. *Id.* ("The problem begins with [the expert's] characterization of ClearCube's October 2000 Confidential Business Plan as 'outdated.' That Plan . . . was produced just one month before the date of first infringement of the '997 patent, and four months before the date of first infringement of the '919 patent. Thus, [the expert] was not simply incorrect when dismissing the Plan as 'outdated,' his opinion was contrary to binding precedent.") (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)).

standard-essential patents—subjects that indisputably do not relate to the design patent at issue here. (D.I. 438 at 10-11; D.I. 501 at 4-5; Tr. at 116-17) To that end, in a sentence of paragraph 51 of her rebuttal report, Ms. Rowe explained that she understood from ClearOne representatives that "on an *ex ante* basis,[] the costs to implement any of the [non-infringing] alternatives . . . would be *de minimis*." (D.I. 438, ex. 7 at ¶ 51) At the end of this sentence, Ms. Rowe includes a lengthy footnote, in which she explains, *inter alia*, that the idea behind the hypothetical negotiation is to evaluate the incremental value of a technology on an "*ex ante* basis" and that this concept is referred to in finance and economics as "'lock in'" or "'patent hold up.'" (*Id.*, ex. 7 at ¶ 51 n.101)

Candidly, the excerpt from paragraph 51 and the content of the footnote are dense, and the Court is not sure exactly what Ms. Rowe was trying to convey with them. But in the end, the Court is sure that whatever Ms. Rowe was doing there, she ultimately does not mean to assess the hypothetical negotiation by focusing on an incorrect pre-November 2019 time period. Indeed, in the next paragraph of Ms. Rowe's report (paragraph 52), Ms. Rowe writes that "if ClearOne were to implement these [non-infringing] alternatives *after* its products were introduced [i.e., after February 2019], there could be some associated costs[,]" and then she calculates those costs to be approximately $50,000. (D.I. 438, ex. 7 at ¶¶ 52-53; *see also* D.I. 513, Slide 136; Tr. at 131) This further assures the Court that Ms. Rowe really does mean to focus on the right time period—i.e., on the costs and benefits to ClearOne of entertaining possible non-infringing alternatives, in light of the facts as they were *in November 2019*.

### 3. Apportionment under Section 289

With regard to Shure's Section 289 argument, the Court first provides some background on the relevant law.

A design patent infringer can be "liable to the owner to the extent of his total profit." 35 U.S.C. § 289. The "total profit" means "all of the profit made from the prohibited conduct, that is, from the manufacture or sale of the article of manufacture to which [the patented] design or colorable imitation has been applied." *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429, 434 (2016) (internal quotation marks omitted). Accordingly, calculating damages under Section 289 is a two-step process. First, the "article of manufacture" must be identified, and second, a calculation must be made of the infringer's total profit through its infringing use of that article of manufacture. *Id*. The patentee bears the burden of identifying the article of manufacture and the total profit on the sale of that article; if the patentee satisfies this burden, the burden then shifts to the infringer to produce evidence of an alternative article of manufacture and any deductible expenses. *See Junker v. Med. Components, Inc.*, CIVIL ACTION No. 13-4606, 2021 WL 131340, at *31 (E.D. Pa. Jan. 14, 2021). Determination of the article of manufacture is generally a question left for the jury. *Nordock, Inc. v. Systems, Inc.*, Case No. 11-CV-118, 2017 WL 5633114, at *7 (E.D. Wis. Nov. 21, 2017).

At one point in the past, a patentee was required to show what portion of the infringer's profit was due to the claimed design and what portion was due to the article itself—i.e., to "apportion" profits. This was difficult for design patentees to accomplish, and Congress eventually removed the need to do so when it passed the predecessor to Section 289. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1441-42 (Fed. Cir. 1998); *Apple Inc. v. Samsung Elecs. Co.*, Case No. 11-CV-01846-LHK, 2017 WL 4776443, at *2 (N.D. Cal. Oct. 22, 2017). In *Nordock, Inc. v. Sys. Inc.*, 803 F.3d 1344 (Fed. Cir. 2015), the United States Court of Appeals for the Federal Circuit counseled that "apportioning profits in the context of design patent infringement is not appropriate[.]" 803 F.3d at 1354-55 (rejecting the defendant's argument that

12

the patentee was not entitled to profits on the entire accused article of manufacture, a dock leveler, but instead only to the profits attributable to the lip and hinge plate portion of the dock leveler, where the lip and hinge plate was depicted in the asserted design patent).

The *Nordock* decision was vacated, however, and the case remanded for further consideration in light of the decision of the Supreme Court of the United States in *Samsung Elecs. Co. v. Apple Inc.*, 137 S. Ct. 429 (2016) ("*Apple*"). *Systems, Inc. v. Nordock, Inc.*, 137 S. Ct. 589 (2016). In *Apple*, a jury had found that Samsung Electronics Co., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC's (collectively, "Samsung") smartphones infringed three of Apple, Inc.'s ("Apple") design patents; the patents were directed to the front face of a smartphone and a grid of icons on a screen. 137 S. Ct. at 433. Apple was awarded damages constituting the entire profit that Samsung made from sales of the infringing smartphones. *Id.* The Federal Circuit affirmed that damages award, rejecting Samsung's position that the profits awarded to Apple should have been limited to the infringing "article of manufacture" (i.e., the screen or case of the smartphone) instead of the entire infringing product itself (i.e., the smartphone). *See id.* at 433-34. The Supreme Court granted *certiorari*, and in its opinion, the Supreme Court addressed the scope of the term "article of manufacture" in Section 289. It concluded that the relevant "article of manufacture" did not always have to be the end product sold to the consumer; instead, if a multi-component product was at issue, the Court concluded that the "article of manufacture" could encompass one component of that end product. *Id.* at 434. The Supreme Court reversed and remanded for further proceedings, declining to lay out a test for identifying the relevant article of manufacture at the first step of the Section 289 damages inquiry. *Id.* at 436. The Federal Circuit then remanded the case back to the district court for determination of whether a new damages trial was necessary and, if so, to establish a

test for identifying the relevant article of manufacture under Section 289. *Apple Inc. v. Samsung Elecs. Co.*, 678 F. App'x 1012, 1014 (Fed. Cir. 2017). On remand, the *Apple* district court identified four factors relevant to determining the article of manufacture as the first step in the Section 289 inquiry ("the *Apple* factors"), which include: (1) the scope of the design claimed in the plaintiff's patent; (2) the relative prominence of the design within the product as a whole; (3) whether the design is conceptually distinct from the product as a whole; and (4) the physical relationship between the patented design and the rest of the product. *Apple Inc.*, 2017 WL 4776443, at *19; *see also Junker*, 2021 WL 131340, at *32.[8]

Turning now to Shure's argument, Shure seeks to exclude a portion of Ms. Rowe's rebuttal report in which she: (1) opines that Shure's damages expert "[o]verstated [t]he [c]ausal [r]elationship [b]etween [t]he [']723 Patent [a]nd ClearOne's [s]ales[;]" (2) sets out reasons why she believes this, and (3) ultimately concludes that "apportionment is appropriate." (D.I. 438, ex. 7 at ¶¶ 89-94) Shure asserts that these paragraphs of Ms. Rowe's report "directly contravene[] Federal Circuit guidance that 'apportioning profits' is inapplicable under [Section] 289" and should thus be excluded. (D.I. 501 at 5; *see also* D.I. 438 at 11-12)

ClearOne, for its part, retorts that this portion of Ms. Rowe's rebuttal report should not be excluded at this juncture for two reasons: (1) these opinions are direct rebuttal to opinions proffered by Shure's damages expert; and (2) the opinions may be relevant to the test for

---

[8] Upon remand in the *Nordock* case, the Federal Circuit remanded the case to the district court with respect to the "article of manufacture" issue. *Nordock, Inc. v. Sys., Inc.*, 681 F. App'x 965, 966 (Fed. Cir. 2017). The district court there noted that *Apple* "does not represent . . . a return to the apportionment scheme Congress rejected" in enacting Section 289, and concluded that with respect to the test for determining the article of manufacture, "each case presents its own problems" and that accordingly "each design patent must be considered in context and considered from all viewpoints, technical, mechanical, popular, and commercial." *Nordock, Inc.*, 2017 WL 5633114, at *5-6 (internal quotation marks and citation omitted).

determining the "article of manufacture" under Section 289, which will be litigated during briefing regarding jury instructions. (D.I. 476 at 11-12) The Court agrees with ClearOne on both counts.

First, ClearOne is correct that the paragraphs at issue here clearly respond to conclusions set out in Dr. Vander Veen's damages report. In the context of discussing Shure's damages under Section 289, Dr. Vander Veen's report includes a sub-section entitled "Article of Manufacture[.]" (D.I. 451, ex. 25 at 27) In this section, Dr. Vander Veen begins by acknowledging that in the past, the entire accused product was considered to be the article of manufacture under Section 289, regardless of the extent to which that product was claimed in the asserted design patent. (*Id*. at ¶ 61) But Dr. Vander Veen notes that this changed under *Apple*, and presently it is in the province of the jury to determine the article of manufacture, utilizing factors like the *Apple* factors set out above. (*Id.* at ¶¶ 61-62) Dr. Vander Veen continues his analysis of the "article of manufacture" by setting out evidence that he believes demonstrates that the success of Shure's product is driven by the design claimed in the '723 patent. (*Id.* at ¶ 63) He concludes by explaining why all four *Apple* factors demonstrate that the relevant article of manufacture is the entirety of ClearOne's accused products. (*Id.* at ¶ 66) Then, in calculating ClearOne's profits (step two of the Section 289 inquiry), Dr. Vander Veen discusses evidence that he believes establishes a strong connection between ClearOne's profits and the design claimed by the '723 patent. (*Id.* at ¶¶ 69-70)

The paragraphs of Ms. Rowe's rebuttal report that Shure seeks to exclude[9] are directly responsive to Dr. Vander Veen's report. They set out the evidence that, in Ms. Rowe's view,

---

[9] These appear to be paragraphs 88-94 of Ms. Rowe's rebuttal damages report. (D.I. 438 at 5)

rebuts Dr. Vander Veen's assertion that the design of Shure's product drove the product's sales. (D.I. 438, ex. 7 at ¶¶ 88-94) Shure's brief ignores the fact that Dr. Vander Veen "opened" the door for a response to his opinions. *See Haskins v. First Am. Title Ins. Co.*, Civil No. 10-5044 (RMB/JS), 2013 WL 5410531, at *4 (D.N.J. Sept. 26, 2013) (denying a motion to strike the plaintiff's expert's report, where the defendant "ignores the fact that [the plaintiff's expert] raised these issues in direct rebuttal to [the defendant's expert's] conclusions" and because the plaintiff's expert has the right to explain why he believes [the defendant's expert] is wrong"); *see also Withrow v. Spears*, 967 F. Supp. 2d 982, 1001 (D. Del. 2013) ("A rebuttal or reply report is proper if the intent of the report is solely to contradict or rebut evidence on the same subject matter identified by the opposing party's expert report.") (internal quotation marks and citations omitted).

      Second, Dr. Vander Veen's own opinions underscore that Ms. Rowe's rebuttal opinions could be relevant to the legal test for determining the "article of manufacture" under Section 289. Dr. Vander Veen's opinion that the '723 patent contributed to Shure's product's success is included a section in which he opines that the "entirety" of ClearOne's products should be considered to be the relevant article of manufacture here. (D.I. 451, ex. 25 at ¶¶ 63, 66) Ms. Rowe's rebuttal report includes a section in which she opines, to the contrary, that the article of manufacture is the "visible outer housing" for ClearOne's BMA products. (D.I. 438, ex. 7 at ¶¶ 95-100) While Shure's Motion does not seek to exclude the paragraphs in this particular section of Ms. Rowe's report, it is clear that in that section, Ms. Rowe is also relying for context on the paragraphs that Shure *does* seek to strike. (*Id.* at ¶ 97 ("As I have discussed throughout my entire report, the claimed design of the 'D723 patent has limited relative value compared to the rest of the functional and technical aspects of the accused products[.]")) It is undisputed that

16

determining the article of manufacture is a question for the jury. (D.I. 476 at 12; D.I. 451, ex. 25 at ¶ 61) Thus, because Ms. Rowe's opinions-at-issue could be relevant to this analysis, the Court concludes that any decision regarding exclusion of those opinions would be premature at this juncture.[10] (D.I. 476 at 12 (ClearOne requesting that the Court "defer ruling [on whether Ms. Rowe's analysis in these paragraphs is relevant to the 'article of manufacture' test] until after it determines the proper test [to use]"))

### III.    CONCLUSION

For the foregoing reasons, the Court DENIES Shure's Motion. Any objections to this Memorandum Order should be filed by **October 8, 2021**; any responses should be filed by **October 12, 2021**.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **October 8, 2021** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

---

[10] This is so even if Ms. Rowe may at times use incorrect terminology in the paragraphs at issue, like the phrase "apportionment is appropriate." (D.I. 438, ex. 7 at ¶ 94)

Dated: October 5, 2021

                                                                                  *Christopher J. Burke*
                                                                                   Christopher J. Burke
                                                                                   UNITED STATES MAGISTRATE JUDGE